**TYCKO & ZAVAREEI, LLP**
Annick M. Persinger (SBN 272996)
*apersigner@tzlegal.com*
10880 Wilshire Blvd., Suite 1101
Los Angeles, CA 90024
Tel: (213) 425-3657
Fax: (202) 973-0900

**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
Katherine A. Bruce (SBN 288694)
*kbruce@clarksonlawfirm.com*
Kelsey J. Elling (SBN 337915)
*kelling@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Attorneys for Plaintiffs and Putative Class Members*

*Clarkson Law Firm, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL PIZANA, MAUREEN HOBBS, CHARLES BERGLUND, JEANETTE MILLS, ERICA LAROCHE, ANN MARIE LYNCH, OSKAR LAFFONT, SAL MUNOZ, KEITH BARNES, individually and on behalf of all others similarly situated, | Case No. 18-cv-00644-DAD-SKO *Assigned Hon. Judge Dale A. Drozd, USDJ; Hon. Sheila K. Oberto, USMJ* Case Filed: May 9, 2018 FAC Filed: June 30, 2018 SAC Filed: Nov. 13, 2019 3AC Filed: May 18, 2022 |
| Plaintiffs, | **THIRD AMENDED CLASS ACTION COMPLAINT:** |
| vs. | 1. Racketeer Influenced and Corrupt Organizations Act in Violation of 18 U.S.C. § 1962(a), (c)-(d) ("RICO") |
| BASIC RESEARCH, LLC, BR COS, LLC, BASIC RESEARCH HOLDINGS, LLC, BASIC RESEARCH INTERMEDIATE, LLC, SIERRA RESEARCH GROUP, LLC, MAJESTIC MEDIA, LLC, CRM SPECIALISTS, LLC, BYDEX MANAGEMENT, LLC, SANMEDICA INTERNATIONAL, LLC, LIMITLESS WORLDWIDE, LLC, NOVEX BIOTECH, L.L.C., BODEE GAY, GINA DAINES, HALEY BLACKETT, KIMM HUMPHRIES, MITCHELL K. FRIEDLANDER, | 2. False and Misleading Advertising in Violation of Cal. Civ. Code §§ 1750, *et. seq.* ("CLRA") 3. False and Misleading Advertising in Violation of Cal. Bus. & Prof. Code §§ 17500 ("FAL") 4. False and Misleading Advertising in Violation of Cal. Bus. & Prof. Code §§ 17200, *et. seq.* ("UCL") **DEMAND FOR JURY TRIAL** |
| Defendants. | |

On behalf of themselves and all persons similarly situated, Plaintiffs Raul Pizana, Maureen Hobbs, Charles Berglund, Jeanette Mills, Erica LaRoche, Ann Marie Lynch, Oskar Laffont, Sal Munoz, and Keith Barnes ("**Plaintiffs**") submit this Third Amended Complaint ("TAC") against Defendants Basic Research, LLC ("**BR**"), BR Cos, LLC ("**BR Cos**"), Basic Research Holdings ("**BR Holdings**"), LLC, and Basic Research Intermediate, LLC ("**BR Intermediate**") (collectively "**Defendant Basic Research**").

Plaintiffs also bring this TAC against SanMedica International, LLC ("**SanMedica**"), Sierra Research Group, LLC ("**Sierra Research**"), Limitless Worldwide, LLC ("**Limitless Worldwide**"), Novex Biotech, L.L.C. ("**Novex Biotech**"), Bydex Management, LLC ("**Bydex Management**"), CRM Specialists, LLC ("**CRM**"), and Majestic Media, LLC ("**Majestic Media**") (collectively, along with the entities that make up Defendant Basic Research, the "**Operations Entities**" "**Operation Entity Defendants**" or "**Entity Defendants**");

In addition, Plaintiffs bring this action against Bodee Gay, Gina Daines, Haley Blackett, Kimm Humphries, and Mitchell K. Friedlander (the "**Individual Defendants**").

"**Defendants**" and/or the "**Basic Research Enterprise**" refers to all Operations Entity Defendants and all Individual Defendants.

Plaintiffs make the allegations herein upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by their attorneys and their retained experts, pursuant to Federal Rule of Civil Procedure 15(a)(2).

/ / /

/ / /

/ / /

/ / /

/ / /

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

I.    **SUMMARY OF THE ACTION**

1.    The Individual Defendants use a web of so-called "affiliates" they maintain under the umbrella of Defendant Basic Research to peddle fake medicine that they claim will increase human growth hormone (or "**HGH**" or "**GH**") and therefore reverse the signs of aging. Defendants' operation of its numerous "affiliated" companies in the Basic Research Enterprise, which consists of all Defendants, is a nationwide racketeering scheme designed to defraud consumers and enrich the Individual Defendants and their company, Defendant Basic Research (consisting of Defendants BR Cos, BR Intermediate, BR Holdings, and BR).

2.    Defendants' fraudulent enterprise is a family business. In 1992, Dennis Gay founded Basic Research, began the creation of Basic Research affiliates, and partnered with Defendant Friedlander to market and sell fraudulent dietary supplements. Now Dennis Gay's children, Defendants Bodee Gay, Gina Daines, Haley Blackett, and Kimm Humphries operate the enterprise that Dennis Gay built to continue the fraudulent sale of the Products that Friedlander "invented," including SeroVital-hgh ("**SeroVital**"), Thrive-hGh ("**Thrive**"), SeroDyne, and Growth Factor 9 ("**GF-9**") (collectively the "**Products**").

3.    Today Basic Research touts itself as a "multimillion-dollar company and one of the top distributers in the weight-loss, bodybuilding, anti-aging, joint health, and skin-care industries." One of the ways that Basic Research has been able to grow into a "top distributer" of dietary supplements is through its continued practice of marketing, advertising, and selling products under the names of numerous shell companies. This business practice is intended to confuse competitors and consumers by creating a complex web of organizations that, according to the late Dennis Gay, was orchestrated to "protect our brands in the Wild West atmosphere that exists today in the supplement industry."

4.    Defendants use their complicated web of affiliates to profit from the sale of the SeroVital formula while hiding that Defendant Basic Research and the

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Individual Defendants are in fact behind this scheme to (1) to flood the market with the idea that oral amino acids can provide anti-aging benefits, and (2) to avoid liability for the fraudulent sale of the Products.

5.     Defendants' web of affiliates is so interconnected that Defendant Gina Daines could not even remember which of the affiliates she owned and which of the affiliates she worked for. Indeed, Defendant Daines has held herself out publicly as a spokesperson and executive of several affiliates (including SanMedica, Limitless, and Novex Biotech), and Defendant SanMedica (the putative "manufacturer" of SeroVital) designated her as the person most knowledgeable about its marketing.

6.     All of the Products at issue are the same formula of oral amino acids sold under different names by Defendants. To avoid liability for their false advertising and to saturate the market with the idea that oral amino acids like the Products can provide an anti-aging miracle, Defendants create a public appearance that each of the Products is independent from the other. Defendants represent that each Product is sold by a different phony company—SeroVital by SanMedica, Thrive and SeroDyne by Limitless, and GF-9 by Novex Biotech. But none of these phony companies is a separate business. Instead, they are the Individual Defendants' and Defendant Basic Research's "brands" that are controlled and operated by the Individual Defendants and Basic Research.

7.     Defendants also use these affiliates, which have no true legal distinction among them, to spread their money and ownership across entities to avoid being held liable to consumers for fraud. Defendant Basic Research, together with the Individual Defendants, create a new limited liability company for each dietary supplement they manufacture, advertise, and sell to consumers to allocate liability to these undercapitalized companies while obfuscating where assets are actually held. In this case, Basic Research and the Individual Defendants created Defendant SanMedica, Defendant Limitless, and Defendant Novex Biotech for the sole purpose of serving

as a conduit for the nationwide sale of SeroVital, Thrive and SeroDyne, and GF-9, respectively.

8.     In addition, Defendant Basic Research and the Individual Defendants create a new limited liability company to conduct various business operations to further distance their assets from exposure to liability and to obfuscate where assets are actually held. In that regard, Defendant Basic Research and the Individual Defendants created Sierra Research to research and develop the Products, Majestic Media to market them, CRM to handle customer service, Basic Research to distribute them, and Bydex to staff the various companies. The division of operations into purportedly separate limited liability companies is designed to fraudulently compartmentalize and avoid liability, even though there is no true or meaningful legal distinction among them.

9.     Defendant Basic Research's and the Individual Defendants' scheme is shown by the following example of the legally indistinct affiliate, Sierra Research, which Defendant Basic Research and the Individual Defendants created to add scientific legitimacy to the Products.  In that regard, Defendants make it appear that their poster girl for their so-called "science," Amy Heaton, works for an independent organization, Sierra Research. But Defendant Basic Research and the Individual Defendants created Sierra Research primarily to create an artificial scientific legitimacy for their  Products to further their scheme to hide those responsible for the fraudulent sale of the Products. Although she is Chief Scientific Officer of Sierra Research, Amy Heaton actually works for Defendant Basic Research and the Individual Defendants, and is paid by Defendant Bydex Management just like all of Defendant Basic Research and the Individual Defendants' other employees. Defendants also have Amy Heaton hold herself out as "Chief Scientific Officer" for more than one of its brands, including, but not limited to, Defendant SanMedica, the Basic Research Brand that sells SeroVital, Limitless Worldwide, the Basic Research

THIRD AMENDED CLASS ACTION COMPLAINT

brand that sells Thrive and SeroDyne, and Novex Biotech, the Basic Research brand that sells GF9.

10.   Defendants use the same misrepresentations about the Products' benefits and the same misleading information about their double-blind placebo-controlled study to market all of the Products. The Individual Defendants and Defendant Basic Research claim that SeroVital, GF-9, and Thrive increase HGH by 682%—which according to SeroVital's and Thrive's packaging and website, can cause "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, [and] heightened sex drive" so as to make "users look and feel decades – not years, but *DECADES* – younger." Similarly, the labeling and advertising of GF-9 falsely promises its consumers a "more youthful, stronger, and active body." And the labeling and advertising of SeroDyne claims that it "complements your body's natural production of this pituitary peptide" aka HGH to improve endurance, metabolic rate, energy, and sleep efficiency.

11.   Defendants also know that, for consumers, "the science is an important reason to believe" and therefore the company aggressively promotes the exact same so-called "science" to sell each of the Products. But, as Plaintiffs' experts have opined and testified, Defendants' double-blind placebo-controlled study on their anti-aging formula shows just the opposite of Defendants' claims—that the Products are no better than a placebo.

12.   In fact, the Products provide consumers with nothing more than a false promise. The scientific community confirms: (1) the Products cannot increase HGH levels whatsoever, let alone by 682%; (2) the Products do not reduce wrinkles, "decrease[] body fat," "increase[] lean muscle mass," strengthen bones, "improve[] mood," "heighten[] sex drive," or make "users look and fees decades … younger" because the oral administration of amino acids like the Products do not increase growth hormone bioactivity; (3) there is no causal link between increased HGH levels and most of the claimed uses, including wrinkle reduction, increased lean muscle

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

mass, stronger bones, improved mood, [or] heightened sex drive; and (4) if the Products were to increase HGH levels as claimed, it would cause significant health risks.

13.   The Products do not increase serum GH levels. As Plaintiffs' expert Dr. Melmed, M.D. confirms, peer-reviewed scientific publications reveal that low dose *oral* amino acids like SeroVital do not induce GH levels. Indeed, Defendants' advertising is false and misleading because, as Dr. Melmed explains, "the oral ingestion of SeroVital is not significantly different from a placebo." Another expert, Dr. H. Madoff, M.D., Ph.D. reached the same conclusion based on Defendants' own study—that there is "no statistically significant difference in total GH levels over the two hours (AUC) following SeroVital compared to placebo treatment." Thus, based on peer-reviewed scientific publications, Defendants' study, and expert testimony, Defendants' claim that the Products increase HGH by 682% is provably false and misleading.[1]

14.   Although Defendants claim that the Products increase HGH, and that increases of HGH  "decrease[] body fat," "increase[] lean muscle mass," strengthen bones, "improve[] mood," "heighten[] sex drive," or make "users look and feel decades … younger," as Plaintiffs' experts and the scientific consensus confirm, the Products do not improve "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger." Dr. Melmed, M.D. confirms that the Products are not associated with these benefits because, based on the scientific consensus regarding oral amino acids as well as the information available regarding SeroVital, oral administration of amino acids like those in SeroVital would not increase GH bio-activity after SeroVital ingestion. Accordingly, based on scientific consensus and

---

[1] Although Plaintiffs' experts reviewed the claims and study for SeroVital, the other Products are the same formula as SeroVital and Defendants' advertising relies on the same study that Plaintiffs' experts conclude showed that SeroVital was no different from placebo.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

expert testimony, Defendants' claim that HGH, which it claims the Products drastically increase, causes weight-loss and anti-aging benefits is provably false and misleading.

15.   In short, the Products are no more effective for its advertised purposes than a placebo, and are therefore worthless to consumers, including consumers in California, who, upon information and belief, have collectively expended tens of millions of dollars or more on the Products during the four-year leading up to the commencement of this action through present (the "**Class Periods**").

## II.   PARTIES

### A.   Plaintiffs

16.   **Plaintiff Raul Pizana.** Plaintiff Pizana is, and at all times relevant hereto was, a citizen of California residing in Kings County. Plaintiff paid approximately $100 for a 30-day supply of SeroVital from a Kohl's store in Hanford, California in early 2017 after reading Defendants' advertisements on the SeroVital's packaging label. Plaintiff purchased SeroVital in reliance upon its advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by SeroVital would achieve the purported benefits of HGH listed on the label including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as Defendants intended: to mean that SeroVital would increase HGH levels by 682%, and that as a result of that increase, Plaintiff would receive the anti-aging benefits stated on SeroVital's label.

17.   Plaintiff used SeroVital as directed. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or anti-aging benefits. Plaintiff's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover,

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. If Plaintiff had known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made on SeroVital's packaging were misleading and false, Plaintiff would not have purchased SeroVital. As it turned out, Plaintiff received zero benefits from SeroVital, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

18.     **Plaintiff Maureen Hobbs.** Plaintiff Hobbs is, and at all times relevant hereto was, a citizen of California residing in San Diego County. In 2019, Plaintiff Hobbs purchased her first 30-day supply of SeroVital for approximately $100 from an Ulta Beauty store in San Diego, California after seeing television advertisements for the product. She later purchased a second box for approximately $100 from an Ulta Beauty store in Riverside County. After her initial purchases, Hobbs purchased approximately eight to ten 30-day supply packages of SeroVital from Ulta Beauty stores in San Diego and Riverside County and SeroVital.com whenever they were on sale for $49.99. In total, Hobbs spent almost $600 on SeroVital before she realized the product did not work and returned five unopened boxes for a refund of $249.95. Plaintiff purchased SeroVital in reliance upon its advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by SeroVital would achieve the purported benefits of HGH listed on the label including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as Defendants intended: to mean that SeroVital would increase HGH levels by 682%, and that as a result of that increase, Plaintiff would receive the anti-aging benefits stated on SeroVital's label.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

-9-

19.     Plaintiff used SeroVital as directed for several months. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or anti-aging benefits. Plaintiff's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. If Plaintiff had known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made on SeroVital's packaging were misleading and false, Plaintiff would not have purchased SeroVital. As it turned out, Plaintiff received zero benefits from SeroVital, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

20.     **Plaintiff Charles Berglund.** Plaintiff Berglund is, and at all times relevant hereto was, a citizen of California residing in Riverside County. In or around 2009, Plaintiff Berglund first purchased Growth Factor 9 for approximately $100 from a retail store in Murrieta, California after seeing television advertisements for the Product. He did not receive any of the advertised benefits, but later purchased several more boxes in or around 2014, hoping that Growth Factor 9 would work for him. After his initial purchases, Berglund purchased another bottle of Growth Factor 9 in Murrieta, California in or around late 2017.  In total, Berglund spent hundreds of dollars on Growth Factor 9 before he realized the product did not work. Plaintiff purchased Growth Factor 9 in reliance upon its advertised ability to increase HGH levels by 682% and provide Plaintiff with its advertised benefits, including promises of increased physical performance, faster recovery, and greater endurance. Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by Growth Factor 9 would achieve the advertised purported benefits of HGH, including increased physical performance, faster recovery, and greater endurance. Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as Defendants intended: to mean that Growth Factor 9 would increase HGH levels by

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

682%, and that as a result of that increase, Plaintiff would receive the physical performance benefits stated on Growth Factor 9's label.

21.    Plaintiff used Growth Factor 9 as directed for several months. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or physical performance benefits. Plaintiff's physical performance, recovery, and endurance remained unchanged. If Plaintiff had known that Growth Factor 9 would not deliver the advertised HGH increasing and performance-improving benefits, and that the promises made on Growth Factor 9's packaging were misleading and false, Plaintiff would not have purchased Growth Factor 9. As it turned out, Plaintiff received zero benefits from Growth Factor 9, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

22.    **Plaintiff Jeanette Mills.** Plaintiff Mills is, and at all times relevant hereto was, a citizen of California residing in Merced County. In or around 2014, Plaintiff Mills purchased her first 30-day supply of SeroVital for approximately $100 in Merced or Turlock, California. She later purchased several more boxes from Costco, the Vitamin Shoppe and/or GNC. Despite not receiving the advertised benefits, Plaintiff Mills continued to purchase the Product in hopes she would one day see the advertised benefits. Most recently, Plaintiff Mills purchased SeroVital in or around 2019. In total, Mills spent hundreds of dollars on SeroVital before she realized the product did not work. Plaintiff purchased SeroVital in reliance upon its advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by SeroVital would achieve the purported benefits of HGH listed on the label including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

Defendants intended: to mean that SeroVital would increase HGH levels by 682%, and that as a result of that increase, Plaintiff would receive the anti-aging benefits stated on SeroVital's label.

23.    Plaintiff used SeroVital as directed for several months. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or anti-aging benefits. Plaintiff's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. If Plaintiff had known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made on SeroVital's packaging were misleading and false, Plaintiff would not have purchased SeroVital. As it turned out, Plaintiff received zero benefits from SeroVital, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

24.    **Plaintiff Erica LaRoche.** Plaintiff Erica LaRoche is, and at all times relevant hereto was, a citizen of California residing in Riverside County. In 2019, Plaintiff LaRoche purchased several 30-day supplies of SeroVital (powder form) for approximately $100/each from a GNC store in Marino Valley, California. Plaintiff purchased SeroVital in reliance upon its advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by SeroVital would achieve the purported benefits of HGH listed on the label including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as Defendants intended: to mean that SeroVital would increase HGH levels by 682%, and that as a result of that increase, Plaintiff would receive the anti-aging benefits stated on SeroVital's label.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

25.     Plaintiff used SeroVital as directed for several months. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or anti-aging benefits. Plaintiff's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. If Plaintiff had known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made on SeroVital's packaging were misleading and false, Plaintiff would not have purchased SeroVital. As it turned out, Plaintiff received zero benefits from SeroVital, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

26.     **Plaintiff Ann Marie Lynch.** Plaintiff Ann Marie Lynch is, and at all times relevant hereto was, a citizen of California residing in Orange County. In 2018, Plaintiff Lynch purchased several 30-day supplies of SeroVital for approximately $100/each from a Costco store in Tustin and Long Beach, California. Plaintiff purchased SeroVital after seeing Defendants' informercial involving Kym Douglas. In total, Lynch spent approximately $400-$500 on SeroVital before she realized the product did not work. Plaintiff purchased SeroVital in reliance upon its advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by SeroVital would achieve the purported benefits of HGH listed on the label including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as Defendants intended: to mean that SeroVital would increase HGH levels by 682%, and that as a result of that increase, Plaintiff would receive the anti-aging benefits stated on SeroVital's label.

THIRD AMENDED CLASS ACTION COMPLAINT

27. Plaintiff used SeroVital as directed for several months. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or anti-aging benefits. Plaintiff's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. If Plaintiff had known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made on SeroVital's packaging were misleading and false, Plaintiff would not have purchased SeroVital. As it turned out, Plaintiff received zero benefits from SeroVital, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

28. **Plaintiff Oskar Laffont.** Plaintiff Laffont is, and at all times relevant hereto was, a citizen of California residing in Los Angeles County. In or around early 2019, Plaintiff Laffont purchased Growth Factor 9 for approximately $100 from a GNC in West Hollywood, California. In total, Laffont spent hundreds of dollars on Growth Factor 9 before he realized the product did not work. Plaintiff purchased Growth Factor 9 in reliance upon its advertised ability to increase HGH levels by 682% and provide Plaintiff with its advertised benefits, including promises of increased physical performance, faster recovery, and greater endurance. Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by Growth Factor 9 would achieve the advertised purported benefits of HGH, including increased physical performance, faster recovery, and greater endurance. Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as Defendants intended: to mean that Growth Factor 9 would increase HGH levels by 682%, and that as a result of that increase, Plaintiff would receive the physical performance benefits stated on Growth Factor 9's label.

29. Plaintiff used Growth Factor 9 as directed for several months. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or physical

performance benefits. Plaintiff's physical performance, recovery, and endurance remained unchanged. If Plaintiff had known that Growth Factor 9 would not deliver the advertised HGH increasing and performance-improving benefits, and that the promises made on Growth Factor 9's packaging were misleading and false, Plaintiff would not have purchased Growth Factor 9. As it turned out, Plaintiff received zero benefits from Growth Factor 9, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

30.   **Plaintiff Sal Munoz.** Plaintiff Munoz is, and at all times relevant hereto was, a citizen of California. In or around mid-to-late 2020, Plaintiff Munoz purchased several 30-day supplies of Growth Factor 9 for approximately $79.20/each from the growthfactor9 online store. In total, Plaintiff Munoz spent hundreds of dollars before he realized the product did not work. Plaintiff purchased Growth Factor 9 in reliance upon its advertised ability to increase HGH levels by 682% and provide Plaintiff with its advertised benefits, including promises of increased physical performance, faster recovery, and greater endurance. Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by Growth Factor 9 would achieve the advertised purported benefits of HGH, including increased physical performance, faster recovery, and greater endurance. Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as Defendants intended: to mean that Growth Factor 9 would increase HGH levels by 682%, and that as a result of that increase, Plaintiff would receive the physical performance benefits stated on Growth Factor 9's label.

31.   Plaintiff used Growth Factor 9 as directed for several months. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or physical performance benefits. Plaintiff's physical performance, recovery, and endurance remained unchanged. If Plaintiff had known that Growth Factor 9 would not deliver the advertised HGH increasing and performance-improving benefits, and that the

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

promises made on Growth Factor 9's packaging were misleading and false, Plaintiff would not have purchased Growth Factor 9. As it turned out, Plaintiff received zero benefits from Growth Factor 9, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

32.    **Plaintiff Keith Barnes**. Plaintiff Barnes is, and at all times relevant hereto was, a citizen of California. In or around 2014 through 2017, Plaintiff recalls purchasing SeroVital (pill form) at Costco and/or other retail stores in Bakersfield, California for approximately $99 to $120. In total, Plaintiff Barnes spent hundreds of dollars before he realized the product did not work. Plaintiff purchased SeroVital in reliance upon its advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Based on Defendants' claim that the product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by SeroVital would achieve the purported benefits of HGH listed on the label including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims as Defendants intended: to mean that SeroVital would increase HGH levels by 682%, and that as a result of that increase, Plaintiff would receive the anti-aging benefits stated on SeroVital's label.

33.    Plaintiff used SeroVital as directed for several months. However, as a result, Plaintiff did not receive any of the advertised HGH increasing or anti-aging benefits. Plaintiff's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. If Plaintiff had known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made on SeroVital's packaging were misleading and false, Plaintiff would not have purchased SeroVital. As it turned out, Plaintiff received zero

benefits from SeroVital, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

34.   **Plaintiffs' Future Harm.** If the Products functioned as advertised, Plaintiffs Pizana, Hobbs, Berglund, Mills, LaRoche, Lynch, Laffont, Munoz, and Barnes would purchase SeroVital or the Products in the future. Because Plaintiffs would like to purchase the Products again and achieve the advertised benefits, they might purchase it again in the future—despite the fact that it was once marred by false advertising or labeling—as they may reasonably, but incorrectly, assume that SeroVital was improved either under the SeroVital brand name or under any of the other substantially similar Products consisting of the same formula. In that regard, Plaintiffs are average consumers who are not sophisticated in the bioavailability or effects of HGH in different formulations, so they are at risk of reasonably, but incorrectly, assuming that Defendants fixed the formulation of the Products or that different products were developed using an entirely different brand or company name. Moreover, as set forth herein, Defendants have rebranded the same formulation of the SeroVital under several new brands, intentionally selling each as if it is being sold by a different and independent company, a pattern they have used with other fraudulent products. *See infra* ¶ 54. Thus, Defendants could rebrand SeroVital and the Products and sell them under a purportedly new company. As Plaintiffs continue to desire to buy products that provide anti-aging and similar benefits, Plaintiffs could be misled or confused in the event Defendants make a new iteration of the SeroVital under a new brand name that appears to be sold by a new company.

## B.   Defendants

35.   **Basic Research Enterprise.** The Basic Research Enterprise is a joint enterprise, joint venture, conspiracy, partnership, and organization comprised of multiple affiliated entities and individuals who are also the alter-egos of each other, including, but not necessarily limited to, the Defendants identified below.  The Basic Research Enterprise splits its operation amongst legally indistinct companies to

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

research and develop, manufacture, market, advertise, distribute, and sell consumers scores of different cosmetics, nutritional supplements, and dietary supplements, such as the Products, under the names of nearly a dozen limited liability companies that are all wholly owned subsidiaries within the Basic Research Enterprise, including those identified below.

36. **Defendants/Basic Research Enterprise.**   The following entities and individuals are herein collectively referred to as "**Defendants**" and the "**Basic Research Enterprise**."

*(i)*     *Indistinct Operations Entities performing the functions of Defendant Basic Research at Basic Research Headquarters.*

37. **Distribution:** *Defendant Basic Research LLC* ("**BR**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, BR has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; BR has operated as the distribution division of the Basic Research Enterprise; and, thereby, BR has distributed the Products for the Basic Research Enterprise.

38. **Research & Development:** *Defendant Sierra Research Group, LLC* ("**Sierra Research**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Sierra has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Sierra has operated as the research and development division of the Basic Research Enterprise; and, thereby, Sierra has researched and developed the Products for the Basic Research Enterprise.

39. **Marketing & Advertising:** *Defendant Majestic Media, LLC* ("**Majestic**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Majestic has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Majestic has operated as the

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

marketing and advertising division of the Basic Research Enterprise; and, thereby, Majestic has marketed and advertised the Products for the Basic Research Enterprise.

40.  **Sales & Customer Service:** *Defendant CRM Specialists, LLC* ("**CRM**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, CRM has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; CRM has operated as the sales and customer service division of the Basic Research Enterprise; and, thereby, CRM has sold and serviced customers for the Products for the Basic Research Enterprise.

41.  **Human Resources & Employment:** *Defendant Bydex Management*, LLC ("**Bydex**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Bydex has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Bydex has operated as the human resources and employment division of the Basic Research Enterprise; and, thereby, Bydex has provided employees to staff each of the affiliated companies within the Basic Research Enterprise in order to distribute, research and develop, market and advertise, sell, and service customers for the Products and the Basic Research Enterprise.

*(ii)*     *Indistinct undercapitalized Operations Entities named on Product labels to perform the function of shielding Defendant Basic Research and the Individual Defendants from liability, and to perform the function of creating a false impression that there is consensus about the efficacy of the Products.*

42.  **Held out as the maker of SeroVital:** *Defendant SanMedica International*, LLC ("**SanMedica**"), a Utah limited liability company is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, SanMedica has been a wholly owned subsidiary

of BR Cos, BR Holdings, and/or BR Intermediate. At all relevant times, SanMedica has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; SanMedica has operated as the manufacturer of SeroVital for the Basic Research Enterprise; and, thereby, SanMedica has manufactured SeroVital for the Basic Research Enterprise. SanMedica, at all relevant times, has approved, authorized, ratified the conduct of all other affiliated Basic Research Enterprise entities and individuals' wrongful activities alleged herein with respect to the research and development, manufacture, marketing, advertising, distribution, and sale of SeroVital.

43. **Held out as the maker of Thrive and SeroDyne**: *Defendant Limitless Worldwide, LLC* ("**Limitless Worldwide**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. During the Class Periods, Limitless Worldwide has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Limitless Worldwide has operated as the manufacturer of Thrive and SeroDyne for the Basic Research Enterprise; and, thereby, Limitless Worldwide has manufactured Thrive and SeroDyne for the Basic Research Enterprise. Limitless Worldwide, at all relevant times, has approved, authorized, ratified the conduct of all other affiliated Basic Research Enterprise entities and individuals' wrongful activities alleged herein with respect to the research and development, manufacture, marketing, advertising, distribution, and sale of Thrive and SeroDyne.

44. **Held out as the maker of GF-9:** *Defendant Novex Biotech, LLC* ("**Novex Biotech**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Novex has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Novex has operated as the manufacturer of GF-9 for the Basic Research Enterprise; and, thereby, Novex has manufactured GF-9 for the Basic Research Enterprise. Novex, at all relevant times, has approved, authorized,

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

ratified the conduct of all other affiliated Basic Research Enterprise entities and individuals' wrongful activities alleged herein with respect to the research and development, manufacture, marketing, advertising, distribution, and sale of GF-9.

(iii)     *Individual Defendants who profit from and direct the functions of the web of affiliates that make up the Basic Research Enterprise.*

45.  **Owner/Director/Executive Officer:** *Defendant Bodee Gay* ("**Bodee Gay**") is a natural person who resides in the State of Utah and operates the Basic Research Enterprise out of the BR Headquarters. At all relevant times prior to 2016, Bodee Gay was the vice president of sales for the Basic Research Enterprise and directly participated in the design, implementation, and audit of sales strategies for the Basic Research Enterprise affiliated companies for the various Products, including SanMedica sales of SeroVital, Limitless Worldwide sales of Thrive and SeroDyne, and Novex Biotech sales of GF-9. Beginning in or around 2016, Bodee Gay became the Chief Executive Officer for the Basic Research Enterprise and directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of its operations, including the design, implementation, and audit of strategies for the research and development, marketing and advertisement, distribution, sales, customer service divisions, and manufacture of the Products as well as the operation of SanMedica, Limitless Worldwide, and Novex Biotech. Beginning in 2018, Bodee Gay became an owner of the Basic Research Enterprise. As an owner and/or executive officer, Bodee Gay has had final decision-making authority over the foregoing aspects of Basic Research Enterprise's operations.

46.  **Owner/Director/Executive Officer:** *Defendant Gina Daines* ("**Daines**") is a natural person who resides in the State of Utah and operates the Basic Research Enterprise out of the BR Headquarters. At all relevant times, Daines has been the Chief Marketing Officer for the Basic Research Enterprise, including for SanMedica, Limitless Worldwide, and Novex Biotech and directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of its marketing

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

and advertising operations, including the design, implementation, and audit of strategies for marketing and advertising the Products. Beginning in 2018, Daines became an owner of the Basic Research Enterprise. As an owner and/or executive officer, Daines has had final decision-making authority over the foregoing aspects of Basic Research Enterprise's operations.

47. **Owner/Director/Executive Officer:** *Defendant M. Friedlander* ("**Friedlander**"), is a natural person who is the purported inventor of SeroVital and who resides in the State of Utah and operates the Basic Research Enterprise out of the BR Headquarters. At all relevant times, Friedlander has been an executive officer and owner of the Basic Research Enterprise and directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of its marketing and advertising operations, including the design, implementation, and audit of strategies for marketing and advertising the Products. As an owner and/or executive officer, Friedlander has had final decision-making authority over the foregoing aspects of Basic Research Enterprise's operations.

48. **Owner/Director/Executive Officer:** *Defendant Haley Blackett* ("**Blackett**"), is a natural person who resides in the State of Utah and operates the Basic Research Enterprise out of the BR Headquarters. At all relevant times, Blackett has been an executive officer and owner of the Basic Research Enterprise and directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of its marketing and advertising operations, including the design, implementation, and audit of strategies for marketing and advertising the Products. As an owner and/or executive officer, Blackett has had final decision-making authority over the foregoing aspects of Basic Research Enterprise's operations.

49. **Owner/Director/Executive Officer:** *Defendant Kimm Humphries* ("**Humphries**"), is a natural person who resides in the State of Utah and operates the Basic Research Enterprise out of the BR Headquarters. At all relevant times, Blackett has been an executive officer and owner of the Basic Research Enterprise and

directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of its marketing and advertising operations, including the design, implementation, and audit of strategies for marketing and advertising the Products. As an owner and/or executive officer, Blackett has had final decision-making authority over the foregoing aspects of Basic Research Enterprise's operations.

### (iv)   The Parent and Grandparent Operations Entities.

50.   **Grandparent/Parent:** Defendant Basic Research Holdings, LLC ("**BR Holdings**") is a Delaware limited liability company headquartered in Dover, Delaware. It maintains its principal place of business and otherwise entirely operates out of 5742 West Harold Gatty Drive, Salt Lake City, Utah 84116 ("**BR Headquarters**").   At all relevant times, BR Cos, BR Holdings, and/or BR Intermediate[2] have operated as holding companies that either jointly or successively

---

[2]   Defendant SanMedica's Corporate Disclosure Statement, filed **June 5, 2018**, lists Basic Research Intermediate, LLC as its parent corporation and Basic Research Holdings, LLC as its grandparent corporation. *See* Dkt. 9.   However, as of **September 15, 2020**, both entities' status are expired and voluntarily withdrawn on Utah's Division of Corporations and Commercial Code website. During a 30(b)(6) deposition in September 2020, it was also revealed for the first time that BR Cos, LLC acquired Basic Research Intermediate, LLC at some unknown point in time and that BR Cos, LLC was the new umbrella company for each entity-Defendant. BR Cos, LLC, however, was only incorporated in the State of Delaware on **December 23, 2019**, and registered with the State of Utah on **February 2, 2020**, both of which followed the filing of this action.

Following the Court's order entered on **April 27, 2022** (Dkt. 170), granting Plaintiff Pizana's motion for leave to file this amended complaint, on **April 28, 2022**, Defendant SanMedica supplemented its Corporate Disclosure Statement to identify BR Cos as its parent corporation and, *for the first time in this litigation*, Phoenix Awakening Holdings, LLC ("**Phoenix**") as its grandparent corporation (Dkt. 171). Yet again, after the filing of this case, Defendant Basic Research and the Individual Defendants created another umbrella company, Phoenix, incorporating it in the State of Delaware on **December 23, 2019**, and registering it to do business in the State of Utah on **February 27, 2020**, with the same headquarters and principal place of business as the Basic Research Enterprise at BR Headquarters. Plaintiffs have sought from Defendant SanMedica a stipulation for leave to add Phoenix as a Defendant to this action and, if it declines, Plaintiffs intend to seek leave of Court. Phoenix stands in the same stead as the parent/grandparent Defendants BR Cos, BR Holdings, BR Intermediate, and BR, which are collectively referred to in this complaint as "Defendant Basic Research."

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

owned, directly or indirectly, all affiliated entities within the Basic Research Enterprise, including those identified below.

51. **Parent:** Defendant Basic Research Intermediate, LLC ("**BR Intermediate**") is a Delaware limited liability company headquartered in Dover, Delaware. It maintains its principal place of business and otherwise entirely operates out of the BR Headquarters. At various relevant times, BR Cos, BR Holdings, and/or BR Intermediate have held ownership of all affiliated entities within the Basic Research Enterprise, including those identified below, indirectly through BR Intermediate.

52. **Grandparent/Parent:** Defendant BR Cos, LLC ("**BR Cos**") is a Delaware limited liability company headquartered in Dover, Delaware. It maintains its principal place of business and otherwise entirely operates out of the BR Headquarters. At all relevant times, BR Cos, BR Holdings, and/or BR Intermediate have operated as holding companies that either jointly or successively owned, directly or indirectly, all affiliated entities within the Basic Research Enterprise, including those identified below.

53. **Defendants' California Contacts.**   The Basic Research Enterprise, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California. Indeed, the Basic Research Enterprise deliberately and intentionally has sold hundreds of millions of dollars' worth of the Products to hundreds of thousands of California consumers. Because California is the most populous state in the country and thus, has a high number of consumers comprising more than 10% of the Products' national market share and sales, it is a primary recipient of Defendants' advertising, and accordingly, Defendants have each worked to ensure that prospective purchasers in California are targets of their deceptive marketing techniques. Defendants also worked with a statistical analysis consulting firm in California that co-authored their self-funded study designed to fraudulently substantiate each of the Products' challenged

-24-

advertising claims. Defendants also attempt to create the appearance of scientific legitimacy by attending conferences in California to present various abstracts and/or purported substantiating research for the Products' challenged advertising claims. For example, Defendants' employee, Amy Heaton, attended a conference in San Francisco California in 2013, to present a mechanism of action study for the Products. Defendants also planned to send Amy Heaton to attend a conference in San Diego to present an abstract on a canine study for the Products that was canceled following the COVD-19 pandemic. Additionally, one of Defendants' purported substantiating studies for the Products was conducted in Los Angeles, California. Further, Defendants respond to inquiries from California consumers. And Defendants maintain a database of all direct to consumer purchases, including purchases placed from Californians, and Products shipped to Californians, demonstrating that Defendants knowingly and deliberately sold approximately $100 million in Products to Californians.

54. **Respondent Superior/Vicarious Liability**. At all relevant times mentioned herein, Defendants were the agents, principals, employees, employers, servants, masters, partners, parents, subsidiaries, successors, predecessors, and joint venturers of each other. In doing the things hereafter alleged, Defendants were acting within the course and scope of such agency, employment, partnership, joint venture, and/or other said legal relationship, and with the consent, authority, ratification, approval, and/or permission of each of the other.

55. **Aiding & Abetting.** At all relevant times, each Defendant aided and abetted each other Defendant. Each Defendant knowingly gave substantial assistance to each other Defendant who performed the wrongful conduct alleged herein. Accordingly, each Defendant is jointly and severally liable for the damages proximately caused by each other Defendant's wrongful conduct.

56. **Conspiracy.** At all relevant times, each Defendant was the co-conspirator of each other Defendant, and, therefore, each Defendant is jointly and severally liable

for the damages sustained as a proximate result of each other Defendant. Each Defendant entered into an express or implied agreement with each of the other Defendants to commit the wrongs herein alleged. Each Defendant was aware that the other Defendant planned to commit the wrongful acts alleged herein and each Defendant agreed with each other Defendant and intended that the wrongful act be committed. Each Defendant cooperated with each other Defendant to engage in the wrongful conduct.

57. **Joint Venture.**  At all relevant times, each Defendant was a member of the joint venture that is the Basic Research Enterprise. Each Defendant combined its, his, her, or their property, skill, and/or knowledge with the intent to carry out a single business undertaking to sell cosmetics, nutritional supplements, and dietary supplements, including the Products. Each Defendant had an ownership interest in the Business Research Enterprise. Each Defendant had joint control over the Business Research Enterprise, even if they agreed to delegate control. Each Defendant agreed to share the profits and losses of the Basic Research Enterprise.

58. **Partnership.** At all relevant times, each Defendant was in a partnership with each other Defendant whereby they agreed to share the profits and losses of the Basic Research Enterprise.

C. **The Individual Defendants**

(i) ***Individual Defendant Bodee Gay.***

59. **Familial Relation.** Defendant Bodee Gay is the brother of Defendants Daines, Humphries, and Blackett, and the son of the now-deceased founder and former owner and chief executive officer of the Basic Research Enterprise (Dennis Gay).

60. **Personal Acts.** Defendant Bodee Gay, as an executive officer and owner of the Basic Research Enterprise, is personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed and relied upon by Plaintiffs and Class members, as alleged

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

herein. Within the Defendants' business enterprise, Bodee Gay is the person ultimately responsible for placing the advertisements for the Products, into the stream of commerce and for selling the products in interstate commerce. Bodee Gay makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Bodee Gay has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, SeroDyne, and GF-9 that Defendants (including Bodee Gay) manufacture, market, advertise, promote, distribute, and sell. His intentional tortious acts and personal participation in the wrongful conduct underlying this action deprive him of any protection he might otherwise have for his personal liability under the corporate shield doctrine, or otherwise.

61. **Dominion/Control.** In connection with the manufacturing, marketing, advertising, promotion, distribution and sale of the Products, Defendant Bodee Gay has exercised complete dominion and control over the Basic Research Enterprise such that these companies are his alter ego, a sham, façade, and mere instrumentality for his personal benefit, and he has disregarded and abused the corporate form and structure of these companies.

62. **Abuse of Corporate Form.** Defendant Bodee Gay has misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade the law, including with response to the manufacture, marketing, advertisement, promotion, distribution and sale of the Products.

63. **Artificial Tradenames.** In addition, Defendant Bodee Gay has fraudulently created trademarks and the above-mentioned multiple corporations in order to evade detection of his true identity as the individual with dominion and control, also in order to defeat the ends of justice and otherwise evade the law, including with respect to the marketing, advertising, promotion, distribution, and sale of the Products.

THIRD AMENDED CLASS ACTION COMPLAINT

### (ii)   *Individual Defendant Gina Daines.*

64.    **Familial Relation.** Defendant Daines is the sister of Defendants Bodee Gay, Humphries, and Blackett, and the daughter of the now-deceased founder and former owner and chief executive officer of the Basic Research Enterprise (Dennis Gay).

65.    **Personal Acts.** Defendant Daines, as the Chief Marketing Officer and owner of the Basic Research Enterprise, is personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed and relied upon by Plaintiffs and Class members, as alleged herein. Within the Defendants' business enterprise, Daines is responsible for placing the advertisements for the Products into the stream of commerce and for selling the Products in interstate commerce. Holding herself out as a Marketing Executive and spokesperson for Defendant Basic Research as well as shell undercapitalized Defendants like SanMedica, Limitless Worldwide, and Novex Biotech, Daines makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Daines has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, SeroDyne, and GF-9 that Defendants (including Daines) manufacture, market, advertise, promote, distribute, and sell. Her intentional tortious acts and personal participation in the wrongful conduct underlying this class action deprive her of any protection she might otherwise have for her personal liability under the corporate shield doctrine, or otherwise.

66.    **Dominion/Control.** In connection with the manufacturing, marketing, advertising, promotion, distribution and sale of the Products, Defendant Daines has exercised complete dominion and control over the Basic Research Enterprise such that these companies are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form and structure of these companies.

67.    **Abuse of Corporate Form.** Defendant Daines has misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade the law, including with response to the manufacture, marketing, advertisement, promotion, distribution and sale of the Products.

68.    **Artificial Tradenames.** In addition, Defendant Daines has fraudulently created trademarks and the above-mentioned multiple corporations in order to evade detection of her true identity as the individual with dominion and control, also in order to defeat the ends of justice and otherwise evade the law, including with respect to the marketing, advertising, promotion, distribution, and sale of the Products.

### *(iii)    Individual Defendant M. Friedlander.*

69.    **Business Relation.** Originally partnered with the other Individual Defendants' father, Dennis Gay, Defendant Friedlander, as a marketing officer and owner of the Basic Research Enterprise who invented SeroVital, is directly involved in the invention, development, endorsement, advertising, marketing, and promotion of Basic Research Enterprise products, including the Products.  Friedlander is responsible for the design, content, approval, distribution, and publication of Defendants' advertisements, including SeroVital advertisement viewed by Plaintiffs.

70.    **Personal Acts.** Defendant Friedlander, as an executive officer and owner of the Basic Research Enterprise, was personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed and relied upon by Plaintiffs and Class members, as alleged herein. Within the Defendants' business enterprise, Friedlander is responsible for placing the advertisements for the Products into the stream of commerce and for selling the Products in interstate commerce. Friedlander makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Friedlander has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, SeroDyne, and GF-9 that Defendants (including

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Friedlander) manufacture, market, advertise, promote, distribute, and sell. Friedlander's intentional tortious acts and personal participation in the wrongful conduct underlying this class action deprive them of any protection they might otherwise have for their personal liability under the corporate shield doctrine, or otherwise.

71.    **Inventor.** Defendant Friedlander also receives "royalty" payments for each sale of various products marketed by Basic Research pursuant to a royalty agreement and/or covenant not to sue between Friedlander and the Basic Research Enterprise. Defendant Friedlander is also listed as the "inventor" of the SeroVital formula on each of the 15 patents that have been granted to the SeroVital formula.

72.    **FTC Order.** Defendant Friedlander is also personally subject to a twenty-year FTC injunction against Defendant Basic Research, LLC and Dennis Gay—the father of the other Individual Defendants Daines, Bodee Gay, Humphries, and Blackett. The injunction, entered by the FTC on June 19, 2006, and terminating on June 19, 2026, among other things: (1) proscribes the marketing and sale of dietary supplements that provide health benefits through any affiliates, unless competent and reliable scientific evidence supports the claims made about such products; (2) prohibits the misrepresentation of any use of endorsements or trade names, as well as the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research; and (3) mandates the advance and prompt disclosure of any change in their corporate structure that may affect their compliance with the order at least thirty days in advance of the change. *See* FTC Order, Dkt. 117-6, at §§ II, III, XI, XIII; Bodee Gay Decl., Dkt. 117-9, at ¶¶ 2, 5, 11, 12 (admitting, under oath, that Basic Research, LLC, SanMedica, and affiliated companies have common ownership and management, and are bound to comply with the FTC Order with respect to marketing and sale of SeroVital). There, as here, Defendant Friedlander used an identical scheme to sell fake dietary supplements that do not provide the advertised health benefits, using a slew of shell companies, trade names, and fake science to create an artificial

air legitimacy, while at the same time attempting to evade and compartmentalize liability while reaping the profits of fraudulent sale to consumers. It is undisputable that the FTC injunction prohibited the Basic Research Enterprise and Friedlander from making unsubstantiated health benefit claims for dietary supplements like the Products either "directly or through any corporation, subsidiary, division, or other device"; and from "misrepresent[ing], in any manner, expressly or by implication, including through the use of endorsements or trade names, the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research." The injunction also required Defendant Friedlander to notify the FTC if he discontinued his business or employment current as of June 19, 2006 (with Basic Research, LLC and its affiliates), and of his affiliation with any new business or employment, for a period of ten years ending June 19, 2016. FTC Order, Dkt. 117-6, at § VIII.

73.    **U.S. Postal Service Orders.** Defendant Friedlander has a lengthy record of wrongdoing and violation of federal and state laws. Defendant Friedlander has been the subject of "Cease and Desist" Orders and "False Representation" Orders issued by the U.S. Postal Service in connection with Friedlander's activities concerning the marketing and sale of dietary supplements which were falsely advertised as providing health benefits to virtually all users, as they were not substantiated by credible, scientifically-derived evidence.

74.    **Dominion/Control.** In connection with the manufacturing, marketing, advertising, promotion, distribution, and sale of the Products, Defendant Friedlander has exercised complete dominion and control over the Basic Research Enterprise such that these companies are his alter ego, a sham, façade, and mere instrumentality for his personal benefit, and he has disregarded and abused the corporate form and structure of these companies.

75.    **Abuse of Corporate Form.** Defendant Friedlander has misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

the law, including with response to the manufacture, marketing, advertisement, promotion, distribution and sale of the Products.

76. **Artificial Tradenames.** In addition, Defendant Friedlander has fraudulently created trademarks and the above-mentioned multiple corporations in order to evade detection of his true identity as the individual with dominion and control, also in order to defeat the ends of justice and otherwise evade the law, including with respect to the marketing, advertising, promotion, distribution, and sale of the Products.

### (iv)   Individual Defendant Haley Blackett.

77. **Familial Relation.** Defendant Blackett is the sister of Defendants Bodee Gay, Humphries, and Daines, and the daughter of the now-deceased founder and former owner and chief executive officer of the Basic Research Enterprise (Dennis Gay).

78. **Personal Acts—Employment.** Defendant Blackett has worked in marketing at Basic Research and Bydex Management for 18 years and is an owner of Basic Research, as well as other Basic Research "affiliated" companies. Individually or acting in concert with the other Defendants, Blackett formulates, directs, controls, or participates in the acts and/or business practices alleged in this Third Amended Complaint. Defendant Daines explained that Blackett worked as the "traffic manager" who "trafficked all the different marketing materials that needed to get completed and made sure they got to different vendors and were reproduced or produced." As an owner of Basic Research, and in her role in marketing, Blackett has final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants.

79. **Personal Acts—Ownership.** Defendant Blackett, as an owner of Basic Research is personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed and relied

upon by Plaintiffs and Class members, as alleged in this Third Amended Complaint. Within the Defendants' business enterprise, Blackett is responsible for placing the advertisements for the Products, into the stream of commerce and for selling the products in interstate commerce. Blackett makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Blackett has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, SeroDyne, and GF-9 that Defendants (including Blackett) manufacture, market, advertise, promote, distribute, and sell. Her intentional tortious acts and personal participation in the wrongful conduct underlying this class action deprive her of any protection she might otherwise have for her personal liability under the corporate shield doctrine, or otherwise.

80.    **Dominion/Control.** In connection with the manufacturing, marketing, advertising, promotion, distribution, and sale of the Products, Defendant Blackett has exercised complete dominion and control over the Basic Research Enterprise such that these companies are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form and structure of these companies.

81.    **Abuse of Corporate Form.** Defendant Blackett has misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade the law, including with response to the manufacture, marketing, advertisement, promotion, distribution and sale of the Products.

82.    **Artificial Tradenames.** In addition, Defendant Blackett has fraudulently created trademarks and the above-mentioned multiple corporations in order to evade detection of her true identity as the individual with dominion and control, also in order to defeat the ends of justice and otherwise evade the law, including with respect to the marketing, advertising, promotion, distribution, and sale of the Products.

*(v)*    ***Individual Defendant Kimm Humphries.***

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

83. **Familial Relation.** Defendant Humphries is the sister of Defendants Bodee Gay, Blackett, and Daines, and the daughter of the now-deceased founder and former owner and chief executive officer of the Basic Research Enterprise (Dennis Gay).

84. **Personal Acts—Employment.** Defendant Humphries works in customer service and in marketing purchasing media for Basic Research. Individually or acting in concert with the other Defendants, Humphries formulates, directs, controls, or participates in the acts and/or business practices alleged in this Third Amended Complaint. As an owner of Basic Research, and in her role in marketing, Blackett has final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants.

85. **Personal Acts—Ownership.** Defendant Humphries, as an owner of Basic Research, is personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed and relied upon by Plaintiffs and Class members, as alleged in this Third Amended Complaint. Within the Defendants' business enterprise, Humphries is responsible for placing the advertisements for the Products, into the stream of commerce and for selling the products in interstate commerce. Humphries makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Humphries has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, SeroDyne, and GF-9 that Defendants (including Humphries) manufacture, market, advertise, promote, distribute, and sell. Her intentional tortious acts and personal participation in the wrongful conduct underlying this class action deprive her of any protection she might otherwise have for her personal liability under the corporate shield doctrine, or otherwise.

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

86.   **Dominion/Control.** In connection with the manufacturing, marketing, advertising, promotion, distribution, and sale of the Products, Defendant Humphries has exercised complete dominion and control over the Basic Research Enterprise such that these companies are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form and structure of these companies.

87.   **Abuse of Corporate Form.** Defendant Humphries has misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade the law, including with response to the manufacture, marketing, advertisement, promotion, distribution and sale of the Products.

88.   **Artificial Tradenames.** In addition, Defendant Humphries has fraudulently created trademarks and the above-mentioned multiple corporations in order to evade detection of her true identity as the individual with dominion and control, also in order to defeat the ends of justice and otherwise evade the law, including with respect to the marketing, advertising, promotion, distribution, and sale of the Products.

D.   **Defendants Are Co-Conspirators Who Direct Their Conduct at California Consumers**

89.   Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein each of these individuals and/or entities was the agent, servant, employee, subsidiary, affiliate, partner, assignee, successor-in-interest, alter ego, or other representative of each of the remaining Defendants and was acting in such capacity in doing the things herein complained of and alleged.

90.   In committing the wrongful acts alleged herein, Defendants planned and participated in and furthered a common scheme by means of false, misleading, deceptive, and fraudulent representations to induce members of the public in California to purchase the Products. Defendants participated in the making of such

representations in that they did disseminate or cause to be disseminated said misrepresentations in California.

91.   Defendants, upon becoming involved with the manufacturing, advertising, and sale of the Products, knew or should have known that the claims about the Products' ability to raise HGH levels and deliver anti-aging benefits were false, deceptive, and misleading. Defendants affirmatively misrepresented the benefits of the Products in order to convince the public and the Products' users in California to purchase and use the Products, resulting in profits of approximately 100 million of dollars or more to Defendants, all to the damage and detriment of the consuming public.

92.   Defendants have created and still perpetuate a falsehood that the Products increase HGH levels in the human body and by doing so can provide "anti-aging" benefits when the medical community has concluded that it cannot do so nor is it safe to do so. As a result, Defendants' consistent and uniform advertising claims about the Product are false, misleading, and/or likely to deceive in violation of California and federal advertising laws.

**E.**   **Defendants' Long-Standing Business Model of Falsely Advertising Dietary Supplements that Provide Health Benefits and Misleadingly Using Tradenames, Fake Science, and Shell Companies to Artificially Legitimize Products**

93.   Defendants' long track record of disseminating false and misleading advertisements for dietary supplements is evidenced  by the fact that Defendants Basic Research, LLC,  Friedlander, and numerous affiliated entities, are the subject of a 20-year injunction, entered by the FTC on June 19, 2006, and terminating on June 19, 2026, that, among other things: (1) proscribes the marketing and sale of dietary supplements that provide health benefits through any affiliates, unless competent and reliable scientific evidence supports the claims made about such products; (2) prohibits the misrepresentation of any use of endorsements or trade names, as well as

THIRD AMENDED CLASS ACTION COMPLAINT

the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research; and (3) mandates the advance and prompt disclosure of any change in their corporate structure that may affect their compliance with the order at least thirty days in advance of the change (hereinafter the "**FTC Order**." *See* FTC Order, Dkt. 117-6, at §§ II, III, XI, XIII; Bodee Gay Decl., Dkt. 117-9, at ¶¶ 2, 5, 11, 12 (admitting, under oath, that Basic Research, LLC, SanMedica, and affiliates have had common ownership and management are bound to comply with the FTC Order with respect to marketing and sale of SeroVital). There, the FTC brought an enforcement action against Basic Research, Friedlander, and their affiliated network of entities for falsely advertising dietary supplements as providing weight loss benefits, and using a variety of trade names and fake science to create an artificial sense of legitimacy. Just like Basic Research and Friedlander did in the FTC action, here, Defendants falsely advertise the Products as increasing HGH to provide anti-aging benefits, again using a variety of trade names—SeroVital by SanMedica, Thrive and SeroDyne by Limitless Worldwide, and GF-9 by Novex Biotech—and studies by Sierra Research that, contrary to Defendants' claims about those studies, either demonstrate the Products do not increase HGH or lack any scientific reliability. The myriad entities named in the FTC action, including their use of multiple trade names and affiliates to artificially legitimize the dietary supplements, illustrates the extent to which Defendants' business model relies on shell companies, affiliates, and confusing corporate structures to perpetrate their fraud. In addition to enjoining Basic Research, LLC, Dennis Gay, Daniel B. Mowrey, and M. Friedlander's fraudulent conduct, the FTC ordered Basic Research, LLC to make a three-million-dollar payment to the FTC on behalf of all respondents.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

**F.     Alter Ego Liability: The Individual Defendants and Defendant Basic Research Are Co-Conspirators Operating the Basic Research Enterprise Such That the Failure to Pierce the Corporate Veil Would Result in an Injustice**

94.     The Individual Defendants and Defendant Basic Research (consisting of Defendants BR Cos, BR Intermediate, BR Holdings, and BR) are subject to alter ego liability as the operators of the web of affiliates making up the Basic Research Enterprise. Each other Entity Defendant member of the enterprise is also an alter ego of the Individual Defendants and Defendant Basic Research because they are functionally indistinct from one another. Failure to pierce the corporate veil among these indistinguishable individuals and entities would result in injustice because it would sanction the Individual Defendants' and Defendants' Basic Research's scheme to undercapitalize entities exposed to liability to protect their fraudulent and profitable sale of the SeroVital formula.

95.     Individual Defendants Gay, Daines, Friedlander, Blackett, and Humphries are alter egos of the corporations they own that make up the Basic Research Enterprise because they operated the Basic Research Enterprise in a manner such that there was no legal distinction between them and the companies that comprise the Basic Research Enterprise with respect to the manufacture, marketing, and sale of the Products. The Defendants, and each of them, showed no regard for the purported separate nature of any of the supposedly separate corporate-affiliates, including Defendant Basic Research and the Operations-Entities Defendants, for the purposes of conducting a fraudulent scheme to sell fake medicine while evading liability by undercapitalizing the illusory affiliates, which do not operate separately from the Basic Research Enterprise or conduct any business outside of the enterprise's business. This family-held partnership with Friedlander forms and uses these affiliates to transfer assets to the Individual Defendants and/or Defendant Basic Research and liabilities away from them and into judgment-proof shell companies.

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

a.  **Ownership Structure.** The Individual Defendants Gay, Daines, Blackett, Humphries, and Friedlander, at various point in time throughout the Class Period, owned Defendant Basic Research (consisting of Defendants BR Cos, BR Intermediate, BR Holdings, and BR), which owned, at various points in the same time period, the web of Operations Entity Defendants (consisting of Defendants Sierra, Majestic, CRM, Bydex, SanMedica, Limitless Worldwide, and Novex Biotech).

b.  **Pooling of Assets in Remote Owners and Debts in Immediate Actors to Evade Liability.** At the Individual Defendants' direction, Defendant Basic Research and the other Operations Entities Defendants comingled funds and/or otherwise consolidated assets in the Individual Defendants and/or Defendant Basic Research, and consolidated debts in Defendant Basic Research and/or the Operations-Entities Defendants. Individual Defendants purposefully pooled assets in remote owners and debts in immediate actors, including encumbering the undercapitalized entity-Defendants with a loan that exceeds one hundred million dollars, to avoid liability for their fraudulent marketing and sale of the Products. In other words, the Individual Defendants deliberately undercapitalized and underinsured Operations Entities and/or Defendant Basic Research, by improperly diverting assets away from said entities while at the same time encumbering those entities with debts for the entire Basic Research Enterprise's operations, in an amount that exceeds the monetary value of their assets. Indeed, the Individual Defendants ensured none of the Basic Research Enterprise entities have insurance that covers the fraudulent marketing and sale of the Products at issue in this case.

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

c.   **Fictitious Compartmentalization of Liabilities in Operations-Entities Defendants.** At the Individual Defendants' and Defendant Basic Research's direction, the Basic Research Enterprise compartmentalized liability for its operations by forming additional shell Operations Entities. In so doing, the Individual Defendants and Defendant Basic Research intended: (1) Sierra Research to subsume all liability for the research, development, and formulation of the Products; (2) Majestic to subsume all liability for the marketing of the Products; (3) CRM to subsume all liability for customer service and direct-to-consumer Products sales; (4) BR to subsume liability for the distribution and sale of the Products through third-party retailers; (5) SanMedica to subsume all liability for the manufacture of SeroVital; (6) Limitless Worldwide to subsume all liability for the manufacture of Thrive and SeroDyne; (7) Novex Biotech to subsume all liability for the manufacture of GF-9; and (8) Bydex Management to subsume all liability for Basic Research Enterprise's agents and employees' individual acts or omissions. However, there is no meaningful distinction between these companies. They operate out of the same BR Headquarters, utilizing the same set of employees and equipment in unison to carryout Basic Research Enterprise's racket of fraudulently manufacturing, marketing, and selling the Products. Indeed, their newest parent corporation, Phoenix (Dkt. 171), has taken out a Small Business Administration ("**SBA**") loan through Basic Research Enterprise's local bank, Zions Bank, in Salt Lake City, Utah, purportedly to retain over 100 employees. Yet, the Individual Defendant Gina Daines disclaimed, on behalf of Defendant SanMedica under oath pursuant to Fed. R. Civ P. 30(b)(6), that it

or its affiliates had any "employees" because the Basic Research Enterprise purports to lease independent contractors from Bydex Management. Further, the Operations Entities Defendants have comingled funds, are encumbered with the debts of the entire Basic Research Enterprise, and have had their assets diverted to the Individual Defendants and/or Defendant Basic Research. The Individual Defendants and Defendant Basic Research deliberately designed this fictious corporate structure to not only provide false legitimacy to the Products to drive sales, but also to compartmentalize liabilities for its operations in different shell companies so that the Individual Defendants can reap the profits of the Basic Research Enterprise without exposing each of themselves or the entity-Defendants to the Enterprise's liabilities.

d.   **Entity-Defendants' Common Ownership/Management to Carryout Enterprise's Singular Business Purpose.** The entity-Defendants, including BR Cos, BR Intermediate, BR Holdings, BR, Sierra, Majestic, CRM, Bydex, SanMedica, Limitless Worldwide, and Novex Biotech, all, in fact, shared identical officers, directors, supervisors, and/or managers, operated from the same location, and all were owned by the individual Defendant family members partnered with Friedlander, to engage in a singular business enterprise—the manufacture, marketing, and sale of supplements, nutraceuticals, and various consumer products that purport to provide health-related benefits. The entity-defendants do not conduct business for any other purpose, business, or companies. Indeed, Individual Defendant Bodee Gay declared, under oath, that Defendants BR and SanMedica share common owners and managers. Dkt. 117-9. Similarly, Defendant Daines,

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

and Amy Heaton have held themselves out as officers of multiple of the Operations Entities.

96.   **Examples.** Examples demonstrating this common enterprise made up of affiliates that had no separate nature include that:

   a.   **Bydex as Purported Employer to All of Basic Research Enterprise's Employees**. There is no distinction between Bydex Management and the companies that comprise the Basic Research Enterprise. The Individual Defendants created Bydex to act as a putative "employer" of all of the employees who work under the "Basic Research" banner, identify themselves as "Basic Research" employees, and consistently and without deviation work solely for the Basic Research Enterprise to manufacture, market, and sell supplements, nutraceuticals, and consumer products advertised to provide purported health benefits, just like the Products, to the exclusion of working for any companies outside of the Basic Research Enterprise. Bydex pays the salaries of all of the Enterprise's workers for the different shell subsidiaries to manufacture, market, and sell the Basic Research Enterprise's products, like the Products, including: Sierra Research (the Enterprise's research and development arm); Majestic (the Enterprise's marketing arm); BR (the Enterprise's distribution arm); CRM (the Enterprise's customer relations and direct-to-consumer sales arm); Bydex Management (the Enterprise's putative employer and human resources arm); SanMedica (the nominal SeroVital manufacturer); Limitless Worldwide (the nominal Thrive and SeroDyne manufacturer); and Novex Biotech (the nominal GF-9 manufacturer). The Individual Defendants and Defendant Basic Research created Bydex Management to

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

-42-

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

artificially limit the liability of the rest of the entities that comprise the Basic Research Enterprise for the individual workers' acts and omissions carried out in furtherance of the Basic Research Enterprise's profits.

b. **Nominal Product Manufacturers SanMedica, Limitless Worldwide, and Novex Biotech.** During the Class Periods, there was no distinction between SanMedica, Limitless Worldwide, and Novex Biotech, or between said entities and the companies that comprise the Basic Research Enterprise. Each of the Products share the same exact formulation and purported substantiating science. The Individual Defendants' creation of unique "trademarks" for the Products—SeroVital, Thrive, SeroDyne, and GF-9—and formation of separate nominal manufacturers identified on the back panel of each Product's labels/packaging—SanMedica, Limitless Worldwide, and Novex Biotech, respectively—is fictitious and purely designed to create a false impression of legitimacy for the "competing" Products, their formulation, and their fake supporting science, as well as flood the marketplace with the false notion that oral amino acids increase growth hormone and, in turn, provide anti-aging benefits. None of the nominal manufacturers have employees other than those who worked from the BR Headquarters, who were paid by Bydex, and who solely worked for the Basic Research Enterprise to manufacture, market, and sell supplements, nutraceuticals, and consumer products advertised to provide health benefits (like the Products). None of these nominal manufacturers perform work for any companies outside of the Basic Research Enterprise. None of these nominal manufacturers use companies other than those in the Basic Research Enterprise to

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

research, develop, formulate, market, distribute, sell, provide customer service, or provide and/or manage a workforce. The Individual Defendants and Defendant Basic Research created SanMedica, Limitless Worldwide, and Novex Biotech to artificially limit the liability of the rest of the entities that comprise the Basic Research Enterprise for their respective Products.

c.    **Sierra Researched, Developed, and Formulated the Products.** There is no distinction between Sierra Research and the companies that comprise the Basic Research Enterprise. The Individual Defendants and Defendant Basic Research established Sierra Research as the research and development arm of the Enterprise to give the Products a false sense of scientific validity by an "independent" organization. Yet, Sierra Research has no employees other than those who solely worked for the Basic Research Enterprise, who were paid by Bydex Management, and who work from the BR Headquarters, and who only work for the Basic Research Enterprise to manufacture, market, and sell supplements, nutraceuticals, and consumer products advertised to provide health benefits (like the Products). Sierra Research does not perform work for any companies outside of the Basic Research Enterprise. Sierra Research does not use companies other than those in the Basic Research Enterprise to research, develop, formulate, market, distribute, sell, provide customer service, or provide and/or manage a workforce. The Individual Defendants and Defendant Basic Research created Sierra Research to artificially limit the liability of the rest of the entities that comprise the Basic Research Enterprise for the research, development, and formulation of the Enterprise's products, including the Products.

-44-

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

d.   **Majestic Marketed the Products.** There is no distinction between Majestic and the companies that comprise the Basic Research Enterprise. The Individual Defendants and Defendant Basic Research established Majestic as the marketing arm of the Enterprise to artificially limit liability for the marketing of products, like the Products, of the entities that comprise the Basic Research Enterprise, including the nominal manufacturers of the Products (SanMedica, Limitless Worldwide, and Novex Biotech), the employer/human resources branch (Bydex Management), the distribution, sales and customer service branches (BR and CRM), and the research, development, and formulation branch (Sierra Research). Yet, Majestic has no employees other than those who solely worked for the Basic Research Enterprise, who are paid by Bydex Management, who work from the BR Headquarters, and who solely worked for the Basic Research Enterprise to manufacture, market, and sell supplements, nutraceuticals, and consumer products advertised to provide health benefits (like the Products). Majestic does not perform work for any companies outside of the Basic Research Enterprise. Majestic does not use companies other than those in the Basic Research Enterprise to research, develop, formulate, market, distribute, sell, provide customer service, or provide and/or manage a workforce.

e.   **CRM and BR Sold the Products.** There is no distinction between CRM and BR and the companies that comprise the Basic Research Enterprise. The Individual Defendants and Defendant Basic Research established BR as the distribution arm, and CRM as the customer service and direct-to-consumer sales arm of the Enterprise to artificially limit liability for the distribution and sale

-45-

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

of products, like the Products, of the entities that comprise the Basic Research Enterprise, including the nominal manufacturers of the Products (SanMedica, Limitless Worldwide, and Novex Biotech), the employer/human resources branch (Bydex Management), the marketing branch (Majestic), and the research, development, and formulation branch (Sierra Research). Yet, CRM and BR have no employees other than those who are paid by Bydex Management, who work from the BR Headquarters, and who solely work for the Basic Research Enterprise to manufacture, market, and sell supplements, nutraceuticals, and consumer products advertised to provide health benefits (like the Products). CRM and BR do not perform work for any companies outside of the Basic Research Enterprise. CRM and BR do not use companies other than those in the Basic Research Enterprise to research, develop, formulate, market, distribute, sell, provide customer service, or provide and/or manage a workforce.

f.   **Parent Corporations.** There is no distinction between the parent companies, Defendant Basic Research (Defendants BR Cos, BR Intermediate, BR Holdings, and BR), and the companies that comprise the Basic Research Enterprise. The parent companies have no employees other than those who work from the BR Headquarters, who are paid by Bydex Management, and who perform work solely for the Basic Research Enterprise to manufacture, market, and sell supplements, nutraceuticals, and consumer products advertised to provide health related benefits (like the Products). The parent companies do not hold assets or perform work for any companies other those that comprise the Basic Research Enterprise. The parent companies do not use

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

companies other than those in the Basic Research Enterprise to research, develop, formulate, market, distribute, sell, provide customer service, or provide and/or manage a workforce. The Individual Defendants and Defendant Basic Research created the Parent and Grandparent Operations Entities, including Defendant Basic Research, to consolidate assets in them and/or these remote parent corporations, and consolidate debts and liabilities in the immediate actors, the Operations-Entities (Defendants SanMedica, Limitless Worldwide, Novex Biotech, Sierra Research, Majestic, BR, CRM, and Bydex Management). The Individual Defendants and Defendant Basic Research schemed to saddle the Operations Entity Defendants with debts, and divert the overleveraged companies' assets to the further-removed Parent and Grandparent Entities, so that the Individual Defendants who own them may misappropriate corporate funds from the Parent companies, while artificially limiting the liability of the Individual Defendants and the Parent companies for Basic Research Enterprise's manufacture, marketing, and sale of supplements, nutraceuticals, and consumer products advertised to provide health related benefits (like the Products). Indeed, the Individual Defendants have failed to insure the Operations Entities delineated on packaging, the Operation Entities performing the functions of the various arms of the Enterprise Defendants, and Defendant Basic Research for liabilities stemming from the fraudulent manufacture, marketing, and sale of the Products at issue in this case, as well as encumbered these entities with debts that exceed their assets, so that the Individual Defendants may reap the profits of the Basic Research

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Enterprise while avoiding all liability by creating these judgment-proof shell companies.

g.    **Deliberate Overleveraging.** The Individual Defendants and Defendant Basic Research deliberately encumbered the Operations Entity Defendants with a business loan exceeding one hundred million dollars and SBA loan of nearly two million dollars. The Individual Defendants and Defendant Basic Research used the assets of the Operations Entity Defendants to secure this business loans to retain employees for the entire Basic Research Enterprise and fund the Basic Research Enterprise's singular business venture to manufacture, market, and sell supplements, nutraceuticals, and consumer products advertised to provide health-related benefits (like the Products). At the same time, the Individual Defendants and Defendant Basic Research diverted the shell companies' profits, assets, and capital away from the entity-Defendants and into the pockets of the Individual Defendants. In this way, the Individual Defendants have successfully created judgment-proof shell companies to avoid liability for fraudulent misconduct at issue in this action.

h.    **Products' (Particularly SeroVital's) Revenues Keep the Entire Enterprise Afloat.** The hundreds of millions of dollars in revenues from the sale of the Products, particularly Serovital, fund the entire Basic Research Enterprise, including operations that are purportedly distinct from the nominal manufacturers (Defendants SanMedica, Limitless Worldwide, and Novex Biotech), and operations that do not support the research, development, formulation, marketing, manufacture, distribution, sale, or staffing

needed for the Products. In this way, the Individual Defendants have commingled the Enterprise's funds.

97.  Based on the foregoing, and at all relevant times, each Defendant was the alter ego of each other Defendant. Accordingly, Defendant Basic Research and the Individual Defendants are jointly and severally liable for the damages proximately caused by each other Defendant's wrongful conduct. There is a unity of interest and ownership between amongst the Individual Defendants and the entity-Defendants that they own and operate. The Individual Defendants and Defendant Basic Research commingled the entity-Defendants' funds and/or other assets; failed to segregate the entity-Defendants' funds and/or assets; diverted the entity-Defendants' funds and/or assets to unauthorized uses; treated the entity-Defendant's assets as their own; failed to obtain requisite authority before acting on the purported behalf of the entity-Defendants; held each entity-Defendant out as liable for the debts of the other entity-Defendants; failed to maintain adequate and separate corporate records for the entity-Defendants; were the shared identical equitable and/or legal owners of the entity-Defendants; exercised domination and control over each entity-Defendant; served as the entity-Defendants' identical officers, directors, supervisors, and/or managers; wholly owned the entity-Defendants as family members and/or through marital ties; used the same office or business location, equipment, and/or computer network, among other things to the entity-Defendants' joint business enterprise; employed the same employees and/or attorneys to operate the entity-Defendants; failed to adequately capitalize the business and/or the entity-Defendants; used the entity-Defendants as mere shell(s), instrumentality(ies), and/or conduit(s) for a single business venture; concealed and misrepresented the identity of the entity-Defendants' responsible ownership, management, and/or financial interest for the joint enterprise; concealed personal or unauthorized business activities to the detriment of the entity-Defendants' finances; disregarded legal formalities for the entity-Defendants; failed to maintain arm's length relationships amongst themselves and the entity-Defendants

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

-49-

as well as between and amongst the entity-Defendants; used the Operations-Defendants to procure labor, services, goods, and/or monies for themselves and/or the parent companies; diverted assets to the detriment of creditors for the entity-Defendants; manipulated assets and liabilities to concentrate assets in themselves or the parent companies and liabilities in the other Operations-Defendants; contracted with consumers for the sale of the Products through BR or CRM with the intent to avoid liability for those sales by using BR and CRM as a shield against their liability; contracted for the research, development and formulation of the Products through Sierra Research with the intent to avoid liability for its work by using Sierra Research as a shield against their liability; contracted for the marketing of the Products through Majestic with the intent to avoid liability for their marketing by using Majestic as a shield against their liability; contracted for the manufacture of the Products through SanMedica, Limitless Worldwide, and Novex Biotech with the intent to avoid liability for their manufacture by using these nominal manufactures as a shield against liability; contracted for the provision of labor to manufacture, market, and sell the Products through Bydex Management with the intent to avoid liability for their involvement by using Bydex Management as a shield against their liability; used each entity-Defendant as a subterfuge for illegal transactions—specifically, the sale of the Products to consumers; and/or formed and/or used the parent companies, Defendant Basic Research (BR Cos, BR Intermediate, BR Holdings, and BR) to transfer to them the Basic Research Enterprise's assets and profits from the sale of the Products and to transfer away from them the Enterprise's growing liabilities for the fraudulent sale of the Products.

98. **Underinsuring/Undercapitalizing/Over-leveraging to Avoid Responsibility for Liabilities.** By underinsuring and undercapitalizing over-leveraged and fake shell corporations, the Individual Defendants and Defendant Basic Resesarch have misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

and otherwise evade the law, including their liability for the manufacture, marketing, advertisement, promotion, distribution, and sale of the Products.

99. **Concealment and Obfuscation of Identities.** The Individual Defendants have fraudulently created trademarks, tradenames, and the shell companies that comprise the Basic Research Enterprise to evade detection of their true identity as the individuals with dominion and control over the Enterprise's operations and shell companies, and thereby defeat the ends of justice and otherwise evade the law, including their liability for the manufacture, marketing, advertising, promotion, distribution, and sale of the Products.

100. **Defendant Bodee Gay is an alter-ego of the Basic Research Enterprise** operates the Basic Research Enterprise out of the BR Headquarters.

> a.   **Undercapitalized, Underinsured, and Overleveraged Nominal Manufacturers.** Gay participated in a scheme to under insure, undercapitalize, and overleverage each of the entity Defendants, including the nominal manufacturers SanMedica, Limitless Worldwide, and Novex Biotech, so that Gay and the Individual Defendants could avoid liability for the fraudulent sale of the SeroVital formula (including GF-9, SeroDyne, Thrive). As the owner, director, and/or executive officer of the Basic Research Enterprise, including each of the entity-Defendants, Gay was responsible for ensuring each company, including the nominal manufacturers, had adequate insurance, adequate capital, and were not overleveraged so that they use their capital and revenues to fund their individual business operations and cover resulting liabilities. Instead, Gay and the Individual Defendants diverted assets to their personal benefit and to the detriment of companies and their liability-creditors. In other words, Gay used these three shell

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

corporations as a façade for operations of the only real stakeholders—Gay's family members and Friedlander.

b.   **Absence of Corporate Records.** This plan is further shown by the absence of corporate records for the shell corporations that the Individual Defendants hold out as the nominal manufacturers of the Products—specifically, SanMedica, Limitless Worldwide, and Novex Biotech, as well as the remainder of the Operations-Defendants and the parent companies, Defendant Basic Research. Instead, Defendant Basic Research maintains all records related to the manufacture and sale of the Products. Gay and the other Individual Defendants, as the owners, directors, and/or executive officers of the entity-Defendants, were responsible for maintaining those entities' corporate records. Instead, they fraudulently created and operated these corporations without corporate records documenting, for example, all resolutions of the board, minutes, ownership interests and rights, shareholder agreements, powers, and obligations, the powers and obligations of the board, executive officer compensation, distribution of dividends, loans, etc., to evade detection and to hide that Gay is an individual with dominion and control of the Basic Research Enterprise.

c.   **Disregard of Legal Separation.** Gay and the other Individual Defendants' scheme also does not observe corporate formalities, including the failure of the nominal manufacturers (SanMedica, Limitless Worldwide, and Novex Biotech) to enter into contracts to pay the other Operations-Defendants for services and goods provided to the nominal manufacturers, including for Bydex's purported leasing of employees, Sierra Research's research, development, and formulation of the Products, Majestic's

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

marketing of the Products, BR's distribution of the Products, and CRM's direct-to-consumer sales and provision of customer service for the Products. As the owner, director, and/or executive officer for the Basic Research Enterprise, including each of the entity-Defendants, Gay is responsible for the dearth of contracts between them and their comingling of funds, assets, and debts.

d.   **Sham Nominal Manufacturers & Artificial Degrees of Separation.** Similarly, Gay and the Individual Defendants were responsible, as owners, directors, and/or executive officers of the Basic Research Enterprise, including each of the entity-Defendants,  for forming each of the shell companies, including the grandparent and parent companies, Defendant Basic Research in which they hold legal ownership interests, and the Operations Defendants, in which they hold equitable or beneficial ownership interests. Gay and the Individual Defendants deliberately chose to identify the illusory undercapitalized, underinsured, and overleveraged nominal manufacturers (SanMedica, Limitless Worldwide, Novex Biotech) as the manufacturers of the Products. Gay and the Individual Defendants also separated themselves from these nominal manufactures by structuring their ownership interest in the grandparent companies, which wholly owned the parent companies, which wholly owned the Operations-Entities Defendants. In this way, Gay and the Individual Defendants purposely held out the nominal manufacturers to the public as the companies responsible for the Products to absorb liability for the Individual Defendant's scheme and operation of the Basic Research Enterprise, conceal the Individual Defendants' true participation and direct liability, obfuscate the involvement of the

other Operations-Entities (such as Sierra Research, Majestic, BR, CRM, and Bydex), and use the parent companies to create artificial degrees of separation between the Individual Defendants and the nominal manufacturers.

e. **Sham Nominal Manufacturers & Sierra Research to Perpetrate Fraud.** And, because Gay and the Individual Defendants were directly involved in the marketing and sales strategy for the Products and responsible for forming each of the shell companies in the Basic Research Enterprise as its owners, directors, and/or executive officers, they directly participated in the creation of the Products' nominal manufacturers (SanMedica, Limitless Worldwide, and Novex Biotech) and the purported "independent" research and development company (Sierra Research). In forming these companies, Gay and the Individual Defendants intended to market the SeroVital formula under different brand names to obfuscate Gay and the other Individual Defendants' scheme to make it appear to the public that there were several HGH products available on the market, which were scientific validated by an "independent" professional organization dedicated to the research and development of supplements, and thus that there was scientific consensus on the efficacy of these fake worthless Products.

f. **Alter-Egos.** Gay and the other Individual Defendants exercised complete dominion and control over the Basic Research Enterprise such that the shell companies are their mere alter-egos, shams, shells, and are a mere instrumentality for Gay and the Individual Defendants' personal benefit of reaping the rewards of the

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

1    fraudulent sale of the SeroVital formula, while evading all liability

2    for this massive consumer fraud.

3    101. **Defendant Gina Daines is an alter-ego of the Basic Research**

4    **Enterprise** who operates the Basic Research Enterprise out of the BR Headquarters.

5        a.    Daines participated in a scheme to undercapitalize named

6              manufacturer corporations like SanMedica, Limitless Worldwide,

7              and Novex Biotech so that Daines and her co-conspirators could

8              avoid liability for the fraudulent sale of the SeroVital formula

9              (including GF-9, SeroDyne, Thrive). In effect, Daines diverted

10             assets to the detriment of liability-creditors. In other words, Daines

11             used these three shell corporations as a façade for operations of the

12             real stockholders—Daines's family members along with

13             Friedlander.

14       b.    This plan is further shown by the absence of corporate records for

15             the shell corporations that the Individual Defendants hold out as

16             the manufacturers of the Products. Instead, Defendant Basic

17             Research maintains all records related to the manufacture and sale

18             of the Products. Daines and the other Individual Defendants

19             fraudulently created and operated these trademark corporations to

20             evade detection and to hide that she is an individual with dominion

21             and control of the Basic Research Enterprise.

22       c.    Daines and the other Individual Defendants' scheme also does not

23             observe corporate formalities. For example, as Chief Marketing

24             Office for Basic Research, Daines was responsible for the

25             distribution of the Products with packaging that identified illusory

26             undercapitalized manufactures (*i.e.* SanMedica, Limitless

27             Worldwide) that Daines and the Individual Defendants purposely

28

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

held out to absorb liability for the Individual Defendant's scheme and operation of the Basic Research Enterprise.

d.   She was also a participant in marketing the SeroVital formula under different brand names to obfuscate her and the other Individual Defendant's scheme to make it appear to the public that there were several Products available on the market, and thus that there was scientific consensus on the efficacy of these fake worthless Products.

e.   Daines and the other Individual Defendants exercised complete dominion and control over the Basic Research Enterprise such that the other companies are mere alter-egos, shams, shells, and are mere instrumentality for her personal benefit of reaping the rewards of the fraudulent sale of the SeroVital formula.

102. **Defendant Friedlander is an alter-ego of the Basic Research Enterprise** who operates the Basic Research Enterprise out of the BR Headquarters.

a.   Like Friedlander had done in the past with other products, Friedlander organized a scheme to undercapitalize named manufacturer corporations like SanMedica, Limitless Worldwide, and Novex Biotech so that Freidlander and Friedlander's co-conspirators could avoid liability for the fraudulent sale of the SeroVital formula (including GF-9, SeroDyne, Thrive). In effect, Friedlander diverted assets to the detriment of liability-creditors. In other words, Freidlander used these three shell corporations as a façade for operations of the real stockholders—Friedlander and Friedlander's former partner's family members.

b.   This plan is further shown by the absence of corporate records for the shell corporations that the Individual Defendants hold out as the manufacturers of the Products. Instead, Defendant Basic

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Research maintains all records related to the manufacture and sale of the Products. Friedlander and the other Individual Defendants fraudulently created and operated these trademark corporations to evade detection and to hide that Friedlander is an individual with dominion and control of the Basic Research Enterprise.

c.      Friedlander and the other Individual Defendants' scheme also does not observe corporate formalities. For example, while Friedlander has been a marketing officer and owner of the Basic Research Enterprise—who was directly involved in the invention, development, endorsement, advertising, marketing, and promotion of the Products—the Products were distributed with packaging that identified illusory undercapitalized manufactures (i.e. San Medica, Limitless Worldwide) that Friedlander and the Individual Defendants purposely held out to absorb liability for the Individual Defendant's scheme and operation of the Basic Research Enterprise.

d.      Friedlander was also a participant in marketing the SeroVital formula under different brand names to obfuscate Friedlander and the other Individual Defendant's scheme to make it appear to the public that there were several Products available on the market, and thus that there was scientific consensus on the efficacy of these fake worthless Products.

e.      Friedlander and the other Individual Defendants exercised complete dominion and control over the Basic Research Enterprise such that the other companies are mere alter-egos, shams, shells, and are mere instrumentality for Friedlander's personal benefit of reaping the rewards of the fraudulent sale of the SeroVital formula.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

f.    Siphoning off funds from the Basic Research Enterprise, Friedlander also receives royalty payments pursuant to a royalty agreement and/or covenant not to sue between Friedlander and the Basic Research Enterprise.

g.    Friedlander has also been warned against operating such schemes with co-conspirators from the family that Friedlander owns the Enterprise with. The other Individual Defendants' father and Friedlander were enjoined by the FTC from using the same scheme to sell the dietary supplements at issue. Specifically, both were enjoined from "making unsubstantiated claims" "directly or through any corporation, subsidiary, division, or other device" from, among other things, "misrepresent[ing], in any manner, expressly or by implication, including through the use of endorsements or trade names, the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research." Friedlander operates the same scheme here only this time with the SeroVital formula and his former business partner's decedents.

103. **Defendant Haley Blackett is an alter-ego of the Basic Research Enterprise** who operates the Basic Research Enterprise out of the BR Headquarters.

a.    Blackett participated in a scheme to undercapitalize named manufacturer corporations like SanMedica, Limitless Worldwide, and Novex Biotech so that Daines and her co-conspirators could avoid liability for the fraudulent sale of the SeroVital formula (including GF-9, SeroDyne, Thrive). In effect, Blackett diverted assets to the detriment of liability-creditors. In other words, Blackett used these three shell corporations as a façade for

operations of the real stockholders—Blackett's family members along with Friedlander.

b. This plan is further shown by the absence of corporate records for the shell corporations that the Individual Defendants hold out as the manufacturers of the Products. Instead, Defendant Basic Research maintains all records related to the manufacture and sale of the Products. Blackett and the other Individual Defendants fraudulently created and operated these trademark corporations to evade detection and to hide that she is an individual with dominion and control of the Basic Research Enterprise.

c. Blackett and the other Individual Defendants' scheme also does not observe corporate formalities. For example, while Blackett worked in marketing at Basic Research and Bydex Management for 18 years and an owner of Basic Research, as well as other Basic Research "affiliated" companies she was responsible for the distribution of the Products with packaging that identified illusory undercapitalized manufactures (*i.e.* SanMedica, Limitless Worldwide) that Blackett and the Individual Defendants purposely held out to absorb liability for the Individual Defendant's scheme and operation of the Basic Research Enterprise.

d. She was also a participant in marketing the SeroVital formula under different brand names to obfuscate her and the other Individual Defendant's scheme to make it appear to the public that there were several Products available on the market, and thus that there was scientific consensus on the efficacy of these fake worthless Products.

e. Blackett and the other Individual Defendants exercised complete dominion and control over the Basic Research Enterprise such that

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

the other companies are mere alter-egos, shams, shells, and are mere instrumentality for her personal benefit of reaping the rewards of the fraudulent sale of the SeroVital formula.

104. **Defendant Kim Humphries is an alter-ego of the Basic Research Enterprise** who operates the Basic Research Enterprise out of the BR Headquarters.

a.    Humphries participated in a scheme to undercapitalize named manufacturer corporations like SanMedica, Limitless Worldwide, and Novex Biotech so that Daines and her co-conspirators could avoid liability for the fraudulent sale of the SeroVital formula (including GF-9, SeroDyne, Thrive). In effect, Humphries diverted assets to the detriment of liability-creditors. In other words, Humphries used these three shell corporations as a façade for operations of the real stockholders— Humphries' family members along with Friedlander.

b.    This plan is further shown by the absence of corporate records for the shell corporations that the Individual Defendants hold out as the manufacturers of the Products. Instead, Defendant Basic Research maintains all records related to the manufacture and sale of the Products. Humphries and the other Individual Defendants fraudulently created and operated these trademark corporations to evade detection and to hide that she is an individual with dominion and control of the Basic Research Enterprise.

c.    Humphries and the other Individual Defendants' scheme also does not observe corporate formalities. For example, while Humphries worked in customer service and in marketing purchasing media for Basic Research the Products were distributed with packaging that identified illusory undercapitalized manufactures (*i.e.* SanMedica, Limitless Worldwide) that Humphries and the Individual

Defendants purposely held out to absorb liability for the Individual Defendant's scheme and operation of the Basic Research Enterprise.

d.  She was also a participant in marketing the SeroVital formula under different brand names to obfuscate her and the other Individual Defendant's scheme to make it appear to the public that there were several Products available on the market, and thus that there was scientific consensus on the efficacy of these fake worthless Products.

e.  Humphries and the other Individual Defendants exercised complete dominion and control over the Basic Research Enterprise such that the other companies are mere alter-egos, shams, shells, and are mere instrumentality for her personal benefit of reaping the rewards of the fraudulent sale of the SeroVital formula.

## III.  JURISDICTION AND VENUE

105. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. Section 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and defendant are citizens of different states. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

106. Pursuant to 28 U.S.C. Section 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District: Plaintiffs are citizens of California and Plaintiff Pizana resides in this District; Defendants made the challenged false representations to Plaintiff Pizana in this District; Plaintiff Pizana purchased the Product in this District; and Plaintiff Pizana used the Product within this District.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Moreover, Defendants receive substantial compensation from sales in this District, and Defendants made numerous misrepresentations which had a substantial effect in this District, including but not limited to, label, packaging, internet, and infomercial advertisements, among other advertising.

107. Defendants are subject to personal jurisdiction in California based upon sufficient minimum contacts which exist between Defendants and California. Defendants are authorized to do and doing business in California.

## IV.  FACTUAL BACKGROUND

### A.  Defendants Operate the Basic Research Enterprise in Such a Way as to Ensure that Consumers Who Purchase Their "Miracle Pills" Are Defrauded

108. Individual Defendants Bodee Gay, Gina Daines, Haley Blackett, and Kimm Humphries inherited the Basic Research family business and their father's partnership with Defendant Friedlander, including the family practice of perpetuating false representations to unsuspecting consumers through misleading advertising and label claims, and operating a complex corporate enterprise to shield it from liability.

109. Defendants contrived and developed a dietary supplement consisting of a blend of five amino acids and one herb (originally called SeroVital) that Defendants claim can increase HGH levels that then result in an anti-aging miracle.

110. To confuse and defraud consumers, Defendants chose to market, advertise, and sell the Products under different names: SeroVital, Thrive, SeroDyne, and GF-9.   Additionally, Defendants chose to sell the Products from Utah to consumers in California and around the country under three different entities: Defendants SanMedica (to sell SeroVital), Limitless Worldwide (to sell Thrive and SeroDyne), and Novex Biotech (to sell GF-9). Defendants intentionally decided to use three different companies to sell the Products three ways: by marketing the identical products as separate brands being sold by purportedly different companies, Defendants would create the appearance of a robust and competitive market for oral

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

amino acids, which would contribute to the public perception that they are legitimate Products that provide anti-aging benefits and not snake oil being marketed by single fraudster.

111.  As evidence of the similarity of Products, each Product retails for $99 per box.[3]

112.  Most of the Products are sold on entirely different websites, with no apparent reference to one another. Defendants own and control each of these websites and have designed each website to obfuscate the fact that each Product is part of a family of Products sold by the same affiliated group, and Defendants use the websites to disseminate misleading information about the Products over interstate wires, from the BR Headquarters in Utah, to consumers in California and around the country. Interestingly, on growthfactor9.com, GF-9 is marketed as "the first-and-only-dietary supplement clinically shown to naturally increase your own GH levels up to 682%"— even though the original formula was called SeroVital. Similarly, on mylimitlessww.com, Limitless Worldwide markets itself has having "discovered a radical new concept" in Thrive. Limitless Worldwide also sells SeroDyne as a "radical, new, proprietary amino acid compound" on mylimitelessww.com while identifying it as a "SeroVital Complex." And on Serovital.com, SeroVital is marketed as a "revolutionary Renewal Complex."

113.  To create the appearance that the Products are backed by legitimate independent research, Defendants decided that Basic Research's own in-house research and development arm should operate under an entirely different name, Defendant Sierra Research, and created a separate entity to further the goals of their conspiracy. But Defendant Sierra Research does not have any employees that do not also work for Basic Research. Instead, Amy Heaton and the other so-called employees

---

[3] As part of this same scheme, Defendants also sell the SeroVital formula under the brand name Nouriche Fertility. Defendants use the same misleading claims about its study on SeroVital to support its claim that Nouriche Fertility provides anti-aging benefits that promote fertility.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

of Sierra Research are paid by Defendant Bydex Management like other Basic Research employees.

114.   Defendants, with the help of their employee—Amy Heaton of Defendant Sierra Research—intentionally misrepresent the significance of Defendants' double-blind placebo-controlled trials on SeroVital. In particular, Defendants tout these trials on labels, and on Product websites to convince reasonable consumers and the general public that there is sound scientific support for their Products, and in particular, that HGH can reverse the signs of aging. The scientific backing is a sham, however, and Defendants know this. Indeed, in rejecting Defendants' analysis of the results of its study, reviewers for one peer-reviewed publication explained that Defendants over emphasized the impact of oral amino acids and that "Baseline hGH in the participants taking placebo was about 500% higher than in the participants taking amino acid supplement. They are unreliable and unexplained data. At the same time the authors state that 'the mean value for hGH was slightly higher [...] the difference was not statistically significant.' Without explaining the reason of such a huge difference (>500%) it is impossible to specify the increase of hGH at 120 minutes (682%). Taking into account that each participant served as their own control, there should not be any difference in baseline hGH." Defendants rely on Dr Heaton's flawed analysis of study data to substantiate its claims for the Products and disseminate this information to consumers via Product labels, websites, Product fact sheets, and emails in response to consumer inquiries from Utah to consumers in California and around the country using interstate wires. This study, however, demonstrates the opposite of Defendants' claims because the data shows that the Products are no better than a placebo.

115.   Despite the reality that Defendants' own study shows the opposite of what they claim, Defendants continue to cite their study disseminated over interstate wires, such as on each of the Product websites, Product labels, Product fact sheets, and emails in response to consumers inquiries to support their claims about each of the

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Products—Products that are also sold under different product and company names. Indeed, for years, Defendants have knowingly engaged in a pattern of omissions and misrepresentations over interstate wires, executed through their deceptive corporate structures, to sell its placebos to consumers in California and around the country. Defendants' enterprise of affiliates and the sale of the Products are devised to defraud Plaintiffs and Class members.

116.   Defendants have used their various entities as tools or instrumentalities to carry out schemes or artifices to defraud. Defendants' schemes or artifices to defraud Plaintiffs and Class members have consisted of systematic and continuing practices of disseminating through the United States mail and interstate wire facilities false and misleading information via television commercials, Internet websites and postings, point-of-purchase advertisements, national magazine advertisements, and the Products' packaging, intended to coax unsuspecting customers, including Plaintiffs and the members of the Class, into purchasing millions of dollars' worth of the Products manufactured, marketed, advertised, and sold by Defendants.

## B.   SeroVital's False and Misleading Advertising and Label Claims

117.   SeroVital is sold online, via infomercials, and at retail outlets across California and the United States. Defendants rely on interstate wires to advertise it to consumers and receive revenues from its sale, both directly from consumers and from middleman retailers and distributors that sell SeroVital. Defendants also rely on the mail to distribute SeroVital from the BR Headquarters in Utah to consumers, distributors, and retailers around the country.

118.   Every unit of SeroVital sold by Defendants conveys a consistent false and misleading message to consumers—that the SeroVital causes a "682% mean increase in HGH levels" and that HGH is "associated with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, [and] heightened sex drive" so as to make "users look and feel decades – not years, but *DECADES* – younger."

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

119.  Because Defendants represent that the SeroVital will cause a "682% mean increase in HGH levels," and that HGH will provide certain benefits listed on the label, consumers reasonably believe that the HGH increase from the SeroVital will cause wrinkle reduction, decrease body fat, increase lean muscle mass, strengthen bones, improve mood, and heighten sex drive such that they will "look and feel decades – not years, but DECADES – younger"—as claimed on the label.  A true and correct representation of the SeroVital's front label is shown below.



120. Reasonable consumers are misled by Defendants' representations because SeroVital does not cause a "682% mean increase in HGH levels." Defendants also deceive reasonable consumers into believing that the increased HGH levels achieved by the SeroVital will provide the purported benefits of HGH, including wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones,

improved mood, [and] heightened sex drive" such that they will look and feel years younger.

121.  From the BR Headquarters in Utah to consumers in California and around the country, Defendants direct and disseminate false representations about the SeroVital as part of their fraudulent scheme to convince consumers that HGH has anti-aging benefits. The specific false and misleading representations concerning the SeroVital include, but are not limited to, the following:

a.  "Turn back time with the 'anti-aging' breakthrough everyone is talking about!"

b.  "It's clear that Growth Hormone has been associated with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades—not years, but DECADES – younger"

c.  "682% mean increase in HGH levels"

d.  "Clinically tested"

e.  "Human Growth Hormone Secretagogue"

f.  "Maximum strength formula"

g.  "Peak growth hormone levels associated with: Youthful Skin Integrity* Lean Musculature* Elevated Energy Production* Adipose Tissue Distribution"

h.  "Now, after more than 20 years of time-consuming, detailed research, there's finally an affordable oral formula that encourages the pituitary gland to increase growth hormone production naturally, without dangerous drugs or synthetic hormone injections."

THIRD AMENDED CLASS ACTION COMPLAINT

C.   **The Substantially Similar Products' Misleading Advertising and Label Claims**

122.  Defendants' GF-9, Thrive, and SeroDyne products are the same formula as SeroVital and are sold as part of the same racketeering scheme.

123.  **Thrive.** Thrive is sold online, via infomercials, and at retail outlets across California and the United States. As with SeroVital, Defendants rely on interstate wires to advertise GF-9 and Thrive to consumers and receive revenues from their sale, both directly from consumers and from middleman retailers and distributors that sell these Products. Defendants also rely on the mail to distribute these Products from the BR Headquarters in Utah to consumers, distributors, and retailers around the country.

124.  Thrive conveys a consistent false and misleading message to consumers—that the SeroVital causes a "mean 8-fold increase in serum growth hormone levels after a single oral serving of the supplement" and that HGH "helps maintain healthy bone strength, increase elastin and reduces wrinkles" and makes users "look and feel decades younger. Not years … DECADES younger"

125.  From the BR Headquarters in Utah to consumers in California and around the country, Defendants direct and disseminate false representations about Thrive as part of their fraudulent scheme to convince consumers that HGH has anti-aging benefits. The specific false and misleading representations concerning the SeroVital include, but are not limited to, the following:

a.   "Fountain of Youth"

b.   "Look younger"

c.   "Feel younger:

d.   "Lose body fat"

e.   "Increase muscle tone"

f.   "Have an increased sex drive"

126. Reasonable consumers are misled by Defendants' representations because the Product does not cause a "mean 8-fold increase in serum growth hormone

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

levels after a single oral serving of the supplement." Defendants also deceive reasonable consumers into believing that the increased HGH levels achieved by the Product will provide the purported benefits of HGH, including wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, and heightened sex drive such that they will look and feel years younger.

127.  **SeroDyne.** SeroDyne is sold online, via infomercials, and at retail outlets across California and the United States.

128.  SeroDyne conveys a consistent false and misleading message to consumers—that it "complements your body's natural production of this pituitary peptide after a single oral serving of the supplement." Because SeroDyne relies on the same double-blind placebo-controlled study to support its claims, it is apparent that this "pituitary peptide" is a reference to HGH.

129.  From the BR Headquarters in Utah to consumers in California and around the country, Defendants direct and disseminate false representations about SeroDyne as part of their fraudulent scheme to convince consumers that their "this pituitary peptide" has anti-aging benefits. The specific false and misleading representations concerning the Product include, but are not limited to, the following:

a.  "more energy"

b.  "less fat"

c.  "more lean muscle mass"

d.  "stronger bones"

e.  "a better sex drive"

f.  "younger-looking skin"

130.  Reasonable consumers are misled by Defendants' representations because SeroDyne does not "complement[] your body's natural production of this pituitary peptide after a single oral serving of the supplement." Defendants also deceive reasonable consumers into believing that the amino acid compound will "complement production" of "a specific pituitary peptide" and provide the purported

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

benefits of the "pituitary peptide," including increase lean muscle mass, stronger bones, improved mood, more energy, better mood, and heightened sex drive such that they will look and feel years younger.

131.  **GF-9.** GF-9 is sold online, via infomercials, and at retail outlets across California and the United States.

132.  GF-9 conveys a consistent false and misleading message to consumers—that the product increases GH levels "by up to 682% safely for a more youthful, stronger, and active body."

133.  From the BR Headquarters in Utah to consumers in California and around the country, Defendants direct and disseminate false representations about GF-9 as part of their fraudulent scheme to convince consumers that HGH has anti-aging benefits. The specific false and misleading representations concerning the Product include, but are not limited to, the following:

        a.    "more energy"

        b.    "less fat"

        c.    "Quicker recovery"

        d.    "Improved sleep"

        e.    "More energy"

        f.    "Better mood"

        g.    "Increased sex drive"

134.  Reasonable consumers are misled by Defendants' representations because the SeroVital does not increase GH levels "by up to 682% safely for a more youthful, stronger, and active body." Defendants also deceive reasonable consumers into believing that the increased HGH levels achieved by the Product will provide the purported benefits of HGH, including increase lean muscle mass, stronger bones, improved mood, more energy, better mood, and heightened sex drive such that they will look and feel years younger.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

**D.** **Plaintiffs' Experts Confirm That Defendants' Advertising Is Provably False and Misleading:**

135. Plaintiffs have retained two leading experts in the areas of endocrinology and growth hormone in connection with the claims made herein: Dr. Shlomo Melmed, M.D. ("Dr. Melmed") and Dr. David H. Madoff, M.D., Ph.D. ("Dr. Madoff"). Attached hereto and incorporated by reference herein as Exhibit 1 is the declaration of Dr. Melmed ("Melmed Decl."). Attached hereto and incorporated by reference herein as Exhibit 2 is the declaration of Dr. Madoff ("Madoff Decl.").

136. Dr. Melmed is a world-renowned endocrinologist and national expert in the field of growth hormone. Dr. Melmed heads the largest pituitary department in the nation at Cedars Sinai Medical Center in Los Angeles, California where he also serves as the Dean of the Medial Faculty, Executive Vice President, Chief Academic Officer and Director of Research Institute. He is also a Professor of Medicine and Associate Dean at the University of California at Los Angeles. Dr. Melmed has over 350 peer-reviewed publications for his research in the area of growth hormone/pituitary gland; has authored over 20 textbooks and over 130 book chapters on growth hormone/pituitary gland; has won a myriad of awards for work in his field; and has lectured on the topics of growth hormone, pituitary issues and endocrinology at countless seminars, workshops, and symposiums around the globe. He is revered by all in his field. *See*, Melmed Decl., Ex. A ("Melmed CV").

137. Dr. Madoff is a clinical endocrinologist, having been in full time endocrine practice since 1989. He is an Assistant Professor of Medicine at The John Hopkins University School of Medicine where he has been teaching since 1987. He also serves as the Director at the Woodholme Center for Diabetes and Endocrine Disorders in Pikesville, Maryland. His internship and residency in Internal Medicine and fellowship in Endocrinology and Metabolism were at John Hopkins Hospital in Baltimore, Maryland. His clinical training and years of patient care in the field of

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

endocrinology provide him with a high level of expertise in the area of growth hormone. *See*, Madoff Decl., Ex. A ("Madoff CV").

138. Dr. Melmed and Dr. Madoff were each tasked with determining: (a) whether SeroVital can increase HGH by 682%; and (b) whether SeroVital is associated with wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger, as advertised by Defendants. *See*, Melmed Decl., Ex. B ("Melmed Report"); Madoff Decl., Ex. B ("Madoff Report").

139. Based on the relevant peer-reviewed scientific literature and research on growth hormone, their extensive personal and clinical research experience working in the field of endocrinology and growth hormone, and their careful reviews of all information available regarding SeroVital, including the product packaging, website, infomercial, excerpts from purported studies, and U.S. patents, Dr. Melmed and Dr. Madoff each concluded SeroVital (and therefore the Substantially Similar Products) cannot increase HGH levels by 682% nor can the Products lead to the anti-aging benefits claimed by Defendants, including, wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger. *See,* Melmed Report at pp. 1-2, 9-12; Madoff Report at pp. 7-11, 14-16.

140. Dr. Melmed and Dr. Madoff each further concluded that were SeroVital (and therefore the Substantially Similar Products) to work as advertised, i.e., raise HGH by 682%, it would subject users to significant adverse health risks. *See,* Melmed Report at pp. 2, 6-8; Madoff Report at p. 16.

### 1. False Advertising Claim #1: Increased HGH Levels

141. Defendants formulated the Products in an identical way, as each Product contains the same five amino acids and one herb. Each capsule of each Product contains:

    a.    374.83 mg L-lysine

-72-

1    b.  181.38 mg L-arginine

2    c.  0.25 mg L-glutamine

3    d.  170.93 mg L-pyroglutamic acid (oxy-proline)

4    e.  0.25 mg N-acetyl L-cysteine

5    f.  0.125 mg Schizonepta (aerial parts) powder

6  142. Oral amino acids, including those contained in the Products' formulation,

7 cannot sustain increased HGH levels. *See,* Melmed Report at p. 9.

8  143. The literature for orally administered amino acids shows no consistent

9 effects on HGH levels, and none have reported clinical benefits. *Id.*

10  144. Most published clinical studies regarding the effects of oral amino acids

11 show no significant HGH increase, some show flat and other actually show HGH

12 suppression. *See,* Melmed Report at p. 9, Table 3. In the few studies when HGH has

13 been reported to rise, it is transient, short-lived, very modest in magnitude, and most

14 importantly, required greater amounts of oral amino acids than are contained in the

15 SeroVital formulation.

16  145. None of the ingredients in the Products—neither individually, nor as

17 formulated—can increase HGH levels in the human body.

18    a.  The only active ingredient in the Products is L-arginine. The

19      amount of L-arginine contained in the Products (181 mg per

20      capsule) is *so low,* even at the recommended 4 capsule dosage, it

21      would have no effect on HGH levels at all. *See,* Melmed Report at

22      p. 9 ¶1. Lowest oral amino acid doses reported to transiently

23      increase GH in all the heterogenous studies are 3 to 9 grams daily.

24      *Id*. The Products contain 10 to 100-fold lower concentrations of

25      effective oral doses. *Id.* The Products' low doses are proven to have

26      no effect on GH. *Id.* Even if a healthy individual would ingest 4

27      capsules of SeroVital (as well as the Substantially Similar

28      Products), the amount of active amino acid ingredient, particularly

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

arginine, would still be below 3 grams—the lowest minimal dose required for any effect at all. *See,* Melmed Report, Table 3 [any dosage under 3 grams has been shown in all published studies to have <u>no effect</u> on HGH].

b.    <u>Lysine and Arginine</u>: The amount of lysine and arginine in the Products cannot increase HGH levels in the body. *See,* Ex. 1: Melmed Report at p. 9, Table 3; s*ee also,* Isidori, A. *et al.*, *A study of growth hormone release in man after oral administration of amino acids.* CURR. MED. RES. OPIN. 1981; 7(7):475-81; Corpas, E. *et al.*, *Oral arginine-lysine does not increase growth hormone or insulin-like growth factor in old men.* J. GERONTOL. 1993 Jul; 48(4):M128-33; da Silva *et al.*, *Hormonal response to L-argine supplementation in physically active individuals.* Food Nutr Res. 2014 Mar. 25;58; Fayh AP *et al.*, *Effect of L-arginine supplementation on secretion of growth hormone and insulin like growth factor in adults.* ARG. BRAS. ENDOCRINOL. METABOL. 2007 June; 51(4): 587-92; Forbes SC *et al.*, *Oral L-arginine before resistance exercise blunts growth hormone in strength trained males.* INT. J. SPORT NUTR. EXERC. METAB. 2014 Apr; 24(2):236-44.

c.    <u>Glutamine</u>: The amount of glutamine in the Products cannot increase HGH levels in the body. The Products contains 1 mg of glutamine in the recommended 4 capsule dosage. To the extent glutamine has been found to increase HGH levels, it requires 2 grams of glutamine, dissolved in a liquid, to do so. *See,* Welbourne TC, *Increased plasma bicarbonate and growth hormone after oral glutamine load.* AM. J. CLIN. NUTR. 1995 May; 61(5):1058-61.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

d.    <u>Oxy-proline</u>: Studies have shown that oxy-proline decreases the non-enzymatic antioxidant defenses in the brain and causes reactive species production and protein oxidation. *See,* Pederzolli CD *et al.*, *Acute administration of 5-oxoproline induces oxidative damage to lipids and proteins and impairs antioxidant defenses in cerebral cortex and cerebellum of young rats.* METAB. BRAIN DIS. 2010 June; 25(2):145-54.

e.    <u>N-acety-cysteine</u>: No causal link to increased HGH levels in the body.

f.    <u>Schizonepeta</u>: No association to increased HGH levels in the body.

### 2.    *False Advertising Claim #2: Anti-Aging Benefits*

146.  Defendants claim: "It's clear that Growth Hormone has been associated with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades – not years, but *DECADES* – younger" and further claim the Products can produce these results.

147.  Human growth hormone is *not* associated with "increased sex drive, reduced wrinkles, increased bone strength, less fat or leaner muscles" in individuals with normal functioning pituitary glands. *See,* Melmed Report at p, 12; Madoff Report at p. 14, ¶¶2.4.1, 2.4.2, 2.4.3, 2.4.4; *see also,* Toogood, A.A. *et. Al.*, 1997, *Preservation of growth hormone pulsatility despite pituitary pathology, surgery, and irradiation*, J. Clin. Endocrinol. Metab. 82(7):2215.  No dose of oral amino acids, or even injectable growth hormone would "reverse" any related clinical conditions because there is no association to begin with.  *See,* Melmed Report at p. 12.

148.  The Products are incapable of reducing wrinkles, decreasing body fat, increasing lean muscle mass, strengthening bones, improving mood, heightening sex drive, or making users look and feel decades younger. *See,* Melmed Report at p, 12; Madoff Report at p. 14, ¶¶2.4.1, 2.4.2, 2.4.3, 2.4.4.

149.  The only clinical study which found any causal link between HGH and lean body mass benefits involved synthetic injections administered for 6 months on men over the age of 60. Rudman, Daniel, M.D., *et al*., *Effects of Human Growth Hormone in Men over 60 Years Old*, N. Eng. J. Med. 1990:323:1-6 (July 5, 1990). The study has since been debunked by the scientific community given that the subjects were not blinded and most of the stated "results" were not actually tested for.

150. In 1996, researchers at University of California at San Francisco, the Department of Veterans Affairs Medical Center, and the San Francisco Medical Center concluded in a randomized, controlled, double-blind clinical trial that HGH does not increase strength, systemic endurance, or cognitive function. Papadakis, Maxine A., M.D., *et al*., *Growth Hormone Replacement in Healthy Older Men Improves Body Composition but Not Functional Ability*, ANNALS INT. MED., 1996:124:8 (Apr. 15, 1996).

151. In 2002, researchers for the National Institute of Health and Johns Hopkins University Medical School evaluated the effects of HGH on body composition, strength, and endurance in a 26-week randomized, double-blind, placebo-controlled study and concluded that HGH cannot arrest the aging process and in fact caused serious side effects in over 40% of participants who used HGH. Blackman MR, *et al*., *Growth hormone and sex steroid administration in healthy aged women and men: a randomized controlled trial*. JAMA 2002; 288(18):2282-92 (Nov. 13, 2002).

152. In 2010, researchers at John Hopkins University School of Medicine concluded that levels of HGH do not positively or negatively affect aging or lifespan. Salvatori, R., M.D., *et al*., *Congenital HGH deficiency has no effect on normal lifespan*, J. CLIN. ENDOCRIN. & MET. (Jan. 2010).

153. In a comprehensive meta-analysis of 11 placebo-controlled trials involving 254 healthy participants, growth hormone showed an increase in free fatty acid levels and no change in muscle strength or exercise capacity. Melmed, Shlomo,

M.D., *Pathogenesis and Diagnosis of Growth Hormone Deficiency in Adults*, N. ENGL. J. MED. 380(26):2558-2559 (June 2019).

154. Even the United States Federal Trade Commission ("FTC") has concluded there exists no reliable evidence to support the claim that natural supplement-based oral products like the Products have the same effects as prescription HGH, which is always given by injection. The FTC has further stated it is not aware of any competent or reliable scientific evidence to support claims that pills and sprays increase the body's HGH levels and provide anti-aging benefits. Accordingly, since 2005, the FTC has sent warning letters to more than 90 internet operators that are selling alleged HGH enhancers for anti-aging benefits. *See* https://www.consumer.ftc.gov/articles/0118-anti-aging-products.

155. In fact, excess growth hormones can facilitate neoplastic (cancer cell) initiation and progression. Excess growth hormones can also inhibit tumor suppressors, thereby contributing to a proliferative microenvironment sustaining abnormalities such as colon polyps. A recent meta-analysis of 23 studies showed a standardized incidence ratio of 1.5 for cancer in patients with acromegaly, i.e., those whose pituitary glands produce too much HGH. Melmed, Shlomo, M.D., *Pathogenesis and Diagnosis of Growth Hormone Deficiency in Adults*, N. ENGL. J. MED. 380(26):2551-2560 (June 2019).

156. Current medical guidelines do not recommend growth hormone as an antiaging therapy because it can have unacceptable adverse effects in otherwise healthy persons with normal pituitary function. *Id.* at 2560.

157. Incredibly, upon information and belief, Defendants have sold tens of millions of dollars or more worth of the Products to California consumers based upon the false promises and misleading advertisements described herein.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

**E.   Defendants' Own Study Supports the Conclusion That SeroVital Formula Is No Different from A Placebo**

158. On their websites for the Products, Defendants cherry-pick information from a self-funded double-blind placebo-controlled study in an attempt to counter the mountain of evidence and scientific consensus that the Products cannot deliver the advertised benefits.[4] For example, although the SeroVital U.S. Patent indicates the original study included 12 males and 4 females, the abstract on the SeroVital website and packaging discusses results only from the 12 males. *See* Madoff Report at ¶¶2.2. In another example, the unlabeled figure on its website is not consistent with their description of the data. *Id.* And the claim that SeroVital leads to a 682% Mean Increase in HGH Levels "is based on a single value of HGH 15 minutes before and a single value of HGH two hours after the administration of Serovital, even though there were two GH levels assessed before and five GH levels assessed following Serovital ingestion." *Id.*

159. In fact, Defendants' study suggests that there is no difference between the Products and a placebo. AUC values provided in the abstract on the SeroVital website suggest that there is actually no difference in effect between placebo and the SeroVital formula on subsequent HGH levels. *See* Madoff Report at p. 10, ¶2.2.2.5. The probability of increased HGH after ingestion of the SeroVital formula is similar to a placebo (20.4 vs 19.67). *See,* Melmed Report at p. 11, ¶2(d)*;* Madoff Report at p. 10, ¶2.2.2.5. Given the overlapping co-efficient of variation (19.9-20.5 and 18.7-20.6) it is not possible to ascribe a statistically significant different to these values. *Id.*

160. Defendants are able to avoid the conclusion that the study demonstrates no statistically significant difference in overall levels over two hours compared to placebo, because it was not published in a peer-reviewed journal. As Dr. Madoff explains, [w]hen a study is accepted for publication in a high-quality journal, all of

---

[4] Each of the Products website refer to the same "placebo-controlled, double-blind study" reviewed and analyzed by Plaintiffs' experts.

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

the background materials, methods, and conclusions are rigorously reviewed by qualified fellow scientists." Here, to the contrary, there is no rigorous detailed description of the patients, procedures, and methods in SeroVital's abstract or Patent. *See* Madoff Report at ¶ 2.2.2.1. Instead, Defendants abstract is confusing, contains contradictions, and contains unlabeled figures that are impossible to interpret. *Id.* at ¶ 2.2.2.5.

161. Additionally, the purported increase shown by the study is so low and transient such that it could not support growth hormone bioactivity. In that regard, Defendants claim its purported study shows an increase of HGH from .017 to 1.33 ng/ml at 2 hours. This is so low, it is undetectable by most assays. *See,* Melmed Report at p. 11, ¶ 2(a). In addition, it is insufficient to increase liver IGF-I levels, which is vital, as IGF-I is the target growth factor for HGH. *Id.* at p. 11, ¶ 2(b). Absent evidence for increased IGF-I levels, any transient mild HGH increase will have no clinical impact. *Id.*

## V.   CLASS ACTION ALLEGATIONS

162. **National Class (RICO).** Plaintiffs brings this action on behalf of themselves and a class of "All persons who purchased the Products for personal use and not for resale during the time period May 9, 2013, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Products"

163. **California Class.** Plaintiffs also bring this action on behalf of themselves and a subclass of "All persons residing in California who purchased the Products for personal use and not for resale during the time period May 9, 2014, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Products."

164. **Numerosity.** The Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in the hundreds of thousands throughout California, and nationwide. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

165. **Commonality.** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

a.   Whether Defendants' conduct is in violation of RICO 18 U.S.C. § 1962(a), (c)-(d);

b.   Whether Defendants' conduct constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code Section 1750, *et seq.*;

c.   Whether Defendants used deceptive representations in connection with the sale of the Products in violation of Civil Code Section 1750, *et seq.*;

d.   Whether Defendants represented the Products have characteristics that they do not have in violation of Civil Code Section 1750, *et seq.*;

e.   Whether Defendants advertised the Products with the intent not to sell them as advertised in violation of Civil Code Section 1750, *et seq.*;

f.   Whether Defendants' advertising is untrue or misleading within the meaning of Business and Professions Code section 17500, *et seq.*;

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

g.    Whether Defendants knew or by the exercise of reasonable care should have known its packaging was and is untrue in violation of Business and Professions Code section 17500, *et seq.*;

h.    Whether Defendants' conduct is an unfair business act or practice within the meaning of Business and Professions Code section 17200, *et seq.*;

i.    Whether Defendants' conduct is a fraudulent business act or practice within the meaning of Business and Professions Code section 17200, *et seq.*;

j.    Whether Defendants' conduct is an unlawful business act or practice within the meaning of Business and Professions Code section 17200, *et seq.*;

k.    Whether Defendants breached an express warranty made to Plaintiffs and the Class;

l.    Whether Defendants' Products are efficacious, effective, and useful for causing "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles";

m.    Whether Plaintiffs and the Class suffered an ascertainable loss as a result of Defendants' misrepresentations;

n.    Whether Plaintiffs and the Class are entitled to restitution, and/or other monetary relief and, if so, the amount and nature of such relief.

166. **Adequacy.** Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained competent and experienced counsel in class action and other complex litigation.

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

167. **Typicality.** Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendants' false representations. Plaintiffs purchased SeroVital or GF-9 because of the claims by Defendants that it would provide the various anti-aging benefits described herein as a result of increased HGH levels. Plaintiffs relied on Defendants' representations and would not have purchased SeroVital (or the other Products) if they had known that the advertising as described herein was false.

168. **Rule 23(b)(3) Superiority.** A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for Class members to prosecute their claims individually.

169. **Rule 23(b)(3) Manageability.** The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

170. **Rule 23(b)(2) Injunction/Declaratory Relief**. Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

171. **Rule 23(b)(3) Superiority.** Absent a class action, Defendants will likely retain the benefits of their wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class

members will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of their ill-gotten gains.

172. **Pre-Litigation Demand—SanMedica.** On October 1, 2019, written notice was sent to Defendant SanMedica International, LLC via certified U.S. mail pursuant to Civil Code section 1750, *et seq.*, which set forth the claims of the Class concerning the SeroVital's false, misleading, deceptive, unlawful, unfair, and fraudulent claims. *See* Exhibit 3.

## VI.

## <u>COUNT ONE</u>

**Conduct and Participation in a RICO Enterprise Through a Pattern of Racketeering Activity**

**(Violation of Racketeer Influenced and Corrupt Organization Act, codified at 18 U.S.C. § 1962(a), (c)-(d))**

***On Behalf of Plaintiffs and the Nationwide Class Against All Defendants***

173. Plaintiffs repeat and reallege all allegations of the previous paragraphs, and incorporate the same as if set forth herein at length.

174. Defendants are individuals and/or entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Defendants Basic Research, LLC, BR Cos, LLC, Basic Research Holdings, LLC, Basic Research Intermediate, LLC, SanMedica International, LLC, Sierra Research Group, LLC, Limitless Worldwide, LLC, Novex Biotech, LLC, Bydex Management, LLC, Majestic Media, LLC, CRM Specialists, LLC, and Defendants Gay, Daines, Blackett, Humphries, and Friedlander.

175. Section 1962(a) makes it:

unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

176.  Section 1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. §1962(c).

177.  Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(a) and (c) among other provisions. 18 U.S.C. § 1962(d).

178.  Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

179.  Beginning before the Class Period and continuing to this day, Defendants have unlawfully increased their profits by making fraudulent claims that the Products—under the guise of multiple different brand and entity names—increase HGH and provide anti-aging benefits when they do not. The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association in fact of persons, including each Defendant and other unnamed co-conspirators. That association in fact was structured by various contracts and non-contractual relationships between the Defendants, by which Defendants assumed different roles in agreeing to carry out a mail and wire fraud scheme to sell the Products under different brands and entities and produce misleading self-funded studies to deceive consumers into thinking the Products provide anti-aging benefits by increasing HGH when, in fact, the Products are no different from a placebo.

180.  The members of the RICO enterprise all share a common purpose: to enrich themselves at Class members' expense by maximizing Defendants' revenues through fraudulent sales of the Products. As set forth herein, Defendants benefitted

financially from their scheme to defraud Plaintiffs and the Class members, including by making false representations that the Products would increase HGH and provide anti-aging benefits, and even going so far as to create their own self-funded studies to substantiate such baseless claims to sell the Products, which Defendants would not have done but for the existence of the scheme.

181. This RICO enterprise has existed for almost 30 years and continues to expand and operate pursuant to agreements entered into between and amongst Defendants and other unnamed co-conspirators. The RICO enterprise has functioned as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

182. The enterprise was characterized by Defendants' pattern of false representations and omissions, made by Defendants' marketing and research and development teams to consumers. These false representations and omissions were designed to induce consumers to purchase costly products that are no different than placebos. This pattern of false representations was disseminated to potential purchasers of the Products in California and around the country, by Defendants based in Utah and Delaware, under the direction and on behalf of Defendants in Utah. The dissemination typically was done using interstate telephone wires.

183. The true nature of Defendants' Products was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiffs and the Class members.

184. Defendants profited from the enterprise, and Plaintiffs and the Class members suffered because the enterprise significantly increased the cost of the Products that worked no different than a placebo. Defendants used the proceeds from this scheme to advance the scheme by funding and operating their marketing machine, including through the use of the mails and interstate wires to sell the Products, providing consumers with misrepresentative information, including via email all over

THIRD AMENDED CLASS ACTION COMPLAINT

interstate wireline communications systems, and obtaining sales revenues via documents and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to the members of the Class, as described throughout.

185. Defendants' scheme was reasonably calculated to deceive Plaintiffs and Class members, all of whom are of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the effectiveness of worthless placebos. Plaintiffs and Class members would not have purchased the Products but for the illegal racketeering scheme operated by Defendants.

186. Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiffs and the Class, and each participated in the enterprise as follows:

187. Defendants Basic Research, LLC, BR Cos, LLC, Basic Research Holdings, LLC, and Basic Research Intermediate, LLC (collectively "Basic Research") direct, control, and participate in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to developing, manufacturing, and marketing scores of cosmetics, nutritional supplements, and dietary supplements (including the Products) that are marketed under the names of nearly a dozen limited liability companies that have been formed by Defendants. Throughout the Class Period, these Defendants oversee shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. In connection with all Defendants, acting from Utah, these Defendants used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities. Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

188.  Defendant Gay directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using his role as CEO of Basic Research to exercise complete dominion and control over Basic Research, SanMedica, and Sierra Research, such that these companies are his alter ego, a sham, façade, and mere instrumentality for his personal benefit, and he has disregarded and abused the corporate form and structure of these companies, including with response to the manufacture, marketing, advertisement, promotion, distribution, and sale of the Products.  Throughout the Class Period, Gay oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Gay, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.  Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

189.  Defendant Daines directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role as owner, former Chief Marketing Officer, and sister of CEO Gay to have final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants. Throughout the Class Period, Daines oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Daines, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were

marketed by different entities.   Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

190.   Defendant Blackett directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role in marketing of Bydex Management, as well as owner and sister of CEO Gay to have final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants. Throughout the Class Period, Blackett oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Blackett, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.   Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

191.   Defendant Humphries directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role in marketing purchasing media and customer service, as well as owner and sister of CEO Gay to have final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants. Throughout the Class Period, Humphries oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Humphries, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.  Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

192.  Defendant Friedlander directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using his role as a named inventor and marketing consultant to have final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants. Throughout the Class Period, Friedlander oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Humphries, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.  Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

193.  Defendant SanMedica International, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including manufacturing, distributing, advertising, and selling SeroVital. Throughout the Class Period, SanMedica oversaw shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale.

194.  Defendant Sierra Research Group, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including

acting as the research and development arm for Basic Research and the Products. Throughout the Class Period, Sierra Research Group oversaw the dissemination of so-called scientific substantiation from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Sierra Research Group used the mail and interstate wires to conduct research in California and to present abstracts and their research to further their goal of saturating the market with the idea that oral amino acids provide an anti-aging miracle.

195.  Defendant Limitless Worldwide, LCC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including manufacturing, distributing, advertising, and selling Thrive and SeroDyne. Throughout the Class Period, Limitless Worldwide oversaw shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale.

196.  Defendant Novex Biotech, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including manufacturing, distributing, advertising, and selling GF-9. Throughout the Class Period, Novex Biotech oversaw shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale.

197.  Defendant Bydex Management, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including as a purported leasing company that is listed as the employer on the paychecks of all of Defendant Basic Research's employees. Throughout the Class Period, Bydex

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

Management oversaw shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Acting from Utah, Bydex Management used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.  Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

198.  Defendant Majestic Media, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including the marketing and advertising division of the Basic Research Enterprise. Throughout the Class Period, Majestic Media marketed and advertised the fraudulently advertised Products from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

199.  Defendant CRM Specialists, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including acting as the sales and customer service division of the Basic Research Enterprise. Throughout the Class Period, CRM Specialists sold and serviced customers for the fraudulently advertised Products from the BR Headquarters in Utah to consumers in California and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

200.  During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three (3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this Third Amended Complaint.

201.  Beginning at an exact date unknown to Plaintiffs, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

202.  The acts set below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiffs and the Class for the benefit of Defendants. Each Racketeering Act involved the same or similar methods of commission and participants and affected the Class similarly.

203.  Without the repeated predicate acts, the ability to conduct their fraud using the mail and telecommunications wires, and the money laundering, Defendants' business would not have succeeded.

204.  The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiffs and the Class to purchase the Products.

205.  Defendants' wrongful conduct has caused injury to Plaintiffs and the Class, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiffs, the Class, and the general public.

206.  Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

207.  To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including mail fraud and wire fraud.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

208. Defendants' ongoing pattern of racketeering activity has injured and continues to injure Plaintiffs and the Class. Defendants' pattern of mail fraud and wire fraud was the proximate cause of the injuries suffered by Plaintiffs and the Class.

A. **Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

209. Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs and the Class out of money, in reliance on the mail. Defendants committed these acts with the intent to defraud Plaintiffs and the Class.

210. Defendants used the mail for the purpose of executing the fraudulent scheme herein.

211. Specifically, Defendants agreed to each of the acts of mail fraud described throughout this Third Amended Complaint, and in particular, in paragraphs 108-116 *supra*. In addition, Defendants agreed to rely on the mail to distribute point-of-purchase advertisements and advertisements published in national print publications to advertise, label, offer for sale, sell, and distribute the Products by falsely claiming that the Products increase HGH and offer a multitude of anti-aging benefits. In such advertisements Defendants also falsely assert that their clinical trial supports such claims.

212. In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants either individually or in combination with themselves, used and caused to be used the U.S. mail by both placing and causing to be placed letters, marketing and sales materials, advertisements, agreements and other matters in depositories and by removing or causing to be removed letters and other mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. § 1341.

213. Defendants could not have furthered their fraud without the use of the mail. For example, because Defendants sought to advertise in major print publications, they required the mail to distribute misleading advertisements to the

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

various states, including California. For these reasons, use of the mail to conduct the fraudulent activity was necessary and inevitable.

**B.     Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

214.  Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiffs and the Class out of money, in reliance on interstate wires. Defendants committed these acts with the intent to defraud Plaintiffs and the Class.

215.  Specifically, Defendants agreed to each of the acts of wire fraud described throughout this Third Amended Complaint, and in particular, in paragraphs 108-116 *supra*. In addition, Defendants agreed to rely on interstate wires to disseminate advertisements via search engines and other online platforms to further the goals of the enterprise. Defendants knew that these advertisements were targeted to drive product sales by falsely claiming that the Products increase HGH and offer a multitude of anti-aging benefits. In such advertisements Defendants also falsely assert that their clinical trial supports such claims.

216.  Additionally, Defendants agreed that Defendants should facilitate communications with class members over interstate wires in furtherance of the fraud. Consumers nationwide contacted Defendants via online platforms to inquire about the Products and facilitate purchases.

217.  In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants either individually or in combination with themselves, used or caused to be used interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343. Defendants' use of interstate wire facilities included advertising the Products through television commercials and Internet postings, as well as interstate

THIRD AMENDED CLASS ACTION COMPLAINT

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

telephone calls from Plaintiffs and Class members who were seeking to purchase the product and/or complain about its non-performance.

218.  Defendants could not have furthered their fraud without the ability to use the telecommunications to share information with consumers and retailers nationwide. Because Defendants needed to communicate with consumers and retailers around the country, use of interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable.

## VII.

## COUNT TWO

**Violation of California Consumers Legal Remedies Act**

**California Civil Code sections 1750, *et seq.***

***On Behalf of Plaintiffs and the California Subclass Against All Defendants***

219.  Plaintiffs repeat and reallege all allegations of the previous paragraphs, and incorporate the same as if set forth herein at length.

220.  This cause of action is brought pursuant to Civil Code Section 1750, *et seq.*, the Consumers Legal Remedies Act ("CLRA"), on behalf of a Class consisting of "All persons who purchased the Products in the State of California for personal use and not for resale during the time period May 9, 2014, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Product."

221.  The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices" in connection with a sale of goods.

222. The practices described herein, specifically Defendants' labeling, advertising, and sale of the Products, were intended to result and did result in the sale of the Products to the consuming public and violated and continue to violate the CLRA by (1) using deceptive representations in connection with the Products; (2) representing the Products have characteristics that it does not have; (3) advertising

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

-95-

and labeling the Products with intent not to sell it as advertised and labeled; and (4) representing that the Products have been supplied in accordance with a previous representation as to the efficacy of the Products, when it has not.

223.  The policies, acts, and practices described herein were intended to result in the sale of the Products to the consuming public and violated and continue to violate Section 1770(a)(5) of the CLRA by representing that the Products have characteristics, benefits, uses, or quantities which it does not have.

224.  The policies, acts, and practices described herein were intended to result in the sale of the Products to the consuming public and violated and continue to violate Section 1770(a)(7) of the CLRA by representing that the Products are of a particular standard, quality, grade, or style, when it is of another.

225.  The policies, acts, and practices described herein were intended to result in the sale of the Products to the consuming public and violated and continue to violate Section 1770(a)(9) of the CLRA by advertising the Products with the intent not to sell them as advertised.

226. Defendants fraudulently deceived Plaintiffs and the Class, and intentionally misrepresented and concealed material facts from Plaintiffs and the Class. Said misrepresentations and concealment were done with the intention of deceiving Plaintiffs and the Class and depriving them of their legal rights and money.

227. Defendants knew or should have known, through the exercise of reasonable care, that the Products do not cause the benefits and results contained in their advertisements.

228. Defendants' actions as described herein were done with conscious disregard of Plaintiffs' rights and Defendants were wanton and malicious in its concealment of the same.

229. Defendants' advertising of the Products was a material factor in Plaintiffs' and the Class's decisions to purchase the Products, as it concerns the ability of the Products to cause anti-aging benefits and increased HGH levels. Defendants'

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

marketing and packaging materials were intended to, and did, induce Plaintiffs and members of the Class to rely upon Defendants' representations that the Products would provide anti-aging benefits and increased HGH levels. These representations were a substantial factor in causing Plaintiffs and the Class to purchase the Products.

230.  Based on Defendants' advertising of the Products, Plaintiffs and the Class reasonably believed they would receive increased HGH levels and anti-aging benefits.

231.  At the time Plaintiffs and the Class purchased the Products, they were unaware of the fact that the Products were not effective for its intended uses and was in fact no more effective than a placebo.

232.  Had they known that Defendants were making misrepresentations about the Products' ability to cause elevated HGH levels and anti-aging benefits, Plaintiffs and the Class would not have purchased the Products.

233.  Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendants' false representations.

234.  **ALTER EGO ALLEGATIONS:** As detailed above, *supra* Section II.F, each Individual Defendant and each Operations Entity Defendant was the alter ego of each other Defendant. Accordingly, each Individual Defendant and Defendant Basic Research is jointly and severally liable for the damages proximately caused by each other Defendant's wrongful conduct. There is a unity of interest and ownership between amongst the Individual Defendants and the Basic Research affiliates they own and operate. The Individual Defendants and Defendant Basic Research commingled funds and/or other assets; failed to segregate funds and/or assets; they diverted funds and/or assets to unauthorized uses; they treated each other Defendant's assets as their own; they failed to obtain requisite authority before acting; held each other Defendant out as liable for the debts of the other Defendant; they failed to maintain adequate and separate records; shared identical equitable and/or legal owners; they exercised domination and control over each other Defendant; shared identical officers, directors, supervisors, and/or managers; they were wholly owned

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

by the same individual or group of individuals who share familial and/or marital ties; used the same office or business location, equipment, and/or computer network, among other things; employed the same employees and/or attorney; failed to adequately capitalize the business and/or company; they used the entity(ies) as mere shell(s), instrumentality(ies), and/or conduit(s) for a single venture, the business of an individual, or the business of another entity; concealed and misrepresented the identity of the responsible ownership, management, and/or financial interest; concealed personal or unauthorized business activities; disregarded legal formalities; failed to maintain arm's length relationships amongst each other Defendant; used each other Defendant to procure labor, services, goods, and/or monies of another; diverted assets to the detriment of creditors; manipulated assets and liabilities to concentrate assets in one or more Defendant(s) and liabilities in the other Defendant(s); contracted with another with the intent to avoid performance by use of the other Defendant as a shield against its(their) liability; used each other Defendant as a subterfuge of illegal transactions; and/or formed and/or used each other Defendant to transfer to it(them) or away from it(them) the existing liability.

235. By letter dated October 1, 2019, Plaintiff Pizana advised Defendant SanMedica of their false and misleading claims pursuant to California Civil Code Section 1782(a). **Exhibit 3**. Because the letter was sent to the BR Headquarters, where every Defendant in this action regularly transacts business, every Defendant received the letter was put on knowledge of the claims. All Defendants failed to rectify or repair its false and misleading advertising or to meet any demands of the letter. Plaintiff brings this action for damages, in addition to injunctive relief, under the CLRA.

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

# VIII.

## COUNT THREE

### Violation of California False Advertising Law

### California Business & Professions Code sections 17500, *et seq.*

### *On Behalf of the Plaintiffs and California Subclass Against All Defendants*

236. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, and incorporate the same as if set forth herein at length.

237. This cause of action is brought pursuant to Business and Professions Code § 17500, *et seq.*, on behalf of a Class consisting of "All persons who purchased the Products in the State of California for personal use and not for resale during the time period May 9, 2014, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Products."

238. California's False Advertising Law, California Business and Professions Code Section 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, in any advertising device or in any other manner or means whatever, including over the Internet, any statement, concerning personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

239. In their advertising of the Products, Defendants made untrue and misleading statements regarding the Products' ingredients and benefits as discussed herein.

240. Defendants controlled the advertising and labeling of the Products. Defendants knew or should have known, through the exercise of reasonable care that their representations that the SeroVital could increase HGH levels and thereby deliver

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

anti-aging benefits as described herein were untrue and misleading.

241.  Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented constitutes unfair competition, unfair, deceptive, untrue, or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Section 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17500.

242.  Pursuant to Business and Professions Code Section 17535, Plaintiffs and the members of the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising the sale and use of the Products.  Likewise, Plaintiffs and the members of the Class seek an order requiring Defendants to disclose such misrepresentations, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

243.  Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendants' false representations.  Indeed, Plaintiffs purchased the SeroVital in reliance of the claims by Defendants that the SeroVital were of the quality represented by Defendants' packaging and advertising. Plaintiffs would not have purchased SeroVital or the Products if they had known that the claims and advertising as described herein were false.

244.  **ALTER EGO ALLEGATIONS:** As detailed above, *supra* Section II.F, each Individual Defendant and each Operations Entity Defendant was the alter ego of each other Defendant. Accordingly, each Individual Defendant and Defendant Basic Research is jointly and severally liable for the damages proximately caused by each other Defendant's wrongful conduct. There is a unity of interest and ownership between amongst the Individual Defendants and the Basic Research affiliates they

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

own and operate. The Individual Defendants and Defendant Basic Research commingled funds and/or other assets; failed to segregate funds and/or assets; they diverted funds and/or assets to unauthorized uses; they treated each other Defendant's assets as their own; they failed to obtain requisite authority before acting; held each other Defendant out as liable for the debts of the other Defendant; they failed to maintain adequate and separate records; shared identical equitable and/or legal owners; they exercised domination and control over each other Defendant; shared identical officers, directors, supervisors, and/or managers; they were wholly owned by the same individual or group of individuals who share familial and/or marital ties; used the same office or business location, equipment, and/or computer network, among other things; employed the same employees and/or attorney; failed to adequately capitalize the business and/or company; they used the entity(ies) as mere shell(s), instrumentality(ies), and/or conduit(s) for a single venture, the business of an individual, or the business of another entity; concealed and misrepresented the identity of the responsible ownership, management, and/or financial interest; concealed personal or unauthorized business activities; disregarded legal formalities; failed to maintain arm's length relationships amongst each other Defendant; used each other Defendant to procure labor, services, goods, and/or monies of another; diverted assets to the detriment of creditors; manipulated assets and liabilities to concentrate assets in one or more Defendant(s) and liabilities in the other Defendant(s); contracted with another with the intent to avoid performance by use of the other Defendant as a shield against its(their) liability; used each other Defendant as a subterfuge of illegal transactions; and/or formed and/or used each other Defendant to transfer to it(them) or away from it(them) the existing liability.

# IX.

## COUNT FOUR

### Violation of California Unfair Competition Law

### California Business & Professions Code sections 17200, *et seq.*

### *On Behalf of Plaintiffs and the California Subclass Against All Defendants*

245. Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

246. This cause of action is brought pursuant to Business and Professions Code Section 17200, *et seq.*, on behalf of a Class consisting of "All persons who purchased the Products in the State of California for personal use and not for resale during the time period May 9, 2014, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Products."

### A.   "Unfair" Prong

247. Under California's Unfair Competition Law, California Business and Professions Code Section 17200, *et seq.*, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California,* 142 Cal. App. 4th 1394, 1403 (2006).

248. Defendants' action of falsely advertising the purported HGH increasing and anti-aging benefits of the Products do not confer any benefit to consumers.

249. Defendants' action of falsely advertising the purported HGH increasing and anti-aging benefits of the Products cause financial injuries to consumers because they do not receive the anti-aging benefits commensurate with their reasonable expectation.

250. Consumers cannot avoid any of the injuries caused by Defendants' false advertising.

251. Accordingly, the injuries caused by Defendants' false advertising activities outweigh any benefits to consumers.

252. Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1169 (9th Cir. 2012).

253. Here, Defendants' false advertising activities have no utility and financially harm consumers. Thus, the utility of Defendants' conduct is vastly outweighed by the gravity of harm.

254. Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 735 (9th Cir. 2007).

255. The California Legislature has passed several laws consistent with its policy against false and misleading advertising, including the CLRA and the FAL. Thus, the unfairness of Defendants' advertising and labeling of the Products are tethered to the California Legislature's policy against false and misleading advertising.

256. Defendants' advertising and packaging of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct.

257. Defendants knew or should have known of its unfair conduct.

258. As alleged in the preceding paragraphs, the misrepresentations by Defendants detailed above constitute an unfair business practice within the meaning of California Business and Professions Code Section 17200.

259. There existed reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

260. All of the conduct alleged herein occurs and continues to occur in

THIRD AMENDED CLASS ACTION COMPLAINT

Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

261. In addition, Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue, or misleading advertising, and an unlawful business practice within the meaning of Business & Professions Code Section 17200.

262. Pursuant to Business & Professions Code Section 17203, Plaintiffs and the members of the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of advertising the sale and use of the Products. Likewise, Plaintiffs and the members of the Class seek an order requiring Defendants to disclose such misrepresentations, and additionally request an order awarding Plaintiffs restitution of the money wrongfully acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

263. Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendants' unfair conduct. Plaintiffs would not have purchased the SeroVital had they known the claims and advertising as described herein were false.

264. **ALTER EGO ALLEGATIONS:** As detailed above, *supra* Section II.F, each Individual Defendant and each Operations Entity Defendant was the alter ego of each other Defendant. Accordingly, each Individual Defendant and Defendant Basic Research is jointly and severally liable for the damages proximately caused by each other Defendant's wrongful conduct. There is a unity of interest and ownership between amongst the Individual Defendants and the Basic Research affiliates they own and operate. The Individual Defendants and Defendant Basic Research commingled funds and/or other assets; failed to segregate funds and/or assets; they diverted funds and/or assets to unauthorized uses; they treated each other Defendant's assets as their own; they failed to obtain requisite authority before acting; held each

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

other Defendant out as liable for the debts of the other Defendant; they failed to maintain adequate and separate records; shared identical equitable and/or legal owners; they exercised domination and control over each other Defendant; shared identical officers, directors, supervisors, and/or managers; they were wholly owned by the same individual or group of individuals who share familial and/or marital ties; used the same office or business location, equipment, and/or computer network, among other things; employed the same employees and/or attorney; failed to adequately capitalize the business and/or company; they used the entity(ies) as mere shell(s), instrumentality(ies), and/or conduit(s) for a single venture, the business of an individual, or the business of another entity; concealed and misrepresented the identity of the responsible ownership, management, and/or financial interest; concealed personal or unauthorized business activities; disregarded legal formalities; failed to maintain arm's length relationships amongst each other Defendant; used each other Defendant to procure labor, services, goods, and/or monies of another; diverted assets to the detriment of creditors; manipulated assets and liabilities to concentrate assets in one or more Defendant(s) and liabilities in the other Defendant(s); contracted with another with the intent to avoid performance by use of the other Defendant as a shield against its(their) liability; used each other Defendant as a subterfuge of illegal transactions; and/or formed and/or used each other Defendant to transfer to it(them) or away from it(them) the existing liability..

**B.**   **"Fraudulent" Prong**

265. California Business and Professions Code Section 17200, *et seq.,* considers conduct fraudulent and prohibits said conduct if it is likely to deceive members of the public. *Bank of Wes v. Superior Court*, 2 Cal. 4th 1254, 553 (1992).

266. Members of the public base their purchasing decisions on the truthfulness of representations made on the packages and labels and other advertising of consumers products.

267. Defendants' conduct of advertising and labeling the Products in a false,

deceptive, and misleading manner is likely to deceive members of the public.

268. Defendants' advertising and packaging of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes fraudulent conduct.

269. Defendants knew or should have known of their fraudulent conduct.

270. As alleged in the preceding paragraphs, the misrepresentations by Defendants detailed above constitute a fraudulent business practice in violation of California Business and Professions Code Section 17200.

271. Defendants had reasonable available alternatives to further its legitimate business interests, other than the conduct described herein.

272. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

273. Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of false, deceptive, and misleading advertising. Likewise, Plaintiffs and the Class seek an order requiring Defendants to disclose such misrepresentations, and additionally request an order awarding Plaintiffs restitution of the money wrongfully acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

274. Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendants' fraudulent conduct. Plaintiffs would not have purchased SeroVital or the Products if they had known the representations were false.

275. **ALTER EGO ALLEGATIONS:** As detailed above, *supra* Section II.F, each Individual Defendant and each Operations Entity Defendant was the alter ego of each other Defendant. Accordingly, each Individual Defendant and Defendant Basic Research is jointly and severally liable for the damages proximately caused by each

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

other Defendant's wrongful conduct. There is a unity of interest and ownership between amongst the Individual Defendants and the Basic Research affiliates they own and operate. The Individual Defendants and Defendant Basic Research commingled funds and/or other assets; failed to segregate funds and/or assets; they diverted funds and/or assets to unauthorized uses; they treated each other Defendant's assets as their own; they failed to obtain requisite authority before acting; held each other Defendant out as liable for the debts of the other Defendant; they failed to maintain adequate and separate records; shared identical equitable and/or legal owners; they exercised domination and control over each other Defendant; shared identical officers, directors, supervisors, and/or managers; they were wholly owned by the same individual or group of individuals who share familial and/or marital ties; used the same office or business location, equipment, and/or computer network, among other things; employed the same employees and/or attorney; failed to adequately capitalize the business and/or company; they used the entity(ies) as mere shell(s), instrumentality(ies), and/or conduit(s) for a single venture, the business of an individual, or the business of another entity; concealed and misrepresented the identity of the responsible ownership, management, and/or financial interest; concealed personal or unauthorized business activities; disregarded legal formalities; failed to maintain arm's length relationships amongst each other Defendant; used each other Defendant to procure labor, services, goods, and/or monies of another; diverted assets to the detriment of creditors; manipulated assets and liabilities to concentrate assets in one or more Defendant(s) and liabilities in the other Defendant(s); contracted with another with the intent to avoid performance by use of the other Defendant as a shield against its(their) liability; used each other Defendant as a subterfuge of illegal transactions; and/or formed and/or used each other Defendant to transfer to it(them) or away from it(them) the existing liability..

**C.   "Unlawful" Prong**

276. California Business and Professions Code Section 17200, *et seq.,* identifies

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

277. Defendants' advertising and labeling of the Products, as alleged in the preceding paragraphs, violates California Civil Code Section 1750, *et seq.* and California Business and Professions Code Section 17500, *et seq.*

278. Defendants' advertising and labeling of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes unlawful conduct.

279. Defendants participation in racketeering scheme to market the Products, as alleged in the preceding paragraphs, violates 18 U.S.C. § 1962(b) and (d).

280. Defendants knew or should have known of its unlawful conduct.

281. As alleged in the preceding paragraphs, the misrepresentations by Defendants detailed above constitute a fraudulent business practice in violation of California Business and Professions Code Section 17200.

282. Defendants had reasonable available alternatives to further its legitimate business interests, other than the conduct described herein.

283. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

284. Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of false, deceptive, and misleading advertising. Likewise, Plaintiff and the Class seek an order requiring Defendants to disclose such misrepresentations, and additionally request an order awarding Plaintiffs restitution of the money wrongfully acquired by Defendants by means of responsibility attached to Defendants' failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

285. Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendants' fraudulent conduct. Plaintiffs would not have purchased SeroVital or the Products if they had known the representations were false.

286. **ALTER EGO ALLEGATIONS:** As detailed above, *supra* Section II.F, each Individual Defendant and each Operations Entity Defendant was the alter ego of each other Defendant. Accordingly, each Individual Defendant and Defendant Basic Research is jointly and severally liable for the damages proximately caused by each other Defendant's wrongful conduct. There is a unity of interest and ownership between amongst the Individual Defendants and the Basic Research affiliates they own and operate. The Individual Defendants and Defendant Basic Research commingled funds and/or other assets; failed to segregate funds and/or assets; they diverted funds and/or assets to unauthorized uses; they treated each other Defendant's assets as their own; they failed to obtain requisite authority before acting; held each other Defendant out as liable for the debts of the other Defendant; they failed to maintain adequate and separate records; shared identical equitable and/or legal owners; they exercised domination and control over each other Defendant; shared identical officers, directors, supervisors, and/or managers; they were wholly owned by the same individual or group of individuals who share familial and/or marital ties; used the same office or business location, equipment, and/or computer network, among other things; employed the same employees and/or attorney; failed to adequately capitalize the business and/or company; they used the entity(ies) as mere shell(s), instrumentality(ies), and/or conduit(s) for a single venture, the business of an individual, or the business of another entity; concealed and misrepresented the identity of the responsible ownership, management, and/or financial interest; concealed personal or unauthorized business activities; disregarded legal formalities; failed to maintain arm's length relationships amongst each other Defendant; used each other Defendant to procure labor, services, goods, and/or monies of another; diverted assets to the detriment of creditors; manipulated assets and liabilities to concentrate

assets in one or more Defendant(s) and liabilities in the other Defendant(s); contracted with another with the intent to avoid performance by use of the other Defendant as a shield against its(their) liability; used each other Defendant as a subterfuge of illegal transactions; and/or formed and/or used each other Defendant to transfer to it(them) or away from it(them) the existing liability..

## X.   **PRAYER FOR RELIEF**

287. WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the members of the Class and California Subclass defined herein, pray for judgment and relief on all Causes of Action as follows:

    a.    For an order certifying the Class and California Subclass, appointing Plaintiffs as representatives, and designating Plaintiffs' counsel as counsel for the Class and California Subclass;

    b.    For all forms of relief set forth above;

    c.    Damages, including treble damages, against Defendants in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum rate allowable by law on any amounts awarded;

    d.    Restitution and/or disgorgement in an amount to be determined at trial;

    e.    For an order enjoining Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, from pursuing the policies, acts, and practices complained of herein;

    f.    For an order enjoining Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any HGH product to not provide to others the means and

CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265

THIRD AMENDED CLASS ACTION COMPLAINT

instrumentalities to pursue the policies, acts, and practices complained of herein;

g.     Punitive damages;

h.     For pre-judgment interest from the date of filing this suit;

i.      Reasonable attorney fees and costs, pursuant to, without limitation, the California Legal Remedies Act and California Civil Code of Procedure § 1021.5; and

j.      Such other and further relief as the Court may deem necessary or appropriate.

DATED: May 18, 2022                          Respectfully Submitted,


/s/ Annick M. Persinger
**TYCKO & ZAVAREEI, LLP**
Annick M. Persinger

**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson
Katherine A. Bruce
Kelsey J. Elling

*Attorneys for Plaintiffs Raul Pizana, Maureen Hobbs, Charles Berglund, Jeanette Mills, Erica LaRoche, Ann Marie Lynch, Sal Munoz, Keith Barnes, and the Proposed Classes*

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury for all causes of action and issues so triable.

DATED: May 18, 2022                          Respectfully Submitted,


/s/ Annick M. Persinger
**TYCKO & ZAVAREEI, LLP**
Annick M. Persinger

*Attorneys for Plaintiffs Raul Pizana, Maureen Hobbs, Charles Berglund, Jeanette Mills, Erica LaRoche, Ann Marie Lynch, Oskar Laffont, Sal Munoz, Keith Barnes, and the Proposed Classes*

THIRD AMENDED CLASS ACTION COMPLAINT

# EXHIBIT 1

**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
rclarkson@clarksonlawfirm.com
Shireen M. Clarkson (SBN 237882)
sclarkson@clarksonlawfirm.com
Bahar Sodaify (SBN 289730)
bsodaify@clarksonlawfirm.com
9255 Sunset Blvd., Ste. 804
Los Angeles, CA 90069
Tel: (213) 788-4050
Fax: (213) 788-4070

**TYCKO & ZAVAREEI, LLP**
Annick M. Persinger, Esq. (SBN 272996)
apersigner@tzlegal.com
483 Ninth Street, Suite 200
Oakland, CA 94607
Tel: (510) 254-6808

*Attorneys for Plaintiff Raul Pizana and the*
*Proposed Plaintiff Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL PIZANA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SANMEDICA INTERNATIONAL, LLC, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**[CLASS ACTION]**<br><br>**DECLARATION OF DR. SHLOMO MELMED, M.D.** |

*(left margin vertical text)* CLARKSON LAW FIRM, P.C. / 9255 Sunset Blvd., Suite 804 / Los Angeles, CA 90069

DECLARATION OF DR. SHLOMO MELMED, M.D.

1

## **DECLARATION OF DR. SHLOMO MELMED, M.D.**

2     I, SHLOMO MELMED, declare as follows:

3          1.     I am the Dean of the Medical Faculty and Executive Vice President,

4     Chief Academic Officer, and Director of Research Institute at Cedars Sinai Medical

5     Center in Los Angeles where I lead the largest pituitary department in the nation. I

6     am also the Associate Dean and a Professor of Medicine at University of California

7     at Los Angeles.  I have been retained for the above-mentioned lawsuit. I have

8     personal knowledge of the facts set forth in this declaration and, if called as a

9     witness, I could and would testify competently thereto.

10          2.     Attached hereto as Exhibit A is a true and correct copy of my

11    curriculum vitae.

12          3.     Attached hereto as Exhibit B is a true and correct copy of my expert

13    report containing my opinions in connection with the above-mentioned lawsuit.

14          I declare under penalty of perjury under the laws of the United States and the

15    State of California that the foregoing is true and correct. Executed on

16    _____5/8_____ 2018 at Los Angeles, California.

17

18                                                    _____

19                                                    Dr. Shlomo Melmed, M.D.

*Left margin (vertical):* CLARKSON LAW FIRM, P.C. / 9255 Sunset Blvd, Suite 804 / Los Angeles, CA 90069

20

21

22

23

24

25

26

27

28

                                            1
              DECLARATION OF DR. SHLOMO MELMED, M.D.

# EXHIBIT A

# CURRICULUM VITAE

## Shlomo Melmed, MB, ChB, FRCP, MACP

| | | | |
|---|---|---|---|
| *Office Address:* | Academic Affairs | *Clinic*: | Pituitary Center |
| | Cedars-Sinai Medical Center | | 127 S. San Vicente Blvd. |
| | 8700 Beverly Blvd., 2015 | | # A6600 (AHSP) |
| | Los Angeles, CA 90048 | | Los Angeles, CA 90048 |
| | Tel (310) 423-4691, Fax (310) 423-0119 | | Tel 310 423-2830 |
| | E-mail address: melmed@csmc.edu | | Fax (310 423-2819 |

**Date of Birth**    July 8, 1948
**Place of Birth**    Cape Town, South Africa
**Citizenship**    U.S.A.

## MEDICAL EDUCATION
University of Cape Town School of Medicine, South Africa        1965 - 1970
Received Degree M.B. Ch.B with Distinction; Gold Medal in Medicine and Pediatrics

## POSTGRADUATE TRAINING AND FELLOWSHIP APPOINTMENTS
 Resident, Internal Medicine and Endocrinology, Sheba Medical Ctr, Israel 1971 - 1977
Endocrinology Research Fellow,        1978 - 1980
Wadsworth VA Medical Center, UCLA School of Medicine

## LICENSURE AND SPECIALTY CERTIFICATIONS        California, #34247
**Diplomate:**    American Board of Internal Medicine        1979
**Diplomate:**    Endocrinology & Metabolism Subspecialty        1983

## FACULTY APPOINTMENTS
*Cedars-Sinai Medical Center, Los Angeles, CA:*

| | |
|---|---|
| Dean of the Medical Faculty and Executive Vice President | 1998 - Current |
| Chief Academic Officer | 1998 - Current |
| Director, Research Institute | 1992 - Current |
| Director, Division of Endocrinology & Metabolism | 1986 - 1998 |
| Associate Director, Cedars-Sinai Research Institute | 1988 - 1991 |
| Associate Director, Division of Endocrinology | 1983 - 1986 |
| Laboratory Instructor, Dept. Physiology, University of Cape Town | 1967 |

*University of California at Los Angeles, School of Medicine:*

| | |
|---|---|
| Associate Dean | 1998 - Current |
| Professor of Medicine | 1988 - Current |
| Associate Professor of Medicine | 1984 - 1988 |
| Assistant Professor of Medicine | 1980 - 1984 |
| Visiting Assistant Professor of Medicine | 1979 - 1980 |

## PROFESSIONAL ACTIVITIES
## Editorial

| | | |
|---|---|---|
| *Editor-in-Chief:* | Endocrine Updates | 1998 - 2012 |
| *Editor-in-Chief:* | Endocrinology | 1992 - 1997 |

| | | |
|---|---|---|
| *Editor:* | Clinical Endocrinology | 1998 |
| *Editor*: | Endocrinology | 1990 – 1992 |
| *Editor:* | Frontiers in Pituitary Endocrinology | 2010 - Current |
| *Editor (Endocrine):* | Encyclopedia of Human Biology (3rd Edition) | 2010 – 2014 |
| *Consulting Editor*: | Journal of Clinical Investigation | 1992 – Current |
| *Editor-in-Chief:* | Pituitary | 1998 - Current |

*Editorial Board:*

| | |
|---|---|
| Endocrinology | 1984 - 1988 |
| Peptide Therapy | 1989 - 1995 |
| Journal Clinical Endocrinology & Metabolism | 1998 - 2001 |
| Endocrine Reviews | 2003 - 2006 |
| Faculty of 1000 Section Head for Neuro-endocrinology | 2004 - 2010 |
| Nature Clinical Practice Endocrinology and Metabolism | 2005 - 2010 |
| Expert Review of Endocrinol and Metab | 2006 - 2010 |
| Endocrine Pathology | 1989 |
| Journal of Endocrinology and Journal of Molecular Endocrinology (Joint Editorial Board) | 2011 - 2012 |
| Endocrine-Related Cancer | 2002 – 2010 |
| Bailliere's Best Practice & Research in Clinical Endocrinology and Metabolism | 1999 - Current |
| Endocrine Today, Clinical News on Diabetes and Endocrine Disorders | 2007 - Current |
| Clinical and Translational Science (CTS) | 2008 - Current |
| Nature Reviews Endocrinology | 2010 – Current |

**REVIEWER**     Journal of Biological Chemistry; Molecular Endocrinology, Nature, New England Journal of Medicine; PNAS; Nature Medicine, Science; Annals of Internal Medicine; JAMA.

**GRANT REVIEWER**

| | |
|---|---|
| NIH, Endocrinology Study Section | 1991; 1996-2000; 2009; 2012 |
| NIH, Chairperson, Special Endocrinology Study Sections | 1990; 1995 |
| NIH, Biomedical Sciences and NIDDK Study Sections (ad hoc) | 1988-1989; 1994; 2009; 2011-2012 |

Wellcome Foundation, UK; Medical Research Council, UK; National Science Foundation; VA Merit Review; US-Israel Binational Foundation; American Diabetes Association, California; Ares-Serono Foundation; French National Research Agency (ANR)

**SERVICE**
*Cedars-Sinai Health System*

| | |
|---|---|
| Executive Committee of the Board | 1998 - Current |
| President's Executive Advisory Committee | 1998 - Current |
| Executive Management Group | 1998 - Current |
| Research Institute Advisory Committee (Chair) | 1992 – 1998 |
| Resource Development Committee | 1998 - Current |
| Community Benefit Committee | 2000 - 2001 |
| Quality Assurance Committee & Executive Committee | 1986 - 1989 |
| Medicine Advisory Committee | 1986 - 1998 |
| Medical Policy Committee | 2000 - Current |
| Housestaff Clinical Competency Committee | 1986 - 1995 |
| Strategic Planning Task Force & President's Council | 1990 – Current |
| Medical Leadership Group (Chair) | 1998 -  Current |

## UCLA School of Medicine

| | |
|---|---|
| Appointments and Promotions Committee Department of Medicine | 1986 - 1993 |
| Committee on Education in the Medical Sciences | 1989 - 1991 |
| Legislative Assembly, UCLA Academic Senate | 1987 - 1989 |
| Search Committee, Brain Research Institute | 1988 |
| NICHD Population Research Center, Executive Committee | 1987 - 1991 |
| Committee on Endocrinology Curriculum Planning | 1990 - 1992 |
| Advisory Board, Center for Neurovisceral Sciences and Women's Health | 2002 - 2007 |
| Deans Education Council | 1999 - Current |
| Task Force for LCME Accreditation | 2004 - Current |
| CTSI Steering Committee | 2011 - Current |

## American Diabetes Association

| | |
|---|---|
| Research Peer Review Committee-California, Chair | 1983 – 1990 |

## American Thyroid Association

| | |
|---|---|
| Program Committee | 1988 |
| Finance and Audit Committee (Chair) | 1988 - 1989 |

## Endocrine Society

| | |
|---|---|
| Council | 1999 - 2003 |
| Clinical Endocrinology Initiatives Committee | 1988 - 1989 |
| Postgraduate Committee | 1990 - 1992 |
| Subcommittee for Introduction to Endocrine Investigation Course | 1990 - 1992 |
| Journals Steering & Publications Committee | 1992 - 1997 |
| Program Committee, Postgraduate Assembly | 1995 |
| Review Committee for Travel Grants | 1995; 2008 |
| Planning Committee, Clinical Endocrinology Update | 1999 |
| Chair, Central Committee, (ISE) Endocrine Society | 2000 - 2008 |
| Self-Assessment Program on CD-ROM (Pituitary Faculty) | 1998 |
| Clinical Guidelines Subcommittee | 2007 – 2010 |
| Endocrine Society Guideline Task Forces Member | 2011 – 2016 |

## International Society of Endocrinology

| | |
|---|---|
| Central Committee, Int'l Society of Endocrinology | 1996 - 2004 |
| Program Committee, International Congress of Endocrinology | 2000 |
| Chair, Program Committee, International Congress of Endocrinology | 2004 |
| President, International Society of Endocrinology | 2004 – 2008 |
| Co-Chair, International Congress of Endocrinology, Cape Town | 2018 |

## AFCR/ASCI/AAP

| | |
|---|---|
| Western Soc Clinical Investigation, Endocrinology Coordinator | 1985, 1987 |
| Endocrinology and Metabolism Chairman, (AFCR/ASCI/AAP) | 1985, 1989, 1991 |
| Nominating Committee, WAP | 1992 |

## Los Angeles Cross-Town Endocrine Society

| | |
|---|---|
| Chairperson | 1984 - 1985 |

## Pituitary Society

| | |
|---|---|
| President | 2002 |
| Executive Council (Founding Member) | 1993 - Current |
| Program Committee (Co-Chair) | 1994 - Current |

| | |
|---|---|
| Chair, International Pituitary Congress | 1989, 1993 |
| Co-Chair, International Pituitary Congress | 1996 - Current |
| *National* | |
| Acromegaly Centennial Symposium, Co-Chair | 1986 |
| Recent Advances in Somatostatin Basic Research Co-Chair | 1991 |
| Gordon Research Conference (PRL) Organizing Committee | 1996 |
| Vice Chair and Chair, Gordon Research Conference (PRL) | 2002, 2004 |
| International Society for NeuroImmuno Modulation, Council | 2000 - 2004 |
| Board of Directors, Association for the Accreditation of Human | |
| Research Protection Programs, Inc. (AAHRPP) | 2001- 2006 |
|    Audit Committee (AAHRPP) | 2003 - 2006 |
|    Accreditation Review Committee    (AAHRPP) | 2003 - 2006 |
| USP Council of Experts – Endocrinology Expert Committee | 1995 - 2005 |
| Association of Patient Oriented Research (APOR) NIH | 2005 - 2008 |
|    Advocacy Committee | |
| Acromegaly Consensus Conference, Co-Chair | 2000 - Current |
| Board Member, California Institute of Regenerative Medicine | 2010 - Current |
|    Independent Citizen Oversight Committee (ICOC) | |
| California Life Sciences Association, Board of Directors | 2014 - Current |

**MEMBERSHIPS IN SCHOLARLY SOCIETIES**
Association of American Physicians (elected)
American Society of Clinical Investigation (elected)
American Association of Clinical Endocrinologists
American Federation of Clinical Research
Western Society of Clinical Investigation
Western Association of Physicians
Endocrine Society
Pituitary Society (Founding member)

**CONSULTING ACTIVITIES**

| | |
|---|---|
| AMA Drug Evaluations | 1993 - 1995 |
| ACP MKSAP Program | 1993 - 1995 |
| Pharmacia | 1996 - 2001 |
| Chair, GH Advisory Group, Eli Lilly, USA | 1995 - 1997 |
| Sensus Corporation | 1995 - 2000 |
| Chair, Acromegaly Advisory Group, Novartis | 1996 - 2008 |
| Henri Beaufor Institute | 1997 - 2000 |
| Current Drugs | 1997 |
| Access the Experts Acromegaly | 2000 - 2002 |
| Neurocrine | 2001 |
| Tercica | 2006 - 2008 |
| Quality Pharmaceutical Services (QPS) | 2009 - 2010 |
| Global HYPOCCS Advisory Board, Eli Lilly | 1995 - 2011 |
| Syntaxin | 2009 - 2012 |
| Genentech | 2013 |
| Chiasma Pharma | 2009 - Current |
| Ionis | 2010 - Current |
| Ipsen Global | 2009 - Current |
| Novartis Global | 2010 - Current |

| | |
|---|---|
| Pfizer | 2010 - Current |
| Stonebridge | 2016- Current |
| Ono Pharma | 2016- Current |
| Midatech Pharma | 2016- Current |
| Emulate, Inc. Board of Directors | 2014 - Current |

**HONORS AND SPECIAL AWARDS**

| | |
|---|---|
| Outstanding Scholarly Physician Award of the Endocrine Society | 2018 |
| Hospital Physician Leadership Award – LA County Medical Association | 2017 |
| Kroc Lectureship, Ohio State University | 2017 |
| America's Top Physicians | 2014 |
| Visiting Professorship Award in Growth Hormone (Endocrine Society) | 2012 |
| Pioneer in Medicine, Cedars-Sinai Medical Center | 2011 |
| Endocrine Regulation Prize, Fondation IPSEN | 2010 |
| Master of the American College of Physicians | 2010 |
| Transatlantic Medal (British Society for Endocrinology) | 2010 |
| Pituitary Society Lifetime Achievement Award | 2009 |
| Fellow, Royal College of Physicians (Hon) | 2007 |
| Endocrine Society Clinical Investigator Award | 2004 |
| Honorary Professor, Fudan University, Shanghai | 2004 |
| Pituitary Society Award, Contributions to Understanding Pituitary Disease | 1997 |
| Honorary Member, German Endocrine Society | 1996 |
| Best Doctors in America | 1994-Current |
| McGill University, Neuro-Endocrinology Award | 1995 |
| Royal Society of Medicine, Clinical Endocrinology Trust Medal | 1994 |
| Fellow of American College of Physicians | 1981 |
| NIAMDD Clinical Investigator Award, NIH | 1981 |

**POST-DOCTORAL TRAINEES**

| | | |
|---|---|---|
| 1. | Shunichi Yamashita, M.D. | 1984-1987 |
| 2. | James Fagin, M.D. | 1987-1991 |
| 3. | John Ong, M.D. | 1986-1987 |
| 4. | Shigeki Morita, M.D. | 1987-1989 |
| 5. | Sarah Pixley, Ph.D. | 1987-1989 |
| 6. | Hironori Namba, M.D. | 1989-1991 |
| 7. | Sawsan Barakat, M.D. | 1989-1991 |
| 8. | Diane Prager, M.D. | 1990-1993 |
| 9. | Vivien Herman, M.D. | 1987-1990 |
| 10. | Hiro Yamasaki, M.D. | 1990-1992 |
| 11. | Keiichi Matsuo, M.D. | 1990-1992 |
| 12. | Rivka Gonsky, Ph.D. | 1990-1993 |
| 13. | Mathew Weber, M.D. | 1992-1994 |
| 14. | Shereen Ezzat, M.D. | 1992-1994 |
| 15. | Hiro Yamamoto, M.D. | 1993-1995 |
| 16. | Jonathan Webster, M.D., Ph.D. | 1994-1996 |
| 17. | Yona Greenman, M.D. | 1994-1996 |
| 18. | Lin Pei, M.D., Ph.D. | 1994-1996 |
| 19. | Hirofumi Takino, M.D. | 1994-1996 |
| 20. | Stephen Petersen, M.D. | 1995-1996 |

| | | |
|---|---|---|
| 21. | Ilan Shimon, M.D. | 1995-1997 |
| 22. | Zhiyong Wang, Ph.D. | 1996-2002 |
| 23. | Sadanori Akita, M.D. | 1995-1997 |
| 24. | David Ray, M.D., Ph.D. | 1995-1997 |
| 25. | Xun Zhang, Ph.D. | 1996-1998 |
| 26. | Marlys Drange, M.D., Ph.D. | 1996-1999 |
| 27. | Alberto Valentini, M.D. | 1996-1998 |
| 28. | Hiroki Yano, M.D. | 1996-1998 |
| 29. | Masahiro Nakashima, M.D. | 1996-1998 |
| 30. | Anthony Heaney, M.D., Ph.D. | 1997-2000 |
| 31. | Chris Auernhammer, M.D. | 1997-1999 |
| 32. | Marcelo Perrone, Ph.D. | 1998-1999 |
| 33. | Pinar Kadioglu, M.D. | 1998-1999 |
| 34. | Maria Zatelli, M.D. | 1998-2000 |
| 35. | Vera Chesnokova, M.D. | 1998-2000 |
| 36. | Hiroki Ishikawa, M.D. | 1999-2001 |
| 37. | Chris McCabe, Ph.D. | 1999 |
| 38. | Ruchi Mathur, MD | 1999-2000 |
| 39. | Run Yu, M.D., Ph.D. | 1999-2004 |
| 40. | Hiralal Maheshwari, M.D. | 1999-2003 |
| 41. | Ana Valeria Barros De Castro, M.D., Ph.D. | 2000-2002 |
| 42. | Rula Abbud, MD, Ph.D. | 2000-2005 |
| 43. | Anat Ben-Shlomo, M.D. | 2000-2005 |
| 44. | Ichiro Takumi, M.D. | 2000-2001 |
| 45. | Kozo Akino, M.D. | 2000-2001 |
| 46. | Anastasia Kariagina, Ph.D. | 2000-2003 |
| 47. | Helen Turner, M.D. | 2001 |
| 48. | Robert Murray, M.D. | 2001-2003 |
| 49. | Ningai Liu, M.D., Ph.D. | 2001-2003 |
| 50. | Irina Miklovsky, PhD | 2001-2004 |
| 51. | Enrico Moro, Ph.D. | 2002-2003 |
| 52. | Merav Fraenkel, M.D. | 2002-2004 |
| 53. | Sergio Licalzi, Ph.D. | 2002-2004 |
| 54. | Martha Cruz-Soto, Ph.D. | 2003-2006 |
| 55. | Tami Rubinek, Ph.D. | 2003-2006 |
| 56. | Ines Donangelo, M.D., Ph.D. | 2004-2007 |
| 57. | George Vlotides, M.D., Ph.D. | 2004-2008 |
| 58. | Yunguang Tong, Ph.D. | 2005-2009 |
| 59. | Cuiqi Zhou, Ph.D. | 2005-2009 |
| 60. | Anna Gruszka, M.D., Ph.D. | 2005-2007 |
| 61. | Yen Hao Chen, Ph.D. | 2006-2008 |
| 62. | Hubina Erika, Ph.D. | 2007-2008 |
| 63. | Alexey Resnenko, Ph.D. | 2007-2008 |
| 64. | Odelia Cooper, MD | 2007-2009 |
| 65. | Weijiang Zhao, Ph.D. | 2000 |
| 66. | Magdalena Uhart, M.D. | 2008-2014 |
| 67. | Hidenori Fukuoka M.D., Ph.D. | 2008-2011 |
| 68. | Yoel Toledano, M.D. | 2008-2010 |
| 69. | Maya Tobita Kano, M.D. | 2010-2012 |

| 70. | Alan Parsa, M.D. | 2010-2012 |
| 71. | Takako Araki, M.D. | 2011-2016 |
| 72. | Yuji Tani, MD, Ph.D. | 2012-2013 |
| 73. | Daniel Cuevas-Ramos, M.D. | 2012-2013 |
| 74. | Maria Victoria Recouvreaux, Ph.D. | 2013-2016 |
| 75. | Xiaohai Liu, MD | 2013-2014 |
| 76. | Masaaki Yamamoto, MD | 2014-Current |
| 77. | Hiraku Kameda, MD | 2015-Current |

## PRE-DOCTORAL TRAINEES

| Beatrice Stefana, M.Pharma | 1995-1997 |
| Elena Faccenda, M.S. | 1995-1997 |
| Anita Huttner, M.S. | 1996 |
| Corinne Bousquet, Ph.D. (Doctoral) | 1996-2000 |
| Gregg Horwitz, Ph.D. (Masters) | 1998-2001 |
| Kolja Wawrowsky, Ph.D. (Doctoral) | 2004-2007 |
| Tamar Eigler, Ph.D. (Doctoral) | 2010-2013 |

## INDIVIDUAL TRAINING FUNDING & AWARDS

| *James Fagin*, (P. I.) | 1985 - 1987 |
| NRSA Individual Training Award (NIADDK) | |
| American Thyroid Association Travel Award | 1986 |
| NIH, FIRST Award | 1989 – 1994 |
| *Sarah Pixley,* NIH Summer Trainee Award | 1986 |
| *Shunichi Yamashita*, (P. I.) | 1986 – 1988 |
| ADA Research Fellowship Award | |
| Research Trainee Award, Crosstown Endocrine Club | 1985 |
| International Thyroid Association, Travel Award | |
| WSCI Outstanding Trainee Award | 1986 – 1987 |
| Dean of Graduate School of Biomedical Sciences | |
|    Nagasaki University School of Medicine | |
| *John Ong,* WSCI Outstanding Trainee Award | 1988 |
| *Diane Prager*, (P. I.) | 1988 - 1990 |
| ADA Research Fellowship Award | |
| WSCI Outstanding Trainee Award | 1988 |
| Crosstown Endocrine Club | |
| AFCR Trainee Award (National) | 1989 |
| Solomon Scholar Trainee Research Award | 1990 |
| NIDDK Clinical Investigator Award | 1991 – 1996 |
| *Shereen Ezzat,* American Thyroid Association Travel Award | 1989 |
| *Hiro Yamasaki*, WSCI Outstanding Endocrinology Trainee | 1989 |
| *Vivien Herman-Bonert*, NIH Clinical Investigator Award | 1991 – 1996 |
| *Lin Pei*, AFCR Trainee Award (National) | 1995 |
| Endocrine Society Travel Award | 1996 |
| NIH Clinical Investigator Award | 1995 – 2001 |
| *Ted Friedman*, NIDA New Investigator Award | 1995 – 2000 |
|    Culpeper Award | 1996 – 1998 |
| *Masahiro Nakashima* | 1996 – 1998 |
|    Professor and Head of Dept of Tumor and Diagnostic Pathology | |
|    Nagasaki University | |

| | |
|---|---|
| *Ilan Shimon*, Merck Senior Fellowship Award, Endocrine Society | 1997 |
| *David Ray*, Endocrine Fellows Foundation Award | 1997 |
| *Chris Auernhammer*, Merck Senior Fellowship Award, Endocrine Society | 1998 |
| *Marlys Drange,* American College of Physicians, | 1997 |
| Regional Scientific Trainee Award; | 1998 |
| Endocrine Fellows Foundation Award | |
| *Tony Heaney*, Endocrine Fellows Foundation Award | 1998 |
| Fullbright Scholarship Award | 1999 |
| Merck Senior Fellowship Award, Endocrine Society | 1999 |
| Chancellor's Award, UCLA Postdoctoral Program | 2000 |
| International Cardura Competitive Awards, Pfizer | 2001 |
| *Gregory A. Horwitz*, Introduction to Molecular & Cellular Research, Travel Grant Award | 1999 |
| Endocrine Society Travel Grant Award | 2000 |
| Novartis Junior Investigator Award | 2000 |
| *Run Yu*, Endocrine Society Trainee Award | 2000 |
| Lilly Pituitary Scholars Fellowship, Endocrine Society | 2001 |
| NIH Clin Investigator Award (K08) | 2005-2010 |
| *Ning-Ai Liu*, 2nd Annual Pfizer Scholars in Endocrinology Grant Program | 2003 |
| Clinical Investigator Award (K08 NIH) | 2003-2008 |
| DERC Pilot and Feasibility Grant (UCSD/UCLA) | 2010-2011 |
| *Cuiqi Zhou,* Travel Grant Award, Endocrine Society | 2008 |
| *Odelia Cooper,* NIH (K23) Mentored Patient Oriented Research Award | 2009-2014 |
| *Hidenori Fukuoka*, Travel Grant Award, Endocrine Society | 2010 |
| *Yunguang Tong*, NIH K99 Award | 2010-2015 |
| *Hidenori Fukuoka*, Presidential Competitive and Travel Grant Award, Endocrine Society | 2010 |
| Young Investigator Award (YIA), Japan Endocrine Society | 2011 |
| *Cuiqi Zhou,* ASPIRE Young Investigator Award (Pfizer) | 2014 |
| *Masaaki Yamamoto*, Outstanding Abstract Award (Endo Society) | 2017 |

**CURRENT FUNDING:**

**Ongoing Research Support:**
**NIH/NIDDK R21DK103198**      **(Melmed PI)**      **06/01/2014-05/31/2018**
Title: Treatment of pituitary Cushing disease with selective CDK inhibitor, R-roscovitine
The goal of this project it to test a new and unique intervention directly targeting corticotroph tumors in patients with Cushing disease.

**NIH/NIDDK T32DK007770**      **(Melmed PI)**      **08/01/1999-06/30/2018**
Title: Institutional Training Program in Endocrinology, Diabetes, and Metabolism
The goal of this project is to fund post-doctoral fellows in Endocrinology at Cedars-Sinai Medical Center.

**Pfizer, Inc. WS2036536**      **(Melmed PI)**      **10/01/2011-12/31/2018**
Title: Comparison of Combination Low-Dose SRL + Daily Pegvisomant Therapy and High Dose SRL + Weekly Pegvisomant Therapy
The goal of this investigator-initiated project is to determine the most effective combination of somatostatin receptor ligand and GH receptor antagonist therapy in subjects with acromegaly at the lowest cost to patients.

**Doris Factor Endowed Molecular Endocrinology Laboratory      (Melmed PI)  08/01/1989-12/31/2020**
Title: Molecular mechanisms of hormone action in target cells and transgenic animals
This permanently endowed laboratory supports research support for molecular endocrinology.

**Cedars-Sinai Research Institute            (Melmed PI)          09/01/2002-12/31/2020**
Title: Pituitary Tumor Surveillance: Pathogenic Correlation
This data/specimen registry aims to observe aspects of pituitary tumor recurrence and markers of persistent disease. The second goal is to evaluate long-term consequences of hormone replacement therapy for pituitary hormone insufficiency, as this is an independent risk factor for premature death.

**Pfizer ASPIRE Award Endocrine in Pituitary Research   (Melmed PI)        11/1/2016 – 10/31/2018**
Title: Mechanisms underlying colon neoplasia in Acromegaly
Investgator-initiated competitive award studying transgenic models to determine role of GH in enabling colon mucosal neoplasia.

### INVITED LECTURES AND PRESENTATIONS  (SELECTED):

| | |
|---|---|
| *1986* | • 38th Postgraduate Assembly of Endocrine Society, Los Angeles |
| *1987* | • 39th Postgraduate Assembly of Endocrine Society, San Francisco |
| *1988* | • UCSF, Peptidomimetic Therapy: A novel approach to endocrine and GI diseases |
| *1989* | • European Neuro-Endocrine Association, London (Plenary) |
| | • Baylor University, Peptidomimetic Therapy Symposium |
| | • 2nd International Pituitary Congress, Palm Desert, CA |
| *1990* | • Pituitary Pathology Workshop, 4th Annual Meeting, Lyon, France |
| | • Endocrine Society, 42nd Postgraduate Assembly, Honolulu, Hawaii |
| | • University of Oregon Health Sciences, Nobel Wiley Jones Lectureship |
| | • University of Washington, Seattle Leonard Visiting Professor of Medicine |
| *1991* | • Endocrine Society: Introduction to Endocrine Investigation |
| | • Spanish Endocrine Society: Annual Mtg., Santiago (Plenary) |
| | • Somastostatin State-of-the-Art: Basic and Clinical Aspects, Monte Carlo |
| | • 5th European Pituitary Workshop, Venice (Plenary) |
| *1992* | • Endocrine Society Ancillary Symposium: Diagnosis and medical management of hormone-secreting pituitary tumors, San Antonio |
| | • NY Academy of Sciences: Role of IGF-I in the nervous system, Arlington, VA |
| | • Intl Symposium on GH II: Basic and clinical aspects, Tarpon Springs, Florida |
| *1993* | • Somatostatin receptor imaging, Amsterdam, Netherlands |
| | • Endocrine Society of Australia, Annual meeting, Ayers Rock, (Plenary) |
| | • Garvin Institute of Medical Research, Sydney, Australia |
| | • Third International Pituitary Congress, Los Angeles |
| | • Sixth Prolactin Congress, Paris |
| | • Israel Endocrine Society, Annual Mtg, Jerusalem (Plenary) |
| | • 45th Postgraduate Assembly, Endocrine Society, San Francisco, Management of pituitary tumors |
| | • Serono Symposia, San Diego GHRH, GH and IGF-I: Basic and Clinical Advances |
| *1994* | • Colorado Diabetes/Endocrine Institute, Aspen, Colorado |
| | • Gordon Research Conference (Prolactin), Oxnard |
| | • Harvard Medical School, Boston, Clinical Endocrinology Update |
| | • Japan Endo Soc, Nagasaki Satellite Symp: Recent advances in Pituitary Research - Chair |
| | • Japan Endocrine Society, Plenary |
| | • Royal Society of Medicine, CERSM Visiting Professor at UK Med Schools |
| | • British Endocrine Society (Plenary) |

- British Growth Factor Group
- European Endocrine Society, Amsterdam
- McGill University Sandoz Neurendocrine Visiting Professor, Montreal
- Endocrine Society Meeting, Anaheim, Management of Acromegaly
- Endocrine Society Annual Meeting Symposium on IGF-I
- Endocrine Nurses Society 4th Annual Symposium, California

*1995*
- State-of-the-Art Conference on Pituitary Tumors, UCSF
- Oregon Health Sciences University - Endocrine Club
- Philadelphia Endocrine Society
- Endocrine Postgraduate Course, Harvard Medical School
- Recent Progress in Hormone Research 51st Conference, Stevenson, Washington
- 5th International Insulin and IGF Symposium, Gainesville, Florida
- International Growth Symposium, Santiago de Compostela, Spain
- Somatostatin Analogs: Basic and Clinical Perspectives, Sorrento, Italy

*1996*
- Clinical Endocrinology Update; Endocrine Society, San Diego
- 4th International Pituitary Congress, San Diego, CA
- 6th European Workshop on Pituitary Adenomas, Berlin, Germany
- 21st International Symposium: GH & GH factors, Venice, Italy
- 2nd International Skull Base Congress, San Diego
- University of Miami School of Medicine, Visiting Professor, Florida
- South Florida Endocrine Society
- Neuro-immuno-endocrine Networks, NAITO Foundation Nogoya, Japan
- International Society for Neuro-immunomodulation, Bethesda, MD
- Biological & Clinical Relevance of the SMS Receptor, Yale, New Haven,
- Mt. Sinai School of Medicine, NY - Visiting Professor
- Paradigm Health Care Acromegaly Teleconference Program

*1997*
- Neuro-endocrine-Immunology, Gordon Conference - Ventura, CA
- Diagnosis and Treatment of Pituitary Insufficiency, Indianapolis, IN
- Sandostatin LAR Meeting, Innsbruck, Austria
- Endocrine Society 79th Ann Mtg, Meet the Professor (Acromegaly), Minneapolis
- European Neuroendocrine Association, Marseille, France
- Symposium on New aspects of somatostatin analogues, Oslo, Norway
- Scandinavian Symposium on Pituitary Adenomas, Oslo, Norway
- University of California San Diego-Visiting Lecturer, Endocrinology
- Intl Symposium on SMS analogs: Basic update and clinical perspectives, Venice, Italy

*1998*
- Intl Symposium GH: Basic Aspects & New Clinical Applications, Marbella, Spain
- 5th International Pituitary Congress, Naples, Florida
- Oregon Health Sciences University, Visiting Professor, Endocrinology
- HYPOCCS Symp, Pathogenesis and management of pituitary tumors, Seville, Spain
- Beufour Ipsen Symposium, "Overview of Pituitary tumor management" Seville, Spain
- European Federation of Endocrine Society, Seville, Spain
- Endocrine Society Symposium, Growth hormone deficiency in Adults, New Orleans
- Endocrine Society Symposium: "Acromegaly: Pharmacotherapy", New Orleans
- 5th International Pituitary Congress, "Pituitary Oncogenes", Naples, Florida
- University of Illinois, Chicago, Visiting Professor
- The 2nd Parnas Conference, "Cytokine regulation of pituitary function" Gdansk, Poland
- Southern Nevada Endocrine Society, "Indications for growth hormone replacement therapy"
- Society for History of Medicine "Growth hormone from Goliath to receptors", Los Angeles,
- University of Southern California, "Pathogenesis of Pituitary Tumors"
- Prince Henry's Trust Visiting Professor, "Pituitary Growth Factors", Melbourne, Australia

**1999**
- "Criteria for cure of acromegaly: in search of a consensus" Co-Chair, Cortina, Italy
- "Octreotide: the next Decennium", Sintra, Portugal
- "New pituitary oncogenes" British Endocrine Society, Bournemouth, UK
- Dopamine resistant prolactinomas" ENEA Mtg. Copenhagen, Denmark
- John Hopkins School of Medicine, Endocrinology Visiting Lecturer
- Annual Meeting Endocrine Society Symposium "Pituitary Oncogenes"
- Controversies in Acromegaly: Point-Counterpoint with leading experts, San Diego
- Chair, GH/IGF-I Workshop, Pasadena
- Simposio Internacional Sobre Patologia Hipofisaria, Buenos Aires, Argentina
- International Symposium of Neuroendocrinology, Curitiba, Brazil
- Medical Advances for the Next Century "Treatment of pituitary tumors", Tel Aviv
- Clinical Endocrinology Update '99, (Endocrine Society) Chair, Pituitary Section

**2000**
- Acromegaly Workshop (Co-Chair), Monte Carlo, France
- Endocrine Society Symposium – "Does acromegaly cause cancer?", Toronto, Canada
- Chair, 4th Annual HypoCCS Symposium and Investigators Meeting Toronto, Canada
- FASEB Plenary Lecture, "Cytokines in the pituitary", San Diego
- American Association of Neurological Surgeons, Plenary, "Recurrent Pituitary Tumors",
- German Endocrine Society "Acromegaly: has time come for primary medical treatment?" and "Pathogenesis of pituitary adenomas" Plenary Lectures, Munich
- 7th European Workshop on Pituitary Disease "New pituitary oncogenes", Oxford, UK
- 11th Intl Congress of Endocrinology, "Pathogenesis of pituitary tumors" Sydney, Australia
- Oxford Union Debate: Therapy of acromegaly
- Visiting Professor, Endocrinology, UCSF
- Visiting Professor, Northwestern University School of Medicine, Chicago

**2001**
- 43rd Spanish Congress of Endocrinology, Santiago de Compostela, Spain, (Plenary)
- 83rd Annual Mtg Endocrine Society, Denver, Colorado "Integration of Endocrine Indications for Somatostatin Analogs"
- GH Symposium, "Excess growth hormone and cancer in adults" Tampa, Florida

**2002**
- Prolactin Gordon Research Conference, Ventura, California (Vice-Chair)
- American Federation of Medical Research, "Cytokine receptor-mediated regulation of pituitary function" Carmel, CA (Plenary)
- Hypoccs Symposium, "Mechanisms of pituitary disease" Miami, Florida
- Endo 2002 Symposium, "Novel therapies for pituitary tumors", San Francisco
- Acromegaly 2002 and Beyond, "Genetic Syndromes causing Acromegaly", San Francisco
- Visiting Lecturer, Brigham and Womens Hospitals, Boston
- 3rd Acromegaly Consensus Conference: Diagnosis & Treatment of acromegaly complications, "Medical treatment options" Versailles, France (Chair)
- Nicholas T. Zervas Award Lectureship, Harvard Medical School, Massachusetts General Hospital, "Endocrine cell cycle lessons from pituitary adenomas" Boston
- The Eighteenth Boris Catz, MD Lectureship, "Impact of early thyroid research on clinical medicine", Cedars-Sinai Medical Center
- European Neuroendocrine Association, "Pituitary oncogenesis" Munich, Germany (Plenary)
- Endocrine Interventions in aging: Growth Hormone, Univ of South Florida, "GH and cancer"
- Endocrine Grand Rounds, Univ of California San Diego, "Acromegaly" "Guidelines for Acromegaly mangement: a consensus statement, Santa Monica

**2003**
- 8th International Pituitary Congress, "Molecular Pathogenesis of Pituitary Tumors", NY
- Global Endocrine Care Summit, "Mortality of Acromegaly",Barcelona
- Endocrine Board Review Course, University of California San Diego
- Chair, 4th Consensus Workshop on Acromegaly "Issues in Medical Treatment", Spain

|      | | |
|------|---|---|
|      | • | Chair, Pituitary Young Investigators Meeting, Nevada |
| *2004* | • | Annual Meeting of Japan Endocrine Society (Plenary), International satellite symposium, Kyoto "Zebrafish pituitary development and regulation", |
|      | • | Honorary Professor and Chair, Acromegaly consensus guidelines for Asia Pacific and Latin America, Fudan University, Shanghai "Goals of clinical management for acromegaly" |
|      | • | Chair, Prolactin Gordon Conference, Oxnard, CA |
|      | • | Program Chair, International Congress of Endocrinology, Lisbon, Portugal |
|      | • | Satellite Symposium, 12th ICE "Acromegaly: new development in therapy" |
|      | • | Visiting Professor, New York University, New York |
|      | • | Endocrine Society Clinical Investigator Award Lecture, New Orleans, Louisiana Endocrine Fellows Foundation "Basic aspects of pituitary function" |
|      | • | European Neuroendocrine Association, Naples, Italy |
|      | • | Societa Italiana Di Endocrinologia, Sie Lombardia Lecture "Oncogenesis of pituitary tumors" |
|      | • | Argentine Endocrine Society, Buenos Aires – Plenary lectures: "Advances in hypophyseal tumorogenesis" and "Controversies in the treatment of acromegaly" |
|      | • | Endocrinology and Metabolism Brazilian Congress, "Acromegaly-clinical treatment" |
| *2005* | • | HYPOCCS Molecular Pathogenesis and Therapy of Pituitary Disease Madrid, Spain |
|      | • | University of California San Diego - Endocrine Grand Rnds |
|      | • | Robert L. Ney Visiting Professor, Johns Hopkins University, MD |
|      | • | Colloques Medecine et Recherche, "Receptor function and new drug targets", Paris, France |
|      | • | Pituitary Today: Molecular, physiological and clinical aspects", Argentina-Brazil,Iguazu |
|      | • | International Workshop "Somatostatin update", Turin, Italy |
|      | • | California Chapter of AACE, 5th Annual Mtg "Update on Management of Acromegaly. |
| *2006* | • | V Consensus Meeting "Guidelines for treatment of GH excess and GH deficiency in the adult", Santa Monica |
|      | • | Yogesh Patel Memorial Lecture "PituitaryTumor Pathogenesis" McGill University |
|      | • | Visiting Professor, Dean's Lecture: "How to succeed in Academic Medicine- Is it worth it?" University of South Florida, Tampa |
|      | • | National Symposium on Pituitary Disorders: "Evaluation of pituitary mass treatment of acromegaly", University of South Florida, Tampa. |
|      | • | "Pituitary trophic status as a tumorigenic determinant", Ipsen Fndn Hormonal Control of Cell Cycle Paris, France, |
|      | • | Growth and Signaling: Pathogenesis of pituitary tumors, Inserm, Paris, France |
| *2007* | • | "Update on Acromegaly Management" UCSF, San Francisco, CA. |
|      | • | UCSD Endocrine Grand Rounds, "Mechanisms for pituitary tumorigenesis" |
|      | • | International Workshop on Treatment of Cushing's Syndrome, Budapest, Hungary, |
|      | • | The Endocrine Society 89th Meeting, "The Year in Pituitary" Toronto, Canada, |
| *2008* | • | Prolactin and Growth Hormone Gordon Conference, Ventura, Pituitary Tumor Pathogenesis, |
|      | • | Pituitary Expert Symposium, Pituitary Senescence, Florence, Italy |
|      | • | Endocrine Society, "Pituitary disorders and pituitary tumors, San Francisco, CA. |
|      | • | Grand Rounds "Acromegaly" University of Tucson, Tucson, AZ, |
|      | • | Pituitary Today II: Molecular, Physiological and Clinical Aspects. Brazil |
| *2009* | • | Western Soc for Clin Investigation. Endocrine Plenary: "Pituitary Tumor Pathogenesis", Carmel |
|      | • | Chair, Acromegaly Consensus Criteria for Cure: Cortina revisited after 10 years", Paris |
|      | • | Bridges in Life Sciences US-CEE Regional networking Mtg IV, "Molecular Mechanisms for Pituitary Tumorigenesis:" Debrecen, Hungary |
|      | • | Co-Chair, International Pituitary Congress, Washington, DC |
|      | • | Course Director, PeerView Institute for Medical Education, "Improving outcomes in Acromegaly and Cushing's Disease" |
| *2010* | • | British Society of Endocrinology: Translantic Lecture, "Pituitary Tumor Pathogenesis", |

Manchester, UK
- Pfizer Visiting Professor, Mount Sinai Medical Center, New York
- Endocrine Society Trainee Day, Plenary "Discovery in Pituitary Medicine", San Diego
- Endocrine Society Symposium, "Targeted therapy for pituitary tumors", San Diego
- Congress of European Neuroendocrine Association - Fondation Ipsen Endocrine Regulation Prize Lecture Liege, Belgium

*2011*
- American Assoc of Clinical Endocrinology "Medical therapy for acromegaly", San Diego
- European Congress of Endocrinology – "Approaches to acromegaly treatment resistance", Rotterdam, Netherlands
- Pan-European Meeting Management of Acromegaly, Athens, Greece
- Expert Knowledge Forum, "The science of acromegaly: molecular and genetic insights", Germany

*2012*
- "Clinical and Economic Impact of Acromegaly", Regional Cooperation for Health, Science and Technology Consortium, Budapest, Hungary
- Management for acromegaly and cushing's disease", City of Hope, Duarte
- Emory University, Medicine Grand Rounds, "Focus on Pituitary Tumors: Progress in Medical Management for Acromegaly and Cushing Disease"
- Emory University, Endocrine Research Conference, ""New targets for pituitary tumor therapy"
- American Association of Clinical Endocrinology "Medical Management for Acromegaly and Cushing Disease", Atlanta, GA
- 15th International Congress of Endocrinology/14th European Congress of Endocrinology "Genes involved in pituitary tumorigenesis" & "Economic value of disease control", Florence, Italy
- Italian Endo Society "Pathogenesis of Pituitary Adenomas", Brescia, Italy
- Chair, Updates in Cushing's Disease: Pituitary Society Workshop Toronto, Canada
- •Co-Chair, 9th Acromegaly Consensus Conference: "Medical Treatment of Acromegaly", Amsterdam, Netherlands,
- 15th European Congress of Endocrinology, Copenhagen, Denmark (Symposium Chair)
- Endocrine Society Visiting Professor in GH Regulation and Disorders, University of Colorado
- 13th International Pituitary Congress, San Francisco, CA (Co-Chair)
- Latin American Knowledge Network "New insights into pituitary tumor therapies"
- Aspiring to Excellence: Pituitary Expert Forum, Stockholm, Sweden,
- 60 minutes Interview "Deer Antler" with Keith Sharman, CSMC
- Memorial Sloan-Kettering Center, NY "Pituitary Tumor Therapeutic Targets"
- Puerto Rican Society of Endocrinology and Diabetes

*2014*
- International Symposium of Neuroendocrinology, "Acromegaly: Past, present and future management", Campinas, Brazil
- AACE Chair: Acromegaly: Assessing the Disorder and Therapy Options, Las Vegas, NV,
- Endo CMES Acromegaly: Diagnosis and Management Options,", Chicago, IL
- European Neuroendocrine Association: "Why are pituitary tumors benign?" Sofia, Bulgaria

*2015*
- John Wayne Cancer Institute Pituitary Centers of Excellence "What Do We Expect From Our Neurosurgical Colleagues", Santa Monica, CA
- Department of Medicine Grand Rounds, UC Irvine Medical Center
- 14th International Pituitary Congress, Co-Chair, San Diego, CA
- 10th Acromegaly Consensus Conference, Co-Chair, Madrid, Spain
- Endocrine Society Clinical Endocrinology Update, ""Update in Management of Pituitary Adenomas – Year in Clinical Pituitary" and "Pituitary/Adrenal Imaging", Miami.
- Pituitary Standalone Meeting: Pituitary Expert Forum, "Molecular targets for pituitary tumors", Spain

- UCSF, Pituitary Disorders: Advances in Diagnosis and Management "Pituitary signaling pathways leading to novel therapies"; "Non-surgical approaches for large pituitary masses"; "Acromegaly management update", San Francisco
- Stem Cell on the Mesa, Alliance for Regenerative Medicine, Advanced Therapies, La Jolla, CA

**2016**
- Global Pituitary Expert Round Table, Zurich, Switzerland, February
- AACE Annual Meeting "Does GH keep you younger?" Orlando, FL
- Advances in Neurosciences and Pituitary Diseases, Las Vegas, NV
- Pituitary Update, Loma Linda University, CA

**2017**
- 15th International Pituitary Congress, Co-Chair, Orlando, FL, March
- 11th Acromegaly Consensus Conference, Nice, France, April
- Kroc Visiting Professor "Growth hormone action in the colon" OHSU, Columbus, Ohio, May
- European Congress of Endocrinology: "Does Growth Hormone Enable Neoplastic Growth?" Lisbon, Portugal, May
- Endocrine Society CEU Course, Chicago, IL, September
- Oppenheimer Lecturer, Citywide Endocrine Conference, Univ of Minnesota, November

## PATENTS ISSUED

1. **Melmed/Akita/Readhead** – Transgenic mouse model for pituitary disorders associated with LIF overexpression and/or GH underexpression, and its use for testing therapeutic drugs. *United States Patent No. 5,824,838, 1998.*
2. **Melmed/Shimon/Culler** – Method of treating hyperprolactinemia and prolactinomas, *United States Patent No. 5,972,893, 1999.*
3. **Melmed/Pei** – Pituitary tumor transforming genes, and related products. *United States Patent No. 6,455,305, 2002.*
4. **Auernhammer/Melmed** – Suppressor of cytokine signaling (SOCS)-3 promoter and methods for its use in genetic therapy in humans. *United States Patent No. 6,541,244, 2003*
5. **Melmed/Pei** – Compositions a method for determining the presence of human PTTG peptide in a sample. *US Patent No. 6,750,327, 2004*
6. **Horwitz/Zhang/Melmed** - Pituitary tumor transforming gene (PTTG) carboxy-terminal peptides and methods of use thereof to inhibit neoplastic cellular proliferation and/or transformation. *US Patent no. 6,858,586, 2005*
7. **Melmed/Pei** – Human PTTG polypeptide and method for producing it. *US Patent no. 6,900,032, 2005*
8. **Melmed/Pei** – Rat PTTG polypeptide and method for producing it. *US Patent no. 6,911,320, 2005*
9. **Horwitz/Zhang/Melmed** – PTTG Carboxy-terminal peptides and methods of use thereof to inhibit neoplastic cellular proliferation and/or transformation), *US Patent no. 6,894,031, 2005.*
10. **Melmed/Wang** - PTTG knockout rodent as a model to study mechanisms for various physiological phenomena, including diabetes. *US Patent no. 6,909,030, 2005.*
11. **Prezant/Heaney/Melmed** – Method of regulating biological activity of pituitary tumor transforming gene (PTTG) 1 using PTTG2. *US Patent no. 6,913,926, 2005.*
12. **Auernhammer/Melmed** – Transgenic expression from a SOCS-3 promoter in vertebrate cells. *US Patent no. 6,943,018, 2005.*
13. **Horwitz/Zhang/Melmed** – Antibodies against rat pituitary tumor transforming gene carboxy-terminal (PTTG-C) peptides. *US Patent no. 6,835,380, 2004.*
14. **Heaney/Melmed** – Use of peroxisome proliferator activated receptor (PPAR)-gamma ligands as a treatment for pituitary tumors and associated conditions, such as Cushing's syndrome. *US Patent no. 6,673,823, 2004.*

15. **Heaney/Melmed** - Transgenic cells transfected with pituitary tumor transforming gene (PTTG) expression vectors and uses therefore. *US Patent no. 7,097,829, 2006.*

16. **Ben-Shlomo/Melmed/Wawrowsky** – Methods for drug screening and characterization by ion flux analysis. *Patent Pending – International Application Number PCT/US2005/046468*

17. **Melmed/IsHak/Berman** – Treatment of anoragasmia or delayed orgasm. *US Patent Pending Application no. 11/324,983, 2006.*

18. **Melmed/Fukuoka** – Use of tyrosine kinase inhibitors for treatment of cushing's disease and hypercortisolism". *US Patent pending application no. 61/300,379, 2010, Intl Patent application no. PCT/US11/23247, 2011.*

19. **Tong/Melmed** – PTTG1 as a biomarker for cancer treatment. *US Patent no. 8,216,782 Granted 2012.*

20. **Fukuoka/Cooper/Melmed-** *Use of tyrosine kinase inhibitors for treatment of prolactinoma. US Patient No 094716, 2011.*

21. **Melmed/Liu** – *Treatment of pituitary corticotroph tumors using R-roscovitine. US Patent No 061601, 2012.*

**BIBLIOGRAPHY**
**PEER-REVIEWED PUBLICATIONS**:

1. Lewin L, **MELMED S**, Bank H:  Rapid screening test for detection of elevated myo-inositol levels in human serum.  Clin Chimica Acta 54:377, 1974.

2. **MELMED S**, Bank H, Lewin L:  Clinical significance of increased serum myo-inositol levels.  Israel J Med Sci 10:1518, 1974.

3. **MELMED S**, Bank H: Metoclopromide and facial dyskinesias. Brit Med J 1:331, 1975.

4. **MELMED S**, Bank H:  Meningitis complicated by eighth nerve deafness and arthritis.  Harefuah 79:22, 1975.

5. **MELMED S**, Lewin L, Bank H:  Myo-inositol-metabolic and clinical aspects.  Harefuah 79:472, 1975.

6. **MELMED S**, Bank H, Katz D:  Streptococcal pancarditis.  Chest 69:108, 1976.

7. **MELMED S**, Lewin L, Bank H:  Serum myo-inositol concentration in impaired renal function.  Proc 13th Int Congress Int Med Helsinski p 139, 1976.

8. Bank H, **MELMED S**, Gross S:  Azathioprine in the management of subacute thyroiditis.  Proc 13th Int Congress Int Med Helsinski p. 85, 1976.

9. **MELMED S**, Lewin L, Bank H:  Myo-inositol clearance in renal failure and in patients with normal kidney function.  Am J Med Sci 274:55, 1977.

10. **MELMED S**, Martinovitz U, Bank H:  Menigo-myelitis associated with mycoplasma pneumoniae pneumonia.  Harefuah 82:353, 1977.

11. Agranat O, **MELMED S**, Altman G, Bank H:  Bacterial and fungal meningitis:  22 year survey in a large general hospital.  Israel J Med Sci 13:1151, 1977.

12. Lewin L, **MELMED S**, Passwell J, Brish M, Boichis H, Bank H:  Myo-inositol in human neonates:  Serum concentrations and renal handling. Pediatric Research 12:3, 1978.

13. Sharon P, **MELMED S**, Neuman G:  Acute pancreatitis in a community with a low alcohol intake.  Int Surg 64:64, 1979.

14. **MELMED S**, Kurtzman G, Reed A, Hershman JM:  Non-thyrotropic pituitary cells in culture convert T4 to T3. Life Sci 24:1947, 1979.

15. **MELMED S**, Harada A, Murata Y, Reed A, Carlson H, Azukizawa M, Martin C, Jorgensen E, Hershman JM:  Fetal responses to TRH after thyroid hormone administration to the rhesus monkey:  Lack of pituitary suppression.  Endocrinology 105:334, 1979.

16. Morley JE, Barnetsky N, Wingert T, Carlson HE, Hershman JM, **MELMED S**, Levin SR, Weitzman R, Chang RJ, Varner AA:  Endocrine effects of naloxone-induced opiate receptor blockade.  J Clin Endocrinol Metab 50:251, 1980.

17. Morley JE, **MELMED S**, Reed A, Kasson BG, Levin RS, Pekary AE, Hershman M:  Effect of vitamin A on the hypothalamic-pituitary-thyroid axis.  Am J Physiol 238:E174, 1980.

18. **MELMED S**, Harada A, Hershman JM, Krishnamurthy T, Blahd W: Development of neutralizing antibodies in immunized patients with thyroid carcinoma.  J Clin Endocrinol Metab 51:358, 1980.

19. **MELMED S**, Spira O, Gordon A, Gross J, Hershman JM:  Suppression of TSH by 3, 5, dimethyl-3'-isopropyl-L-thyronine in euthyroid and hypothyroid rats.  Endocrinology 107:1050, 1980.

20. **MELMED S**, Carlson HE, Murata Y, Socol M, Hershman JM:  Fetal and maternal growth hormone levels in the rhesus monkey:  Responses to TRH.  Neuroendocrinol Let 1:89, 1979.

21. **MELMED S**, Carlson HE, Briggs J, Hershman JM:  Cell culture alters the hormonal responses of rat pituitary tumors to dynamic stimulations. Endocrinology 107:789, 1980.

22. **MELMED S**, Carlson HE, Briggs JE, Hershman JM:  Autofeedback of prolactin in cultured pituitary cells.  Horm Res 12:340, 1980.

23. **MELMED S**, Nelson M. Kaplowitz N, Yamada T, Hershman JM:  Role of intracellular glutathione in modulation of thyroxine conversion to triiodothyronine and hormone production by cultured pituitary cells. In:  Thyroid Research, Stockigt JR, Nagataki S (Eds), Australian Academy of Science, Canberra, p 453, 1980.

24. Sack J, Sazbon L, **MELMED S**, Lunenfeld B, Najenson T:  Low serum triiodothyronine and reverse triiodothyronine concentrations in patients with prolonged coma.  Israel J Med Sci. 16:402, 1980.

25. **MELMED S**, Nelson M, Kaplowitz N, Yamada T, Hershman JM:  Glutathione-dependent thyroxine 5'-monodeiodination modulates growth hormone production by cultured non-thyrotropic rat pituitary cells. Endocrinology, 108:970-976, 1981.

26. Sharp B, Morley JE, Carlson HE, **MELMED S**, Hershman JM:  Role of endogenous opiate peptides in the regulation of rat TSH secretion.  Brain Research 219:335-344, 1981.

27. **MELMED S**, Park J, Hershman JM:  Triiodothyronine induces a transferable factor which suppresses TSH secretion in cultured mouse thyrotropic tumor cells.  Biochem Biophys Res Comm 98:1022-1028, 1981.

28. Sharp B, **MELMED S**, Goldberg R, Carlson HE, Refetoff S, Hershman JM: Radioimmunoassay detection of endorphin from longterm culture of human pituitary tumor cells.  Acta Endocrinol 99:174-178, 1982.

29. **MELMED S**, Odenheimer D, Carlson HE, Hershman JM:  Establishment of functional human pituitary tumor cell cultures.  In Vitro 18:35-42, 1982.

30. **MELMED S**, Nademanee K, Reed AW, Hendrickson J, Singh BN, Hershman JM: Hyperthyroxinemia with bradycardia and normal thyrotropin secretion following chronic amiodarone administration.  J Clin Endocrinol Metab 53:997-1001, 1981.

31. **MELMED S**, Carlson HE, Hershman JM:  Histidyl-proline diketopiperazine suppresses prolactin secretion in human pituitary tumor cell cultures.  Clin Endocrinol 16:97-100, 1982.

32. Lewin LM, Yannai Y, **MELMED S**, Weiss M:  Myo-inositol in the reproductive tract of the female rat.  Int J Biochem 14:147-150, 1982.

33. **MELMED S**, Geola F, Reed AW, Pekary AE, Park J, Hershman JM:  Comparison of methods for assessing thyroid function in non-thyroid illness. J Clin Endocrinol Metab 54:300-306, 1982.

34. Socol ML, Druzin ML, Murata Y, **MELMED S**, Martin C Jr., Hershman JM:  A cyclic variation in thyroid-stimulating hormone in the fetal rhesus monkey.  Am J Obstet Gynecol 139:712-714, 1981.

35. Nademanee K, Singh BN, Hendrickson JA, Reed AW, **MELMED S**, Hershman JM: Pharmacokinetic significance of serum reverse T3 levels during amiodarone treatment:  A potential method for monitoring chronic drug therapy.  Circulation 66:202-211, 1982.

36. Neufeld N, **MELMED S**: 3,5,-dimethyl-3'-isopropyl-L-thyronine therapy in diabetic pregnancy: Stimulation of fetal lung phospholipids.  J Clin Invest 68:1605-1609, 1981.

37.   **MELMED S**:  Bromocriptine inhibits colony formation by rat pituitary tumor cells in a double-layered agar colonigenic assay.  Endocrinology 109:2258-2260, 1981.

38.   **MELMED S**, Braunstein GD, Hershman JM, Wade MC:  Modulation of ectopic secretion of human chorionic gonadotropin by cultured ovarian adenocarcinoma cells.  Gynecol Oncol 16:49-55, 1983.

39.   **MELMED S**:  GH3 rat pituitary tumor cells are deficient in hypoxanthine-guanine phosphoribosyl transferase activity.  Biochem Biophys Res Commun 108:1460-1466, 1982.

40.   **MELMED S**, Braunstein GD:  Human chorionic gonadotropin stimulates proliferation of Nb 2 rat lymphoma cells.  J Clin Endocrinol Metab 56:1068-1070, 1983.

41.   **MELMED S**:  Isolation of human x mouse somatic cell hybrids producing human prolactin:  Dominant expression of hormone secretion and regulation.  J Clin Endocrinol Metab 56:1145-1151, 1983.

42.   Cheung CY, **MELMED S**, Braunstein GD:  Dopaminergic regulation of prolactin and growth hormone synthesis in rat pituitary tumor cells. Brain Research 270:165-168, 1983.

43.   Davidson MB, **MELMED S**:  Hepatocyte insulin binding and action in rats with sommatomammotrophic tumors.  Diabetologia 25:60-65, 1983.

44.   **MELMED S**:  Insulin suppresses growth hormone secretion by rat pituitary cells.  J Clin Invest 73:1425-1433, 1984.

45.   Davidson MB, **MELMED S**:  Insulin binding and action in rats bearing growth hormone secreting transplantable tumors.  In:  Lessons from Animal Diabetes, Ed. by Shafrir E, Renold AE, p 231, London:  John Libbey, 1984.

46.   Gilbert PL, Siegel RJ, **MELMED S**, Sherman CT, Fishbein MC:  Cardiac morphology in rats with growth hormone-producing tumors.  J Mol Cell Cardiol 17:805-811, 1985.

47.   **MELMED S**, Ezrin C, Kovacs K, Goodman R, Frohman LA:  Acromegaly due to secretion of growth hormone by an ectopic pancreatic islet cell tumor.  New Engl J Med 312:9-17, 1985.

48.   **MELMED S**, Neilson L, Slanina S:  Insulin suppresses rat growth hormone messenger RNA levels in rat pituitary tumor cells.  Diabetes 34:409-412, 1985.

49.   **MELMED S**, Slanina SM:  Insulin suppresses triiodothyronine-induced growth hormone secretion by GH3 rat pituitary cells.  Endocrinology 117:532-537, 1985.

50.   Drazzin B, Mehler PS, Leitner JW, Sussman KE, Dahl R, Vatter A, **MELMED S**:  Localization of somatostatin receptors in secretion vesicles in anterior pituitary cells and pancreatic islets.  J Recept Res 5:83-103, 1985.

51.   **MELMED S**, Fagin J, Leung M:  Bromocriptine inhibits incorporation of 3H-thymidine into rat pituitary tumor cells.  Brain Research 369:83-90, 1986.

52.   Yamashita S, **MELMED S**:  Insulin-like growth factor I action on rat anterior pituitary cells:  Suppression of growth hormone secretion and messenger RNA levels.  Endocrinology 118:176-182, 1986.

53.   **MELMED S**, Fagin J:  Isolation and characterization of rat-mouse somatostatin cell hybrids secreting growth hormone and prolactin.  Exptl Cell Res 162:475-485, 1986.

54.   Yamashita S, **MELMED S**:  Suppression of triiodothyronine-induced growth hormone messenger RNA by insulin-like growth factor-I in thyroidectomized rat pituitary cells.  Frontiers in Thyroidology 1:697-700, 1986.

55.   Yamashita S, **MELMED S**:  Effects of insulin on rat anterior pituitary cells:  Inhibition of growth hormone secretion and mRNA levels. Diabetes 35:440-447, 1986.

56.   Yamashita S, Slanina S, Kado H, **MELMED S**:  Autoregulation of pituitary growth hormone mRNA levels in rats bearing transplantable mammosommatotropic pituitary tumors.  Endocrinology 118:915-918, 1986.

57.   **MELMED S**, Yamashita S:  Insulin-like growth Factor-I action on hypothyroid rat pituitary cells:  Suppression of triiodothyronine-induced growth hormone secretion and messenger RNA levels.  Endocrinology 118:1483-1490, 1986.

58.   Neufeld ND, Braunstein GD, **MELMED S**, Corbo L, Rasor J:  Prenatal Therapy in Experimental Diabetic Pregnancy:  Association with Fetal Lung Maturity.  J Perinatol 6:101, 1986.

59.  Karpf D, Yamashita S, **MELMED S**, Kudish H, Braunstein GD:  In vitro secretion of deoxycorticosterone by a benign Leydig cell tumor of the testis.  J Urol 136:114, 1986.

60.  Yamashita S, Weiss M, **MELMED S**:  Insulin-like growth-factor I regulates growth hormone secretion and messenger RNA levels in human pituitary tumor cells.  J Clin Endocrinol Metab 63:730-735, 1986.

61.  Yamashita S, Ong J, Fagin JA, **MELMED S**:  Expression of the myc cellular oncogene in human thyroid tissues.  J Clin Endocrinol Metab 63:1170-1173, 1986.

62.  Yamashita S, **MELMED S**:  Insulin regulation of rat growth hormone gene transcription.  J Clin Invest 78:1008-1014, 1986.

63.  Ong J, Yamashita S, **MELMED S**:  Insulin-like growth factor I induces c-fos messenger RNA in L6 rat skeletal muscle cells.  Endocrinology 120:353-357, 1987.

64.  Fagin JA, **MELMED S**:  Relative increase in insulin-like growth factor I messenger RNA levels in compensatory renal hypertrophy.  Endocrinology 20:718-724, 1987.

65.  Yamashita S, **MELMED S**:  Insulin-like factor-I regulation of growth hormone gene transcription in primary rat pituitary cells.  J Clin Invest 79:449-452, 1987.

66.  **MELMED S**, Yamashita S, Kovacs K, Ong J, Rosenblatt S, Braunstein GD: Cushing's syndrome due to ectopic proopiomelanocortin gene expression by islet cell carcinoma of the pancreas.  Cancer 59:(4)772-778, 1987.

67.  Alexander N, **MELMED S**, Morris M:  Suppressed serum prolactin levels in sino-aortic denervated rats.  Am J Physiol 21:R290-293, 1987.

68.  Fagin JA, Pixley S, Slanina S, Ong J, **MELMED S**:  IGF-I gene expression in GH3 rat pituitary cells.  Endocrinology 120:2037-2043, 1987

69.  Pixley S, Weiss M, **MELMED S**:  Identification of human growth hormone messenger ribonucleic acid in pituitary adenoma cells by in situ hybridization.  J Clin Endocrinol Metab 65:575-580, 1987.

70.  Yamashita S, Ong J, **MELMED S**:  Regulation of human growth hormone gene expression by insulin-like growth factor I in transfected cells.  J Biol Chem 262:13254-13257, 1987.

71.  Morita S, Yamashita S, **MELMED S**:  IGF-I action on rat anteriorpituitary cells:  Effects of intracellular messengers on growth hormone secretion and messenger RNA levels.  Endocrinology 121:2000-2006, 1987.

72.  Fagin S, Brown A, **MELMED S**:  Regulation of pituitary IGF-I mRNA levels in rats harboring somatomammotropic tumors:  implications for growth hormone autoregulation.  Endocrinology 122:2204-2210, 1988.

73.  Prager D, Yamashita S, **MELMED S**:  Insulin regulates prolactin secretion and messenger RNA levels in pituitary cells.  Endocrinology 122:2946-2952, 1988.

74.  **MELMED S**, Ziel F, Braunstein GD, Downs T, Frohman LA:  Medical management of ectopic production of growth hormone releasing hormone by a carcinoid tumor.  J Clin Endo Metab 67 (2):395-399, 1988.

75.  Prager D, **MELMED S**:  Insulin regulates expression of the human growth hormone gene in transfected cells.  J Biol Chem 263:16580-16585, 1988.

76.  Mc Allister T, Price T, **MELMED S**:  Lack of effect of naloxone on prolactin and seizures in electroconvulsive therapy.  Epilepsia 30 (1):41-44, 1989.

77.  Namba S, Morita S, **MELMED S**:  Insulin-like growth factor I action on growth hormone secretion and mRNA levels: interaction with somatostatin.  Endocrinology 124:1794-1799, 1989.

78.  Barakat S, **MELMED S**:  Reversible shrinkage of a growth hormone secreting pituitary adenoma by a long-acting somatostatin analog, SMS 201-995.  Archives of Int Med 149:1443-1445, 1989.

79.  Morita S, Fernandez C, **MELMED S**:  Retinoic acid selectively stimulates growth hormone secretion and messenger ribonucleic acid levels in rat pituitary cells.  Endocrinology 124:2052-2056, 1989.

80.  Fagin JA, Fernandez-Mejia C, **MELMED S**:  Pituitary Insulin-like growth factor I gene expression:  Regulation by triiodothyronine and growth hormone.  Endocrinology 125:2385-2391, 1989.

81.  Siegel RJ, Fishbein MC, Said JW, Fealy M, Chai A, Rubin SA, **MELMED S**: Identification of growth hormone at the myocardial cell surface.  Am J Cardiovascular Path 2:345-350, 1989.

82. Prager D, Gebremedhin S, **MELMED S**:  An insulin-induced DNA-binding protein for the human growth hormone gene. J Clin Invest, 85:1680-1685, 1990.

83. Matsuo K, Yamashita S, Niwa M, Kurihara M, Harakawa S, Izumi M, Nagataki S, **MELMED S**:  Thyroid hormone regulates rat pituitary insulin-like growth factor-I receptors.  Endocrinology 126:550-554, 1990.

84. Rubin SA, Buttrick P, Malhotra A, **MELMED S**, Fishbein MC:  Cardiac physiology, biochemistry and morphology in response to excess growth hormone in the rat.  J Mol and Cell Cardiology 22:429-438, 1990.

85. Harakawa S, Yamashita S, Tobinaga T, Matsuo K, Hirayu H, Izumi M, Nagataki S, **MELMED S**:  In vivo regulation of hepatic insulin-like growth factor-I messenger ribonucleic acids with thyroid hormone. Endocrinology Japan 37:205-211, 1990.

86. Herman V, Fagin J, Gonsky R, Kovacs K, **MELMED S**:  Clonal origin of pituitary adenomas.  J Clin Endocrinol and Metab 71:1427-1433, 1990.

87. Herman V, Weiss M, Becker D, **MELMED S**:  Hypothalamic hormonal regulation of human growth hormone gene expression in somatotroph adenoma cell culture.  Endocrine Pathology 1:236-244, 1990.

88. Yamasaki H, Prager D, Gebremedhin S, Moise L, **MELMED S**:  Binding and action of insulin-like growth factor I in pituitary tumor cells. Endocrinology 128:857-862, 1991.

89. Shohat M, Herman V, **MELMED S**, Neufeld N, Shrech R, Pulst S, Graham JM, Rimoin DL, Korenberg JR:  Deletion of 20p 11.23 ->pter with growth hormone neurosecretory disorder but normal growth hormone releasing hormone gene.  Am J Human Genetics 39:56-63, 1991.

90. Ezzat S, Laks D, Oster J, **MELMED S**:  Growth hormone regulation in primary fetal and neonatal rat pituitary cell cultures:  The role of thyroid hormone.  Endocrinology 128:937-943, 1991.

91. Ezzat S, Strom C, **MELMED S**:  Colon polyps in acromegaly.  Annals Internal Medicine 114:754-755, 1991.

92. Yamasaki H, Prager D, Gebremedhin S, **MELMED S**:  Insulin-like growth factor I attenuation of growth hormone is enhance by over-expression of pituitary insulin-like growth factor I receptors.  Molecular Endocrinology 5:890-896, 1991.

93. Ezzat S, Ren SG, Braunstein GD, **MELMED S**:  Octreotide stimulates insulin-like growth factor binding protein 1 levels in acromegaly.  J Clin Endo Metab 73:441-443,1991.

94. Gonsky R, Herman VS, **MELMED S**, Fagin J:  Transforming DNA sequences isolated from human prolactin-secreting pituitary tumors.  Molecular Endocrinology 5:1687-1695, 1991.

95. Ren SG, Ezzat S, **MELMED S**, Braunstein GD: Somastatin analog induces insulin-like growth factor binding protein-1 (IGFBP-1) expression in human hepatoma cells. Endocrinology 131:2479-2481, 1992.

96. Weber MM, **MELMED S**, Rosenbloom J, Yamasaki H, Prager D:  Rat somatotroph insulin-like growth factor II signalling: Role of the insulin-like growth factor I receptor.  Endocrinology 131:2147-2153, 1992.

97. Yamasaki H, Prager D, Gebremedhin S, **MELMED S**: Human IGF-I receptor 950Tyrosine is required for somatotroph growth factor signal transduction.  J Biol Chem 267:20953-20958, 1992.

98. Ezzat S, Ren SG, Braunstein GD, **MELMED S**:  Octreotide stimulates IGF binding protein 1: A potential pituitary-independent mechanism for drug action. J Clin Endocrinol Metab 75:1459-1463, 1992.

99. Prager D, Yamasaki H, Weber M, Gebremedhin S, **MELMED S**: Human IGF-I receptor function in pituitary growth hormone-secreting cells is suppressed by a dominant negative mutant. J Clin Invest 90:2117-2122, 1992.

100. Ezzat S, Snyder PJ, Young WF, Boyajy, LD, Newman C, Klibanski A, Molitch ME, Boyd AE, Sheeler L, Cook DM, Malarkey WB, Jackson I, Vance ML, Thorner MO, Barkan A, Frohman LA, **MELMED S**: Octreotide treatment of acromegaly a randomized, multicenter study. Ann Int Med 117:711-718, 1992.

101. Ezzat S, **MELMED S**: Endocrine applications of the somatostatin analogue octreotide (Sandostatin). Metab Clin and Exp 41:34-38, 1992.

102. Ezzat S, Ezrin C, Yamashita S, **MELMED S**:  Recurrent acromegaly due to ectopic growth hormone gene expression by a metastatic pancreatic tumor.  Cancer 71:66-70, 1993.

103. Prager D, Weber MM, Gebremedhin S, **MELMED S**: Interaction between insulin and thyroid hormone in rat pituitary tumor cells: insulin attenuates T3-induced growth hormone mRNA levels. J of Endocrinology 137:107-114, 1993.

104. Smith RA, **MELMED S**, Sherman B, Frane J, Munsat TL, Festoff BW: Recombinant growth hormone treatment of amyotrophic lateral sclerosis. Muscle and Nerve 16:624-633, 1993.

105. **MELMED S**: Medical management of acromegaly - what and when? Acta Endocrinol, 1993.

106. Ezzat S, **MELMED S**, Endres D, Eyre DR, Singer FR: Biochemical assessment of bone formation and resorption in acromegaly. J Clin Endocrinol Metab, 76:1452-1457, 1993.

107. Yamasaki H, Prager D, **MELMED S**: Structure-function of the human IGF-I receptor: A discordance of somatotroph internalization and signaling. Molecular Endocrinol 7:681-685, 1993.

108. Herman V, Drazin N, Gonsky R, **MELMED S**: Molecular screening of pituitary adenomas for gene mutations and rearrangements. J Clin Endocrinol Metab 77:50-55, 1993.

109. Yamamoto H, Prager D, Yamasaki H, **MELMED S**: Rat pituitary GC cell insulin-like growth factor I receptor regulation. Endocrinology 133:1420-1425, 1993.

110. Prager D, Yamasaki H, Li J, **MELMED S**: Human insulin-like growth factor I receptor internalization role of the juxtamembrane domain. J Biol Chem 269:11934-11937, 1994.

111. **MELMED S,** Dowling RH, Frohman L, Ho K, Lamberts SWJ, LaMont JT, Sassolas G, Schoenfield L, Snyder P, Wass JAH: Consensus statement: benefits vs. risks of medical therapy for acromegaly. Am J of Med 97:468-473, 1994.

112. Greenman Y, **MELMED S**: Heterogenous expression of two somatostatin receptor subtypes in pituitary tumors. J Clin Endocrinol Metab 78:398-403, 1994.

113. Pei L, **MELMED S**, Scheithauer B, Kovacs K, Prager D: H-ras mutations in human pituitary carcinoma metastases. J Clin Endocrinol Metab 78:842-846, 1994.

114. Prager D, Hsiao-Lin, Asa S, **MELMED S:** Dominant negative inhibition of tumorigenesis in vivo by human insulin-like growth factor I receptor mutant. Proc Natl Acad Sci 91:2181-2185, 1994.

115. Prager D, Yamasaki H, Weber MM, **MELMED S**:  Role of the insulin-like growth factors in regulating neuroendocrine function. Neurobiology of Aging 15:569-572, 1994.

116. Greenman Y, **MELMED S**: Expression of three somatostatin receptor subtypes in pituitary adenomas: Evidence for preferential SSTR5 expression in the mammosomatotroph lineage. J Clin Endocrinol Metab 79:724-729, 1994.

117. Webster J, Prager D, **MELMED S:** Insulin-like growth factor-I activation of extracellular signal-related kinase-1 and -2 in growth hormone-secreting cells. Mol Endocrinol 8:539-544, 1994.

118. Pei L, **MELMED S**: The neurofibromatosis gene in human pituitary adenomas. Endocrine Pathol 5:229-232, 1994.

119. Greenman Y, Prager D, **MELMED S**:  IGF-I receptor sub-membrane is intact in GH-secreting pituitary tumors. Clin Endo 42:169-172, 1994

120. Akita S, Webster J, Ren S-G, Takino H, Said J, Zand O, **MELMED S:** Human and murine pituitary expression of leukemia inhibitory factor (LIF) novel intrapituitary regulation of adrenocorticotropin hormone (ACTH) synthesis and secretion. J Clin Invest 95:1288-1298, 1995.

121. Pei L, **MELMED S**, Scheithauer B, Benedict WF, Kovacs K, Prager D: Frequent loss of heterozygosity at the retinoblastoma susceptibility gene (RB) locus in aggressive pituitary tumors: Evidence for a chromosome 13 tumor suppressor gene other than RB[1]. Cancer Research 55:1613-1616, 1995.

122. Takino H, Herman V, Weiss M, **MELMED S**: Purine-binding factor (NM23) gene expression in pituitary tumors: marker of adenoma invasiveness. J Clin Endocrinol Metab 80:1733-1738, 1995.

123. Newman CB, **MELMED S**, Snyder PJ, Young WF, Boyaji LD, Stewart WN, Klibanski A, Molitch ME, Boyd AE, Sheeler L, Cook D, Malarkey WB, Jackson IMD, Van ML, Thorner MO, Ho PJ, Jaffe CA, Frohman LA, Kleinberg DL: Safety and efficacy of long-term octreotide therapy of acromegaly: Results of a multicenter trial in 103 patients. J Clin Endocrinol Metab 80:2768-2775, 1995.

124. Pei L, **MELMED S**: Characterization of the rat vasoactive intestinal polypeptide (VIP) receptor 5' region. Biochem Journal 308:719-723, 1995.

125. Rosenfeld RG, Albersson-Wikland K, Cassorla F, Douglas Frasier S, Hasegawa Y, Hintz RL, Lafranchi S, Lippe B, Loriaux L, **MELMED S**, Preece MA, Ranke MB, Reiter EO, Rogol AD, Underwood LE, Werther GA:  Diagnostic Controversy: The diagnosis of childhood growth hormone deficiency revisited. J Clin Endocrinol Metab 80:1532-1540, 1995.

126. Greenman Y, Woolf P, Coniglio J, Mara RO, Pei L, Said J, **MELMED S**: Remission of acromegaly caused by pituitary carcinoma following surgical excision of GH secreting metastasis detected by 111-indium pentetreotide scan. J Clin Endocrinol Metab 81:1628-1633, 1996.

127. Faccenda E, **MELMED S**, Bevan JS, Eidne KA: Structure of the thyrotropin-releasing hormone (TRH) receptor in functional and in clinically non-functioning pituitary adenomas. Clin Endocrinology 44: 341-347, 1996.

128. Shimon I, Huttner A, Said J, Spirina OM, **MELMED S**: Heparin-binding secretory transforming gene (hst) facilitates rat lactotrope cell tumorigenesis and induces prolactin gene transcription. J Clin Invest 97:187-195, 1996.

129. Ray DW, Ren S-G, **MELMED S**: Leukemia inhibitory factor (LIF) stimulates proopiomelanocortin (POMC) expression in a corticotroph cell line: role of stat pathway. J Clin Invest 97:1852-1859, 1996.

130. Akita S, Malkin J, **MELMED S:** Disrupted murine leukemia inhibitory factor (LIF) gene attenuates adrenocorticotropic hormone (ACTH) secretion. Endocrinology 137:3140-3143 1996.

131. Wang Z, Song-Guang R, **MELMED S**: Hypothalamic and pituitary leukemia inhibitory factor gene expression in vivo: a novel endotoxin-inducible neuro-endocrine interface. Endocrinology 137:2947-2953, 1996.

132. Stefana B, Ray DW, **MELMED S**: Leukemia inhibitory factor (LIF) induces differentiation of pituitary corticotroph function: an immuno-neuroendocrine phenotypic switch. Proc Nat Acad Sci 93:12502-12506, 1996.

133. Akita S, Conn PM, **MELMED S**: Leukemia inhibitory factor (LIF) induces acute adrenocorticotrophic hormone (ACTH) secretion in fetal rhesus macaque primates: A novel dynamic test of pituitary function. J Clin Endocrinol Metab 81:4170-4173, 1996.

134. Shohat M, Tick D, Barakat S. Bu X, **MELMED S**, Rimoin DL: Short-term recombinant human growth hormone treatment increases growth rate in achondroplasia. J Clin Endocrinol Metab 81:4033-4037, 1996.

135. Shimon I, Taylor JE, Dong JZ, Bitonte RA, Kim S, Morgan B, Coy DH, Culler MD, **MELMED S**: Somatostatin receptor subtype specificity in human fetal pituitary cultures: Differential role of SSTR2 and SSTR5 for growth hormone, thyroid-stimulating hormone and prolactin regulation. J Clin Invest 99:789-798, 1997.

136. Pei L, **MELMED S**: Isolation and characterization of a pituitary tumor transforming gene (PTTG). Mol Endocrinol, 11:433-441, 1997.

137. Bousquet C, Ray DW, **MELMED S**: A common proopiomelanocortin binding element mediates leukemia inhibitory factor and corticotropin releasing hormone transcriptional synergy. J Biol Chem, 272:10551-10557, 1997.

138. Akita S, Readhead C, Stefaneanu L, Fine J, Tampanaru-Sarmesin A, Kovacs K, **MELMED S**: Pituitary-directed leukemia inhibitory factor transgene forms Rathke's cleft cysts and impairs adults pituitary function: A model for human pituitary Rathke's cysts. J Clin Invest, 99:2462-2469, 1997.

139. Shimon I, Yan X, Ray DW, **MELMED S**: Cytokine-dependent gp130 receptor subunit regulates human fetal pituitary adrenocorticotropin hormone and growth hormone secretion. J Clin Invest, 100:357-363, 1997.

140. Shimon I, Yan Xinmin, Taylor J., Weiss MH, Culler MD, **MELMED S**. Somatostatin Receptor (SSTR) Subtype-Selective Analogues Differentially Suppress in vitro Growth Hormone and Prolactin in Human Pituitary Adenomas: Novel Potential Therapy for Functional Pituitary Tumors. J Clin Invest 100:2386-2392, 1997.

141. Wang Z, **MELMED S:** Identification of an upstream enhancer within a functional promoter of the human leukemia inhibitory factor receptor gene and its alternative promoter usage. J Biol Chem, 272:27957-27965, 1997.

142. Shimon I, **MELMED S**: Structure and function of somatostatin receptors in growth hormone control. Endocrinology 155:S3-S6, 1997.

143. Ren SG, **MELMED S**, Braunstein GD: Decidual leukemia inhibitory factor production and action on human chorionic gonadotropin secretion at different stages of gestation in vitro. Early Pregnancy: Biology and Medicine 3: 102-108, 1997.

144. Shimon I, **MELMED S** Human fetal pituitary expresses functional growth hormone-releasing peptide receptors. J Clin Endocrinol Metab 83:174-178, 1998.

145. Bonert V, Seliverstov M, **MELMED S**: Pregnancy in acromegaly: Successful therapeutic outcome. J Clin Endocrinol Metab, 83:727-731, 1998.

146. Shimon I, Hinton DR, Weiss MH, **MELMED S**: Prolactinomas express human heparin-binding secretory transforming gene (hst) protein product: Marker of tumor invasiveness. Clin Endocrinol, 48:23-29, 1998.

147. Prezant TR, Levine J, **MELMED S**: Molecular characterization of the MEN-1 tumor suppressor gene in sporadic pituitary tumors. J Clin Endocrinol Metab, 83:1388-1391, 1998.

148. Ren S-G, Seliktar J, Li X, Braunstein GD, **MELMED S**: Measurement of leukemia inhibitory factor in biological fluids by radioimmunoassay. J Clin Endocrinol Metab 83:1275-1283, 1998.

149. Chesnokova V, Auernhammer C, **MELMED S**: Murine leukemia inhibitory factor (LIF) gene disruption attenuates the hypothalamo-pituitary-adrenal axis stress response. Endocrinology 139:2209-2216, 1998.

150. Auernhammer C, Chesnokova V, **MELMED S**: Leukemia inhibitory factor (LIF) modulates IL-1$\beta$ induced activation of the hypothalamo-pituitary-adrenal axis. Endocrinology 139:2201-2208, 1998.

151. Takeuchi S, Koeffler P, Minton D, Miyoshi I, **MELMED S**, Shimon I: Mutation and expression analysis of the cycline dependent-kinase inhibitor gene p27 KIP1 in pituitary tumors. J Endocrinology 157:337-341, 1998.

152. Auernhammer C, Chesnokova V, Bousquet C, **MELMED S**: Pituitary corticotroph SOCS-3: novel intracellular regulation of cytokine-mediated POMC gene expression and ACTH secretion. Molecular Endocrinol 12:954-961, 1998.

153. **MELMED S**, Jackson I, Kleinberg D, Klibanski A: Current treatment guidelines for Acromegaly. J Clin Endocrinol Metab, 83:2646-2652, 1998.

154. Newman C, **MELMED S**, George A, Torigian D, Duhaney M, Snyder S, et al: Octreotide as primary therapy for acromegaly. J Clin Endocrinol & Metab, 83:3034-3040, 1998.

155. Drange M, **MELMED S**: Long-acting lanreotide induces clinical and biochemical remission of acromegaly caused by disseminated carcinoid. J Clin Endocrinol Metab, 83:3104-3109, 1998.

156. Shimon I, **MELMED S**: Management of pituitary tumors. Annals of Internal Medicine, 129:472-483, 1998

157. Wang Z, **MELMED S**: Functional map of a placenta specific enhancer of the human leukemia inhibitory factor receptor gene. J Biol Chem, 273:26069-26077, 1998.

158. Shimon I, Yan X, Magoffin DA, Friedman T, **MELMED S**: Intact leptin receptor is selectively expressed in human fetal pituitary and pituitary adenomas and signals human fetal pituitary growth hormone secretion. J Clin Endocrinol Metab, 83:4059-4064, 1998.

159. Yano H, Readhead C, Nakashima M, Ren S-G, **MELMED S**: Pituitary-directed leukemia inhibitory factor transgene causes Cushing's syndrome: Neuro-immune endocrine modulation of pituitary development. Molecular Endocrinology, 12:1708-1720, 1998.

160. Zhang X, Horwitz G, Heaney T, Nakashima M, Prezant TR, Bronstein M, **MELMED S**: Pituitary tumor transforming gene (PTTG) expression in pituitary adenomas: marker for functional tumor invasiveness. J Clin Endocrinol Metab, 84:761-767, 1999.

161.  Zhang X, Horwitz G, Prezant T, Valentini T, Bronstein M, **MELMED S**: Structure, expression and function of human pituitary tumor transforming gene (PTTG). Mol Endocrinol, 13:156-166, 1999.

162.  Gadelha MR, Prezant TR, Une KN, Glick RA, Moskal SF, Vaisman M, **MELMED S,** Kineman RD, Frohman LA: Loss of heterozygosity on chromosome 11q13 in two families with acromegaly/gigantism is independent of mutations of the multiple endocrine neoplasia type I (Men-I) gene. J Clin Endocrinol Metab, 84:249-256, 1999.

163.  Prezant T, Kadioglu P, **MELMED S**: An intronless homolog of human proto-oncogene hPTTG is expressed in pituitary tumors: Evidence for hPTTG family. J Clin Endocrinol Metab, 84:1149-1152, 1999.

164.  Auernhammer C, **MELMED S**: Interleukin-11 stimulates POMC gene expression and ACTH secretion in corticotroph cells: evidence for a redundant cytokine network in the HPA axis. Endocrinology, 140:1559-1566, 1999.

165.  Bousquet C, **MELMED S**: Critical role for STAT3 in murine pituitary ACTH leukemia inhibitory factor (LIF) signaling. J Biol Chem, 274:10723-10730, 1999.

166.  Auernhammer C, Bousquet C, **MELMED S**: Autoregulation of pituitary corticotroph SOCS-3 expression-characterization of the murine SOCS-3 promoter. Proc Natl Acad Sci, 96:6964-6969, 1999.

167.  Tran A, Kovacs K, Stefaneanu L, Kontogeorgos G, Scheithauer BW, **MELMED S**: Expression of leukemia inhibitory factor in craniopharyngioma. Endo Path 10(2): 103-108, 1999.

168.  Ren S-G, Seliktar J, Li X, Hershmann J, Braunstein GD, **MELMED S**: In vivo and in vitro regulation of thyroid leukemia inhibitory factor (LIF) marker of hypothyroidism. J Clin Endocrinol & Metab 84:2883-2887, 1999.

169.  **MELMED S**: Insulin-like growth factor I – a prototypic peripheral-paracrine hormone? Endocrinology 140:3879-3880, 1999.

170.  Bousquet C, Susini C, **MELMED S:** Inhibitory roles for SHP-1 and SOCS-3 following pituitary proopiomelanocortin induction by leukemia inhibitory factor. J Clin Invest 104:1277-1285, 1999.

171.  Heaney AP, Horwitz GA, Wang Z, Singson R, **MELMED S.** Early involvement of estrogen-induced pituitary tumor transforming gene (PTTG1) and fibroblast growth factor (bFGF) expression in prolactinoma pathogenesis. Nature Medicine 5:1317-1321, 1999.

172.  Drange M, **MELMED S**: Molecular pathogenesis of acromegaly. Pituitary, 2:43-50, 1999.

173.  Meisel SR, Shimon I, Edginston TS, **MELMED S,** Cercek B, Shah PK: Leukaemia inhibitory factor enhances tissue factor expression in human monocyte-derived macrophages: a gp130-mediated mechanism. Br J Haematology 107: 747-755, 1999.

174.  Drange MR, Fram NR, Bonert VH, **MELMED S**: Pituitary tumor registry: A novel clinical resource. J Clin Endocrinol Metab, 85:168-174, 2000.

175.  Wang Z, **MELMED S**: Characterization of the murine pituitary tumor transforming gene (PTTG) gene and its promoter. Endocrinology, 141:763-771, 2000.

176.  Heaney A, **MELMED S**: New Pituitary Oncogenes. Endocrine Related Cancer, 7:3-15, 2000.

177.  Heaney A, **MELMED S**, Singson R, McCabe CJ, Nelson V, Nakashima M: Expression of pituitary tumor transforming gene in colorectal tumors. Lancet 355:716-719, 2000.

178.  Giustina A, Barkan A, Casanueva F, Cavagnini F, Frohman L, Ho K, Veldhuis J, Wass, von Werder J, **MELMED S**: Criteria for cure of acromegaly: A consensus statement, J Clin Endocrinol Metab, 85:526-529, 2000.

179.  Wang Z, **MELMED S:** Pituitary tumor transforming gene (PTTG) transforming and transactivation activity. J Biol Chem 275:7459-7461, 2000.

180.  Yu R, Ren S-G, Wang Z, Horwitz G, **MELMED S:** The pituitary tumor transforming gene (PTTG) regulates cells survival and division; evidence from live cell imaging. Mol Endo, 14:1137-1146, 2000.

181.  Kontogeorgos G, Patralexis H, Tran A, Kovacs K**, MELMED S:** Expression of leukemia inhibitory factor in human pituitary adenomas: a morphologic and immunocytochemical study. Pituitary 2:245-251, 2000.

182. Bonert VH, Zib K, Scarlett JA, **MELMED S**: Growth hormone receptor antagonist therapy in acromegalic patients resistant to somatostatin analogs. J Clin Endocrinol Metab, 85: 2958-2961, 2000.

183. Maheshwari HG, Herman-Bonert V, Shahinian H, Kovacs K, **MELMED S**: Long acting peptidomergic control of gigantism caused by acidophilic stem cell adenoma. J Clin Endocrinol Metab, 85:3409-3416, 2000.

184. Bousquet C, Zatelli MC, **MELMED S**: Direct regulation of pituitary proopiomelancortin by STAT3 provides a novel mechanism for immuno-neuroendocrine interfacing. J Clin Invest 106: 1417-1425, 2000.

185. Chesnokova V, **MELMED S**: Leukemia inhibitory factor (LIF) mediates the hypothalamic pituitary adrenal axis response to inflammation. Endocrinology 141:4032-4040, 2000.

186. Stefaneanu L, Kovacs K, Thapar K, Horvath E, **MELMED S**, Greenman Y: Octreotide effect on growth hormone and somatostatin subtype 2 receptor mRNAs of the human pituitary somatotroph adenomas. Endocrine Path 11:41-48, 2000.

187. Yu R, Heaney AP, Lu W, Chen J, **MELMED S**: Pituitary tumor transforming gene causes aneuploidy and p53-dependent and p53-independent apoptosis. J Biol Chem, 275:36502-36505, 2001.

188. Ishikawa H, Heaney AP, Yu R, Horwitz G, **MELMED S**: Human pituitary tumor transforming gene (PTTG) induces angiogenesis. J Clin Endocrinol Metab, 86:867-874, 2001.

189. Yu R, **MELMED S**: Oncogene activation in pituitary tumors. Brain Pathology, 11:328-341, 2001.

190. Rubinek T, Hadani M, Barkai G, **MELMED S,** Shimon I: Prolactin (PRL)-releasing peptide stimulates prolactin secretion from human fetal pituitary cultures and growth hormone release from cultured pituitary adenomas. J Clin Endocrinol Metab, 86:2826-2830, 2001.

191. **MELMED S**: Acromegaly and Cancer: not a problem. J Clin Endocrinol Metab, 86:2929-34, 2001.

192. Bousquet C, Chesnokova V, Kariagina A, Ferrand A, **MELMED S**: cAMP neuropeptide agonists induce pituitary suppressor of cytokine signaling-3: novel negative feedback mechanism for corticotroph cytokine action. Mol Endo, 15:1880-1890, 2001.

193. Wang Z, Yu R, **MELMED S**: Mice lacking pituitary tumor transforming gene (PTTG) show testicular and splenic hypoplasia, thymic hyperplasia, thrombocytopenia, aberrant cell cycle progression and premature centromere division, Mol Endo 15:1870-1879, 2001.

194. Auernhammer CJ, **MELMED S**: The central role of SOCS-3 in integrating the neuro-immunoendocrine interface. J Clin Invest, 108:1735-1740, 2001.

195. van der Lely A, Hutson K, Trainer PJ, Besser M, Barkan A, et al: Long-term treatment of acromegaly with pegvisomant, a growth hormone receptor antagonist, Lancet, 2001.

196. Bode JG, Ludwig S, Freitas CA, Schaper F, Ruhl M, **MELMED S**, Heinrich PC, Haussinger D. The MKK6/p38 mitogen activated protein kinase pathway is capable of inducing SOCS3 gene expression and inhibits IL-6 induced transcription. Biol Chem 382:1447-1453, 2001.

197. Ben Shlomo A, **MELMED S:** Growth hormone excess and cancer. J Anti-Aging Med 4:373-381, 2001.

198. Heaney A, **MELMED S**: Functional role of estrogen receptor in pituitary tumor pathogenesis, J Clin Invest, 109:277-283, 2002.

199. Chesnokova V, Kariagina A, **MELMED S**: Opposing effects of pituitary leukemia inhibitory factor and SOCS-3 on the ACTH axis response to inflammation. Am J Physiology, 282:E1110-E1118, 2002.

201. **MELMED S,** Casanueva F, Cavagnini F, Chanson P, Frohman L, Giordano G, Grossman A, Ho K, Kleinberg D, Lamberts S, Laws E, Lombardi G, Pinchera A, Serio M, Vance ML, Vigneri R, Wass J, von Werder K, Giustina A. Guidelines for acromegaly management: a consensus statement. J Clin Endocrinol Metab, 87:4054-4058, 2002.

202. Yu R, Song-Guang R, **MELMED S**: Proteasome inhibitors induce apoptosis in GH- and PRL-secreting rat pituitary tumor cells. Journal of Endocrinology, 174:379-386, 2002.

203. Heaney AP, Fernando M, Yong W, **MELMED S**: Functional PPAR-γ Receptor is a novel therapeutic target for ACTH-secreting pituitary adenomas, Nature Medicine, 8:1281-1287, 2002.

204. Stoika, RS, Yu R, **MELMED S**: Expression and function of pituitary tumour transforming gene (PTTG) for T-lymphocyte activation. British Journal of Haematology, 119:1070-1074, 2002.

205. Kontogeorgos G, Scheithauer BW, Kovacs KK, Horvath E, **MELMED S**: Growth factors and cytokines in paragangliomas and pheochromocytomas, with a special reference to the sustentacular cells. Endocrine Pathology, 13: 192-206, 2002.

206. **MELMED S**, Vance ML, Barkan AL, Bengtsson B-A, Kleinberg D, Klibanski A, Trainer PJ: Current status and future opportunities for controlling acromegaly. Pituitary, 5:185-196, 2002.

207. Chesnokova V, **MELMED S**: Minireview: Neuro-immuno-endocrine modulation of the hypothalamic-pituitary-adrenal (HPA) axis by gp130 signaling molecules. Endocrinology 143:1571-1574, 2002.

208. Ben-Shlomo A, Miklovsky I, Ren S-G, Yong WH, Heaney AP, Culler MD, **MELMED S**: Leukemia inhibitory factor regulates prolactin secretion in prolactinoma and lactotroph cells, J Clin Endocrinol and Metab, 88:858-63, 2003.

209. Horwitz GA, Miklovsky I, Heaney AP, Ren S-G, **MELMED S**: Human pituitary tumor transformation gene (PTTG1) motif suppresses prolactin expression. Mol Endo 17:600-609, 2003.

210. Wang Z, Moro E, Kovacs K, Yu R, **MELMED S**: Pituitary tumor transforming gene-null male mice exhibit impaired pancreatic beta cell proliferation and diabetes. Proc Natl Acad Sci 100:3428-32, 2003.

211. Heaney AP, **MELMED S**: PPAR-γ   receptor ligands: novel therapy for pituitary adenomas. J Clin Invest, 111:1381-8, 2003.

212. Liu N-A, Huang H, Yang Z, Herzog W, Hammerschmidt M, Lin S, **MELMED S**: Pituitary corticotroph ontogeny and regulation in transgenic zebrafish. Mol Endo, 17:959-966, 2003.

213. Ren, SG, Kim S, Taylor J, Dong J, Moreau J-P, Culler M, **MELMED S**: Suppression of rat and human growth hormone and prolactin secretion by a novel somatostatin/dopaminergic chimeric ligand. J Clin Endocrinol Metab, 88:5414-21, 2003.

214. Yu R, Lu W, **MELMED S**: Overexpressed pituitary tumor transforming gene (PTTG) cause aneuploidy in live human cells. Endocrinology, 144:4991-4998, 2003.

215. Ren SG, Taylor J, Dong J, Yu R, Culler MD, **MELMED S**: Functional association of somatostatin receptor subtypes 2 and 5 in inhibiting human growth hormone secretion. J Clin Endocrinol and Metab 88:4239-45, 2003.

216. Clemmons DR, Chihara K, Freda PU, Ho KK, Klibanski A, **MELMED S**, Shalet SM, Strasburger CJ, Trainer PJ, Thorner MO: Optimizing control of acromegaly: integrating a growth hormone receptor antagonist into the treatment algorithm. J Clin Endocrinol Metab 88:4759-67, 2003.

217. Giustina A, Casanueva FF, Cavagnini F, Chanson P, Clemmons D, Frohman LA, et al: Diagnosis and treatment of acromegaly complications. J Endocrinol Invest 26:1242-47, 2003.

218. **MELMED S**: Mechanisms for pituitary tumorigenesis: the plastic pituitary. J Clin Invest 112 (11): 1603-1618, 2003.

219. Abbud RA, Kelleher R, **MELMED S**: Cell specific pituitary gene expression profiles after treatment with leukemia inhibitory factor reveal novel modulators for POMC expression. Endocrinology, 145:867-880, 2004.

220. Bonert VB, **MELMED S**  Body mass index determines evoked GH responsiveness in normal health male subjects: Diagnostic caveat for adult GH deficiency. J Clin Endocrinol Metab, 89:3397-3401, 2004.

221. Murray RD, Kim K, Ren S-G, Chelly M, Umerhara Y, **MELMED S**: Central and peripheral actions of somatostatin on the growth hormone-insulin-like growth factor-I axis. J Clin Investigation, 114:349-356, 2004.

222. Heaney A, **MELMED S:**  Molecular targets in pituitary tumors. Nature Rev Cancer, 4:285-295, 2004.

223. Murray RD, Kim K, Ren SG, Lewis I, Weckbecker G, Bruns G, **MELMED S:** The novel somatostatin ligand (SOM230) regulates human and rat anterior pituitary hormone secretion. J Clin Endocrinol Metab, 89:3027-3032, 2004.

224. Ben-Shlomo A, Herman-Bonert V, **MELMED S:** Pegvisomant: the role of a growth hormone receptor antagonist in the treatment of acromegaly. Curr Opin in Endo and Diab. 11:276-280, 2004.

225. Yu R, **MELMED S**: Pituitary tumor transforming gene: an update. Kontogeorgos G, Kovacs K (eds) in Molecular Pathology of the Pituitary. Front Horm Res, Basel, Karger, 32:175-185, 2004.

226. Boelaert K, Yu R, Tannahill L, Stratford AL, Khanim FL, Eggo MC, Moore JS, Young LS, Gittoes NJ, Franklyn JA, **MELMED S**, McCabe CJ. PTTG's c-terminal PXXP motifs modulate critical cellular processes in vitro. J Mol Endocrinol 33:663-77, 2004.

227. Abbud A, Barker EM, Takumi I, Ren SG, Chen DY, Wawrowsky K, **MELMED S**: Early multipotential pituitary focal hyperplasia in the α-subunit of glycoprotein hormone-driven pituitary tumor transforming gene transgenic mice. Mol Endo, 19:1383-91, 2005.

228. Chesnokova V, Kovacs K, Castro A-V, Alon D**, MELMED S**: PTTG hypoplasia in PTTG -/- mice is protective for Rb +/- pituitary tumorigenesis. Mol Endo, 19:2371-2379, 2005.

229. Ben-Shlomo A, Wawrowsky KA, Miklovsky I, Ren SG, Taylor J, Culler MD, **MELMED S**: Somatostatin receptor type 5 modulates somatostatin receptor type 2 regulation of ACTH secretion.  J Biol Chem 280:24011-21, 2005.

230. **MELMED S,** Sternberg R, Cook D, Klibanski A, Chanson P, Bonert V, Vance ML, Rhew D, Kleinberg D, Barkan A: A critical analysis of pituitary tumor shrinkage during primary medical therapy in acromegaly. J Clin Endo Metab, 90:4405-4410, 2005.

231. **MELMED S**. Pharmacologic treatment of acromegaly. Medscape Clinical Update (e-pub), 2005.

232. Akino K, Akita S, Mizuguchi T, Takumi I, Yu R, Wang XY, Roxga J, Demetriou AA, **MELMED S,** Ohtsuru A, Yamashita S. A novel molecular marker of pituitary tumor transforming gene involves in rat liver regeneration. J Surg Res 129:142-146, 2005.

233. **MELMED S,** Casanueva F, Cavagnini F, Chanson P, Frohman LA, Laws E, Gaillard R, Ghigo E, Ho K, Kleinberg D, Jacquet P, Lamberts S, Lombardi G, Sheppard MC, Thorner M, Vance ML, Wass JAH, Giustina A. Consensus statement: medical management of acromegaly. Eur J of Endo 153:737-40, 2005.

234. Donangelo I, **MELMED S**: Treatment of acromegaly: future. Endocrine 28:123-8, 2005.

235. Donangelo I, **MELMED S**: Pathophysiology of pituitary adenomas. J Endocrinol Invest 28:100-105, 2005.

236. Liu N-A, Liu Q, Wawrowsky K, Yang Z, Lin S, **MELMED S:**  Prolactin receptor signaling mediates the osmotic response of embryonic zebrafish lactotroph. Mol Endocrinology, 20:871-80, 2006.

237. Yu R, Bonert V, Cruz-Soto M, **MELMED S:** Comment: Cyclin-dependent kinase inhibitor gene polymorphisms in pituitary gigantism. Endocrine 29:119-120, 2006.

238. **MELMED S**: 2004 World Health Organization classification of pituitary tumors: what is new? Acta Neuropath (Berl) 111:78-79, 2006.

239. Gillingwater TH, Wishart TM, Chen PE, Haley JE, Robertson K, MacDonald SH, Middleton S, Wawrowski K, Shipston MJ, **MELMED S**, Wyllie DJ, Skehel PA, Coleman MP, Ribchester RR: The neuroprotective WldS gene regulates expression of PTTG1 and erythroid differentiation regulator 1-like gene in mice and human cells. Hum Mol Genet 15:625-635, 2006.

240. Donangelo I, **MELMED S**: Implication of pituitary tropic status on tumor development. Front Horm Res 35:1-8, 2006.

241. Bronstein MD, **MELMED S**: Pituitary tumorigenesis. Arg Bras Endocrinol Metab 49:615-625, 2006.

242. Lum PY, Chen Y, Zhu J, Lamb J, **MELMED S**, Wang S, Drake TA, Lusis AJ, Schadt EE: Elucidating the murine brain transcriptional network in a segregating mouse population to identify core functional modules for obesity and diabetes. J Neurochem, Supplement (97) 1:50-62, 2006.

243. Akita S, Akino K, Ren SG, **MELMED S**, Imaizumi T, Hirano A: Elevated circulating leukemia inhibitory factor in patients with extensive burns. J Burn Care Res, 27:221-225, 2006.

244. Ren S-G, **MELMED S**: Pyridoxal phosphate inhibits pituitary cell proliferation and hormone secretion. Endocrinology 147:3936-3942, 2006.

245. Bonert VH, **MELMED S**: Acromegaly with moderate hyperprolactinemia caused by an intrasellar macroadenoma. Nat Clin Prac Endo and Metab 2:408-12, 2006.

246. Fraenkel M, Caloyeras J, Ren SG, **MELMED S**: Sex-steroid milieu determines diabetes rescue in pttg-null mice. J Endocrinol 189:519-528, 2006.

247. Donangelo I, Gutman S, Horvath E, Kovacs K, Wawrowsky K, Mount M, **MELMED S**: PTTG over-expression facilitates pituitary tumor development. Endocrinology 147:4781-4791, 2006.

248. **MELMED S**, Acromegaly. New Engl J Med, 355:2558-2573, 2006.

249. Liu NA, Liu Q, Wawrowsky K, Yang Z, Lin S, **MELMED S**: Prolactin receptor signaling mediates the osmotic response of embryonic zebrafisih lactotrophs. Mol Endocrinol 20:871-880, 2006.

250. Yu R, Bonert V, Saporta I, Raffel LJ, **MELMED S**: Aryl hydrocarbon receptor interacting protein variants in sporadic pituitary adenomas. J Clin Endocrinol & Metab, 91:5126-5129, 2006.

251. Ben-Shlomo A, **MELMED S**: Skin manifestations in acromegaly. Clinics in Dermatology in Endocrinology and the Skin, Vol. 24, pp. 256-259, 2006.

252. Vlotides G, Cruz-Soto M, Rubinek T, Eigler T, Auernhammer C, **MELMED S**: Mechanisms for growth factor-induced pituitary tumor transforming gene-1 (PTTG1) expression in pituitary folliculostellate TtT/GF cells. Mol Endo 20:3321-3335, 2006.

253. Tong Y, Tan Y, Zhou C, **MELMED S**: Pituitary tumor transforming gene interacts with SP1 to modulate G1/S cell phase transition. Oncogene, 26:5596-5605, 2007.

254. **MELMED S**: Aryl hydrocarbon receptor interacting protein and pituitary tumorigenesis: *A*nother *I*nteresting *P*rotein. J Clin Endocrinol Metab, 92:1617-1619, 2007.

255. Ben-Shlomo A, **MELMED S**: Selective regulation of somatostatin receptor subtype signaling: evidence for constitutive receptor activation. Mol Endo, 21:2565-2578, 2007.

256. Rubinek T, Wolf I, Chesnokova V, Vlotides G, **MELMED S**: Discordant proliferation and differentiation in pituitary transforming gene-null bone marrow stem cells. Am J Physiol 293:C1082-1092, 2007.

257. Gruszka A, Ren S-G, Dong J, Culler MD, **MELMED S**: Regulation of growth hormone and prolactin gene expression and secretion by chimeric somatostatin-dopamine molecules. Endocrinology, 148:6107-6114, 2007.

258. Chesnokova V, Zonis S, Rubinek T, Yu R, Ben-Shlomo A, Kovacs K, Wawrowsky K, **MELMED S:** Senescence mediates pituitary hypoplasia and restrains pituitary tumor growth. Cancer Res, 67:10564-10572, 2007.

259. Ben-Shlomo A, **MELMED S**: Drug profile: Pasireotide- a somatostatin analog for the potential treatment of acromegaly, neuroendocrine tumors and Cushing's disease. IDrugs 10:885-895, 2007.

260. Melmed GY, Yu R, Vlotides G, Ross G, Soraya A, Devlin S, **MELMED S**: Anti-aging therapy with human growth hormone associated with metastatic colon cancer in a patient with Crohn's colitis". Clin Gastr and Hepat, 6:360-363, 2008. PMCID: PMC2696478

261. **MELMED S**: Update in Pituitary Disease, J Clin Endocrinol and Metab 93:331-338, 2008. PMID:18258780

262. Cooper O, Geller J, **MELMED S:** Ovarian hyperstimulation syndrome caused by an FSH-secreting pituitary adenoma. Nat Clin Pract Endo & Metab, 4:234-238, 2008. PMCID: PMC2777809

263. Liu N-A, Ren M, Song J, Rios Y, Wawrowsky K, Ben-Shlomo A, Lin S, **MELMED S**: In vivo time-lapse imaging delineates the zebrafish pituitary proopiomelanocortin lineage boundary regulated by FGF3 signal. Developmental Biology, 319:192-200, 2008. PMCID: PMC2583244

264. Murray RD, **MELMED S**: A critical analysis of clinically available somatostatin analog formulations for therapy of acromegaly. J Clin Endocrinol Metab, 93:2957-2968, 2008. PMID: 18477663

265. Ben-Shlomo A, **MELMED S**: Somatostatin agonists for treatment of acromegaly. Mol and Cell Endocrinol, 286:192-208, 2008. PMCID: PMC2697610

266. Vlotides G, Siegel E, Donangelo I, Gutman S, Ren S-G, **MELMED S**: Rat prolactinoma cell growth regulation by epidermal growth factor receptor ligands. Cancer Res, 68:6377-6386, 2008. PMCID: PMC2497431

267.  Zhou C, Tong Y, Wawrowsky K, Bannykh S, Donangelo I, **MELMED S**:  Oct-1 induces human pituitary tumor transforming gene (hPTTG1) expression in endocrine tumors. Endocrine-Related Cancer, 15:817-831, 2008. PMID:18550719

268.  Tong Y, Ben-Shlomo A, Zhou C, Wawrowsky K, **MELMED S**: Pituitary tumor transforming gene (PTTG1) modulates Aurora Kinase A activity. Oncogene 27:6385-95, 2008.

269.  Bonert VS, Kennedy L, Petersenn S, Barkan A, Carmichael J, **MELMED S**: Lipodystrophy in patients with acromegaly receiving pegvisomant. J Clin Endocrinol Metab 93:3515-3518, 2008. PMID:18611977

270.  Giustina A, Barkan A, Chanson P, Grossman A, Hoffman A, Ghigo E, Casanueva F, Colao A, Lamberts S, Sheppard M, **MELMED S**: Pituitary Society, European Neuroendocrine Association. Guidelines for the treatment of growth hormone excess and growth hormone deficiency in adults. J Endo Invest, 31:820-838, 2008. PMID:18997495

271.  Chesnokova V, Zonis S, Kovacs K, BenShlomo A, Wawrowsky K, Bannykh S, **MELMED S**: p21Cip1/Kip1 restrains pituitary tumor growth. Proc Natl Acad Sci 105:17499-17503, 2008.

272.  Biller BM, Grossman AB, Stewart PM, **MELMED S**, Bertagna X, Bertherat J, Buchfelder M, Colao A, Hermus AR, Hofland LJ, Klibanski A, Lacroix A, Lindsay JR, Newell-Price J, Nieman LK, Petersenn S, Sonino N, Stalla GK, Swearingen B, Vance ML, Wass JA, Boscaro M. Treatment of adrenocorticotropin-dependent Cushing's syndrome: a consensus statement. J Clin Endocrinol Metab 93:2454-2462, 2008.

273.  Webb SM, Strasburger CJ, Mo D, Harman ML, **MELMED S**, Jung H, Blum WF, Attanasio AF: on behalf of the HypoCCS international Advisory Board. Changing patterns of the adult growth hormone deficiency diagnosis documented in a decade-long global surveillance database. J Clin Endocrinol Metab, 94:392-399, 2009. PMID: 19001512

274.  Carmichael JD, Bonert VS, Mirocha JM, **MELMED S,**  The utility of oral glucose tolerance testing (OGTT) for diagnosis and assessment of treatment outcomes in 170 patients with acromegaly. J Clin Endocrinol Metab, 94:523-527, 2009. PMID:19033371

275.  Ben-Shlomo A, Zhou C, Pichurin O, Chesnokova V, Liu NA, Culler M, **MELMED S**: Constitutive somatostatin receptor activity determines tonic pituitary cell response. Mol Endo, 23:337-348, 2009. PMCID: PMC2725764

276.  **MELMED S,** Barkan A, Chanson P, Clemmons D, Colao A, Grossman A, Ho K, Kleinberg D, Laws E, Molitch M, Schlechte J, Vance ML, Giustina A: Guidelines for acromegaly management: an update, J Clin Endocrinol Metab 94:1509-17, 2009.

277.  Arzt E, Chesnokova V, Stalla GK, **MELMED S**: Pituitary adenoma growth: A model for cellular senescence and cytokine action, Cell Cycle 8: 677-682, 2009. PMCID: PMC2710531

278.  Vlotides G, Cooper O, Chen YH, Ren SG, Greenman Y, **MELMED S**: Heregulin regulates prolactinoma gene expression, Cancer Res 69:4209-4216, 2009. PMCID: PMC2688701

279.  Vlotides G, Chen YH, Eigler T, **MELMED S**: Fibroblast growth factor-2 auto-feedback regulation in pituitary folliculostellate TtT/GF cells, Endocrinology 150:3252-8, 2009. PMCID: PMC2703553

280.  **MELMED S**: Acromegaly pathogenesis and treatment. J Clin Investigation, 119:3189-202, 2009. PMCID: PMC2769196

281.  Ben-Shlomo A, Schmid H, Wawrowsky K, Pichurin O, Hubina E, Chesnokova V, Liu NA, Culler M, **MELMED S**: Differential ligand-mediated pituitary somatostatin receptor subtype signalling: Implications for corticotroph tumor therapy. J Clin Endocrinol Metab, 94:4342-50, 2009. PMCID: PMC2697610.

282.  Zhou C, Wawrowsky K, Bannykh S, Gutman S, **MELMED S**: E2F1 induces pituitary tumor transforming gene (PTTG1) expression in human pituitary tumors. Mol Endocrinol, 23:2000-12, 2009. PMCID: PMC2796149

283.  Chesnokova V, **MELMED S**: Pituitary tumour-transforming gene (PTTG) and pituitary senescence. Horm Res 71 Suppl 2:82-87, 2009. PMID:19407503

284. Boscaro M, Ludlam WH, Atkinson B, GLusman JE, Petersenn S, Reincke M, Snyder P, Tabarin A, Biller BMK, Fiindling J, **MELMED S**, Darby CH, Hu K, Wang Y, Freda PU, Grossman AB, Frohman LA, Bertherat J. Treatment of pituitary-dependent Cushing's disease with the multireceptor ligand somatostatin analog pasireotide (SOM230): a multicenter, phase II trial. J Clin Endocrinol Metab 94:115-122, 2009.

285. Webb SM, Mo D, Lamberts SWJ, **MELMED S**, Cavagnini F, Giraldi FP, Strasburger CJ, Zimmermann AG, Woodmansee WW on behalf of the International HypoCCS advisory board: Metabolic, cardiovascular and cerebrovascular outcomes in growth hormone-deficient subjects with previous Cushing's disease or non-functioning pituitary adenoma. J Clin Endocrinol Metab 95:630-8, 2010. PMID:20022992

286. **MELMED S,** Cook D, Schopohl J, Goth MI, Lam KSL, Marek J. Rapid and sustained reduction of serum growth hormone and insulin-like growth factor-1 in patients with acromegaly receiving lanreotide Autogel therapy:  a randomized, placebo-controlled, multicentre study with a 52 week open extension. Pituitary 13:18-28, 2010. PMCID: PMC2807598

287. Klibanski A, **MELMED S**, Clemmons DR, Colao A, Cunningham RS, Molitch ME, Vinik AI, Adelman DT, Liebert KJP: The endocrine tumor summit 2008: appraising therapeutic approaches for acromegaly and carcinoid syndrome. Pituitary, 13:266-286, 2010. PMCID: PMC2913001

288. Giustina A, Chanson P, Bronstein MD, Klibanski A, Lamberts A, Casanueva FF, Trainer P, Ghigo E, Ho K, **MELMED S**: A consensus on criteria for cure of acromegaly. J Clin Endocrinol Metab, 95:3141-3148, 2010.

289. Cooper O, Ben-Shlomo A, Bonert V, Bannykh S, Mirocha J, **MELMED S**: Silent corticogonadotroph pituitary adenomas: clinical and cellular characteristics and long-term outcomes.  Hormones and Cancer, 1:80-92, 2010. PMCID: PMC2921667

290. Petersenn S, Schopohl J, Barkan A, Mohideen P, Colao A, Abs R, Buchelt A, Ho Y-Y, Hu K, Farrall AJ, **MELMED S**, Biller BMK, and the Pasireotide Acromegaly Study Group: Pasireotide (SOM230) demonstrates efficacy and safety in patients with acromegaly: a randomized, multicenter, Phase II trial. J Clin Endocrinol Metab, 95:2781-2789, 2010.

291. Ben-Shlomo A, Wawrowsky K, **MELMED S**: Constitutive activity of somatostatin receptor subtypes, Methods Enzymol 484:149-64, 2010. PMID:21036231

292. Yu R, **MELMED S**: Pathogenesis of pituitary tumors. Prog Brain Res 182:207-27, 2010. PMID:20541667

293. Chesnokova V, Zonis S, Ben-Shlomo A, Wawrowsky K, **MELMED S**: Molecular mechanisms of pituitary adenoma senescence. Front Horm Res 38:7-14, 2010.  PMID:20616490

294. Rios Y, **MELMED S**, Lin S, Liu N-A: Zebrafish usp39 mutation leads to rb1 mRNA splicing defect and pituitary lineage expansion. PLoS Genetics, 7:1271-82, 2011. PMID:18477663

295. **MELMED S**, Casanueva FF, Hoffman AR, Kleinberg DL, Montori VM, Schlechte JA, Wass JAH: Diagnosis and treatment of hyperprolactinemia: An Endocrine Society Clinical Practice Guideline, J Clin Endocrinol Metab, 96:273-288, 2011. PMID:21296991

296. Fukuoka H, Cooper O, Mizutani J, Tong Y, Song-Guang R, Bannykh S, **MELMED S:** HER2/ErbB2 receptor signaling in rat and human prolactinoma cells: strategy for targeted prolactinoma therapy. Mol Endocrinol, 25:92-103, 2011. PMID:21106881

297. Hoffman AR, **MELMED S**, Schlechte J: Patient guide to hyperprolactinemia diagnosis and treatment. J Clin Endocrinol Metab 96:35A-6A, 2011. PMID:21296988

298. Chesnokova V, Zonis S, Zhou C, Ben-Shlomo A, Wawrowsky K, Toledano Y, Tong Y, Kovacs K, Scheithauer B, **MELMED S**: Lineage-specific restraint of pituitary gonadotroph cell adenoma growth. PLoS One, 6(3):e17924, 2011.

299. Giustina A, Bronstein MD, Casanueva FF, Chanson P, Ghigo E, Ho KK, Klibanski A, Lamberts S, Trainer P, **MELMED S**: Current management practices for acromegaly: an international survey. Pituitary, 14:125-33, 2011. PMID: 21213053

300. **MELMED S**: Pathogenesis of Pituitary Tumors. Nature Reviews Endocrinology, 7:257-266, 2011.

301.   Famini P, Maya MM, **MELMED S**: Pituitary magnetic resonance imaging for sellar and parasellar masses: Ten year experience in 2598 patients. J Clin Endocrinol Metab, 96:1633-41, 2011.

302.   Ben-Shlomo A, Sheppard MC, Stephens JM, Pulgar S, **MELMED S**: Clinical, quality of life and economic value of acromegaly disease control. Pituitary 14:284-294, 2011.

303.   Liu NA, Jiang H, Fan X-M, Ben-Shlomo A, Wawrowsky K, Lin S, **MELMED S**. Targeting zebrafish and murine pituitary corticotroph tumors with a cyclin-dependent kinase (CDK ) inhibitor. Proc Natl Acad Sci, 108:8414-9, 2011.

304.   Tong Y, Zhao W, Wawrowsky K, **MELMED S**: PTTG1 attenuates drug-induced cellular senescence. PLoS One, 6:e23754, 2011.

305.   Tong Y, Zhou J, Mizutani J, Fukuoka H, Ren S-G, Gutierrez-Hartmann A, Koeffler HP, **MELMED S**: CEBPD suppresses prolactin expression and prolactinoma cell proliferation, Mol Endocrinol 25:1880-91, 2011.

306.   Fukuoka H, Cooper O, Ben-Shlomo A, Mamelak A, Ren SG, Bruyette D, **MELMED S**: EGFR as a Therapeutic Target for human, canine, and mouse ACTH-Secreting Pituitary Adenomas. J Clin Invest, 121:4712-21, 2011.

307.   Tong Y, Zheng Y, Zhou J, Oyesiku NM, Koeffler HP, **MELMED S**: Genomic characterization of human and rat prolactinomas. J Clin Endocrin Metab, 153:3679-3691, 2012.

308.   Tuvia S, Atsmon J, Teichman SL, Katz S, Salama P, Pelled D. Landau I, Karmeli I, Kramer WG, Bidlingmaier M, Strasburger CJ, Kleinberg DL, **MELMED S**, Mamluk R. Oral octreotide absorption in human subjects: Comparable pharmacokinetics to parenteral octreotide and effective growth hormone suppression. J Clin Endocrinol Metab, 97:2362-2369, 2012.

309.   Cooper O, **MELMED S**: Subclinical hyperfunctioning pituitary adenomas: the silent tumors. Best Practice & Research Clinical Endocrinology & Metabolism, 26:447-460, 2012.

310.   Gruszka A, Culler M, **MELMED S**: Somatostatin analogs and chimeric somatostatin-dopamine molecules differentially regulate human growth hormone and prolactin gene expression and secretion *in vitro*. Mol and Cell Endocrinol, 362:104-109, 2012.

311.   Toledano Y, Zonis S, Song-Guang R, Wawrowsky K, Chesnokova V, **MELMED S:** Estradiol partially recapitulates murine pituitary cell cycle response to pregnancy. Endocrinology 153:5011-5022, 2012.

312.   Giustina A, Mazziotti G, Torri V, Spinello M, Floriani I, **MELMED S:** Meta-analysis on the effect of octreotide on tumor mass in acromegaly. PLos One, 7:e36411, 2012.

313.   Chesnokova V, Zonis S, Wawrowsky K, Tani Y,  Ben-Shlomo A, Ljubimov V, Mamelak A, Bannykh S, **MELMED S**: Clusterin and FOXL2 act concordantly to regulate pituitary gonadotroph-cell adenoma growth. Mol Endocrinol 26:2092-103, 2012.

314.   Somm E, Bonnet N, Martinez A, Marks PMH, Cadd VA, Elliott M, Toulotte A, Ferrari SL, Rizzoli R, Huppi PS, Harper E, **MELMED S,** Jones R, Aubert ML. A botulinum toxin-derived targeted secretion inhibitor (TSI) inhibits rat GH/IGF-I axis: a novel therapeutic approach for acromegaly. J Clin Invest 122:3295-306, 2012.

315.   Thakker RV, Newey PJ, Walls GV, Bilezikian J, Dralle H, Ebeling PR, **MELMED S**, Sakurai A, Tonelli F, Brandi ML; Endocrine Society: Clinical practice guidelines for multiple endocrine neoplasia type 1 (MEN1). J Clin Endocrinol Metab 97:2990-3011, 2012.

316.   Mamelak AN, Carmichael J, Bonert VH, Cooper O, **MELMED S**. Single-surgeon fully endoscopic endonasal transsphenoidal surgery: outcomes in three-hundred consecutive cases. Pituitary, 16:393-401, 2013.

317.   Hartman ML, Xu R, Crowe BJ, Robison LL, Erfurth EM, Kleinberg DL, Zimmerman AG, Woodmansee WW, Cutler GB, Chipman JJ, **MELMED S**. Prospective safety surveillance of growth hormone (GH) deficient adults: comparison of GH-treated vs. untreated patients. J Clin Endocrinol Metab, 98:980-988, 2013.

318.   Ghazi AA, Amirbaigloo A, Dezfooli AA, Saadat N, Ghazi S, Pourafkari M, Tirgari F, Dhall D, Bannykh S, **MELMED S,** Cooper O: Ectopic acromegaly due to growth hormone releasing hormone. Endocrine, 43:293-302, 2013.

319. **MELMED S**: Update: Idiopathic Adult Growth Hormone Deficiency. J Clin Endo Metab, 98:2187-97, 2013.

320. Ben-Shlomo A, Pichurin O, Khalafi R, Zhou C, Chesnokova V, Ren S-G, Liu NA, **MELMED S**. Constitutive somatostatin receptor subtype 2 activity attenuates GH synthesis. Endocrinology 154:2399-409, 2013.

321. **MELMED S,** Casanueva FF, Klibanski A, Bronstein MD, Chanson P, Lamberts SW, Strasburger CJ, Wass JAH, Giustina A: A consensus on the diagnosis and treatment of acromegaly complications. Pituitary 16:294-302, 2013.

322. Chesnokova V, Zhou C, Zonis S, Tani Y, Ben-Shlomo A, Ren SG, **MELMED S**: Growth hormone is a cellular senescence target in pituitary and non-pituitary cells. Proc Natl Acad Sci 110(35):E3331-9, 2013.

323. Petersenn S, Webber D, Farrall A, DeBlock C, **MELMED S**, Schopohl J, Caron P, Cuneo R, Kleinberg D, Colao AM, Barkan A. Long-term efficacy and safety of subcutaneous pasireotide in acromegaly: results from an open-label, multicenter, Phase II extension study. Pituitary, 17:132-140, 2014.

324. Zhou C, Tong Y, Wawrowsky K, **MELMED S**: PTTG acts as a STATs target gene for colorectal cancer cell growth and motility. Oncogene 33:851-61, 2014.

325. Donangelo I, Ren SG, Eigler T, Svendsen C, **MELMED S**: Sca+ murine pituitary adenoma cells show tumor growth advantage. Endocr Relat Cancer 21:203-216, 2014.

326. Carmichael JD, Bonert V, Nuno M, Ly D, **MELMED S**: Acromegaly clinical trial methodology impact on reported biochemical efficacy rates of somatostatin receptor ligand treatments: a meta-analysis. J Clin Endocrinol Metab, 99:1825-1833, 2014.

327. Giustina A, Chanson P, Kleinberg D, Bronstein MD, Clemmons D, Klibanski A, Van der Lely AJ, Strasburger CJ, Lamberts SW, Ho, Casanueva FF, **MELMED S**: Expert consensus document: A consensus on the medical treatment of acromegaly. Nat Revs Endocrinol, 10:243-248, 2014.

328. Ben-Shlomo A, Mirocha J, Gwin SM, Khine AK, Liu NA, Sheinin RC, **MELMED S**: Clinical factors associated with biochemical adrenal-cortisol insufficiency in hospitalized patients. Am J of Med, 127:754-762, 2014.

329. Eigler T, Ben-Shlomo A, Zhou C, Khalfai R, Ren SG, **MELMED S**: Constitutive somatostatin receptor subtype-3 signaling suppresses growth hormone synthesis. Mol Endocrinol, 28:554-64, 2014.

330. Keeley PW, Zhou C, Lu L, Williams RW, **MELMED S**, Reese BE: Pituitary tumor-transforming gene 1 regulates the patterning of retinal mosaics. Proc Natl Acad Sci,111:9295-300, 2014.

331. Katznelson L, Laws Jr ER, **MELMED S**, Molitch ME, Utz A, Wass JA: Acromegaly: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab, 99(11):3933-51, 2014.

332. Mo D, Hardin DS, Erfurth EM, **MELMED S:** Adult mortality or morbidity is not increased in childhood-onset growth hormone deficient patients who received pediatric GH treatment: an analysis of the Hypopituitary control and complications study (HypoCCS) Pituitary 17(5) 477-85, 2014.

333. Cuevas-Ramos D, Carmichael JD, Cooper O, Bonert VH, Gertych A, Mamelak AN, **MELMED S**: A structural and functional acromegaly classification. J Clin Endocrinol Metab, 100:122-31, 2015.

334. Liu X, Kano M, Takako A, Cooper O, Fukuoka H, **MELMED S**: ErbB receptor-driven prolactinomas respond to targeted lapatinib treatment in female transgenic mice. Endocrinology, 156:71-79, 2015.

335. **MELMED S**, Brkic V, Bidlingmaier M, Mercado MA, Van der Lely AJ, BIermasz N, Bolanowski M, Coculescu M, Schopohl J, Racz K, Glaser B, Goth M, Greenman Y, Trainer P, Mezosi E, Shimon I, Giustina A, Korbonits M, Bronstein M, Kleinberg D, Teichman S, Gliko-Kabir I, Mamluk R, Haviv A, Strasburger C: Safety and efficacy of oral octreotide in acromegaly: Results of a multicenter phase III trial. J Clin Endocrinol Metab, 100(4):1699-1708, 2015.

336. Zhou C, Jiao Y, Wang R Ren SG, Wawrowsky K**, MELMED S**: STAT3 upregulation in pituitary somatotroph adenomas induces growth hormone hypersecretion. J Clin Invest, 125(4):1692-1702, 2015.

337. Liu N-A, Araki T, Cuevas-Ramos D, Hong J, Ben-Shlomo A, Tone Y, Tone M, **MELMED S**: Cyclin E-mediated human proopiomelanocortin regulation as a therapeutic target for Cushing Disease. J Clin Endocrinol Metab, 100(7):2557-2564, 2015.

338. **MELMED S:** Fertility and Fragrance: Another cause of Kallmann Syndrome. J Clin Invest, 125:2275-8, 2015.

339. Giustina A, Bevan JS, Bronstein MD, Casanueva FF, Chanson P, Petersenn S, Truong Thanh X-M, Sert C, Houchard A, Guillemin I, **MELMED S**. The Sagit Investigator Group. SAGIT: clinician-reported outcome instrument for managing acromegaly in clinical practice—development and results from a pilot study. Pituitary 19(1):39-49, 2016.

340. Greenman Y, Cooper O, Yaish I, Robenshtok E, Sagiv N, Jonash KT, Mallick J, Gertych A, Shimon I, Ram Z, **MELMED S**, Stern N. Treatment of clinically and non-functioning pituitary adenomas with dopamine agonists. Eur J Endocrinol 175(1):63-72, 2016.

341. Chesnokova V, Zonis, Zhou C, Recouvreux V, Ben Shlomo A, Araki T, Barrett R, Workman M, Wawrowky K, Ljubimov VA, Uhart M, **MELMED S**: Growth hormone is permissive for neoplastic colon growth. Proc Natl Acad Sci USA 113(23):E3250-9, 2016.

342. Christiansen JS, Backeljauw PF, Bidlingmaier M, Biller BMK, Boguszewski MCS, Casanueva FF, Chason P, Chatelain P, Choong CS, Clemmons DR, et al. Growth hormone research society perspective on the development of long-acting growth hormone preparations. Eur J of Endocrinology 174(6):C1-8, 2016.

343. Fleseriu M, Hashim I, Karavitaki N, **MELMED S,** Murad MH, Salvatori R, Samuels M. Hormonal replacement in hypopituitarism in Adults: An endocrine society clinical practice guideline. J Clin Endocrinol Metab, 101(11):3888-3921, 2016.

344. Araki T, Liu NA, Tone Y, Ben-Shlomo A, Heltsley R, Cuevas-Ramos D, Cooper O, Tone M, **MELMED S**: E2F1-mediated human POMC expression in ectopic Cushing's syndrome. Endocrine-Related Cancer, 23(11):857-870, 2016.

345. Araki T, Liu X, Kameda H, Tone Y, H Fukuoka, M Tone, **MELMED S**. EGFR induces E2F1-mediated corticotroph tumorigenesis. J Endo Society, 1(2):127-143, 2017.

346. Ben-Shlomo A, Liu NA, **MELMED S**: Somatostatin and dopamine receptor regulation of pituitary somatotroph adenomas. Pituitary. 20(1):93-99, 2017.

347. Cooper O, Bonert V, Moser F, Mirocha J, **MELMED S:** Altered pituitary gland structure and function in posttraumatic stress disorder. J Endo Society, 1(6): 577-587, 2017.

348. Babu H, Ortega A, Nuno M, Dehghan A, Schweltzer A, Bonert VH, Carmichael JD, Cooper O, **MELMED S**, Mamelak AN. Long-term endocrine outcomes following endoscopic endonasal transsphenoidal surgery for acromegaly and associated prognostic factors. Neurosurgery, 2017 (Epub ahead March 29).

349. Recouvreux V, Wu B, Gao AC, Zonis S, Chesnokova V, Bhowmick N, Chung L, **MELMED S:** Androgen receptor regulation of local growth hormone in prostate cancer cells. Endocrinology, 158(7):2255-2268, 2017.

350. Casanueva FF, Barkan A, Buchfelder M, Klibanski A, Laws ER, Loeffler JS, **MELMED S**, Mortini P, Wass J, Giustina A. On behalf of the Pituitary Society, Expert Group on Pituitary Tumors. Criteria for the definition of Pituitary tumor centers of excellence (PTCOE): A Pituitary Society Statement. Pituitary 20:489-498, 2017.

## LETTERS TO THE EDITOR

1. **MELMED S**: Radiotherapy for Acromegaly.  N Eng J Med 323:612-613, 1990 (letter).

2. **MELMED S,** Ezzat S:  Colonic Polyps in Acromegaly (letter).  Ann Int Med 115:232-233, 1991.

3. **MELMED S**: Letter from the United States.  The Endocrinologist 48:13, 1998.

4. Giustina A, **MELMED S:** Acromegaly Consensus: The next steps. J Clin Endocrinol Metab 88:1913-1914, 2003.

5. **MELMED S**: Acromegaly. N Engl J of Med, 356:1274-1276, 2007.

### REVIEWS-PEER REVIEWED

1. Morley JE, **MELMED S**:  Gonadal dysfunction in systemic disorders. Metabolism 28:1051, 1979.
2. **MELMED S**, Braunstein GD, Horvath E, Ezrin C, Kovacs K: Pathophysiology of acromegaly.  Endocrine Reviews 4:271-290, 1983.
3. **MELMED S**:  Control of prolactin synthesis and secretion.  Sem Reprod Endocrinol 2:1-8, 1984.
4. **MELMED S**, Chang J, Braunstein GD, Becker D:  Growth hormone and prolactin-secreting pituitary tumors.  Ann Intern Med 105:238-253, 1986.
5. **MELMED S**, Fagin JA:  Acromegaly update: Etiology, Diagnosis and Management.  West J Med 146:328-336, 1987.
6. **MELMED S**:  Acromegaly.  New Eng J Med 322:966-977, 1990.
7. Ezzat S, **MELMED S**:  The role of growth factors in the pituitary.  J Endocrinol Invest 13:691-698, 1990
8. Ezzat S, **MELMED S**:  Are patients with acromegaly at increased risk for neoplasia?  J Clin Endocrinol and Metab 72:245-249, 1991.
9. Ezzat S, **MELMED S**:  Acromegaly:  Etiology, Diagnosis and Management. Comprehensive Therapy 17:31-35, 1991.
10. Greenman Y, **MELMED S**: Diagnosis and management of nonfunctioning pituitary tumors. C.H. Coggins (Ed.), Ann Rev of Med, Vol. 47:95-106, 1996.
11. **MELMED S**, Ho K, Thorner M, Klibanski A, Reichlin S: Recent advances in pathogenesis, diagnosis and management of acromegaly. J Clin Endocrinol Metab, 80:3395-3402, 1995.
12. **MELMED S**: Unwanted effects of growth hormone excess in the adult. J Pediatr Endocrinol 9:369-374, 1996.
13. **MELMED S**: Molecular pathophysiology of acromegaly. Acta Pediatr Scan 417:45-48, 1996
14. Shimon S, **MELMED S**: Genetic basis of endocrine disease: Pituitary tumor pathogenesis. J Clin Endocrinol Metab, 82:1675-1681, 1997.
15. **MELMED S**: gp130-related cytokines and their receptors in the pituitary. Trends in Endocrinol and Metab 8(10):391-397, 1998.
16. **MELMED S**: Structure and function of the dopamine receptor. Endocrinologist 7:385-389, 1997.
17. Ray DW, Ren S-G, **MELMED S**: Leukemia inhibitory factor regulates proopiomelanocortin transcription. Proc New York Acad of Sci, 17:189-202, 1997.
18. Klibanski A, Ho K, Freda PU, Clemmons DR, Barkan AL, Kleinberg DL, Trainer PJ, Swearingen B, Molitch ME, Wass JAH, Thorner MO, **MELMED S**, Strasburger CJ, Frohman LA. State-of-the-art strategies for the diagnosis and management of acromegaly. The Endocrinologist 2001 11:223-232.
19. Ray D, **MELMED S**: Pituitary cytokine and growth factor expression and action. Endocrine Reviews 18:206-228, 1997.
20. Auernhammer C, **MELMED S**: Leukemia inhibitory factor-neuroimmune modulator of endocrine function. Endocrine Reviews, 21:313-345, 2000.
21. Prezant TR, **MELMED S**: Molecular pathogenesis of pituitary tumors in Current Opinion in Endocrinology and Diabetes. 9:61-78 2002.
22. Chesnokova V, **MELMED S**: Neuro-immuno-neuroendocrine modulation of the HPA axis by gp130 signaling molecules. Endocrinology, 143:1571-1574, 2002.
23. Turner HE, Harris AL, **MELMED S**, Wass JA: Angiogenesis in endocrine tumours. Endocrine Reviews, 24:600-632, 2003.
24. Ben-Shlomo A, **MELMED S**: The role of pharmacotherapy in peri-operative management of patients with acromegaly. J Clin Endocrinol Metab, 88:963-8, 2003.
25. Vlotides G, Eigler T, **MELMED S**: Pituitary tumor-transforming gene: physiology and implications for tumorigenesis. Endo Rev, 28:165-186, 2007.
26. Ben-Shlomo A, **MELMED S**: Pituitary somatostatin receptor signaling. Trends in Endocrinol and Metab, 21:123-133, 2010. PMCID: PMC2834886

27. Chesnokova V, **MELMED S**: Pituitary senescence: The evolving role of Pttg. <u>Mol Cell Endocrinol,</u> 326:55-59, 2010. PMCID: PMC2906651
28. Ljubimov V, Vlotides G, Zhou C, Yu R, **MELMED S**: Pttg1. <u>UCSD-Nat Mol Pages,</u> 2011.
29. Cooper O, Vlotides G, Fukuoka H, Greene MI, **MELMED S**: Expression and function of pituitary ErbB receptors and ligands. <u>Endocr Related Cancer</u>, 18:R197-R211, 2011.
30. **MELMED S**: Pituitary Tumors. <u>Endocrinol Metab North Am.</u> 44(1):1-9, 2014.
31. **MELMED S**, Kleinberg DL, Bonert V, Fleseriu M: Acromegaly: Assessing the disorder and navigating therapeutic options for treatment. <u>Endocrine Practice</u>, 20(1):7-17, 2014.
32. Herold K, Majzoub J, **MELMED S,** Pendergrass M, Schlumberger M: Endocrinology research-reflecting on the past decade and looking to the next. <u>Nat Rev Endo,</u> 11:672-80, 2015.
33. **MELMED S:** New therapeutic agents for acromegaly. <u>Nat Rev Endo,</u> 12(2):90-8, 2016.
34. **MELMED S:** Pituitary Medicine: from discovery to patient-focused outcomes. <u>J Clin Endocrinol Metab,</u> 101(3):769-77, 2016.

## EDITORIALS

1. **MELMED S**, Braunstein GD:  Bromocriptine and pleuropulmonary disease. <u>Arch Int Med</u> 149:258, 1989.
2. Herman V, **MELMED S**:  Clonality of endocrine tumors.  <u>Endocrine Pathology</u> 2:61-63, 1991.
3. Prager D and **MELMED S**: Insulin and insulin-like growth factor I receptors: Are there functional distinctions? <u>Endocrinology</u> 132:1419-1420, 1993.
4. Drange M, **MELMED S**: To sleep perchance to eat. <u>J Clin Endo Metab</u>, 82:1311-1312, 1997.
5. **MELMED S**: Fond Farewell. <u>Endocrinology</u> 139:821, 1998.
6. **MELMED S**: Tight control of growth hormone: an attainable outcome for acromegaly treatment. <u>J Clin Endocrinol Metab</u> (Editorial), 83:3409-3410, 1998.
7. **MELMED S**:  The immuno-neuroendocrine interface. <u>J Clin Invest</u>, 108:1563-1566, 2001.
8. **MELMED S:** Supplemental growth hormone in healthy adults: the endocrinologist's responsibility (Editorial). <u>Nature Clin Practice Endo & Metab</u> 2:1, 2006.
9. **MELMED S**: Melvin M. Grumbach 1925-2016. <u>Proc Natl Acad Sci</u> 114: 4845-4847, 2017.

## TEXTBOOKS

1. Robbins R and **MELMED S** (eds):  Acromegaly:  A century of scientific and clinical progress, Plenum Press, NY, 1987.
2. Draznin B, **MELMED S**, Le Roith D:  Molecular & Cellular Biology of Diabetes Mellitus, A. Liss, N.Y., 1988:
   Vol I   - Insulin Secretion
   Vol II  - Insulin Action
   Vol III - Complications
3. **MELMED S** and Robbins R:  Current issues in Endocrinology and Metabolism: Molecular and Clinical Advances in Pituitary Disorders, Blackwell Scientific Publications, Boston, 1991.
4. **MELMED S**: Acromegaly. Endo & Metab Clinics of No. America (Guest Editor), WB Saunders, Vol. 21:3, 1992.
5. **MELMED S** (ed): Molecular and Clinical Advances in Pituitary Disorders: the Proceedings of the 3rd International Pituitary Congress, Marina Del Rey, CA, 1993.
6. **MELMED S**:  The Pituitary.  Blackwell, Boston, 1995; 2000 2nd Edition.
7. **MELMED S**: Oncogenesis and Molecular Biology of Pituitary Tumors, Karger Publications, Switzerland, 1996.
8. Conn P.M. and **MELMED S** (eds): Endocrinology: Basic and Clinical Principles, Humana Press, Inc., Totowa NJ, 1997.

9.    **MELMED S**: Hormone Action: Basic and Clinical Aspects, Biomedica 2000.
10.   Baxter J, New M and **MELMED S** (eds): Genetics in Endocrinology by Lippincott-Raven Publishers, 2001.
11.   Burger HG, Loriaux DL, Marshall JC, **MELMED S**, Odell WD, Potts W, Rubenstein AH: 4th Edition, Endocrinology. Vols I, II, and III DeGroot LJ, Jameson JL (Eds), WB Saunders, PA 2001; 5th Edition, 2005.
12.   **MELMED S** and Conn PM (Eds): 2nd Edition, Endocrinology: Basic and Clinical Principles, Humana Press, 2005.
13.   Kronenberg H, Larsen R, **MELMED S**, Polonsky K (eds): Williams Textbook of Endocrinology (Saunders), 10th Edition, 2002; 11th Edition 2006.
14.   DeGroot LJ and Jameson JL, Kretser DD, Grossman AB, Marshall JC, **MELMED S**, Potts JT Jr, Weir GC (eds): Endocrinology 5th Edition, Elsevier Publishers, 2006.
15.   **MELMED S**, Rochefort H, Chanson P, Christen Y (Eds): Research and Perspectives in Endocrine Interactions: Hormonal Control of Cell Cycle, Springer-Verlag 2006.
16.   Kronenberg HM, **MELMED S**, Polonsky KS, Larsen PR (Eds): Williams Textbook of Endocrinology, 11th Edition, Elsevier, 2008.
17.   DeGroot LJ and Jameson JL, Kretser DD, Grossman AB, Marshall JC, **MELMED S**, Potts JT Jr, Weir GC (eds): Endocrinology 6th Edition, Elsevier Publishers, 2010.
18.   **MELMED S**, Polonsky KS, Larsen PR, Kronenberg HM (Eds): Williams Textbook of Endocrinology, 12th Edition, Elsevier, 2011.
19.   **MELMED S**: The Pituitary. Elsevier Academic Press, 3rd Edition, 2011.
20.   **MELMED S**: Encyclopedia of Human Biology (3rd Edition), Elsevier; Editor (Endocrine), 2013.
21.   DeGroot LJ and Jameson JL, Kretser DD, Grossman AB, Marshall JC, **MELMED S**, Potts JT Jr, Weir GC (eds): Endocrinology 7th Edition, Elsevier Publishers, 2015.
22.   **MELMED S**, Polonsky KS, Larsen PR, Kronenberg HM (Eds): Williams Textbook of Endocrinology, 13th Edition, Elsevier Publications, 2016.


## NON-PEER REVIEWED

1.    **MELMED S**:  Acromegaly update.  38th Annual Endocrine Society Postgraduate Assembly, Los Angeles, 1986 (presented).
2.    **MELMED S**:  Pituitary Tumors:  Medical Management.  Advances in Neuroophthalmology 18th Jules Stein Eye Institute Postgraduate Seminar, p 41, 1987.
3.    **MELMED S**: Medical Management of Pituitary Tumors. 39th Annual Endocrine Society Postgraduate Assembly, San Francisco 1987.
4.    **MELMED S**: Medical Management of Pituitary Tumors.  Audio-Digest 25:20, 1987.
5.    **MELMED S**:  Use of Somatostatin in the Management of Pituitary and Extrapituitary Acromegaly. Peptidomimetic Therapy:  A novel approach to Endocrine and Gastrointestinal Diseases, San Francisco, 1988 (presented).
6.    **MELMED S**:  Use of somatostatin in acromegaly.  Peptidometic Therapy, Baylor University, Houston, 1988 (presented).
7.    **MELMED S**:  Peptide Therapy for Pituitary Tumors.  Peptide Therapy. 1(4): 10-11, 1989.
8.    **MELMED S**:  Management of growth hormone hypersecretion.  Endocrine Society 42nd Postgraduate Assembly, 1990.
9.    **MELMED S**:  Evidence for an intrinsic cell mutation in pituitary tumorigenesis:  Techniques, Results and Perspectives.  4th Meeting of the International Pituitary Pathology Club, Vaison La Romaine, France, 1990.

10. **MELMED S**:  Physician's Dilemma: The management of patients with pituitary tumors and acromegaly.  Preliminary results of a multi-center trial with octreotide acetate: Clinical activity.  The Endocrine Society Meeting, Washington, DC, 1991.

11. Sassolas G, **MELMED S**: Symposium: Basic sandostatin research. Metab Clin and Exp 41:11-16, 1992.

12. **MELMED S**:  Recent advances in Somatostatin Basic Research:  Action of somatostatin on the GH/IGF-I axis: new advances.  Satellite Symposium, Sandostatin, State-of-the-art, Monte Carlo, 1991 (presented).

13. **MELMED S**:  Pathophysiology of acromegaly.  10th Spanish Endocrine Congress Meeting, Santiago de Compostela, Spain, 1991 (presented).

14. **MELMED S**. Acromegaly: Therapeutic Options in Endocrine Society Postgraduate Assembly Mtg, 1993.

15. Prager D, Yamasaki H, **MELMED S**: Pituitary IGF-I receptor structure function in Proceedings of 3rd International Pituitary Congress pp. 127-134, 1993.

16. Pei L, Prager D, Scheihauer B, **MELMED S**, Herman V. Molecular characterization of pituitary tumors in Proceedings of 3rd International Pituitary Congress pp. 21-28, 1993.

17. **MELMED S**, Treatment of Acromegaly in Lifetime Medical Television by Alpha Telecommunications (video), May-July 1993.

18. **MELMED S**. Pathophysiology of acromegaly: a review of the current state of knowledge in Acromegaly: Therapeutic Strategies by Excerpta Medica, 1993.

19. **MELMED S**. Comprehensive Management of Acromegaly. Metabolism, Vol 43 pp. 1-5, 1994.

20. **MELMED S**:  Acromegaly: Modern Diagnosis and Therapy. Postgraduate course in Clinical Endocrinology, Massachusetts General Hospital-Harvard Medical School, 1995.

21. **MELMED S**: Unwanted effects of growth hormone excess in the adult. Growth Symposium, Santiago de Compostela, 1995.

22. **MELMED S**: Acromegaly in Somatostatin Analogs: Basic and clinical perspectives, Sorrento, Italy 1995.

23. **MELMED S**: Treatment of Acromegaly. UpToDate in Medicine, Vol. 5, 1996; 1998, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012.

24. **MELMED S**: Clinical manifestations of Acromegaly. UpToDate in Medicine, Vol. 5, 1996; 1998, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012.

25. **MELMED S**: Diagnosis of Acromegaly. UpToDate in Medicine, Vol. 5, 1996; 1998, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012.

26. **MELMED** S: Physiology of growth hormone. UpToDate in Medicine, Vol 5, 1996, 1998, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012.

27. **MELMED S**: Definition and pathogenesis in Acromegaly on CD-Rom: Recent update on Acromegaly. Eds A. Giustina, JD Veldhuis, 1999.

28. **MELMED S:** Pharmacotherapy of Acromegaly. Clinical Endocrinology Update, Syllabus 109-114, 1999.

29. **MELMED S:** Is it time for new indications for GH? Endocrine Today, Clinical news on diabetes and endocrine disorders article, 2007.

30. **MELMED S:** Challenges in life sciences and health systems in 21st Century. RECOOP HST Association Mtg in Croatia, 2014

31. **MELMED S:** Uncommon knowledge: Advancing medical therapy of pituitary tumors. Basic Researcher Perspective. Endocrine News Magazine, October 2014, pp 50-55.

32. **MELMED S:** Letter from America Endocrinology: "Sine Stercore Tauri". The Endocrinologist Issue 114/15 p. 17, 2014.

## BOOK CHAPTERS

1. **MELMED S**, Hershman JM:  The Thyroid and Aging.  pp 33-54.  In: <u>Endocrine Aspects of Aging,</u> Korenman S. (Ed.), Elsevier, Science Publishing Co., New York, 1982.

2. **MELMED S**: Control of prolactin synthesis and secretion in Seminars in <u>Reproductive Endocrinology</u>, 2:1-8, 1984.

3. **MELMED S**:  Human growth hormone gene regulation in somatotroph tumors. <u>Acromegaly Centennial;</u> Plenum Press, NY, 1987.

4. **MELMED S**, Braunstein GD:  Endocrine dysfunction in amyotrophic lateral sclerosis. <u>Neurologic Clinics</u> Feb 1987 pp 33-42.

5. **MELMED S**: Ectopic Pituitary and Hypothalamic Hormone Syndromes. <u>Endocrinology & Metabolism Clinics of North America:</u> W.B. Saunders Company, Sept 1987.

6. **MELMED S**: Feedback regulation of growth hormone secretion in the <u>Brain as an Endocrine Organ</u> eds Cohen M, Foa P:  Springer Verlag, NY 1988.

7. **MELMED S**: Growth factor regulation of pituitary function. in <u>Neuroendocrine Perspectives</u> eds. E.E. Muller and R.M. and R.M. Macleod, Springer Verlag NY, 1988.

8. **MELMED S**: Oncogenes and the Thyroid in <u>Thyroid Today</u> (ed) J. Oppenheimer, Vol 11, January 1988.

9. Fagin J, Morita S, **MELMED S**: Cellular Pathophysiology of prolactinomas in <u>Prolactin-related Disorders.</u>  RE Blackwell and RJ Chang (eds), MacMillan, NJ, 1987.

10. Prager D, **MELMED S**: Insulin regulation of Growth Hormone Gene Expression in Draznin B, Melmed S, LeRoith D, (eds) <u>Molecular & cellular biology of diabetes mellitus</u>, A. Liss NY, 1988 pp 163-173.

11. **MELMED S**, Morita S: Triiodothyronine regulation of GH secretion: additive effects of retinoic acid. <u>Proceedings Nagasaki, International Symposium on Graves Disease</u> ed S. Nagasaki.

12. **MELMED S**, Braunstein GD: Diseases of hypothalamus and pituitary in <u>Stein's Textbook of Internal Medicine, 3rd Edition</u>, Little Brown, 9:2141-2155, 1989.

13. Festoff BW, **MELMED S**, Smith R: Therapeutic trial of recombinant human growth hormone in amyotrophic lateral sclerosis, <u>Advances in Neuromuscular Diseases</u> p 117-126, 1989.

14. **MELMED S**, Prager D, Fagin J: Feedback regulation of growth hormone gene expression by insulin-like growth factor I. <u>Molecular and Cellular Biology of Insulin-like Growth Factors and their Receptors</u> by D. LeRoith and M. K. Raizada (eds) Plenum Publishing Co., pp. 57-72, 1988.

15. Smith RA, Jacoby S, Festoff B, Peterson L, **MELMED S**, Molnar G, Sherman B, and Frane J:  The Influence of compliance and other human factors on ALS treatment trials. In: <u>Progress in Clinical Trials. Amyotrophic Lateral Sclerosis.</u> F.C. Rose, Ed., Demos Publications, New York, 1990, pp 1-14.

16. **MELMED S**:  Hereditary endocrine tumors in Current Therapy in <u>Endocrinology and Metabolism</u>.  Ed. W. Bardin, Mosby, NY pp. 496-498, 1990.

17. Ezzat S, **MELMED S**:  Pituitary Tumors in the Elderly by J Morley, S Korenman (eds), Blackwell Scientific Publications.  <u>Geriatric Endocrinol</u>, pp. 58-69, 1990.

18. **MELMED S**, Prager D: Molecular Biology of the Endocrine System K. Kovacs & S. Asa (eds) <u>Endocrine Pathology</u>, Blackwell Scientific Publications, NY, Vol 1 pp. 124-142, 1991.

19. **MELMED S**:  Acromegaly.  Rakel, <u>Conn's Current Therapy</u>, Pub: W.B. Saunders Company, pp. 565-568, 1991.

20. Herman V, Fagin J, Gonsky R, Namba H, Weiss M, Becker D, **MELMED S**: Clonal origin of human pituitary tumors and evidence for transforming activity in <u>Molecular and Clinical Advances in Pituitary Disorders,</u> Blackwell Scientific, pp 247-252, 1991.

21. **MELMED S**:  Extra-pituitary Acromegaly.  Ed. W. Daughaday, <u>Endocrinology and Metabolism Clinics of North America</u>, pp. 507-518, 1991.

22. **MELMED S**, Herman VS, Prager D, Yamasaki H, Gonsky R, Fagin J: Pituitary adenomas: <u>New trends in basic and clinical research</u>: Role of growth factors in regulation of pituitary hormone production and in the pathogenesis of pituitary tumors.  Elsevier Science Publishing Co., pp. 123-130, 1991.

23. **MELMED S**: Etiology of pituitary acromegaly. <u>Endo & Metab Clinics of No. America</u>, WB Saunders, pp. 539-551, 1992.

24. **MELMED S**: Pathogenesis of pituitary tumors in <u>Molecular Genetics of Nervous Tumors</u> by A. Levine and H. Schmidek (eds), pp. 255-263, 1993.

25. **MELMED S**: Acromegaly in <u>Endocrine Tumors</u> by E. Mazzaferri and N. Samaan (eds) published by Blackwell Scientific Publications, 1993.

26. Prager D, **MELMED S**: Somatotroph IGF-I signalling <u>in Role of IGF-I in the nervous system</u>. D. LeRoith (ed) NY Academy of Sciences, 1993.

27. **MELMED S**. Hereditary endocrine tumors in <u>Current Therapy in Endocrinology and Metabolism,</u> Mosby, 1993, Philadelphia.

28. **MELMED S**. General aspects of the management of pituitary tumors by surgery or radiation therapy in <u>DeGroot's Textbook of Endocrinology,</u> WB Saunders Company, Philadelphia, 1993.

29. **MELMED S**. Tumor mass effects of lesions in the hypothalamus and pituitary in <u>DeGroot's Textbook of Endocrinology,</u> WB Saunders Company, Philadelphia, 1993.

30. **MELMED S**. Molecular mechanisms of tumor formation in hereditary and sporadic tumors of the men I type: pituitary neoplasia in <u>Endocrinology and Metabolism Clinics of North America</u>, R. Gagel (ed), 1993.

31. **MELMED S**, Braunstein GD:  Disorders of the hypothalamus and anterior pituitary in <u>Stein's Textbook of Internal Medicine, 4th Edition</u>, Little Brown, J.H. Stein (ed), pp 1773-1788, 1993.

32. **MELMED S**. Molecular mechanisms of pituitary tumorigenesis in <u>The Pituitary</u>, H. Imura (ed), Raven Press, 1994.

33. **MELMED S**. Octreotide stimulates insulin-like growth factor (IGF) binding protein-1: A novel mechanism of drug action in acromegaly in <u>Seminars in Oncology</u>, L. Kvols, T. O'Dorisio (eds), WB Saunders Company, 1994.

34. Prager D, **MELMED S**. Mechanisms for insulin-like growth factor I regulation of growth hormone secretion. B B Bercu and R F Walker (eds) <u>Growth Hormone II: Basic and Clinical Aspects</u>, pp. 73-84, 1994.

35. Asa SL, Kovacs K, **MELMED S**: The hypothalamic-pituitary axis. S. Melmed (ed.) in <u>The Pituitary</u> by Blackwell Scientific, 1994.

36. Herman-Bonert VS, Prager D, **MELMED S**: Growth Hormone. S. Melmed (ed.) in <u>The Pituitary</u> by Blackwell Science, 1994.

37. **MELMED S:** Acromegaly. S. Melmed (ed.) in <u>The Pituitary</u> by Blackwell Science, 1994.

38. Greenman Y, **MELMED S**: TSH secreting pituitary tumors. S. Melmed (ed.) in <u>The Pituitary</u> by Blackwell Science, 1994.

39. **MELMED S**: Pituitary Neoplasia. In Multiple Endocrine Neoplasia. <u>Endo and Metab Clinics of North America,</u> Vol 23:81-92, 1994.

40. **MELMED S**. Growth hormone in <u>Reproductive Endocrinology</u>, E. Adashi (ed) by Raven Press, 1995.

41. **MELMED S**: Overview of growth hormone and IGF-I effects on intermediary metabolism and bone. MR Blackman, J Roth, SM Harman and JR Shapiro (eds.) in <u>GHRH, GH, and IGF-I Basic and Clinical advances</u> by Springer-Verlag, 1995.

42. Herman V, **MELMED S**: Acromegaly <u>in Current Diagnosis</u> (Vol. 9). RB Conn, WZ Borer, JW Snyder (Editors), 1995.

43. **MELMED S.** Anterior Pituitary <u>in Current Practice of Medicine</u> S. Korenman (ed), Philadelphia, 1996.

44. Pei L, **MELMED S**: Oncogenesis and molecular biology of pituitary tumors, S. Melmed (ed), Karger Publications, 1995.

45. **MELMED S**, Yamashita S, Yamasaki H, Fagin J, Namba H, Yamamoto H, Weber M, Morita S, Webster J, Prager D: IGF-I receptor signalling lessons from the somatotroph <u>in Recent Progress in Hormone Research,</u> PM Conn (Ed), Vol. 51 1996.

46. Shimon I, **MELMED S**: Anterior Pituitary Hormones <u>in Scientific Basis of Endocrinology</u>, PM Conn and S Melmed (Eds.), 1995.

47. Greenman Y, **MELMED S**: Somatostatin receptor subtypes in pituitary tumors <u>in Oncogenes and molecular biology of pituitary tumors,</u> S. Melmed (Ed), Karger, 1995.

48. Pei L, **MELMED S**: Oncogenes and tumor suppressor genes in tumorigenesis of the endocrine system in Scientific Basis of Endocrinology, PM Conn and S Melmed (Eds), 1995.

49. Herman V, **MELMED S**: Acromegaly in Current Diagnosis, RB Conn, et al (Eds) 9th Edition, 1996.

50. **MELMED S**: Molecular pathogenesis of somatotroph adenomas in Pituitary Adenomas, Elsevier, pp. 13-20, 1996.

51. Shimon I, **MELMED S**: Acromegaly: Differential diagnosis and treatment in Pituitary Disease: Diagnosis and Treatment, Wierman ME (Ed), 1997.

52. **MELMED S**: Pituitary function and neoplasia in Principles of Molecular Medicine Textbook, L Jameson (Ed), Human Press, NJ, pp 443-449, 1998.

53. **MELMED S**: Acromegaly Method in Conn's Current Therapy. R. Rakel (Ed), 1998.

54. **MELMED S**: Acromegaly in Metabolism Clinical and Experimental, 45:51-52, 1996.

55. Drange M, and **MELMED S**: IGFs in the evaluation of acromegaly. In Contemporary Endocrinology. The IGF System: Molecular Biology, Physiology, and Clinical Applications, RG Rosenfield & CT Roberts (ED), Humana Press, pp 699-720, 1999.

56. Shimon I, and **MELMED S**: Diagnosis and treatment of pituitary disease. Weitzer (ED) in Psychotherapy & Psychosomatics, 67:119-124, 1998.

57. Shimon I, **MELMED S:** Pathogenesis and molecular biology of pituitary tumors in Pituitary Tumors, Thapar K, Kovacs K, Scheithauer BW, Lloyd RV (Eds), Humana Press 1998.

58. Prezant T, **MELMED S**: Pituitary oncogenes in Epidemiology, Pathogenesis and Management of pituitary tumors (Ed) SM Webb, pp 81-93, BioScientifica Limited Bristol, UK, 1998

59. Shimon I, **MELMED S**: Pituitary tumor pathogenesis in Genetics in Endocrinology. Baxter J, Melmed S, New M (Eds), 1998.

60. Drange MR, **MELMED S**: Acromegaly: Definition and pathogenesis in Acromegaly on CD-ROM. A. Giustina (Ed), 1998.

61. Drange MR, **MELMED S**: Etiopatogenia de la Acromegalia in Libro De La Acromegalia. S. Webb (Ed), 1998.

62. Ray DW, Ren S-G, **MELMED S**: Leukemia inhibitory factor regulates proopiomelanocortin transcription in Neuroimmunomodulation: Molecular aspects, integrative systems, and clinical advances, (Ed) McCann, SM. Annals of The New York Academy of Sciences. 840:162-173, 1998.

63. Shimon I, **MELMED S**: Hypothalamic involvement in disorders of pituitary hormone secretion in Neuroendocrinology in Physiology and Medicine (Eds) Conn, PM and Freeman ME, 1998.

64. **MELMED S**, Braunstein GD: Disorders of the hypothalamus and anterior pituitary in Stein's Textbook of Internal Medicine 5th Edition. St. Louis, Mosby pp 1773-1788, 1998.

65. **MELMED S:** Pathogenesis of pituitary tumors in Advances in Pituitary Tumor Therapy. Endocrinology and Metabolism Clinics of North America, 28:1-12, 1999.

66. Auernhammer CJ, Bousquet C, Chesnokova V, **MELMED S**: Leukemia inhibitory factor-new mechanisms for ACTH regulation in Regulation of Pituitary Hormone Secretion, P Beck-Peccoz (Ed). BioScientifica Ltd., Bristol, 1999.

67. Heaney AP, **MELMED S**: Pituitary tumour transforming gene: a novel factor in pituitary tumour formation. Bailliere's Clinical Endocrinology and Metabolism. 13:367-380, 1999.

68. **MELMED S**, Auernhammer C: gp130-related cytokines in Principles of Molecular Regulation, (Eds) PM Conn and Means AR, pp 115-132, 2000.

69. **MELMED S**: Growth hormone in New World Health, Sterling Publications, 2000.

70. Shimon I, **MELMED S:** Pathogenes and molecular biology of pituitary tumors in Diagnosis and management of pituitary tumors. Thapar K, Kovacs K, Scheithauer B, Lloyd RV (Eds), Human Press, 2000.

71. Prezant T, **MELMED S**: Pathogenesis of pituitary tumors in Comprehensive Clinical of Endocrinology 3rd Edition, Harcourt by Besser & Thorner (Eds), 2001.

72 Ben-Shlomo A, **MELMED S**: Acromegaly in Neuroendocrinology, Endocrinology and Metabolism Clinics of North America Series, Klibanski A (Ed), pp. 565-583, 2001.

73. Heaney AP, **MELMED S**: Etiology of Pituitary Tumors for Pituitary Adenomas, in Pituitary Disease of Endocrine Update. Sheperd M (Ed), 2001.

74. Bonert VH, **MELMED S**: Pregnancy and Acromegaly in Pituitary Tumors in Pregnancy, Bronstein M (Ed), pp. 109-121, 2001.

75. **MELMED S**: Disorders of the anterior pituitary and hypothalamus in 15th Edition Harrison's Principles of Internal Medicine. Braunwald, Fauci, Kasper, Hauser, Longo, Jameson (Eds), pp. 2029-2052, 2001.

76. **MELMED S**: Evaluation of pituitary masses in De Groot L. and Jameson J (eds): Endocrinology, 4th Edition (Saunders) pp 282-288, 2001.

77. **MELMED S** in Neuroendocrinology and Pituitary Gland: *Acromegaly* in De Groot L. and Jameson J (eds): Endocrinology, 4th Edition (Saunders) pp 300-312, 2001.

78. Herman-Bonert V, **MELMED S**: Growth hormone in Reproductive Endocrinology, Surgery and Technology, Adashi, Rock and Rosenwaks (Eds), Raven Press, The Pituitary 2nd Edition, 2001.

79. Wass J, Lamberts S, **MELMED S**: Long-term treatment strategies for acromegaly in  Handbook of Acromegaly, J Wass (Eds), BioScientifica, Ltd in UK, pp 79-83, 2001.

80. Wass J, **MELMED S**, Turner HE: Future areas of research in acromegaly in Handbook of Acromegaly, J Wass (Eds), BioScientifica, Ltd in UK pp. 87-89, 2001.

81. Heaney A, **MELMED S:** Molecular pathogenesis of pituitary tumors in Oxford Textbook of Endocrinology, Wass & Shalet (Eds), 2002.

82. Abbud R, **MELMED S**: SOCS: Suppressors of cytokine signaling. In The Encyclopedia of Molecular Medicine, Ed. Thomas E. Creighton, Wiley & Sons, Inc., 2002.

83. **MELMED S**: Anterior Pituitary in Williams Textbook of Endocrinology, 10th Edition, Larsen, Kronenberg, Melmed & Polonsky (Eds), Harcourt Hlth Sci, 2002.

84. **MELMED S**: Acromegaly in The Pituitary 2nd Edition, Blackwell Sciences, 2002.

85. Prezant T, **MELMED S**: Pathogenesis of pituitary tumors. Comprehensive Clinical Endocrinology, 3rd Edition, Besser M & Thorner M (Ed), 2002.

86. Greenman Y, **MELMED S**: TSH-secreting tumors in The Pituitary 2nd Edition, Blackwell Sciences 2002.

87. Bonert VH, **MELMED S**: Growth Hormone in The Pituitary 2nd Edition, Blackwell Sciences, 2002.

88. Bonert VH, **MELMED S**: Early Diagnosis and Treatment of Endocrine Disorders (Ed) Robert S. Bar, Humana Press Inc., 2002.

89. Ben-Shlomo A, **MELMED S**: Primary pharmacotherapy for acromegaly. The expanding role of octreotide II: advances in endocrinology and eye disease. Eds: Lamberts SWJ & Ghigo E. BioScientifica 2002.

90. Yu R, **MELMED S:** Pituitary oncogenes in Central and Peripheral mechanisms in pituitary disease (Eds DL Kleinberg and DR Clemmons) pp 99-118, BioScientifica Ltd, Bristol, 2002.

91. Castro AVB**, MELMED S**: Growth regulation: Clinical aspects of GHRH Encyclopedia of Hormones, Elsevier Science (USA), pp. 226-234, 2003.

92. Murray RD, **MELMED S**: Acromegaly in NORD Guide to Rare Disorders, Lippincott, Williams and Wilkins, Philadelphia, PA, 2003.

93. Murray RD, **MELMED S**: Growth Hormone Deficiency in NORD Guide to Rare Disorders, Lippincott, Williams and Wilkins, Philadelphia, PA, 2003.

94. **MELMED S,** Kleinberg DL: Anterior pituitary in Williams Textbook of Endocrinology 10th Edition, Larsen, Kronenberg, Melmed, Polonsky (Eds), Saunders Publication, pp. 177-280, 2003.

95. Murray RD, **MELMED S**: The Pituitary in Encyclopaedia of Life Sciences, 2004.

96. Heaney A, **MELMED S**: Oncogenes and tumor suppressor genes in tumorigenesis of the endocrine system in Scientific Basis of Endocrinology, PM Conn and S Melmed (Eds), 2004.

97. Shimon I, **MELMED S:** Anterior pituitary hormones in Scientific Basis of Endocrinology, PM Conn and S Melmed (Eds), 2004.

98.  Ben-Shlomo A, **MELMED S**: Acromegaly, Therapy. Encyclopedia of Endocrine Diseases Vol 1, 2004, Elsevier Inc.

99.  **MELMED S,** Jameson JL: Disorders of the anterior pituitary and hypothalamus in 16th Edition of Harrison's Principles of Internal Medicine, Kasper, Braunwald, Fauci, Hauser, Longo, Jameson (Eds), McGraw Hill Publishing, pp 2076-2097, 2005.

100. **MELMED S**: Acromegaly in DeGroot Textbook of Endocrinology (5th Edition), 2005.

101. **MELMED S**. Evaluation of Pituitary Masses in De Groot Textbook of Endocrinology (5th Edition), 2005.

102. Heaney A, **MELMED S:** Oncogenes and tumor suppressor genes in tumorigenesis of the endocrine system. In Endocrinology: Basic and Clinical Principles, 2nd Edition (PM Conn and S Melmed, Eds), Humana Press, 2005.

103. Yu R, Hui H, **MELMED S**: Insulin secretion and action. In Endocrinology: Basic and Clinical Principles, 2nd Edition (PM Conn and S Melmed, Eds), Humana Press, 2005.

104. Donangelo I, **MELMED S**: Treatment of Acromegaly: Future. In Endocrine 2005, 28:123-8.

105. Donangelo I, **MELMED S**. Primary Medical Therapy of GH-Secreting Adenomas. In: Laws ER and Lanzino G: Transsphenoidal Surgery. Philadelphia, Elsevier, 2005.

106. Yu R, **MELMED S**: Pituitary tumor transforming gene: an update in Molecular Pathology of the Pituitary (Eds) Kontogeorgos G, Kovacs K. In Frontiers of Horm Res 32, pp. 175-185, 2006. Karger Publication.

107. **MELMED S**, Jameson JL: Disorders of the anterior pituitary and hypothalamus in Harrison's Endocrinology, J Larry Jameson (Ed), pp. 19-56, 2006.

108. Donangelo I, **MELMED S**: Molecular pathogenesis of pituitary adenomas in Clinical Endocrine Oncology, 2nd Edition, Ian Hay and John Wass (Eds), 2006.

109. Chesnokova V, Yu R, Ben-Shlomo A, **MELMED S**: Pituitary trophic status as a tumorigenic determinant in Hormonal Control of Cell Cycle, Melmed S, Rochefort H, Chanson P, Christen Y (Eds), Proceedings in International Workshop Fondation Ipsen, pp. 83-87, 2006.

110. **MELMED S** and Kleinberg D: Anterior Pituitary in Williams Textbook of Endocrinology 11th Edition, pp. 155-263, 2007.

111. **MELMED S**: Pituitary in ACP Medicine, Dale DC, Federman, DD (Eds).WebMD Corporation, 2008.

112. Ben-Shlomo A, **MELMED S**: Acromegaly in Endocrinology and Metabolism Clinics of North America, 37:101-122, 2008. PMCID: PMC2697616

113. **MELMED S,** Jameson JL: Disorders of the Anterior Pituitary and Hypothalamus. 17th Edition of Harrison's Principles of Internal Medicine, Fauci, Braunwald, Kasper, Hauser, Longo, Jameson, Loscalzo (Eds), McGraw Hill Publishing, 2195-2216, 2008.

114. Snyder P and **MELMED S**: Clinically nonfunctioning pituitary masses. In De Groot and Jameson Endocrinology, 6th Edition, by Elsevier Publication, 2009.

115. **MELMED S**: Acromegaly. In De Groot and Jameson Endocrinology, Elsevier Publication 6th Edition, 2009.

116. Yu R and **MELMED S**: Current concepts in molecular pathogenesis of acromegaly in Acromegaly: A handbook of history, current therapy and future prospects, JAH Wass (Eds), Bioscientifica Publishing, pp. 21-39, 2009.

117. Ben-Shlomo A, Liu NA, **MELMED S**: Pathogenesis of Cushing's Disease in Cushing's Disease Textbook, M. Bronstein (ed), 2009.

118. Donangelo I, **MELMED S**: Molecular pathogenesis of pituitary tumors. In Oxford Textbook of Endocrinology and Diabetes, Wass J & Stewart P (Eds), 2010.

119. Yu R, **MELMED S**: Pathogenesis of Pituitary Tumors. In Neuroendocrinology Textbook, Martini L (Ed), Elsevier Publisher, 2010.

120. **MELMED S,** Ho K:  Pituitary Physiology and diagnostic evaluation. In Williams Textbook of Endocrinology, 12th Edition, Elsevier, 2010.

121. **MELMED S,** Kleinberg D: Pituitary masses and tumors. In <u>Williams Textbook of Endocrinology, 12th Edition</u>, Elsevier, 2010.

122. Bonert VH, **MELMED S**: Growth Hormone. In <u>The Pituitary, 3rd Edition</u>, Elsevier Publisher, San Diego, CA, 2010.

123. Ben-Shlomo A, **MELMED** S: Regulation of the hypothalamic pituitary axis. In <u>The Pituitary, 3rd Edition</u>, Elsevier Publisher, San Diego, CA, 2010.

124. **MELMED S**: Acromegaly. In <u>The Pituitary, 3rd Edition</u>, Elsevier, San Diego, CA, 2010.

125. Greenman Y, **MELMED S**: TSH-secreting pituitary tumors. In <u>The Pituitary, 3rd Edition</u>, Elsever Publisher, San Diego, CA, 2010.

126. **MELMED S,** Jameson LJ: Disorders of the anterior pituitary and hypothalamus. Longo DL, Fauci AS, Kasper DL, Hauser SL, Jameson JL, Loscalzo J (Eds) <u>in Harrison's Principles of Internal Medicine, 18th Edition</u> 2010.

127. Chesnokova V, Zonis S, Ben-Shlomo A, Wawrowsky K, **MELMED S:** Molecular mechanisms of pituitary adenoma senescence. Arzt E, Bronstein M, Guitelman M (Eds) in <u>Pituitary Today II: New Molecular, Physiological and Clinical Aspects, Front Horm Res,</u> Basel, Karger 2010.

128. **MELMED S.** Pituitary Genetic factors in Cushings. New M, Lekarev O, Parsa A, Yuen TT, O'Malley B and Hammer GD (Eds) in <u>Genetic Steroid Disorders</u>, 2012.

129. Snyder PJ and **MELMED S**: Clinically non-functioning sellar masses. DeGroot LJ, Jameson JL, Kretser DD, Grossman AB, Marshall JC, Melmed S, Potts JT Jr, Weir GC (Eds) in <u>Endocrinology: Adult and Pediatric, 7th Edition</u>, Elsevier, 2013.

130. Parsa A, **MELMED S**: Genetic factors in Cushing Disease Pathogenesis. New MI (Ed), Lekarev O, Parsa A, Yuen TT, O'Malley B, Hammer GD (Assoc Eds) in <u>Genetic Steroid Disorders</u>, 2013, Elsevier.

131. **MELMED S** and Kleinberg D: Pituitary Masses and Tumors. Kronenberg HM, Melmed S, Polonsky KS, Larsen PR (Eds): in Williams Textbook of Endocrinology, 13th Edition, Elsevier, 2015.

132. **MELMED S.** Acromegaly. DeGroot LJ, Jameson JL, Kretser DD, Grossman AB, Marshall JC, Melmed S, Potts JT Jr, Weir GC (Eds) in <u>Endocrinology: Adult and Pediatric, 7th Edition,</u> Elsevier, 2015.

133. **MELMED S**, Jameson LJ: Hypopituitarism. Kasper DL, Fauci AS, Hauser SL, Longo DL, Jameson JL & Loscalzo J (Eds) in <u>Harrison's Principles of Internal Medicine 19th Edition</u>, McGraw-Hill Publications, pp 2255-2261, 2015.

134. **MELMED S**, Jameson LJ: Anterior Pituitary Tumor Syndromes. Kasper DL, Fauci AS, Hauser SL, Longo DL, Jameson JL & Loscalzo J (Eds) in <u>Harrison's Principles of Internal Medicine 19th Edition</u>, McGraw-Hill Publications, pp 2261-2274, 2015.

135. **MELMED S**, Jameson LJ: Anterior Pituitary: Physiology of Pituitary Hormones. Kasper DL, Fauci AS, Hauser SL, Longo DL, Jameson JL & Loscalzo J (Eds) in <u>Harrison's Principles of Internal Medicine 19th Edition,</u> McGraw-Hill Publications, pp 401e1-401e4, 2015.

136. **MELMED S.** Hypothalamic-Pituitary Regulation. In: Conn, M.P., ed., <u>Conn's Translational Neuroscience.</u> San Diego: Academic Press, pp 317-331, 2017.

137. Bonert VH, **MELMED S:** Growth Hormone. In <u>The Pituitary, 4th Edition</u>, Elsevier, San Diego, CA, 2017.

138. Ben-Shlomo A, **MELMED S**: Regulation of the hypothalamic pituitary axis. In <u>The Pituitary, 4th Edition</u>, Elsevier, San Diego, CA, 2017.

# EXHIBIT B

APRIL 2018

# ORAL ARGININE AND GROWTH HORMONE

Shlomo Melmed, M.D.

**Objectives**

I was tasked with preparing this expert opinion to comprehensively answer the following questions:

1. Does Serovital increase GH levels by 682%?
2. Is Serovital administered orally associated with "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger"?
3. Is GH administered by injection associated with "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger"?

To comprehensively address these questions, I have relied on the relevant peer-reviewed scientific literature, my own extensive peer-reviewed scholarly contributions in the field, my experience with both pharmaceutical and regulatory bodies pertinent to the field, as well as my own 40 year personal clinical and research experience working in this field.

**Conclusions**

Based on my educational, scientific and clinical experience, as well as critically reviewing the evidence in critical peer-reviewed literature, as well as available Serovital public documentation, I conclude:

1. Serovital does not increase serum GH levels. This conclusion is based on absent rigorous validation of this claim, high variability of oral amino acid absorption, the very low dosages of amino acids comprising the capsule, variability of GH serum assays especially at the low levels depicted, and the high variability of <u>normal</u> GH secretory patterns.  A critical review of available peer-reviewed

1

scientific publications reveals that low dose oral amino acids like Serovital do not induce GH levels.

2. Serovital does not improve: "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making uses look and feel decades younger" because based on the scientific consensus regarding oral amino acids as well as the information available regarding Serovital, oral administration of amino acids like those in Serovital would not increase GH bio-activity after Serovital ingestion. An elevated serum IGF-I level would be required to support this claim and would be essential to elicit any of the changes claimed. This biomarker of GH activity has not been shown after ingesting a Serovital capsule because the circulating half-life of GH is only 12-14 minutes, so any transiently increased GH level potentially elicited by Serovital would almost immediately be dissipated. Any transient mild GH increase from Serovital will have no sustained clinical impact.

3. Even GH administered by injection is not associated with most of the claimed benefits including wrinkle reduction, increased lean muscle mass, stronger bones, or heightened sex drive mainly because true adult GH deficiency is not associated with these features. In healthy individuals with no pituitary disease, there is also no evidence that GH would cause these effects except for fat weight loss. The only documented impact of a sustained daily injected GH to healthy individuals is acute fat mass decrease with increased total body weight, with no evidence for increased muscle strength or exercise capacity. Thus, even if Serovital were administered by injection, it would not result in most of the claimed benefits.

4. In healthy individuals with no pituitary disease, use of GH injections is discouraged by all professional consensus guidelines and is illegal. Even if orally ingested Serovital were to increase GH levels, the internal tissues would be exposed to excess GH for that specific patient; this is associated with significant side-effect. Thus, any potential theoretical acute impact of orally induced, or injected GH, on weight loss should be weighed against serious patient safety concerns.

**Introduction**

Pituitary growth hormone (GH) secretion is controlled by hypothalamic hormones, as well as pituitary and peripheral signals, all of which impact GH production. Establishing an accurate diagnosis of adult GH sufficiency or deficiency (GHD) is challenged by the pulsatility of GH secretion, provocative GH stimulation test result variability, and poor GH assay standardization. The time-dependent lower GH secretion associated with normal aging and also with obesity, may be confused with truly well-defined deficient GH, and often leads to erroneous diagnosis of GH deficiency. In fact, most existing data show either no GH increase, flat GH or even suppressed GH after oral amino acid injection. Therefore, in order to determine pituitary GH secretory reserve available for appropriate growth and/or metabolic control, several validated and standardized injectable tests are employed to elicit pituitary GH secretion. True adult GH deficiency is mainly caused by an expanding pituitary-associated mass compressing pituitary function, head trauma or prior head/neck irradiation. Otherwise healthy individuals without those conditions invariably exhibit *normal* GH secretion. In fact in adults, so-called "idiopathic" pituitary GH deficiency is an extremely rare entity. Non-rigorous approaches to diagnostic evaluation of these patients often leads to an erroneous GHD diagnosis. Intravenous arginine and GHRH, glucagon injections are the main tests to establish patterns of GH secretion. *Oral arginine or other amino acids have not been validated or approved as rigorous stimulators of GH secretion nor are they employed in clinical practice.* Therefore, accepted clinical guidelines uniformly stress adherence to validated biochemical diagnostic techniques, consensus-driven protocols and rigorous diagnostic criteria.

Patients with pituitary damage and well-defined associated adult GHD, exhibit commonly encountered and often non-specific clinical features including increased central obesity, loss of lean muscle mass, decreased bone mass and cardiac dysfunction.

3

Some of these clinical findings may be halted or reversed with sustained long-term daily GH injections. As GH is a peptide molecule which cannot be absorbed intact, it cannot be administered orally, and daily injections are required. Definition of GH replacement effectiveness and dosing requires specialized consideration firstly of diagnosis confirmation, and patient age and weight (19, 47). Serious safety risk profiles are also determinants for injectable GH replacement decisions. The FDA has not approved any oral amino acid for sustaining GH levels in deficient patients and certainly not in normal individuals. Therefore, not only is GH treatment discouraged in patients with no pituitary disease, but even for those with rigorously proven pituitary GH deficiency, injections are required; oral amino acid would have no sustained effect.

*GH secretion and action*

Pituitary GH is required for linear growth during childhood and adolescence, and also exerts non-growth related metabolic functions throughout the adult lifespan.

GH secretion by the pituitary gland is determined by complex brain and peripheral signals (Fig. 1) derived from the hypothalamus, as well as the liver, gut and reproductive organs, all participate in regulating GH secretion. The result of these positive and negative inputs is episodic pituitary GH release with secretory patterns determined by gender (sexual dimorphic patterns), age GH (lowering) and sleep (GH augmentation) (30). Obesity leads to *blunted* GH secretion, while malnutrition increases GH. GH levels normally drop with age, and most elderly individuals who are otherwise healthy exhibit very low or undetectable GH levels (Table 1) (see below that this normal GH lowering with age maybe protective). Ingestion of food and glucose acutely suppresses (GH) while fasting may increase GH. Therefore, nutritional status, age and gender must all be accounted for in assessing in GH secretion.

4

GH production is induced by hypothalamic GHRH signaling, while hypothalamic somatostatin is the primary signal blocking GH secretion (6). IGF-I, the peripheral target hormone for GH, mediates most growth-promoting GH actions (60). Peripheral hormones including glucocorticoids, estrogen, and thyroid hormone also participate in regulating GH production.

*Diagnosis of Adult GHD*

Pituitary tumors with gland compression, inflammation, stroke, or radiation, may lead to lower GH production, with the resultant clinical features of adult GH deficiency (Table 2). Confirming an accurate adult GHD diagnosis is imperative to qualify a patient for clinically appropriate but costly, long-term injectable GH replacement (49). Absent these conditions, GH secretion is invariably normal.

Assessment of "abnormal" adult GH secretion requires an awareness of potential pitfalls, especially as a *single serum GH measurement does not accurately reflect appropriate pituitary function.* This is especially important as GH secretion is pulsatile, over seconds, minutes, and hours (28). "The challenges of accurately measuring serum GH levels are further compounded by poor cross-laboratory and cross-assay harmonization, poor assay standardization, and unclear sensitivity cut-off points (18). For example, even the most modern GH assays may exhibit a 10% or greater variability for the *same sample* measured. Measurement of serum IGF-I is a surrogate marker of GH secretion, but normal IGF-I levels may also be encountered in adult patients with validated GH deficiency." (47)

Most clinical features of adult GHD are non-specific, including increased fat and decreased lean body mass, low energy, and mood disorders. As these relatively non-specific disorders are very common in the population, and true GH deficiency with

pituitary damage is very rare, the costly diagnostic evaluation for GHD is only justified when disordered -pituitary function is present (35). In fact, the accuracy of GH test results in patients exhibiting commonly encountered *non-specific* GHD symptoms, is strongly determined by appropriate pre-testing determination of those patients *likely to exhibit compromised pituitary function*. Invariably, patients with no pituitary mass lesion have *normal* GH secretion.

Rigorous criteria for screening for adult GHD require careful clinical evaluation (Table 2) and GH status measurement should be limited to these groups of patients (56):

- Adult patients, having received prior GH therapy for childhood GHD for increasing linear growth, require re-testing as adults to confirm the GHD diagnosis. (2, 29)

- Those patients who have undergone pituitary or brain surgery, or radiation therapy. GH is low in about half of brain tumor patients, likely as a consequence of damage from surgery and radiation. (55, 57) For example, after radiation, GH levels fall rapidly and within 5 years virtually all such patients are GH deficient (Figure 2).

- Patients with a known hypothalamic-pituitary, including hypothalamic or pituitary tumor, cyst, or secondary tumor metastasis.

- Those patients with significant head trauma from prior motor vehicle accident, contact sports injury, treatment of a brain, or stroke leading to pituitary damage. (7)

- Those patients with illnesses known to affect GH production including viral, bacterial or fungal pituitary infections, or malignancy.

*"Unless one of the above conditions are met, provocative GH testing should be avoided in adult patients presenting with commonly encountered generalized complaints of weakness,*

*frailty, lethargy or abdominal obesity"* (47). A misleading diagnosis of GHD, leads to unnecessary and inappropriate numbers of patients with <u>normal pituitary function</u> who may ultimately receive unsafe injectable GH replacement in error, which may lead to unsafe side-effects.

*Biochemical testing for GHD*

Distinguishing GHD patients from normal patients with intact pituitary function may be difficult and the diagnosis entails important clinical and biochemical pitfalls. Rigorous diagnosis requires demonstration of an appropriately blunted GH response to at <u>least 2 provocative tests to elicit GH release.</u> Insulin-induced hypoglycemia (ITT) is the reference gold standard for diagnosis of GH deficiency, intravenous GHRH + arginine, or injectable glucagon are also employed (13, 27, 35, 50).

Using sensitive immunochemiluminescent two-site GH assays, specific and sensitive peak GH cut-off values after ITT and intravenous GHRH-arginine testing for GHD were 5.1 and 4.1 ug/l respectively with a 96% sensitivity and 92% specificity as assessed by ROC analysis (8). Other proposed peak cut-offs for GHD diagnosis are <3 ug/l for the ITT, and <9 ug/l for GHRH-arginine testing, and an evoked GH of >15 ug/dl accurately discriminated between GHD and healthy adults (53). In a multicenter, randomized open label study of 69 subjects using a rigorous calibrated GH assay, intravenous GHRH-arginine stimulation results were highly reproducible with 95% specificity cut-off at 3.67-4.96 ug/l (13). Factors which may lead to <u>misleading biochemical diagnosis</u> of low GH i.e. blunted evoked GH responses, include elevated body mass index, age, and oral estrogen ingestion. When using the intravenous Arg-GHRH stimulation test abdominal obesity is a strong confounder of elicited GH levels (12, 20, 44).  For patients who are obese, or with relative abdominal <u>obesity</u>, GH responses to stimulation testing are usually <u>blunted</u> i.e. a false positive result for GH

deficiency. Importantly, peak GH levels elicited by intravenous Arg-GHRH were blunted by 1 ug/L for each 1 cm increase in waist circumference (44). Accordingly, the presumptive diagnosis of GHD requires strong distinguishing evidence in obese patients (27). "To avoid the challenges of false-positive evoked GH response errors measurement of IGF-I levels are also required to rigorously inform adult GHD diagnosis.  The finding of a low age-matched IGF-I level increases the likelihood of the diagnosis, especially in the face of obesity (50).

As normal GH production drops with age, especially in men, the use of random GH measurements, may lead to an incorrect diagnosis of GHD and unjustified injectable GH replacement in normal patients >50 years old (27, 59). With normal aging, spontaneous GH secretion loses pulsatility with decreased GH bursts.  IGF-I levels also decline with aging (3).  Aging is normally associated with abdominal adiposity, decreased lean body mass, loss of bone mineral density and higher insulin levels. "Age-related abdominal fat mass and hyperinsulinemia are associated with age-related declines in GH (17).  Decreased GH associated with aging may in fact be beneficial to overall health and well-being (58). In fact, in a unique transgenic mouse model of selective pituitary ablation, recapitulating the disorder of GHD, insulin sensitivity was actually enhanced independently of diet (43)." Several lines of evidence also indicate that lower GH hormone levels associated with aging are protective against developing cancer (14). In a compelling study, a community of genetically determined GH deficiency, does not develop cancer (14, 32), highlighting the advantages of low GH to prevent cancer. These reports indicate that having a low (or absent) GH level in fact protects the patient against developing a malignancy. Therefore, the drop in GH levels during normal aging is in fact beneficial. Replacing GH unnecessarily in these patients may therefore be harmful.

*Oral amino acids effect on GH levels*

The mainstay of transiently eliciting pituitary GH secretion is by using either intravenous insulin, arginine and/or GHRH. Use of oral amino acids is not advocated or approved, as the evidence is lacking (11, 21-26, 39, 45, 62). As portrayed in <u>Table 3</u>, the effects of oral amino acids on GH levels in the literature are highly variable. In the few studies when GH has been reported to rise, it is transient, short-lived, and very modest in magnitude. Most studies however, show no significant GH increase, some show flat GH and others actually show GH suppression.  Several factors determining the wide variability and inconsistency of GH responses to oral amino acids are:

**1.  Absent validation**

Although the intravenous arginine-GHRH test, and the intramuscular glucagon test have been rigorously validated in controlled studies of normal and GH-deficient subjects. The literature for orally administered amino acids shows no consistent effects on GH levels, and none have reported clinical benefits. Most of the more rigorous studies show no induction of GH

Studies listed in <u>Table 3</u> are mostly insufficiently powered with poorly controlled or exclusion criteria, and most *importantly have not included truly hypo-pituitary subjects include as negative controls*. This latter group is required as a control group for a rigorous conclusion that oral amino acids in fact induce GH secretion. This is especially important as GH levels are <u>normally</u> very low.

**2.  Variability of oral amino acid absorption**

Gastric enzymes and stomach acid conditions may variably digest or disrupt orally ingested amino acids. Food ingestion may also alter oral amino acid availability for absorption. Fasting or feeding conditions are not uniformly controlled in these studies.

3.  **Variability of GH assays**

GH assays are notoriously imprecise with wide variations in sensitivity and reproducibility. In the best assays, inter-assay variability may still be ~10% even when the same sample is being measured. Minor changes in very low GH levels portrayed are therefore imprecisely measured and distinguishing significant differences in levels is not interpretable.

4.  **Variability of GH secretory patterns**

Most GH levels are undetectable during the day, and it is difficult to accurately distinguish levels of GH in a random blood sample. GH secretion is episodic and pulsatile and about 65% of total daily GH is secreted at night triggered by sleep onset. Normally GH pulses are interspersed with basal troughs with circulating GH largely undetectable. "Using conventional immunoassays, serum GH levels are usually *undetectable* for more than half the 24 hour clock period" (47). GH secretion declines with age starting at the transition to young adulthood (28), and continues to decline with aging." Therefore, it is not possible to evaluate effects of oral amino acids on very low levels of GH secretion absent the appropriate controlled timing of measurements.

**Serovital**

1.  Each capsule contains 375 mg of L-lysine and 181 mg of L-arginine, plus 3 other amino acids. These doses are far lower than any reported in the literature for effects on GH (Table 3). Lowest oral amino acid doses reported to transiently increase GH in all the heterogenous studies are 3 to 9 grams daily. Thus, these capsules contain 10 to 100-fold lower concentrations of effective oral doses published in the literature, and these low doses have been shown in all published

studies to have no effect on GH. Even if a healthy individual would ingest 4 capsules of Serovital, the amount of active amino acid ingredient, especially argininine, would still be below 3 grams shown in the literature to be the lowest minimal dose required in the very few uncontrolled studies published.

2. Increases of GH by Serovital "by 682%" have not been reported in the peer-reviewed scientific literature. The advertising copy provided depicts GH increasing from 0.17 to 1.33 ng/ml at 2 hours. This very modest increase is:

   a. At the lower sensitivity of most GH assays, and is undetectable by some assays.

   b. Insufficient to increase liver IGF-I levels, which are not shown. This is vital, as IGF-I is the target growth factor for GH. Absent evidence for increased IGF-I levels, any transient mild GH increase will have no clinical impact. This is also important as high doses of oral arginine were also shown to suppress IGF-I levels (10).

   c. Values for GH depicted are within the normal variability of most GH assays, and undetectable by some assays.

   d. The total area under the curve (AUC) for GH after oral capsule ingestion show in the advertisement is quite <u>similar</u> to placebo (20.4 vs 19.67) for placebo. Given the overlapping co-efficent of variation (19.9-20.5 and 18.7 - 20.6) it is not possible to ascribe a statistically significant difference to these values. In short, the oral ingestion of Serovital is not significantly different from a placebo.

3. The circulating ½ life of GH in blood is 12-14 minutes, so even any modest increase after capsule ingestion would be dissipated completely within 30 minutes.

4. As the half-life of circulating GH is very short (~12-14 minutes), a sustained level of GH is required to be elicited for months to impact GH responses in peripheral

tissues (including bone, liver, and adipose tissue). A single minutes-long burst of elicited GH will not increase IGF-I levels or induce obesity changes. Given these very modest and questionably significant transient GH increases, it is not possible for these levels to add to endogenous normal GH function on body fat. Low sex drive and wrinkles depicted in the advertisement are not features of GH deficiency, and there is no clinical evidence that any dose even of injectable GH would "reverse" these clinically unrelated conditions.

5. In fact, the FDA has defined GH deficiency as <2.8 ng/ml after a validated stimulation test (see approved labels for adult GH replacement). So, at best, these amino acids capsules do does not increase GH levels to normal expected levels (only 1.22 ng/ml).

6.  In conclusion: Based on the scientific consensus regarding oral amino acids as well as the information available regarding Serovital, Serovital does not increase GH by 682%, nor lead to anti-aging, fat loss, or any of the other claimed benefits.


In summary, the diagnosis of AGHD should only be made in those patients with lower GH response to at least two validated injected agents. Even so, there remains a significant false-positive error rate in GH levels elicited by a single validated injected stimulation test (50). The propensity by some practitioners for inappropriate GH deficiency diagnosis as a prelude to administering unsafe non-approved GH supplementation for athletes or the frail elderly underscores the initial need for a stringent diagnostic approach (9, 40, 52) in these patients.

*GH replacement by injection for GH deficiency*

In the USA, adult GH replacement is only approved for those with proven pituitary GH deficiency, or for those with well documented prior childhood-onset GH

deficiency. GH replacement therapy should only be offered to those patients rigorously diagnosed by evidence-based criteria as being GH-deficient, and in whom a clear cause for the disorder has been established (40, 56). GH is also approved for treating AIDS-related muscle wasting in adults. Adult GH replacement protocols should ideally be individualized, with titration of initial low injected GH doses determined by clinical responses, IGF-I levels maintained in the mid-normal range, and side effect frequency and severity carefully monitored.

"In patients truly fulfilling clinical and diagnostic criteria for GHD, physiologic GH replacement by daily injection  reverses several related co-morbidities, including improving quality of life, enhancing lean body mass, improving cardiovascular function and exercise capacity, and increasing bone density (5, 31, 36, 54) (Table 4).These changes only occur if accompanied by induced IGF1 levels. The scientific literature shows no benefits for GH replacement (except for acute fat  loss) in otherwise healthy adults without a rigorous GHD diagnosis, nor is injectable GH approved for those subjects. GH has been attempted to try and enhance athletic performance (37).  In a comprehensive meta-analysis of the impact of injected GH in healthy young adults, the integrated conclusion from 11 studies comprising 254 subjects was that GH elicits fat mass loss, (about 1.2 kg on average) with increased total body weight, but does not increase muscle strength or exercise capacity (34). These clinically modest and largely short-lived effects should be placed in the context of the potential side-effects of sustained GH abuse (either from injections, or theoretically from Serovital) leading to serious adverse effects, including diabetes, and ultimately the spectrum of serious co-morbidities associated with gigantism and acromegaly (38, 46). These include:

- arthritis
- *diabetes is of special concern, as GH, regardless of source, is a potent antagonist of insulin action, leading to high blood sugar levels.*

- sleep apnea

- respiratory problems

- headache

- TMJ

- biting disorders (47)

Thus, even if Serovital would theoretically increase GH levels, the internal tissues would be exposed to excess GH for that specific patient, and similar to GH abuse by athletes, or inappropriate GH administration to normal pituitary-replete subjects, this entails a *significant health risk* (19, 42) (Table 5).

Side-effects of GH replacement to truly GH-deficient adults are reported in up to 30% of patients, and include joint pains, muscle pains, edema, paresthesia and carpal tunnel syndrome (15, 36), sleep apnea, insomnia and shortness of breath and disordered glucose metabolism (33). The long-term safety profile for new cancers and diabetes in GHD adults receiving GH replacement is being assessed in long-term surveillance studies (1, 4, 51). However, in normal otherwise healthy GH-replete subjects inappropriate GH administration may cause edema, sweating, fatigue and in higher doses, diabetes and cardiac dysfunction (16, 61) (Table 5). *Given the health risks, the diagnosis of adult GHD may be erroneously made to justify unapproved and unsafe GH use in athletes elderly or frail patients* (9). Because GH administration enhances lean body mass and may cause fat loss, the use of GH (either by injection, or theoretically by Serovital) to reverse, halt, or decelerate age-associated frailty is tempting, but is not approved and is *unsafe* (52). Effects of increased GH on cancer growth is under investigation and low GH in the elderly may in fact be normal or protective, as GH and/or IGFI levels normally are lowered with aging. Thus, theoretically artificially inducing GH in healthy individuals by Serovital would be a serious health risk, especially for elderly patients.

14

Given the stringent clinical and laboratory challenges, and high costs in establishing the diagnosis of GH deficiency, the justification for replacing injectable GH to these patients requires a measured assessment of both clinical and financial cost-benefit, as well as patient safety concerns. The unapproved and illegal (in the USA) injectable use of GH for patients inaccurately diagnosed as GHD, is not supported by the evidence (19). There is no documented peer-reviewed evidence that oral amino acids will in fact lead to sustained GH increases, and certainly not to alleviation of some of the features of true GH deficiency.

**TABLE   1   Adult Growth Hormone Secretion is regulated by food and over the lifespan**

| Interval | Young Adult | Fasting | Obesity | Middle Age |
|---|---|---|---|---|
| 24-h secretion (μg/24 h) | 540 ± 44 | 2171 ± 333 | 77 ± 20 | 196 ± 65 |
| Secretory bursts (number in 24 h) | 12 ± 1 | 32 ± 2 | 3 ± 0.5 | 10 ± 1 |
| GH burst (μg) | 45 ± 4 | 64 ± 9 | 24 ± 5 | 10 ± 6 |

**TABLE 2   Causes of Adult GH Deficiency**

| | | |
|---|---|---|
| **TRAUMATIC** | **VASCULAR** | **CRITICAL ILLNESS** |
| Surgical Resection | Pregnancy-related | **HORMONAL** |
| Radiation Damage | Aneurysm | Hyperparathyroidism |
| Traumatic Brain Injury | Apoplexy | **DRUGS** |
| **INFILTRATIVE/INFLAMMATORY** | Subarachnoid hemorrhage | Somatostatin analog |
| Primary Hypophysitis | Arteritis | **IDIOPATHIC** |
| Lymphocytic | | |
| Granulomatous | **NEOPLASTIC** | |
| Xanthomatous | Pituitary Adenoma | |
| Secondary Hypophysitis | Parasellar mass | |
| Sarcoidosis | Rathke cyst | |
| Histiocytosis X | Dermoid cyst | |
| Wegeners Granulomatosis | Meningioma | |
| Hemochromatosis | Germinoma | |
| Pituitary Antibodies | Ependymoma | |
| Pit-1 Antibodies | Glioma | |
| **INFECTIONS** | Craniopharyngioma | |
| Tuberculosis | Hypothalamic tumor | |
| Pneumocytis Carinii | Pituitary metastatic deposits | |
| Fungal | Hematologic malignancy | |
| Parasites | | |
| Viral | | |

Adapted from: Melmed S, Ho K:  Pituitary Physiology and diagnostic evaluation. In Williams Textbook of Endocrinology, 12th Edition, Elsevier, 2010.

**Table 3   Effect of Oral amino acids on adult growth hormone**

| Reference | N [age (y)] | Sex | Status | Amino acids and dosages | GH Assay | GH Sampling | GH response |
|---|---|---|---|---|---|---|---|
| Estratto 1980 | 22 (10-25 yrs) | M/F | Healthy | 200 mg Arg | RIA | 30 min | ↓ GH decrease |
| Isidori et al 1981 | 15 – 20 yrs | M | Healthy | 1.2 g Arg + 1.2 g Lys | | | ↑ 8-fold at 90 min<br>↑ 4.3-fold at 90 min |
| Corpas 1993 | 16 (69 ± 5 yrs) | M | Healthy | 3.0 g Arg + 3.0 g Lys, twice daily for 14 d | Nichols IRMA | 8 hrs Nocturnal | No GH effect |
| Lambert et al 1993 | 7 (22.6 ±1.0) | M | Body builders | 2.4 g Arg + 2.4 glys | Pharmacia | 2 hr AUC | No GH effect |
| Fogelholm 1993 | 11 (19 - 35 yrs) | M | Weightlifters | 2 g/day Arg<br>2 g/day Lys<br>2 g/day Orn | CIS-Bio<br>Elisa | 24 hrs AUC | No GH increase |
| Suminski et al 1997 | 22.4 ± 0.8 | M | Resistance training | 1.5 g Arg +1.5 g Lys | | | ↑ 2.7-fold at 60 min |
| Marcell 1999 | 20 (22 ± 0.9)<br>8 (68 ± 2.1) | M/F | Healthy | 5 g Arg | Nichols | 60 mins AUC | No GH increase |
| Blum 2000 | 10 (55 +5 yrs) | F | Healthy | 9 g  L-Arg,<br>Daily for 1 month | Ion Exchange CT | Random | ↑ 0.6 – 1.5 |
| Collier 2005 | 8 (18 – 33 yrs) | M | Healthy | 5-13 g Arg | Nichols Chemil | 5 hrs | ↑ 2.9 – 4.7 |
| Collier 2006 | 8 (18-25 yrs) | M | Resistant Exercise | 7 g Arg | Nichols Chemil | 2 hr AUC | ↓ Exercise-induced GH |
| Van Vught 2008 | 8 (18 -24 yrs) | F | Healthy | 1.13 g Lys<br>1.43 g Arg | Beckman | 2 hrs/ peak | ↑ GH |
| Blazejewski 2009 | 24 (24.2 + 3 yrs) | M | Healthy | 30 g Arg for 21 days | Diasorin | 4 hrs during 21 days | ↓ GH decrease<br>↓ IGF-I decrease |
| Forbes 2011 | 14 (25 ± 5 yrs) | M | Healthy | 0.15 g/Kg Arg | Diagnostic Biochem | 3 hrs/AUC | No GH increase |
| Forbes 2014 | 14 (25 ± 4 yrs) | M | Strength Trained | .075 g/kg Arg | Diagnostics Biochem | 2 hr/AUC | ↓ GH decrease |
| Zajac 2014 | 17 (22 ± 1.7 yrs) | M | Body builders | 3 g Arg twice/daily for 3 weeks<br>2.2 g Ornithine | IRMA Diagnostic systems | 2 mins | ↑ Acute GH only after training |

**Table 4   Proven Adult GH Deficiency with Pituitary Disease**

| Clinical Consequence | Effect of daily injectable GH Replacement |
|---|---|
| **Body Composition** | |
| General and central adiposity | Decrease |
| Reduce lean mass | Increase |
| Reduced bone mass | Increase |
| **Function** | |
| Reduced exercise capacity | Improve |
| Muscle weakness | Improve |
| Impaired cardiac function | Improve |
| Hypohydrosis | Improve |
| **Quality of Life** | |
| Low mood | Improve |
| Fatigue | Improve |
| Low motivation | Improve |
| Reduced satisfaction | Improve |
| **Cardiovascular Risk Profile** | |
| Abnormal lipid profile | Improve |
| Insulin resistance | Improves in long-term |
| Inflammatory markers | Decrease |
| Intimal media thickening | Decrease |
| Cardiovascular and Cerebrovascular events | Unknown |
| **Laboratory** | |
| Blunted peak GH to stimulation | |
| Low IGF-1 | Increase |
| Hyper insulinemia | Increase |
| High LDL- and low HDL-cholesterol | Improve |
| **Longevity** | Unknown |

Modified from: Melmed S, Ho K:  Pituitary Physiology and diagnostic evaluation. In Williams Textbook of Endocrinology, 12th Edition, Elsevier, 2010.

**TABLE 5**

# Side Effects of Adult Growth Hormone Treatment

- Edema
- Arthralgias
- Myalgias
- Muscle stiffness
- Paresthesias
- Increased perspiration
- Carpal tunnel syndrome
- Atrial fibrillation
- Cardiac disorders
- Headache
- Benign intracranial hypertension
- Increase in melanocytic skin nevi
- Hyperglycemia
- Sleep apnea
- Iatrogenic acromegaly
- Effects on cancer growth under investigation

Figure 1:  Pituitary Hormone Secretion



**Figure 1**.  Hypothalamic Pituitary Control of GH Secretion.  Hypothalamic GH-releasing hormone (GHRH) and somatostatin, which traverse the portal vein, somatotroph-specific transcription factors, and negative feedback control of insulin-like growth factor I (IGF-I) all participate in regulatory GH synthesis and secretion. Accurate measurement of pulsatile GH secretion requires ultrasensitive assays. POU1F1 denotes POU domain, class 1, transcription factor 1; Prop-1 Prophet of Pit-1; GHS growth hormone secretagogues (e.g., ghrelin); and SRIF somatostatin.  From Melmed S, Acromegaly. NEJM 2006 355:2558 (48)

Figure 2: Pituitary Tumor Radiation causing GH deficiency



**Figure 2**.  Life-table analysis indicating probabilities of initially normal hypothalamic-pituitary-target gland axes remaining normal after radiotherapy (3750-4250 cGy). Growth hormone (GH) secretion is the most sensitive of the anterior pituitary hormones to effects of external radiotherapy and GHD preceeds development of ACTH, LH, FSH, and TSH hormone deficiencies (Adapted from Littley MD, Shalet SM, Beardwell CG, et al: Hypopituitarism following external radiotherapy for pituitary tumors in adults. Q J Med 70:145-160, 1989) (41) (9)

References:

1.  **Abs R, Bengtsson BA, Hernberg-Stahl E, Monson JP, Tauber JP, Wilton P, Wuster C** 1999 GH replacement in 1034 growth hormone deficient hypopituitary adults: demographic and clinical characteristics, dosing and safety. Clin Endocrinol (Oxf) 50:703-713

2.  **Aimaretti G, Baffoni C, Bellone S, Di Vito L, Corneli G, Arvat E, Benso L, Camanni F, Ghigo E** 2000 Retesting young adults with childhood-onset growth hormone (GH) deficiency with GH-releasing-hormone-plus-arginine test. J Clin Endocrinol Metab 85:3693-3699

3.  **Aimaretti G, Fanciulli G, Bellone S, Maccario M, Arvat E, Delitala G, Camanni F, Ghigo E** 2001 Enhancement of the peripheral sensitivity to growth hormone in adults with GH deficiency. Eur J Endocrinol 145:267-272

4.  **Attanasio AF, Jung H, Mo D, Chanson P, Bouillon R, Ho KK, Lamberts SW, Clemmons DR, Hypo CCSIAB** 2011 Prevalence and incidence of diabetes mellitus in adult patients on growth hormone replacement for growth hormone deficiency: a surveillance database analysis. J Clin Endocrinol Metab 96:2255-2261

5.  **Attanasio AF, Lamberts SWJ, Matranga AMC, Birkett MA, Bates PC, Valk NK, Hilsted J, Bengtsson BA, Strasburger CJ, Group TAGHDS** 1997 Adult growth hormone (GH)-deficient patients demonstrate heterogeneity between childhood onset and adult onset before and during human GH treatment. Journal of Clinical Endocrinology and Metabolism 82:82-88

6.  **Ben-Shlomo A, Melmed S** 2010 Pituitary somatostatin receptor signaling. Trends Endocrinol Metab 21:123-133

7.  **Benvenga S, Campenni A, Ruggeri RM, Trimarchi F** 2000 Clinical review 113: Hypopituitarism secondary to head trauma. J Clin Endocrinol Metab 85:1353-1361

8.  **Biller BM, Samuels MH, Zagar A, Cook DM, Arafah BM, Bonert V, Stavrou S, Kleinberg DL, Chipman JJ, Hartman ML** 2002 Sensitivity and specificity of six tests for the diagnosis of adult GH deficiency. J Clin Endocrinol Metab 87:2067-2079

9.  **Birzniece V, Nelson AE, Ho KK** 2011 Growth hormone and physical performance. Trends Endocrinol Metab 22:171-178

10. **Blazejewski S, Georges A, Forest K, Corcuff JB, Abouelfath A, Girodet PO, Kamagate M, Jacquet A, Pillet O, Bordenave L, Moore N** 2009 The chronic oral administration of arginine aspartate decreases secretion of IGF-1 and IGFBP-3 in healthy volunteers. Fundam Clin Pharmacol 23:339-344

11. **Blum A, Cannon RO, 3rd, Costello R, Schenke WH, Csako G** 2000 Endocrine and lipid effects of oral L-arginine treatment in healthy postmenopausal women. J Lab Clin Med 135:231-237

12. **Bonert VS, Elashoff JD, Barnett P, Melmed S** 2004 Body mass index determines evoked growth hormone (GH) responsiveness in normal healthy male subjects: diagnostic caveat for adult GH deficiency. J Clin Endocrinol Metab 89:3397-3401

13. **Chanson P, Cailleux-Bounacer A, Kuhn JM, Weryha G, Chabre O, Borson-Chazot F, Dubois S, Vincent-Dejean C, Brue T, Fedou C, Bresson JL, Demolis P, Souberbielle JC** 2010 Comparative validation of the growth hormone-releasing hormone and arginine test for the diagnosis of adult growth hormone deficiency using a growth hormone assay conforming to recent international recommendations. J Clin Endocrinol Metab 95:3684-3692

14. **Chesnokova V, Zonis S, Zhou C, Recouvreux MV, Ben-Shlomo A, Araki T, Barrett R, Workman M, Wawrowsky K, Ljubimov VA, Uhart M, Melmed S** 2016 Growth hormone is permissive for neoplastic colon growth. Proc Natl Acad Sci U S A 113:E3250-3259

15. **Chipman JJ, Attanasio AF, Birkett MA, Bates PC, Webb S, Lamberts SW** 1997 The safety profile of GH replacement therapy in adults. Clin Endocrinol (Oxf) 46:473-481

16.     **Cittadini A, Berggren A, Longobardi S, Ehrnborg C, Napoli R, Rosen T, Fazio S, Caidahl K, Bengtsson BA, Sacca L** 2002 Supraphysiological doses of GH induce rapid changes in cardiac morphology and function. J Clin Endocrinol Metab 87:1654-1659

17.     **Clasey JL, Weltman A, Patrie J, Weltman JY, Pezzoli S, Bouchard C, Thorner MO, Hartman ML** 2001 Abdominal visceral fat and fasting insulin are important predictors of 24-hour GH release independent of age, gender, and other physiological factors. J Clin Endocrinol Metab 86:3845-3852

18.     **Clemmons DR** 2011 Consensus statement on the standardization and evaluation of growth hormone and insulin-like growth factor assays. Clin Chem 57:555-559

19.     **Clemmons DR, Molitch M, Hoffman AR, Klibanski A, Strasburger CJ, Kleinberg DL, Ho K, Webb SM, Bronstein MD, Bouillon R, Ben-Shlomo A, Hamrahian AH, Chanson P, Barkan AL, Merriam GR, Blackman MR, Salvatori R** 2014 Growth hormone should be used only for approved indications. J Clin Endocrinol Metab 99:409-411

20.     **Colao A, Di Somma C, Savastano S, Rota F, Savanelli MC, Aimaretti G, Lombardi G** 2009 A reappraisal of diagnosing GH deficiency in adults: role of gender, age, waist circumference, and body mass index. J Clin Endocrinol Metab 94:4414-4422

21.     **Collier SR, Casey DP, Kanaley JA** 2005 Growth hormone responses to varying doses of oral arginine. Growth Horm IGF Res 15:136-139

22.     **Collier SR, Collins E, Kanaley JA** 2006 Oral arginine attenuates the growth hormone response to resistance exercise. J Appl Physiol (1985) 101:848-852

23.     **Corpas E, Blackman MR, Roberson R, Scholfield D, Harman SM** 1993 Oral arginine-lysine does not increase growth hormone or insulin-like growth factor-I in old men. J Gerontol 48:M128-133

24.     **Fogelholm GM, Naveri HK, Kiilavuori KT, Harkonen MH** 1993 Low-dose amino acid supplementation: no effects on serum human growth hormone and insulin in male weightlifters. Int J Sport Nutr 3:290-297

25.     **Forbes SC, Bell GJ** 2011 The acute effects of a low and high dose of oral L-arginine supplementation in young active males at rest. Appl Physiol Nutr Metab 36:405-411

26.     **Forbes SC, Harber V, Bell GJ** 2014 Oral L-arginine before resistance exercise blunts growth hormone in strength trained males. Int J Sport Nutr Exerc Metab 24:236-244

27.     **Gasco V, Corneli G, Rovere S, Croce C, Beccuti G, Mainolfi A, Grottoli S, Aimaretti G, Ghigo E** 2008 Diagnosis of adult GH deficiency. Pituitary 11:121-128

28.     **Giustina A, Veldhuis JD** 1998 Pathophysiology of the neuroregulation of growth hormone secretion in experimental animals and the human. Endocr Rev 19:717-797

29.     **Gleeson HK, Gattamaneni HR, Smethurst L, Brennan BM, Shalet SM** 2004 Reassessment of growth hormone status is required at final height in children treated with growth hormone replacement after radiation therapy. J Clin Endocrinol Metab 89:662-666

30.     **Goldenberg N, Barkan A** 2007 Factors regulating growth hormone secretion in humans. Endocrinol Metab Clin North Am 36:37-55

31.     **Gotherstrom G, Elbornsson M, Stibrant-Sunnerhagen K, Bengtsson BA, Johannsson G, Svensson J** 2009 Ten years of growth hormone (GH) replacement normalizes muscle strength in GH-deficient adults. J Clin Endocrinol Metab 94:809-816

32.     **Guevara-Aguirre J, Balasubramanian P, Guevara-Aguirre M, Wei M, Madia F, Cheng CW, Hwang D, Martin-Montalvo A, Saavedra J, Ingles S, de Cabo R, Cohen P, Longo VD** 2011 Growth hormone receptor deficiency is associated with a major reduction in pro-aging signaling, cancer, and diabetes in humans. Sci Transl Med 3:70ra13

33.     **Hartman ML, Xu R, Crowe BJ, Robison LL, Erfurth EM, Kleinberg DL, Zimmermann AG, Woodmansee WW, Cutler GB, Jr., Chipman JJ, Melmed S, on behalf of the International Hypo**

**CCSAB** 2013 Prospective Safety Surveillance of GH-Deficient Adults: Comparison of GH-Treated vs Untreated Patients. J Clin Endocrinol Metab

34. **Hermansen K, Bengtsen M, Kjaer M, Vestergaard P, Jorgensen JOL** 2017 Impact of GH administration on athletic performance in healthy young adults: A systematic review and meta-analysis of placebo-controlled trials. Growth Horm IGF Res 34:38-44

35. **Ho KK** 2007 Consensus guidelines for the diagnosis and treatment of adults with GH deficiency II: a statement of the GH Research Society in association with the European Society for Pediatric Endocrinology, Lawson Wilkins Society, European Society of Endocrinology, Japan Endocrine Society, and Endocrine Society of Australia. Eur J Endocrinol 157:695-700

36. **Hoffman AR, Kuntze JE, Baptista J, Baum HB, Baumann GP, Biller BM, Clark RV, Cook D, Inzucchi SE, Kleinberg D, Klibanski A, Phillips LS, Ridgway EC, Robbins RJ, Schlechte J, Sharma M, Thorner MO, Vance ML** 2004 Growth hormone (GH) replacement therapy in adult-onset gh deficiency: effects on body composition in men and women in a double-blind, randomized, placebo-controlled trial. J Clin Endocrinol Metab 89:2048-2056

37. **Holt RI, Erotokritou-Mulligan I, Sonksen PH** 2009 The history of doping and growth hormone abuse in sport. Growth Horm IGF Res 19:320-326

38. **Karges B, Pfaffle R, Boehm BO, Karges W** 2004 Acromegaly induced by growth hormone replacement therapy. Horm Res 61:165-169

39. **Lambert MI, Hefer JA, Millar RP, Macfarlane PW** 1993 Failure of commercial oral amino acid supplements to increase serum growth hormone concentrations in male body-builders. Int J Sport Nutr 3:298-305

40. **Lipworth WL, Ho K, Kerridge IH, Day RO** 2012 Drug policy at the margins: the case of growth hormone replacement for adults with severe growth hormone deficiency. Med J Aust 197:204-205

41. **Littley MD, Shalet SM, Beardwell CG, Ahmed SR, Applegate G, Sutton ML** 1989 Hypopituitarism following external radiotherapy for pituitary tumours in adults. Q J Med 70:145-160

42. **Liu H, Bravata DM, Olkin I, Friedlander A, Liu V, Roberts B, Bendavid E, Saynina O, Salpeter SR, Garber AM, Hoffman AR** 2008 Systematic review: the effects of growth hormone on athletic performance. Ann Intern Med 148:747-758

43. **Luque RM, Lin Q, Cordoba-Chacon J, Subbaiah PV, Buch T, Waisman A, Vankelecom H, Kineman RD** 2011 Metabolic impact of adult-onset, isolated, growth hormone deficiency (AOiGHD) due to destruction of pituitary somatotropes. PLoS One 6:e15767

44. **Makimura H, Stanley T, Mun D, You SM, Grinspoon S** 2008 The effects of central adiposity on growth hormone (GH) response to GH-releasing hormone-arginine stimulation testing in men. J Clin Endocrinol Metab 93:4254-4260

45. **Marcell TJ, Taaffe DR, Hawkins SA, Tarpenning KM, Pyka G, Kohlmeier L, Wiswell RA, Marcus R** 1999 Oral arginine does not stimulate basal or augment exercise-induced GH secretion in either young or old adults. J Gerontol A Biol Sci Med Sci 54:M395-399

46. **Melmed S** 2009 Acromegaly pathogenesis and treatment. J Clin Invest 119:3189-3202

47. **Melmed S** 2013 Idiopathic adult growth hormone deficiency. J Clin Endocrinol Metab 98:2187-2197

48. **Melmed S** 2006 Medical progress: Acromegaly. N Engl J Med 355:2558-2573

49. **Melmed S** 2006 Supplemental growth hormone in healthy adults: the endocrinologist's responsibility. Nat Clin Pract Endocrinol Metab 2:119

50. **Molitch ME, Clemmons DR, Malozowski S, Merriam GR, Vance ML, Endocrine S** 2011 Evaluation and treatment of adult growth hormone deficiency: an Endocrine Society clinical practice guideline. J Clin Endocrinol Metab 96:1587-1609

51.    **Monson JP** 2003 Long-term experience with GH replacement therapy: efficacy and safety. Eur J Endocrinol 148 Suppl 2:S9-14

52.    **Olshansky SJ, Perls TT** 2008 New developments in the illegal provision of growth hormone for "anti-aging" and bodybuilding. JAMA 299:2792-2794

53.    **Popovic V, Leal A, Micic D, Koppeschaar HP, Torres E, Paramo C, Obradovic S, Dieguez C, Casanueva FF** 2000 GH-releasing hormone and GH-releasing peptide-6 for diagnostic testing in GH-deficient adults. Lancet 356:1137-1142

54.    **Rosilio M, Blum WF, Edwards DJ, Shavrikova EP, Valle D, Lamberts SW, Erfurth EM, Webb SM, Ross RJ, Chihara K, Henrich G, Herschbach P, Attanasio AF** 2004 Long-term improvement of quality of life during growth hormone (GH) replacement therapy in adults with GH deficiency, as measured by questions on life satisfaction-hypopituitarism (QLS-H). J Clin Endocrinol Metab 89:1684-1693

55.    **Schneider HJ, Rovere S, Corneli G, Croce CG, Gasco V, Ruda R, Grottoli S, Stalla GK, Soffietti R, Ghigo E, Aimaretti G** 2006 Endocrine dysfunction in patients operated on for non-pituitary intracranial tumors. Eur J Endocrinol 155:559-566

56.    **Shalet SM** 2010 Partial growth hormone deficiency in adults; should we be looking for it? Clin Endocrinol (Oxf) 73:432-435

57.    **Snyder PJ, Fowble BF, Schatz NJ, Savino PJ, Gennarelli TA** 1986 Hypopituitarism following radiation therapy of pituitary adenomas. American Journal of Medicine 81:457-462

58.    **Thorner MO** 2009 Statement by the Growth Hormone Research Society on the GH/IGF-I axis in extending health span. J Gerontol A Biol Sci Med Sci 64:1039-1044

59.    **Veldhuis JD, Roelfsema F, Keenan DM, Pincus S** 2011 Gender, age, body mass index, and IGF-I individually and jointly determine distinct GH dynamics: analyses in one hundred healthy adults. J Clin Endocrinol Metab 96:115-121

60.    **Yamashita S, Melmed S** 1987 Insulinlike growth factor I regulation of growth hormone gene transcription in primary rat pituitary cells. J Clin Invest 79:449-452

61.    **Young J, Anwar A** 2007 Strong diabetes. Br J Sports Med 41:335-336; discussion 336

62.    **Zajac A, Poprzecki S, Zebrowska A, Chalimoniuk M, Langfort J** 2010 Arginine and ornithine supplementation increases growth hormone and insulin-like growth factor-1 serum levels after heavy-resistance exercise in strength-trained athletes. J Strength Cond Res 24:1082-1090

# EXHIBIT 2

**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
rclarkson@clarksonlawfirm.com
Shireen M. Clarkson (SBN 237882)
sclarkson@clarksonlawfirm.com
Bahar Sodaify (SBN 289730)
bsodaify@clarksonlawfirm.com
9255 Sunset Blvd., Ste. 804
Los Angeles, CA 90069
Tel: (213) 788-4050
Fax: (213) 788-4070

**TYCKO & ZAVAREEI, LLP**
Annick M. Persinger, Esq. (SBN 272996)
apersigner@tzlegal.com
483 Ninth Street, Suite 200
Oakland, CA 94607
Tel: (510) 254-6808

*Attorneys for Plaintiff Raul Pizana and the*
*Proposed Plaintiff Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL PIZANA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SANMEDICA INTERNATIONAL, LLC, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**[CLASS ACTION]**<br><br>**DECLARATION OF DR. DAVID H. MADOFF, M.D., PH.D.** |

CLARKSON LAW FIRM, P.C.
9255 Sunset Blvd., Suite 804
Los Angeles, CA 90069

DECLARATION OF DR. DAVID H. MADOFF, M.D., PH.D.

CLARKSON LAW FIRM, P.C.
9255 Sunset Blvd., Suite 804
Los Angeles, CA 90069

## DECLARATION OF DR. DAVID H. MADOFF, M.D., PH.D.

I, DAVID H. MADOFF, declare as follows:

    1.    I am the Director of The Woodholme Center for Diabetes and Endocrine Disorders in Pikesville, Maryland and an Assistant Professor of Medicine at The John Hopkins University School of Medicine.  I have been retained for the above-mentioned lawsuit. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

    2.    Attached hereto as Exhibit A is a true and correct copy of my curriculum vitae.

    3.    Attached hereto as Exhibit B is a true and correct copy of my expert report containing my opinions in connection with the above-mentioned lawsuit.

    I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed on MAY 8th 2018 at Pikesville, MD.

Dr. David H. Madoff, M.D., Ph.D.

1

DECLARATION OF DR. DAVID H. MADOFF, M.D., PH.D.

EXHIBIT A

| | 1838 Greene Tree | Cell: (443) 794-7810 |
|---|---|---|
| | Road, Suite 225A | Fax: (410) 486-4277 |
| | Pikesville, MD 21208 | dmadoff1@jhmi.edu |

## David H. Madoff, M.D., Ph.D.

**Updated 4/11/2016**

---

**Present Employment**

Director, The Woodholme Center for Diabetes and Endocrine Disorders, Pikesville, MD

**Education and Training**

Clinical/Research Fellow - Division of Endocrinology and Metabolism, The Johns Hopkins Hospital, July 1986 - June 1989
Baltimore, MD

Internal Medicine Residency and Internship
The Johns Hopkins Hospital, Baltimore MD
July 1983 – 1985
Baltimore, MD

M.D. 1983, UMDNJ - Rutgers Medical School
(Now Robert Wood Johnson Medical School),
Piscataway, N.J.

Ph.D. 1981, The Graduate School of Biological Sciences at Rutgers University, Department of Biochemistry,
New Brunswick, N.J.

A.B. 1976, Rutgers College, with Highest Distinction in Microbiology
New Brunswick, N.J.

**Licensure**

Maryland

**Board Certification**

American Board of Internal Medicine:
Internal Medicine 1987
Endocrinology and Metabolism 1989

**Prior Employment**

Chief, Division of Endocrinology and Metabolism
The Good Samaritan Hospital of MD, Inc.
July, 1989 to June, 2006

1

**Academic Appointments and Teaching Experience**

Assistant Professor of Medicine, Part Time
The Johns Hopkins Univ. School of Medicine
September, 1987 to the present

Attending Physician, The Good Samaritan Hospital, July 1989 to June, 2006

Attending Physician, Division of Endocrinology and Metabolism, The Johns Hopkins University School of Medicine, July 1988 - 1992

Lecturer, Medical Biochemistry Course, The Johns Hopkins University School of Medicine, 1988 – 1991

Lecturer, Medical Physiology Course, The Johns Hopkins University School of Medicine, 1986-2002

**Forensic Experience**

Medical Malpractice

Pharmaceutical product liability

Motor vehicle accidents

Work related injuries

Mold exposure and endocrine disorders

Employee/employer disputes

Prison healthcare

Nursing Home healthcare

Deportation issues related to health

| **Invited Lecturer: Symposia** | American College of Physicians, Maryland Affiliate,  2007 |
|---|---|
| | American Diabetes Assoc., Delaware Affiliate, 2001 |
| | International Symposium on Triglycerides, Metabolic Disorders, and Cardiovascular Disease, NYC  July, 2003 |
| | Maryland Association of Family Practitioners |
| | Memorial Hospital, Primary Care Conference, 2004. Colorado Springs, Colorado |
| | Perry Point VAMC, 2007, 6th Annual Medical Staff Research, Education and Strategic Planning Day |
| | Nebraska Heart Institute 2004, 2005 |
| | N.J. Association of Family Practitioners |
| | Primary Care 2007 (April and July) |
| | PRI-MED Symposia 2006 |
| | Wisconsin Academy of Family Practice |
| **Invited Lecturer: Hospitals** | The Johns Hopkins Hospital Medical Grand Rounds |
| | The Johns Hopkins Hospital Endocrine Grand Rounds |
| | The Johns Hopkins Hospital Preventive Cardiology Rounds |
| | Columbia St. Mary's Hospital, Milwaukee, Wisconsin |
| | Clarksburg D.O. Residency Program |
| | Doctor's Community Hospital, Lanham, Maryland |
| | Franklin Square Hospital, Baltimore, Maryland |
| | Harbor Hosptial, Baltimore, Maryland |
| | MedStar Physicians Partners |
| | Rockingham Memorial Hospital, Harrisonburg, Virginia |
| | Ruby Memorial Hospital, WVU School of Medicine |
| | Saint Joseph Hospital, Baltimore, Maryland |

Sinai Hospital of Baltimore, Maryland

Southern Maryland Hospital

Suburban Hospital, Bethesda, Maryland

The Good Samaritan Hospital of Maryland, Inc.

**Preceptorship**          Nurse Practitioner Program, University of Maryland 2003, 2005

The Johns Hopkins University School of Medicine Longitudinal Clerkship for first and second year medical students, 2009 to the present

**Medical Societies**          American Association of Clinical Endocrinologists

American Diabetes Association

American Diabetes Association, National Member, Committee on Complications, 1995

American Diabetes Association, Maryland Affiliate
Board Member 1989-1994
Chairman, Professional Affairs Committee, 1993-1994
Recipient, President's Award for Outstanding Service, 1994-1995

American Medical Association

**Occasional Reviewer for Journal Articles**          Endocrine Practice

Diabetes

Diabetes Care

Medicine

**Symposium Chairman**          Diabetes Management
  Washington, D.C.  May 18, 1999
   Sponsor: Merck

Caring for the Diabetic Lower Extremity
  Baltimore, Maryland  April 28, 1995
   Sponsor: American Diabetes Association

Examining the Psychosocial Ramifications of
Type 1 Diabetes in Children
  Miami, Florida  October 19, 2011
   Sponsor: The Johns Hopkins University School of Medicine

4

**Scientific Publications**

Ghosh, S, and Madoff, D.H.  2007.  Cushing Syndrome Uncovered During Treatment of Hyperthyroidism.  The Endocrinologist.  17:309-311.

Osih, Regina, Ilag, Liza, and Madoff, David H.  2005.  A Case of Mistaken Identity: Diagnosing a Unilateral Cortisol-Producing Adrenal Adenoma in a Patient on Exogenous Glucocorticoids.  The Endocrinologist  15:4-6.

Madoff, David H.  2004.  The Prevalence and Implications of CHD in Patients with Diabetes.  CV Digest 9/2004.

Madoff, David H.  2003.  Metabolic Syndrome and Cardiovascular Disease: New Management Considerations.  Preventive Medicine in Managed Care 3:S59-S65.

Bellantoni, Marie and Madoff, David H.  1995.  Osteoporosis and Back Pain: Diagnosis, Treatment, and Prevention.  State of the Art Reviews, Physical Medicine and Rehabilitation.  Spinal Rehabilitation. 9(3):641-656.

Madoff, David H., Dizon, Ana Marie, and Burd, Joyce K., 1995.  A Case of Mistaken Identity:  Occult primary adrenal insufficiency in a patient taking exogenous glucocorticosteroids.  The Endocrinologist, 5:380-381.

Blevins, Lewis S., Jr., Hall, Scott G., Madoff, David H., Laws, Edward R., and Ward, Gary S. 1992.  Case Report:  Acromegaly and Cushing's Disease in a patient with Synchronous Pituitary Adenomas.  Am. J. Med. Sci. 304:294-297.

Madoff, D.H., Martensen, T.M. and Lane, M.D.  1988.  Insulin and insulin-like growth factor-I stimulate the tyrosine phosphorylation of a 160kDa soluble protein in 3T3-L1 adipocytes.  Biochemical Journal 252:7-15.

Madoff, D.H., and Lenard, J.  1982.  A membrane glycoprotein that accumulates intracellularly:  cellular processing of the large glycoprotein of Lacrosse virus.  Cell 28:821-829.

**Patient Publications**

Madoff, David H.  1996.  What is Diabetes and What Can We Do to Prevent It?    Baltimore City Medical Society Report: Spring, 1996.

Madoff, David H.  1992.  Thyroid Nodules: A Patient's Guide.  Baltimore City Medical Society Report: Winter, 1992.

5

| | |
|---|---|
| **Physician Education Publications** | Madoff, David H.  2004.  Prevention and Treatment of Diabetic Renal Disease.  Metropolitan Medical Specialty Bulletin: June, 2004. |
| | Madoff, David H.  2003.  Early Identification of Patients At Highest Risk for an Atherothrombotic Event. Metropolitan Medical Specialty Bulletin: April, 2003. |
| | Madoff, David H.  2001.  Preventing Recurrent Nephrolithiasis. Metropolitan Medical Specialty Bulletin: April, 2001. |
| | Madoff, David H.  1999.  Treating Diabetes: Adhering to National Standards of Care. Metropolitan Medical Specialty Bulletin: October, 1999. |
| **Presenter: Web-based Continuing Medical Education** | Optimizing Patient Outcomes: Sequencing Therapy in Type 2 Diabetes-Part 2, with Dr. Rita Kalyani and Thomas Donner, The Johns Hopkins Medical Institutions, launched 7/25/2013. |
| | Improving Patients Outcomes:  Hypoglycemia Risk Reduction in Patients with Type 2 Diabetes Mellitus, with Dr. Thomas Donner and Stephen Clement, The Johns Hopkins Medical Institutions, launched 1/30/2015. |
| **Medical Legal Articles** | Hypoglycemia and Motor Vehicle Accidents, Blog 6/2014. |
| | Diabetes Hypoglycemia in Nursing Homes, Blog 9/2014. |

6

# EXHIBIT B

**David H. Madoff, M.D., Ph.D., Director**
**The Woodholme Center for Diabetes and Endocrine Disorders**
1838 Greene Tree Road, Suite 225A
Pikesville, Maryland  21208
(443) 794-7810  Fax (410) 486-4277

# Expert Report

4/30/2018

I have been asked to discuss the following questions:

1. Can Serovital®-h**gh** (Serovital) increase human growth hormone (HGH) levels by a mean of 682%?

2. What would be the effects of chronic mean elevation in HGH by 682%, as claimed by the manufacturers of Serovital, in humans who have normal levels of HGH at baseline?

3. What is the evidence that increasing HGH levels in humans who have normal HGH at baseline will result in "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades-not years, but DECADES younger" as stated on the Serovial product package?

I am board-certified in Internal Medicine and Endocrinology and Metabolism. I have been a practicing physician for 34 years, and a practicing Endocrinologist for 28 years. I am particularly qualified to opine in this case because I have been treating patients with growth hormone deficiency and other pituitary disorders for 28 years.  As the first graduate of the joint M.D.-Ph.D. program at UMDNJ-Robert Wood Johnson Medical School, I studied the intracellular processing of a viral glycoprotein, similar in certain aspects to the processing of peptide hormones such as growth hormone and insulin-like growth factor-1 (IGF-1).  In addition, as an endocrine faculty member at The Johns Hopkins University School of Medicine, I ran a laboratory dedicated to the study of the cellular actions of insulin, a hormone that is closely related to insulin-like growth factor-1, the latter of which is instrumental in the action of growth hormone.  I have included my curriculum vitae at the end of this report.

I offer my opinions, all of which are expressed to a reasonable degree of medical certainty. Each opinion is supported with background data and references from peer-reviewed scientific publications. In the event that additional records become available, I reserve the right to amend any of my opinions stated below in this report.

Expert Report Dr. David H. Madoff                                                        2
Serovital Class Action Litigation

**The following are my opinions in this case followed by my rationale for those opinions:**

**1.  The Basics: What is growth hormone and what does it do?**

    **1.1.  What is growth hormone, where is it made, and how is it released by the body?**

Growth hormone (GH) is a hormone that is synthesized by cells called somatotrophs within the anterior pituitary, a structure that is located at the base of the brain.  GH, a peptide hormone composed of a unique sequence of 191 amino acids released by the pituitary in a very precise and highly regulated fashion, travels in the bloodstream to produce its effects throughout the body.[1]  GH secreted from the pituitary in short bursts, or pulses, has a short half-life of 14 minutes in the blood.  There are about 10 pulses of GH each day, each lasting about 90 minutes,[2] and between pulses of GH the levels are typically undetectable.  As a result, 50% of random GH blood tests collected during the daytime in normal individuals, and 95% of random GH samples collected during the daytime in obese or elderly individuals are undetectable in sensitive GH assays.[3]  Per 24-hour sampling of HGH every twenty minutes, mean HGH levels are: 1.0+0.2 ng/mL nighttime, 0.6+0.1 ng/mL daytime, and peak HGH levels are: 4.3+0.7 ng/mL nighttime, 2.7+0.5 ng/mL daytime,[4] and 20-30 ng/mL following exercise.[5]

**Due to immense hour-to-hour variation in GH levels, it is quite difficult to accurately quantitate average or mean GH levels in human subjects.  Most GH levels are undetectable, mean GH levels are between 0.6 ng/mL and 1.0 ng/mL depending upon the time of the day, and peak GH levels are between 2.7 ng/mL and 4.3 ng/mL depending upon the time of the day.**

---

**Abbreviations used in this report:** AUC-area under the curve, BMD-bone mineral density, BMI-body mass index, CI-confidence intervals, GH-growth hormone, GHD-growth hormone deficiency, HGH-human growth hormone, IGF-1-insulin-like growth factor-1, LBM-lean body mass

[1] Gunawardane, K, *et. al.,* 2015, *Normal physiology of growth hormone in adults,* Endotext.org.
[2] Toogood, A.A., *et. al.,* 1997, *Preservation of growth hormone pulsatility despite pituitary pathology, surgery, and irradiation,* J. Clin. Endocrinol. Metab. **82**(7):2215.
[3] Chapman, I.M., *et. al.,* 1994, *Enhanced sensitivity growth hormone (GH) chemiluminescence assay reveals lower postglucose nadir GH concentrations in men than women,* J. Clin. Endocrinol. Metab., **78**(6):1312.
[4] Toogood, A.A., *et. al.,* 1997, *Preservation of growth hormone pulsatility despite pituitary pathology, surgery, and irradiation,* J. Clin. Endocrinol. Metab. **82**(7):2215.
[5] Salvatori, R., 2004, *Growth hormone and IGF-1,* Rev. Endocr. Metab. Disord., **5**(1):15.

Expert Report Dr. David H. Madoff                                       3
Serovital Class Action Litigation

1.2.   **What are the effects of HGH on the body?**

HGH exerts its effects on cells throughout the body by first binding tightly to a specific protein called the GH-receptor located on the cell-surface of GH-responsive cells.  Following cell-surface GH binding to GH-receptor, mediators within the responsive cell cause changes in the cell's nucleus to alter the levels of important proteins, enzymes and other control elements within that cell.[6]

The most important organ that responds directly to GH is the liver. In response to GH, liver cells synthesize and secrete the hormone IGF-1.  Most of the IGF-1 in the body is produced in the liver, accounting for about 75% of the total.  Most of the effects of GH are produced by IGF-1.

Mainly through the regulation of IGF-1 levels, GH causes the following important effects:[7]

a.  Linear growth in childhood and adolescence

b.  Release of fat from fat cells (adipocytes)

c.  Stimulation of protein synthesis

d.  Resistance to insulin which can cause high blood glucose and diabetes, especially when GH levels are excessive

e.  Water, sodium and phosphate retention

**GH secretion stimulates the synthesis and secretion of IGF-1 mainly in the liver.  IGF-1 produces multiple important effects throughout the body.**

1.3.   **What are the effects of excessive GH in humans?**

Acromegaly is an endocrine disorder characterized by an excess of both GH and IGF-1 in the body, usually due to a pituitary tumor that secretes uncontrolled and excessive amounts of GH.  Mean 24-hour GH levels in patients with untreated acromegaly vary between

---

[6] Gunawardane, K, *et. al.,* 2015, *Normal physiology of growth hormone in adults,* Endotext.org.
[7] Ibid.

Expert Report Dr. David H. Madoff                                                   4
Serovital Class Action Litigation

9.5 and 103 ng/mL.[8]  Acromegaly, if untreated, can be a devastating condition that has been reported to cause:[9]

a.  Gigantism in children, joint and back pain due to arthropathy, temporomandibular joint pain, dental malocclusion[10]

b.  Enlarged jaw, swollen hands and feet, course facial features, enlargement of the tongue, deepening of the voice

c.  Enlargement of many organs such as the heart, liver, lungs, kidneys, thyroid, and prostate

d.  Cardiovascular disease including hypertension, enlarged heart, and heart failure

e.  Obstructive sleep apnea

f.  Overt diabetes in 10-15% of cases, prediabetes in 50% of cases

g.  Increased frequency of adenomatous colonic polyps and colon cancer

h.  Fatigue and weakness

i.  Carpal tunnel syndrome

j.  Increased mortality due to cardiovascular disease

Treatment of acromegaly with subsequent normalization of GH and IGF-1 leads to improvement in most, but not all of the aforementioned conditions.

**As endocrinologists, our experience with patients who have acromegaly clearly demonstrates that excessive GH is potentially very dangerous and can cause many undesirable effects.**

---

[8] Kraftson, A., and Barkan, A., 2010, *Quantification of day-to-day variability in growth hormone levels in acromegaly,* Pituitary, **13**(4):351-354.
[9] Melmed, S., 2017, *Causes and clinical manifestations of acromegaly,* Up To Date.
[10] Hordon, Lesley, 2017, *Rheumatic and bone disorders associated with acromegaly,* Up to Date.

Expert Report Dr. David H. Madoff                                          5
Serovital Class Action Litigation

### 1.4.    What are the effects of too little GH?

GH deficiency (GHD) can be due to a variety of causes including large pituitary tumors, pituitary irradiation or surgery, tumors near the pituitary, or other rare causes.  The reported consequences of GHD are:[11]

a.  Decrease in lean body mass (LBM)

b.  Lower bone mineral density (BMD), possible increased incidence of fractures

c.  Lower general quality of life

d.  Possible increase in known cardiovascular risk factors

e.  Possible increase in mortality, although untreated congenital GHD does not lead to shortened life expectancy[12]

Treatment of patients with proven GHD can lead to improvement in quality of life, increased LBM, reduced subcutaneous fat mass, increased BMD in men but not women, and improvements in some of the other aforementioned issues, but no change in mortality. Unfortunately, treatment with GH can also have side-effects such as persistent elevated blood glucose, carpal tunnel syndrome, arthralgias, and swelling in the hands and feet.[13]

Treatment with GH in patients with documented GHD is controversial.  Whereas Dr. Peter Snyder suggests not to treat most patients with adult-onset GHD unless it is their preference to be treated,[14] the 2016 Endocrine Society guidelines favor treatment for most patients with GHD unless there is a contraindication.[15]

---

[11] Snyder, P.J., 2018, *Growth hormone deficiency in adults,* Up To Date.

[12] Aguiar-Oliveira, M.H., *et. al.,* 2010, *Longevity in untreated congenital growth hormone deficiency due to a homozygous mutation in the GHRH receptor gene,* J. Clin. Endocrinol. Metab. **95**:714-721.

[13] Snyder, P.J., 2018, *Growth hormone deficiency in adults,* Up To Date.

[14] Ibid.

[15] Fleseriu, M., *et. al.,* 2016, *Hormonal replacement in hypopituitarism in adults: an endocrine society clinical practice guideline,* J. Clin. Endocrinol. Metab. **101**:3888-3921.

**Endocrine experts generally agree on the following:**

**a. GH should only be administered to patients with clinical features of adult GHD and biochemically proven evidence of adult GHD.[16,17,18]**

**b. Normal elderly individuals should not be tested or treated for GHD because there exists no evidence to support treatment in this segment of the population.[19,20,21] Treatment with GH has many potential adverse side effects, and such treatment has no proven long-term benefits.**

**c. Athletes should not be treated with GH to enhance their performance because there is no scientific evidence to support this practice.[22,23] Treatment with GH has many potential adverse side effects, and such treatment has no proven long-term benefits.**

**1.5.    What are the changes in HGH secretion with aging, and are these changes normal or pathological?**

There is a decrease in GH secretion in normal aging individuals from a peak of 150 μg/kg/day during puberty to 25 μg/kg/day at age 55.[24]  As is the case with GH secretion, IGF-1 secretion reaches a peak during puberty and decreases as we age.[25]

Although normal aging is associated with many alterations in body composition that have been associated with GHD (increased fat mass, decreased LBM, decreased BMD), it is unclear as to which is the cause, and which is the effect.

**It is unknown whether lower GH and IGF-1 levels in the elderly cause body composition changes associated with aging, or**

[16] Ibid.
[17] Snyder, P.J., 2018, *Growth hormone deficiency in adults,* Up To Date.
[18] Cook, D.M., *et. al.,* 2009, *American Association of Clinical Endocrinologists medical guidelines for clinical practice for growth hormone use in growth hormone-deficient adults and transitions patients-2009 update,* Endocrine Practice, **15**(Suppl 2):1-29, section R2.
[19] Fleseriu, M., *et. al.,* 2016, section 2.13.
[20] Snyder, P.J., 2018, *Growth hormone deficiency in adults,* Up To Date.
[21] Cook, D.M., *et. al.,* 2009, section R3.
[22] Fleseriu, M., *et. al.,* 2016, section 2.14.
[23] Cook, D.M., *et. al.,* 2009, section R3.
[24] Veldhuis, G.A., 1998, *Pathophysiology of the neuroregulation of growth hormone secretion in experimental animals and the human,* Endocr. Rev., **19**(6):717.
[25] Gunawardane, K, *et. al.,* 2015, *Normal physiology of growth hormone in adults,* Endotext.org.

Expert Report Dr. David H. Madoff                                                    7
Serovital Class Action Litigation

> whether other factors associated with the aging process cause
> low GH and IGF-1 levels.[26]
>
> Endocrine experts agree that normal elderly patients without
> documented GHD should not be treated with GH. [27,28,29]

## 2. Serovital: What is it and what does its manufacturer, Sanmedica International, claim as its benefits for people who use it?

### 2.1. What is Serovital?

2.1.1. Serovital is an over-the-counter product that contains five amino acids and one herb.  Each capsule contains:[30]
- 374.83 mg L-lysine
- 181.38 mg L-arginine
- 0.25 mg L-glutamine
- 170.93 mg L-pyroglutamic acid (oxy-proline)
- 0.25 mg N-acetyl L-cysteine
- 0.125 mg Schizonepta (aerial parts) powder

2.1.2. Individuals are instructed to take four capsules of Serovital daily with water on an empty stomach, either in the morning two hours before breakfast or two hours after dinner prior to bedtime.[31]

### 2.2. Sanmedica International claims that taking Serovital leads to a "682% Mean Increase in HGH Levels."[32]

2.2.1. An abstract on the Serovital website, which represents the only analysis of Serovital on record, describes a cross-over, placebo-controlled randomized study of 12 males, age $32\pm14$ years, body mass index (BMI) $26.4\pm5.0$ kg/M$^2$ who were studied after being given a single dose of Serovital or placebo.[33]  In other words, the Serovital website is describing a study in which 12 male subjects were initially given either Serovital or a placebo in a randomized fashion, and their GH levels were measured at baseline and 15, 30, 60, 90, and 120 minutes later.  Sometime thereafter an identical

---

[26] Ibid., pg. 7.

[27] Fleseriu, M., *et. al.,* 2016, section 2.13.

[28] Snyder, P.J., 2018, *Growth hormone deficiency in adults,* Up To Date.

[29] Cook, D.M., *et. al.,* 2009, section R3.

[30] Heaton, *et. al.,* United States Patent No. US8,551,542B1, 10/8/2013.

[31] Serovital product package

[32] Ibid.

[33] Serovital.com website, The Science.  Reference 16 is cited for this abstract, however reference 16 is not listed below in the reference section.

Expert Report Dr. David H. Madoff                                         8
Serovital Class Action Litigation

study was performed, but during the second study the subjects who initially received Serovital were given placebo and the subjects who initially received placebo were given Serovital.

The design of this Serovital study is more fully described within the Serovital U.S. Patent:[34]  The original study included 12 males and 4 females, but only the data for the males is included on the website and packaging.  Each study subject underwent their two studies one week apart in an Inpatient unit following an overnight fast.

Results reported in this abstract indicated that: "Mean growth hormone increased eight-fold over baseline (equivalent to 682%) after the supplement from 0.17 at baseline to 1.33ng/ml at 120 minutes compared to a mean decrease of 52% after placebo from 0.93 to 0.45ng/ml (Figure 2). The mean change in GH levels from baseline to 120 minutes (GH at 120 minutes minus GH at 0 minutes), was 1.15 (95% CI: 0.17, 2.14) ng/ml after the supplement versus 0.48 (1.47, 0.50) ng/ml after the placebo, demonstrating a statistically significant differential effect (P=0.01). After the supplement, the mean AUC for GH across 120 minutes was 20.43 (95% CI: 19.90, 20.95) ng/ml/min which was significantly higher (P=0.04) than placebo at 19.67 (18.74, 20.59) ng/ml/min. Overall, 120 minutes after taking the supplement, GH levels were significantly higher in both absolute levels and by AUC.

The Serovital U.S. patent included the same unlabeled figure from the Serovital website and packaging with an identical description (figure 1.).

The Serovital website further states: "Our study had a broad range of ages and BMI's and included both genders. An additional advantage of our study over previous GH evaluations is that it contained a placebo control group and was randomized and double-blinded".

2.2.2.  I put forth the following comments regarding this abstract on the Serovital website and the description of the same study in the Serovital patent:

2.2.2.1.   This study is not cited in the medical literature, and there is no evidence that this study was accepted for publication in a peer-reviewed journal.  When a scientific study is accepted for publication in a high-quality journal, all of the background materials, methods, and conclusions are rigorously reviewed

---

[34] Heaton, *et. al.,* United States Patent No. US8,551,542B1, 10/8/2013.

Expert Report Dr. David H. Madoff                                          9
Serovital Class Action Litigation

by qualified fellow scientists.  To the contrary, there is no rigorous detailed description of the patients, procedures, and methods in this abstract or in the Serovital U.S. Patent.

2.2.2.2.    The only figure on this site is not labelled, and it is unclear as to what exactly the aqua and red lines represent.  Although we could assume that the aqua line represents subjects who received Serovital and the red line represents subjects who received placebo, their description of the data is not consistent with this interpretation.  Without more detailed labelling, this figure which displays data depicting the short-term effects of Serovital on GH levels is impossible to scientifically interpret.

2.2.2.3.    Baseline HGH levels were 0.17 ng/mL in the 12 male subjects before ingesting Serovital and 0.93 ng/mL in the same 12 male subjects before ingesting placebo.  In other words, HGH levels were 447% higher in the same 12 male subjects prior to ingestion of either placebo or Serovital, independent of Serovital ingestion.  The huge discrepancy in baseline HGH levels in the same group of 12 male subjects underscores the known difficulties in accurately assessing HGH levels in human subjects (see section 1.1 above).  Given the large differences in HGH levels in the same subjects before administration of placebo or Serovital, it is likely that the results of the study are due to random variation in HGH levels and not due to Serovital.

**Baseline HGH levels varied greatly in the same 12 male subjects prior to administration of placebo or Serovital, calling in to question the results of the HGH levels following the administration of placebo or Serovital, and calling in to question the results of this study.**

2.2.2.4.    The observed change in HGH levels two hours following Serovital administration to these 12 male subjects was 1.15 ng/mL (CI 0.17-2.14).  The confidence interval (CI) is a term that refers to the 95% likelihood that the results of any study will fall between the numbers cited for the confidence interval, in this case 0.17 to 2.14.[35]  In other words, the change in GH levels in 95% of the subjects in this study following Serovital administration was as low as 0.17 and as high as 2.14.

---

[35] Bonis, P.A.L., 2016, *Glossary of common biostatistical and epidemiological terms,* Up To Date.

Expert Report Dr. David H. Madoff                                              10
Serovital Class Action Litigation

The fact that the confidence interval is so wide for the change in HGH levels following Serovital once again underscores the variability and difficulty in accurately measuring HGH levels as reviewed in section 1.1 above. The confidence intervals for the change in HGH levels following placebo were similarly quite wide, calling in to question the results of this small study.  The claim by Sanmedica International that Serovital leads to a "682% Mean Increase in HGH Levels is based on a single value of HGH 15 minutes before and a single value of HGH two hours after the administration of Serovital, even though there were two GH levels assessed before and five GH levels assessed following Serovital ingestion."[36]

**Since baseline and post-Serovital HGH levels in this small group of subjects were so variable, the conclusion that Serovital leads to a "682% Mean Increase in HGH Levels is not supported by the data depicted in their uncited, unpublished abstract.**

2.2.2.5.   AUC values provided in the abstract on the Serovital website suggests that there is actually no difference in effect between placebo and Serovital on subsequent GH levels. AUC is a calculation of the total growth hormone levels during the entire two hours following either placebo or Serovital.  The values for AUC are very nearly identical and show no clinically relevant or statistically significant difference: 20.43 for Serovital treated subjects and 19.67 for placebo treated subjects.  Importantly, the confidence intervals for the AUC for placebo and Serovital treated subjects are overlapping, demonstrating that there is no statistical difference in GH following Serovital ingestion.

How can we reconcile the fact that total growth hormone values following Serovital and placebo administration are identical according to AUC values, with the statement by Sanmedica International that: "taking Serovital leads to a "682% Mean Increase in HGH Levels?"[37]

**The abstract described on the Serovital website, which represents the only reported, uncited, unpublished study of Serovital on record, is a very small study of 12 males on a single day.  This abstract is confusing, is not**

---

[36] Serovital.com website, The Science.

[37] Ibid.

**cited in the medical literature, contains contradictions, displays an unlabeled figure that is impossible to interpret, and demonstrates no statistically significant difference in total GH levels over the two hours (AUC) following Serovital compared to placebo treatment.**

2.2.2.6.    There is no mention of other hormones or blood levels measured during the brief experiment discussed on the Serovital website.[38]  It is well known that oral arginine ingestion can increase insulin levels,[39] and it is important to understand the impact of Serovital on chronic insulin levels before this product can be used on a large population of unselected individuals in an unmonitored and unregulated fashion.  In the Isidori article cited on the Serovital website, insulin levels were stimulated from a baseline of $7.3 \pm 3.2$ μU/mL to a peak $21.0 \pm 1.5$ μU/mL at 30 mins following ingestion of similar levels of arginine and lysine found in Serovital: 1.2 gm of arginine and 1.2 gm of lysine given to 15 subjects.  Peak insulin levels were $18.3 \pm 2.5$ μU/mL and $17.7 \pm 8.4$ μU/mL when the study was repeated 10 and 20 days later.[40]  Administration of insulin to patients with all forms of diabetes mellitus most often leads to weight gain, and it is possible that insulin administration also contributes to excess cardiovascular risk and mortality in patients with Type 2 diabetes mellitus.[41]

**Daily administration of arginine and lysine at the dose found in Serovital have been demonstrated to repeatedly increase insulin levels in healthy adults.[42]  No data are available regarding insulin levels following the ingestion of Serovital.  Since elevated insulin levels have been implicated in weight gain and cardiovascular risk in individuals with Type 2 diabetes, it is advisable to fully understand the chronic effects of Serovital on insulin levels and cardiovascular risk in healthy adults before subjecting them to chronic Serovital**

---

[38] Serovital.com website, The Science.

[39] Isidori, A., *et. al.,* 1981, *A study of growth hormone release in man after oral administration of amino acids,* Curr. Med. Res. Opin., **7**:475-481.

[40] Isidori, A., *et. al.,* 1981, *A study of growth hormone release in man after oral administration of amino acids,* Curr. Med. Res. Opin., **7**:475-481.

[41] Herman, M.E., *et. al.,* 2017, *Insulin therapy increases cardiovascular risk in type 2 diabetes,* Prog. Cardiovasc. Dis., **60**(3):422-434.

[42] Isidori, A., *et. al.,* 1981, *A study of growth hormone release in man after oral administration of amino acids,* Curr. Med. Res. Opin., **7**:475-481.

           **administration in an unmonitored and unregulated fashion.**

2.2.2.7.  The only available data on Serovital from their website is a study of 12 males performed on two days one week apart. There is no long-term study of Serovital to determine the effects of Serovital on essential factors such as chronic GH and IGF-1 levels, insulin and other hormone levels, weight, blood pressure and pulse, cholesterol profile, blood glucose, or cardiovascular health, or important issues such as lean body mass, fat mass, or bone density, or other issues such as mood, general well-being, libido, wrinkle reduction, or looking and feeling decades younger.

**The study described on the Serovital website and in the Serovital United States Patent does not prove that Serovital ingestion has any beneficial effects on humans.  This study demonstrates no statistically significant difference in overall GH levels over two hours (AUC) following Serovital compared to placebo treatment.**

**No data exist regarding possible adverse side effects as a result of chronic Serovital administration.**

**The abstract reported on the Serovital website and in the Serovital U.S. Patent provides no rationale for the safe and effective use of Serovital on a large population for long periods of time in an unmonitored and unregulated fashion.**

**2.3.   The Serovital U.S. Patent describes additional human studies with Serovital.[43]**

2.3.1.  There are two additional unlabeled figures in the patent (figures 2 and 3) that describe a separate experiment in which 10 males and 5 females, mean age 33±7 years were provided a 3-week supply of Serovital.  The subjects were instructed to ingest Serovital two hours after dinner prior to bedtime every night for 3 weeks.  The subjects reported the time they went to bed, time of final wakening, estimated time to fall asleep, the time of awakening during sleep and the length of time awake.  There was no placebo arm to this study.  The authors state that the time to fall asleep decreased with

---

[43] Heaton, *et. al.,* United States Patent No. US8,551,542B1, 10/8/2013.

an average slope of -0.24 min/day, and the time awake during sleep decreased by an average slope of -0.26 min/day.[44]

**My criticisms of this study are:**
- This is an uncontrolled study, there is no placebo arm
- The sleep parameters are self-reported and not measured objectively
- The correlation coefficients provided in the unlabeled figures 2 and 3 are quite low ($R^2$ = 0.2282 and $R^2$ = 0.203 respectively) meaning that the changes in self-reported sleep parameters are not statistically significant.  In other words, the use of Serovital caused no observable change in self-reported sleep parameters during this study.
- Both figure 2 and figure 3 are unlabeled, and thus it is uncertain what exactly they mean.

2.3.2.  A study is described in which healthy men and women ages 30 to 80 years were to be given either daily Serovital or placebo for 6 months.  Exclusion criteria were described.  The subjects were to be assessed weekly during the study for weight, body composition, physical performance, and hormonal analyses.[45]  **The results of this study are not published in the medical literature or mentioned on the Serovital website, packaging, or U.S. Patent.**

2.3.3.  A study is described in which healthy men over 60 years old were to be given varied doses of Serovital or a placebo for 6 months.  Exclusion criteria were described.  The subjects were to be assessed weekly during the study for lean body mass, adipose mass, skin thickness, bone density at various skeletal sites, and energy levels.[46]  **The results of this study are not published in the medical literature or mentioned on the Serovital website, packaging, or U.S. Patent.**

2.3.4.  A study is described in which healthy men and women between the ages of 30 and 80 years were to be given different doses of Serovital or placebo for 6 months.  Subjects were to be assessed weekly for anxiety (e.g. Hamilton Anxiety Rating Scale), stress hormones (e.g. cortisol and GH), and sleep parameters.[47]  **The results of this study are not published in the medical literature or mentioned on the Serovital website, packaging, or U.S. Patent.**

---

[44] Ibid., pg. 9, Example 3
[45] Ibid., pg. 10, Example 4.
[46] Ibid., pg. 10, Example 5.
[47] Ibid., pg. 10, Example 6.

**2.4. Sanmedica International claims: "It is clear that Growth Hormone has been associated with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades- not years, but DECADES younger."[48]**

### 2.4.1. Is GH associated with "wrinkle reduction"?

According to the scientific medical literature, GH has never been associated with wrinkle reduction.[49,50,51]

### 2.4.2. Is GH associated with decreased body fat and increased LBM?

GHD in adults is associated with decreased lean body mass, and treatment of adults with proven GHD with GH injections can lead to increased LBM, reduced subcutaneous fat,[52] increased strength in limb girdle muscles,[53] and improved exercise performance.[54]  In a small study of 12 healthy adult men from 61 to 81 years old with IGF-1 levels in the lower age-adjusted normal range, treatment with GH for six months was accompanied by an 8.8% increase in LBM, a 14.4% decrease in adipose mass, a 1.6% increase in average lumbar vertebral bone density, and a statistically insignificant 7.1% increase in skin thickness.  There were small increases in the mean systolic blood pressure and fasting glucose in GH-treated subjects.  Reduction in wrinkles, improved mood, improved libido and feeling decades younger were not studied or reported on in this paper.[55]

In a 26-week randomized, double-blind, placebo-controlled parallel group study of GH injection therapy in healthy aged women (n=57) and men (n=74), Blackman, et. al. treated 35 subjects with GH and sex steroid, and 30 subjects with GH and placebo sex steroid and compared their responses to the appropriate control group in a 2 x 2 design.  LBM increased, and fat mass decreased statistically significantly in men and women.  Statistically significant adverse

---

[48] Serovital product package

[49] Gorouhi, F. and Maibach, H.I., 2009, *Role of topical peptides in preventing or treating aged skin,* Int. J. Cosmetic Sci., **31**:327-345.

[50] Puizina-Ivic', N., 2008, *Skin aging,* Acta Dermatoven., **17**(2):

[51] Ganceviciene, R., *et. al.,* 2012, *Skin anti-aging strategies,* Dermato-Endocrinology, **4**(3):308-319.

[52] Snyder, P.J., 2018, *Growth hormone deficiency in adults,* Up To Date.

[53] Cuneo, R.C., *et.al.,* 1991, *Growth hormone treatment in growth hormone-deficient adults. I. Effects on muscle mass and strength,* J. Appl. Physiol. **70**:688-694.

[54] Cuneo, R.C., *et.al.,* 1991, *Growth hormone treatment in growth hormone-deficient adults.  II. Effects on exercise performance,* J. Appl. Physiol. **70**:695-700.

[55] Rudman, D., *et. al.,* 1990, *Effects of human growth hormone in men over 60 years old,* N. Engl. J. Med., **323**:1-6.

effects of GH in this study included edema in 38% of women (vs. 0% in controls), carpal tunnel symptoms in 32% of men (vs. 0% in controls), arthralgias in 41% of men (vs. 0% in controls), diabetes or glucose tolerance in 18 men receiving GH vs. 7 men not receiving GH. Reduction in wrinkles, improved mood, improved libido and feeling decades younger were not studied or reported on in this paper. **Based on the study results, the authors concluded: "Because adverse effects were frequent (importantly, diabetes and glucose intolerance), GH interventions in the elderly should be confined to controlled studies."[56]**

**Based upon all of the existing data regarding GH therapy for normal adults, Endocrine Society and AACE guidelines and leaders in the field recommend against the use of GH therapy in patients who do not have proven GHD. Their rationale is that treatment with GH has many potential adverse side effects, and such treatment has no proven long-term benefits.[57,58,59]**

### 2.4.3. Is GH associated with heightened sex drive?

GH treatment doesn't heighten sex drive based upon an extensive systematic review and meta-analysis of 54 randomized controlled trials involving 3,400 patients with GHD who were treated with GH.[60]

### 2.4.4. Will GH treatment cause recipients to feel decades younger?

Based on the scientific medical literature cited in this report, GH treatment will not cause recipients to feel decades younger.

The implication and claim on the Serovital package and website that Serovital causes recipients to feel decades younger is false.

---

[56] Blackman, M.R., *et.al.*, 2002, *Growth hormone and sex steroid administration in healthy aged women and med: a randomized trial,* JAMA, **288**(18):2282.
[57] Fleseriu, M., *et. al.,* 2016, section 2.13.
[58] Snyder, P.J., 2018, *Growth hormone deficiency in adults,* Up To Date.
[59] Cook, D.M., *et. al.,* 2009, section R3.
[60] Hazem, *et. al.,* 2012, *Body Composition and quality of life in adults treated with GH therapy: a systematic review and meta-analysis,* Eur. J. Endocrinol., **166**(1):13-20.

Expert Report Dr. David H. Madoff                                                      16
Serovital Class Action Litigation

2.4.5. **Do studies involving GH therapy in subjects with GHD scientifically address potential benefits of GH treatment in individuals with normal GH?**

**No. Patients with GHD are treated to replace a deficiency in GH, whereas the individuals without GHD are treated to augment normal GH levels.  An analogy with insulin, thyroid hormone or glucocorticoid therapy is appropriate: Long-term treatment of patients with these hormone deficiencies is proven to be beneficial and safe, whereas long-term treatment of normal individuals with these hormones is proven to be harmful and without benefit.**

3. **What are the potential harms in taking Serovital if it could increase mean GH levels by 682%?**

If Serovital were hypothetically capable of chronically increasing mean GH levels by 682%, GH levels could approach the levels of GH in patients with acromegaly.  As discussed in section 1.3 above, excessive GH in patients with acromegaly is potentially very dangerous and can cause many undesirable effects.  In other words, if Serovital hypothetically worked as claimed on the Serovital website, users could face the same damaging issues as patients with acromegaly, namely increased mortality due to cardiovascular disease, diabetes, prediabetes, obstructive sleep apnea, organ enlargement, musculoskeletal issues, enlarged jaw, swollen hands and feet, course facial features, fatigue, weakness, increased frequency of colonic polyps and cancer, and deepening of the voice.

**If, hypothetically speaking, Serovital worked as claimed in its website, there could be terrible, undesirable adverse side effects from excess GH.**

4. **Connecting the dots: Does the study described in the abstract on the Serovital website prove that Serovital is associated with "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades-not years, but DECADES younger", as implied.[61,62]**

Based upon the previous sections in this report, Serovital does not cause any of the beneficial effects as stated on the product package and website.

---

[61] Serovital.com website, The Science.
[62] Serovital product package.

Expert Report Dr. David H. Madoff                                    17
Serovital Class Action Litigation

**In summary:**

1. **It is quite difficult to accurately quantitate average or mean GH levels in human subjects.**

2. **Excessive GH is potentially very dangerous and can cause many undesirable effects.**

3. **Normal elderly individuals should not be tested or treated for GHD because there exists no evidence to support treatment in this segment of the population.**

4. **Studies on GH therapy in subjects with GHD do not scientifically address potential benefits of GH in individuals with normal GH. Patients with GHD are treated to replace a deficiency in GH, whereas the individuals without GHD are treated to augment normal GH levels. An analogy with insulin, thyroid hormone or glucocorticoid therapy is appropriate: Long-term treatment of patients with these hormone deficiencies is proven to be beneficial and safe, whereas long-term treatment of normal individuals with these hormones is proven to be harmful and without benefit.**

5. **Due to established and untested effects of chronic Serovital administration on insulin and other hormone levels, Serovital can possibly cause undesirable adverse side effects.**

6. **If, hypothetically speaking, Serovital worked as claimed on the product package and website, there could be undesirable adverse side effects from excess GH.**

7. **The data regarding the effects of Serovital on the Serovital website provide no rationale for the safe and effective use of Serovital on a large population for long periods of time in an unmonitored and unregulated fashion.**

8. **Serovital doesn't cause any of the beneficial effects as stated on the product package and website.  Claims made on the packaging and website regarding Serovital are false.**

Expert Report Dr. David H. Madoff                                    18
Serovital Class Action Litigation

If you have any further questions or concerns, feel free to contact me.

Sincerely,

David Madoff

Expert Report Dr. David H. Madoff                                                    19
Serovital Class Action Litigation

| | |
|---|---|
| | 1838 Greene Tree    Cell:    (443) 794-7810 |
| | Road, Suite 535       Fax:    (410) 486-4277 |
| | Pikesville, MD  21208   dmadoff1@jhmi.edu |

# David H. Madoff, M.D., Ph.D.
**Updated  7/11/2015**

---

| | |
|---|---|
| **Present Employment** | Director, The Woodholme Center for Diabetes and Endocrine Disorders, Pikesville, MD |
| **Education and Training** | Clinical/Research Fellow - Division of Endocrinology and Metabolism, The Johns Hopkins Hospital, July 1986 - June 1989 Baltimore, MD |
| | Internal Medicine Residency and Internship The Johns Hopkins Hospital, Baltimore MD July 1983 – 1985 Baltimore, MD |
| | M.D. 1983, UMDNJ - Rutgers Medical School (Now Robert Wood Johnson Medical School), Piscataway, N.J. |
| | Ph.D. 1981, The Graduate School of Biological Sciences at Rutgers University, Department of Biochemistry, New Brunswick, N.J. |
| | A.B. 1976, Rutgers College, with Highest Distinction in Microbiology New Brunswick, N.J. |
| **Licensure** | Maryland |
| **Board Certification** | American Board of Internal Medicine:    Internal Medicine 1987    Endocrinology and Metabolism 1989 |
| **Prior Employment** | Chief, Division of Endocrinology and Metabolism The Good Samaritan Hospital of MD, Inc. July, 1989 to June, 2006 |

Expert Report Dr. David H. Madoff                                        20
Serovital Class Action Litigation

**Academic Appointments and Teaching Experience**

Assistant Professor of Medicine, Part Time
The Johns Hopkins Univ. School of Medicine
September, 1987 to the present

Attending Physician, The Good Samaritan Hospital, July 1989 to June, 2006

Attending Physician, Division of Endocrinology and Metabolism, The Johns Hopkins University School of Medicine, July 1988 - 1992

Lecturer, Medical Biochemistry Course, The Johns Hopkins University School of Medicine, 1988 – 1991

Lecturer, Medical Physiology Course, The Johns Hopkins University School of Medicine, 1986-2002

**Forensic Experience**

Medical Malpractice

Pharmaceutical product liability

Motor vehicle accidents

Work related injuries

Mold exposure and endocrine disorders

Employee/employer disputes

Prison healthcare

Nursing Home healthcare

Deportation issues related to health

Expert Report Dr. David H. Madoff                                      21
Serovital Class Action Litigation

| | |
|---|---|
| **Invited Lecturer: Symposia** | American College of Physicians, Maryland Affiliate,  2007 |
| | American Diabetes Assoc., Delaware Affiliate, 2001 |
| | International Symposium on Triglycerides, Metabolic Disorders, and Cardiovascular Disease, NYC  July, 2003 |
| | Maryland Association of Family Practitioners |
| | Memorial Hospital, Primary Care Conference, 2004. Colorado Springs, Colorado |
| | Perry Point VAMC, 2007, 6th Annual Medical Staff Research, Education and Strategic Planning Day |
| | Nebraska Heart Institute 2004, 2005 |
| | N.J. Association of Family Practitioners |
| | Primary Care 2007 (April and July) |
| | PRI-MED Symposia 2006 |
| | Wisconsin Academy of Family Practice |
| **Invited Lecturer: Hospitals** | The Johns Hopkins Hospital Medical Grand Rounds |
| | The Johns Hopkins Hospital Endocrine Grand Rounds |
| | The Johns Hopkins Hospital Preventive Cardiology Rounds |
| | Columbia St. Mary's Hospital, Milwaukee, Wisconsin |
| | Clarksburg D.O. Residency Program |
| | Doctor's Community Hospital, Lanham, Maryland |
| | Franklin Square Hospital, Baltimore, Maryland |
| | Harbor Hosptial, Baltimore, Maryland |
| | MedStar Physicians Partners |
| | Rockingham Memorial Hospital, Harrisonburg, Virginia |
| | Ruby Memorial Hospital, WVU School of Medicine |
| | Saint Joseph Hospital, Baltimore, Maryland |

Expert Report Dr. David H. Madoff                                          22
Serovital Class Action Litigation

|  | Sinai Hospital of Baltimore, Maryland |
|--|--|
|  | Southern Maryland Hospital |
|  | Suburban Hospital, Bethesda, Maryland |
|  | The Good Samaritan Hospital of Maryland, Inc. |

**Preceptorship**    Nurse Practitioner Program, University of Maryland 2003, 2005

The Johns Hopkins University School of Medicine Longitudinal Clerkship for first and second year medical students, 2009 to the present

**Medical Societies**    American Association of Clinical Endocrinologists

American Diabetes Association

American Diabetes Association, National Member, Committee on Complications, 1995

American Diabetes Association, Maryland Affiliate
Board Member 1989-1994
Chairman, Professional Affairs Committee, 1993-1994
Recipient, President's Award for Outstanding Service, 1994-1995

American Medical Association

**Occasional Reviewer for Journal Articles**    Endocrine Practice

Diabetes

Diabetes Care

Medicine

**Symposium Chairman**    Diabetes Management
  Washington, D.C.  May 18, 1999
  Sponsor: Merck

Caring for the Diabetic Lower Extremity
  Baltimore, Maryland  April 28, 1995
  Sponsor: American Diabetes Association

Examining the Psychosocial Ramifications of
Type 1 Diabetes in Children
  Miami, Florida  October 19, 2011
  Sponsor: The Johns Hopkins University School of Medicine

Expert Report Dr. David H. Madoff                                      23
Serovital Class Action Litigation

**Scientific Publications**

Ghosh, S, and Madoff, D.H.  2007.  Cushing Syndrome Uncovered During Treatment of Hyperthyroidism.  The Endocrinologist.  17:309-311.

Osih, Regina, Ilag, Liza, and Madoff, David H.  2005.  A Case of Mistaken Identity: Diagnosing a Unilateral Cortisol-Producing Adrenal Adenoma in a Patient on Exogenous Glucocorticoids.  The Endocrinologist  15:4-6.

Madoff, David H.  2004.  The Prevalence and Implications of CHD in Patients with Diabetes.  CV Digest 9/2004.

Madoff, David H.  2003.  Metabolic Syndrome and Cardiovascular Disease: New Management Considerations.  Preventive Medicine in Managed Care 3:S59-S65.

Bellantoni, Marie and Madoff, David H.  1995.  Osteoporosis and Back Pain: Diagnosis, Treatment, and Prevention.  State of the Art Reviews, Physical Medicine and Rehabilitation.  Spinal Rehabilitation. 9(3):641-656.

Madoff, David H., Dizon, Ana Marie, and Burd, Joyce K., 1995.  A Case of Mistaken Identity:  Occult primary adrenal insufficiency in a patient taking exogenous glucocorticosteroids.  The Endocrinologist, 5:380-381.

Blevins, Lewis S., Jr., Hall, Scott G., Madoff, David H., Laws, Edward R., and Ward, Gary S. 1992.  Case Report:  Acromegaly and Cushing's Disease in a patient with Synchronous Pituitary Adenomas.  Am. J. Med. Sci. 304:294-297.

Madoff, D.H., Martensen, T.M. and Lane, M.D. 1988.  Insulin and insulin-like growth factor-I stimulate the tyrosine phosphorylation of a 160kDa soluble protein in 3T3-L1 adipocytes.  Biochemical Journal 252:7-15.

Madoff, D.H., and Lenard, J.  1982.  A membrane glycoprotein that accumulates intracellularly:  cellular processing of the large glycoprotein of Lacrosse virus.  Cell 28:821-829.

Expert Report Dr. David H. Madoff                                    24
Serovital Class Action Litigation

| | |
|---|---|
| **Patient Publications** | Madoff, David H.  1996.  What is Diabetes and What Can We Do to Prevent It?    Baltimore City Medical Society Report: Spring, 1996. |
| | Madoff, David H.  1992.  Thyroid Nodules: A Patient's Guide. Baltimore City Medical Society Report: Winter, 1992. |
| **Physician Education Publications** | Madoff, David H.  2004.  Prevention and Treatment of Diabetic Renal Disease.  Metropolitan Medical Specialty Bulletin: June, 2004. |
| | Madoff, David H.  2003.  Early Identification of Patients At Highest Risk for an Atherothrombotic Event. Metropolitan Medical Specialty Bulletin: April, 2003. |
| | Madoff, David H.  2001.  Preventing Recurrent Nephrolithiasis. Metropolitan Medical Specialty Bulletin: April, 2001. |
| | Madoff, David H.  1999.  Treating Diabetes: Adhering to National Standards of Care. Metropolitan Medical Specialty Bulletin: October, 1999. |
| **Presenter: Web-based Continuing Medical Education** | Optimizing Patient Outcomes: Sequencing Therapy in Type 2 Diabetes-Part 2, with Dr. Rita Kalyani and Thomas Donner, The Johns Hopkins Medical Institutions, launched 7/25/2013. |
| | Improving Patients Outcomes:  Hypoglycemia Risk Reduction in Patients with Type 2 Diabetes Mellitus, with Dr. Thomas Donner and Stephen Clement, The Johns Hopkins Medical Institutions, launched 1/30/2015. |
| **Medical Legal Articles** | Hypoglycemia and Motor Vehicle Accidents, Blog 6/2014. |
| | Diabetes Hypoglycemia in Nursing Homes, Blog 9/2014. |